**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CASE NO. 12-

B&M LINEN CORP and 220 COSTER LLC,
                              Plaintiff,

vs.

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J.
TELLER

                    Defendants

vs.

MIRON MARKUS and BORIS MARKUS

       Additional Counterclaim Defendants.

_____

220 LAUNDRY LLC and ELIOT SPITZER

       Third –party Plaintiffs,

vs.

MIRON MARKUS and BORIS MARKUS

       Third–party Defendants

**CV 12 –        2982**

**NOTICE OF REMOVAL**

**NO SUMMONS ISSUED**

BIANCO, J.

WALL, M.J

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
2012 JUN 14  AM 11: 50
FILED
CLERK

Pursuant to Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 28 U.S.C. §§ 1334 and 1452(a), plaintiff and third party defendant B&N Linen Corp. ("B&M"), in a civil action pending in the Supreme Court of the State of New York, Nassau County, B&M LINEN CORP and 220 COSTER LLC v. 220 LAUNDRY LLC, ELIOT SPITZER, MICHAEL STEINBERG and ADAM J.

1

TELLER Index No. 13989/11 (the "Action"), by their undersigned attorneys, give notice that the Action is hereby removed to the United States District for the Eastern District of New York (the "District Court"). Removal is based upon the following:

## JURISDICTION AND BACKGROUND

    1.    On or around September 27, 2011, B&M and 220 Coster LLC commenced the Action in state court. The Action has been assigned Index No. 13989/11.

    2.    The Action is based upon claims arising from an alleged breach of contract.

    3.    The Action seeks the recovery of monies, in excess of $10,000,000.

    4.    The Action is in its early stages.

    5.    On April 16, 2012, B&M filed a voluntary Chapter 11 Bankruptcy Petition with the United States Bankruptcy Court for the Southern District of New York.

    6.    The allegations in the Action arise under and/or are related to the Defendant's Chapter 11 case under the Bankruptcy Code and are intertwined with the disputed claims of the defendants.

    7.    Thus, removal of the Action is appropriate under 28 U.S.C. § 1452(a), which allows for the removal of claims and causes of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power.

    8.    The District Court has jurisdiction over the Action pursuant to 28 U.S.C.§§ 1334 and 1452(a).

9.      This Court derives its authority to hear and determine the Action on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and the District Court's General Order of Reference.

## VENUE

10.      Venue for removal purposes is proper in this Court pursuant to 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027(a), because the Action is pending in a court in this District and the District Court has jurisdiction under 28 U.S.C. § 1334.

## CORE/NON-CORE PROCEEDINGS

11.      This action is a "core proceeding" within the meaning of 28 U.S.C.§157(b)(2)(A) and (O).

## MISCELLANEOUS REQUIREMENTS

12.      All prerequisites for removal under 28 U.S.C. § 1452 and Bankruptcy Rule 9027 and any other applicable provisions of law have been met.

13.      B&M will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Court from which the Action was removed.

14.      B&M will promptly serve a true and correct copy of this Notice of Removal upon counsel for all parties with an interest in the removed Action.

15.      The undersigned has been advised that pursuant to Bankruptcy Rule 9027(a), copies of substantially all process and pleadings in the underlying Action are annexed hereto as Exhibits.

WHEREFORE, B&M hereby removes the Action to the United States District Court for the Eastern District of New York, and requests that the Action be transferred and referred to the United States Bankruptcy Court for the Southern District

of New York pursuant to 28 U.S.C. § 157(a) and the District Court's General Order of

Reference.

Dated: New York, New York
      June 14, 2012

                         **SHAFFERMAN & FELDMAN LLP**
                         **Counsel for B&M Linen Corp.**
                         **286 Madison Avenue, Suite 502**
                         **New York, New York 10118**
                         **(212) 509-1802**

                         **By:** _____
                                 Joel M. Shafferman

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

```
─────────────────────────────────────── ╲
                                          )
B&M LINEN CORP and 220 COSTER LLC,        |
                        Plaintiff(s),     |
                                          |
        -against-                         |          **COMPLAINT**
                                         ╳
220 LAUNDRY LLC, ELIOT SPITZER,           |
MICHAEL STEINBERG and ADAM J. TELLER      |
                        Defendant(s).     |
─────────────────────────────────────── ╱          Index No.
```

Plaintiffs, B&M LINEN CORP (hereinafter, "B&M") and 220 COSTER LLC (hereinafter, "COSTER"), by their attorneys LAW OFFICES OF JULIEAN GALAK, P.C., as and for their Complaint, upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, hereby alleges as follows:

### THE PARTIES

1) At all times hereinafter mentioned, Plaintiff B&M was, and still is, a corporation organized and existing under the laws of the State of New York, having their principal office at 100 Leahy St., Jericho, NY 11753.

2) At all times hereinafter mentioned, Plaintiff COSTER was, and still is, a Limited Liability Company organized and existing under the laws of the State of New York, having their principal office at 100 Leahy St., Jericho, NY 11753

3) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., (hereinafter, "220 LAUNDRY") was/is, a domestic Limited Liability Company with a place of business located in Bronx, New York.

4) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign Limited Liability Company duly authorized to conduct and conducting business in the State of New York.

5) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign Limited Liability Company doing business in the State of New York.

6) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic partnership duly existing under and by virtue of the laws of the State of New York.

7) At all times hereinafter mentioned, ZAR Defendant 220 LAUNDRY LLC. was/is, a foreign partnership duly authorized to conduct and conducting business in the State of New York.

8) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign partnership doing business in the State of New York.

9) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic sole proprietorship duly existing under and by virtue of the laws of the State of New York.

10)    At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign sole proprietorship duly authorized to conduct and conducting business in the State of New York.

11)    At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign sole proprietorship doing business in the State of New York.

12)    At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic entity duly existing under and by virtue of the laws of the State of New York.

13)    At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign entity duly authorized to conduct and conducting business in the State of New York.

14)    At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign entity doing business in the State of New York.

15)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC was/is, a domestic corporation duly existing under and by virtue of the laws of the State of New York.

16)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign corporation duly authorized to conduct and conducting business in the State of New York.

17)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign corporation doing business in the State of New York.

18)     At all times hereinafter mentioned, Defendant ELIOT SPITZER (hereinafter, "SPITZER"), was/is, an individual residing in the State of New York.

19)     At all times hereinafter mentioned, SPITZER was/is, an individual doing business in the State of New York.

20)     At all times hereinafter mentioned, Defendant ADAM J. TELLER (hereinafter, "TELLER"), was/is, an individual residing in the State of New York.

21)     At all times hereinafter mentioned, TELLER was/is, an individual doing business in the State of New York.

22)     At all times hereinafter mentioned, Defendant MICHAEL STEINBERG (hereinafter, "STEINBERG"), was/is, an individual residing in the State of New York.

23)     At all times hereinafter mentioned, STEINBERG was/is, an individual doing business in the State of New York.

**THE DOCUMENTS**

24)     On or about November 2010, B&M as Seller and SPITZER as Purchaser entered into an Asset Sale Agreement for the sale of a commercial laundry business (hereinafter, "Original Agreement").

25)     On or about May 19, 2011, B&M and SPITZER entered into the attached written modification of the Agreement (hereinafter "Modification" when referring to said writing, or "Modified Agreement" when referring to the Agreement as modified by the Modification).

26)     On or about May 19, 2011, SPITZER executed an assignment, assigning all of his rights under the Modified Agreement to 220 LAUNDRY.

27)     On or about May 19, 2011, and effective May 23, 2011, B&M and 220 LAUNDRY closed title on the assets transferred under the Modified Agreement.

28)     On or about May 19, 2011, and effective May 23, 2011, 220 LAUNDRY executed a note in the face amount of $8,600,000 (hereinafter, "First Note"), along with a security agreement, in favor of B&M as part of the agreed upon purchase price.

29)     On or about May 19, 2011, and effective May 23, 2011, 220 LAUNDRY executed a note in the face amount of $1,000,000 (hereinafter, "Second Note"), along with a security agreement, in favor of B&M as part of the agreed upon purchase price.

30)     On or about May 19, 2011, and effective May 23, 2011, SPITZER executed a Guaranty personally guaranteeing the First and Second Notes.

31)     On or about May 19, 2011, and effective May 23, 2011, TELLER executed a Guaranty personally guaranteeing the First and Second Notes.

32)     On or about May 19, 2011, and effective May 23, 2011, STEINBERG executed a Guaranty personally guaranteeing the First and Second Notes.

33)     On or about May 19, 2011, and effective May 23, 2011, COSTER as Landlord and 220 LAUNDRY as Tenants entered into a lease agreement (hereinafter, "Lease") for the premises known as 220 Coster St., Bronx, NY 10474 (hereinafter, "Premises").

34)     Pursuant to Section 50 of the Modified Agreement, all documents enumerated above were and are held in escrow by B&M's attorney.

## DEFENDANTS' DEFAULTS

35)     220 LAUNDRY have defaulted on the First Note in that they have failed to pay the sum of $41,666.67, due no later than September 23, 2011 by that date.

36)     220 LAUNDRY have defaulted on the Modified Agreement in that they have failed to timely and fully make payments on account of Accounts Receivable in accordance with Section 49 of the Modified Agreement.

37)     220 LAUNDRY have defaulted under Article III, Section 1 of the Lease in that they have failed to adequately maintain the Premises.

38)     220 LAUNDRY have defaulted under Article V of the Lease in that they have failed to comply with all applicable federal, state, and local regulations, including but not limited to workplace safety regulations.

39)     220 LAUNDRY have defaulted under the First and Second Note in that a default under the Lease constitutes a default under the Notes.

40)     220 LAUNDERY have defaulted under the Lease in that a default under the First or Second Note constitutes a default under the Lease.

## FIRST CAUSE OF ACTION AGAINST 220 LAUNDRY

41)     Plaintiffs repeat all allegations in paragraphs 1 through 38.

42)     220 LAUNDRY have failed to pay B&M the amounts owing pursuant to the First Note.

43)     Accordingly, 220 LAUNDRY are liable to B&M for, and B&M has been damaged in the aggregate amount of Forty One Thousand Six Hundred Sixty Six Dollars and Sixty Seven cents ($41,666.67), plus interest and other remedies as determined appropriate by the Court.

## SECOND CAUSE OF ACTION AGAINST 220 LAUNDRY

44)     Plaintiffs repeat all allegations in paragraphs 1 through 43.

45)     In accordance with the acceleration clauses therein, a default in payment under the First and Second Note makes the entire principal of the Notes due and payable immediately.

46)     Accordingly, 220 LAUNDRY are liable to B&M for, and B&M has been damaged in the aggregate amount of Eight Million Six Hundred Thousand Dollars ($8,600,000.00) under the First Note, and One Million Dollars ($1,000,000.00) under the Second Note, less any principal actually paid to date, plus interest and other remedies as determined appropriate by the Court.

## THIRD CAUSE OF ACTION AGAINST SPITZER AND TELLER

47)     Plaintiffs repeat all allegations in paragraphs 1 through 46.

48)     The Defendants, SPITZER and TELLER are obligated to B&M under the Guarantees in the event of the failure of 220 LAUNDERY to pay under the notes.

49)     Accordingly, SPITZER and TELLER are liable to B&M for, and B&M has been damaged in the aggregate amount Eight Million Six Hundred Thousand Dollars ($8,600,000.00) under the First Note, and One Million Dollars ($1,000,000.00) under the Second Note, less any principal actually paid to date, plus interest and other remedies as determined appropriate by the Court.

## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS

50)     Plaintiffs repeat all allegations in paragraphs 1 through 49.

51)     In accordance with Section 50 of the Modified Agreement, 220 LAUNDRY's failure to make timely payment under the note permits B&M to reverse the transaction of sale, regain possession of all Assets, and terminate the Lease.

52)     On or about September 27, 2011, B&M notified 220 LAUNDRY in writing (hereinafter, "Notice of Default", attached) that 220 LAUNDRY is in default, and that B&M is enforcing the provisions in Section 50 of the Modified Agreement, and that no sale has occurred and all assets are transferred back to B&M.

53)     On or about September 27, 2011, COSTER notified 220 LAUNDRY in writing, by the aforementioned Notice of Default, that 220 LAUNDRY is in default, and that COSTER is enforcing the provisions in Section 50 of the Modified Agreement, and that the lease is deemed void effective September 27, 2011.

54)     Accordingly, the Defendants have no further interest in the Assets and/or Premises of any kind.


## FIFTH CAUSE OF ACTION AGAINST DEFENDANTS

55)     Plaintiffs repeat all allegations in paragraphs 1 through 54.

56)     During the period from May 23, 2011 through September 27, 2011, the Defendants made purchases of goods and services under B&M's name and/or accounts.

57)     Defendants have failed to make payment for said goods and services, and the vendors of such goods and services have made demands for payment against B&M.

58)     Said goods and services were purchased by the Defendants for use by 220 LAUNDRY.

59)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Two Hundred Forty Six Thousand Six Hundred Seventy Six Dollars and Sixty Four cents ($246,676.30), plus interest and other remedies as determined appropriate by the Court


## SIXTH CAUSE OF ACTION AGAINST DEFENDANTS

60)     Plaintiffs repeat all allegations in paragraphs 1 through 59.

61)     Under Section 49 of the Modified Agreement, 220 LAUNDRY is required to collect from customers and pay to B&M those accounts receivable due for work performed by B&M prior to May 23, 2011.

62)     220 LAUNDRY has failed to do so, and one or more of the Defendants have retained the monies so collected.

63)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Five Hundred Ninety Seven Thousand Eight Hundred Eighty Five Dollars and Seventy Four cents ($597,885.74), plus interest and other remedies as determined appropriate by the Court.

### SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS

64)     Plaintiffs repeat all allegations in paragraphs 1 through 63.

65)     Through the actions, inactions, and negligence of the Defendants, the value of the Assets has decreased from the time that the Defendants took possession of the Assets on or about May 23, 2011 until B&M regained possession on or about September 27, 2011.

66)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the amount of said reduction of value as determined by the court but in no event less than Four Million Dollars ($4,000,000.00).

### EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS

67)     Plaintiffs repeat all allegations in paragraphs 1 through 66.

68)     Through the actions, inactions, and negligence of the Defendants, the Premises suffered material damage.

69)     Accordingly, the Defendants are liable to COSTER for, and COSTER has been damaged in the amount of said damage as determined by the court but in no event less than One Million Dollars ($1,000,000.00).

### NINTH CAUSE OF ACTION AGAINST 220 LAUNDRY

70)    Plaintiffs repeat all allegations in paragraphs 1 through 69.

71)    In accordance with the Modified Agreement, B&M agreed to provide, and 220 LAUNDRY agreed to pay for, consulting services, to be performed by employees of B&M, to assist 220 LAUNDRY in operating the business.

72)    B&M performed said consulting services.

73)    220 LAUNDRY failed to fully pay for said services.

74)    Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Twenty Thousand Eight Hundred Thirty Three Dollars ($20,883.00), plus interest and other remedies as determined appropriate by the Court

### TENTH CAUSE OF ACTION AGAINST DEFENDANTS

75)    Plaintiffs repeat all allegations in paragraphs 1 through 74.

76)    On or about September 1, 2011, SPITZER requested that the employees of B&M provide additional assistance to 220 LAUNDRY, beyond that contemplated by the Modified Agreement.

77)    SPITZER and B&M agreed that employees of B&M would perform such services, and that B&M would be paid $100 per hour for such services, including travel time from the employee's residences in Nassau County.

78)    B&M performed said such services.

79)    220 LAUNDRY failed to fully pay for said services.

80)    Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Nine Thousand Dollars ($9,000.00), plus interest and other remedies as determined appropriate by the Court

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

a)     on their first cause of action against 220 LAUNDRY in the principal amount of Forty One Thousand Six Hundred Sixty Six Dollars and Sixty Seven cents ($41,666.67), plus interest;

b)     on their second cause of action against 220 LAUNDRY in the principal amount of Nine Million Six Hundred Thousand Dollars ($9,600,000.00), less principal previously received, plus interest;

c)     on their third cause of action against SPITZER and TELLER in the principal amount of Nine Million Six Hundred Thousand Dollars ($9,600,000.00), less principal previously received, plus interest;

d)     on their fourth cause of action against the Defendants judgment declaring that the Defendants have no interest in the Assets or the Premises of any kind;

e)     on their fifth cause of action against the Defendants in the principal amount of Two Hundred Forty Six Thousand Six Hundred Seventy Six Dollars and Sixty Four cents ($246,676.30), plus interest, and

f)     on their sixth cause of action against the Defendants in the principal amount of Five Hundred Ninety Seven Thousand Eight Hundred Eighty Five Dollars and Seventy Four cents ($597,885.74), plus interest, and

g)     on their seventh cause of action against the Defendants for such sums as may be determined by the court, but no less than Four Million Dollars ($4,000,000.00), and

h)     on their eighth cause of action against the Defendants for such sums as may be determined by the court, but no less than One Million Dollars ($1,000,000.00), and

i)   on their ninth cause of action against the Defendants in the principal

     amount of Twenty Thousand Eight Hundred Thirty Three Dollars

     ($20,883.00), plus interest, and

j)   on their tenth cause of action against the Defendants in the principal

     amount of Thousand Dollars ($9,000.00), plus interest, and

k)   costs, disbursements, attorney's fees, and

l)   such other and further relief as the Court deems appropriate.

DATED:     Brooklyn, New York
           September 27, 2011

                              _____
                              Juliean Galak,
                              LAW OFFICES OF JULIEAN GALAK, P.C.
                              Attorney for the Plaintiff
                              3105 BRIGHTON 3RD ST., SUITE 1-K
                              BROOKLYN, NY 11235
                              (718) 646-4715

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
--------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,          :

              Plaintiffs,          :

    -against-          :          Index No. 11-013989

220 LAUNDRY LLC, ELIOT SPITZER,          :
MICHAEL STEINBERG and ADAM J. TELLER,          :

              Defendants,          :

    -against-          :

MIRON MARKUS and BORIS MARKUS,          :

           Additional Counterclaim :          **ANSWER,**
           Defendants          :          **COUNTERCLAIMS AND**
--------------------------------------------------------X          **THIRD-PARTY COMPLAINT**
                  :

220 LAUNDRY LLC and ELIOT SPITZER,          :

            Third-party Plaintiffs,          :

    -against-          :

MIRON MARKUS and BORIS MARKUS,          :

           Third-party Defendants.  :
--------------------------------------------------------X

      Defendants 220 Laundry LLC ("220 Laundry" or "Purchaser"), Eliot Spitzer

("Spitzer"), Michael Steinberg and Adam J. Teller, for their Answer and Counterclaims

and 220 Laundry LLC and Eliot Spitzer, for their Third-party Complaint herein:

      1.      Admit the allegations of Paragraphs 1, 2, 3, 18, 19, 20, 21, 22, 23 and 32.

1

2.      Deny the allegations of Paragraphs 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 31, 35, 36, 37, 38, 39, 40, 42, 43, 46, 49, 54, 59, 62, 63, 65, 66, 68, 69, 73, 74, 76, 77, 79 and 80.

3.      Deny the allegations of Paragraph 12, except admit that 220 Laundry was and is a New York limited liability company.

4.      Deny the allegations of Paragraph 24 as to the title of the document, but admit execution of an Assets Purchase Agreement.

5.      Admit, upon information and belief, the allegations contained in Paragraphs 25, 26, 27, 28, 29, 30, and 33, but affirmatively allege that pursuant to the terms of the Modification of Assets Purchase Agreement, all executed copies, including originals and copies thereof, were held in escrow by counsel for Plaintiffs, and that no copies of the executed documents are in the possession of Defendants.

6.      Admit the allegations of Paragraph 34, except as to any Guaranty said to be executed by Defendant Teller.

7.      In response to the allegations of Paragraphs 41, 44, 47, 50, 55, 60, 64, 67, 70 and 75, incorporate by reference the responses contained herein as to all referenced paragraphs.

8.      In response to the allegations of Paragraph 45, deny that any default occurred, and otherwise refer to the contents of the referenced documents for the scope and effect thereof.

9.      Deny the allegations of Paragraph 48, except admit that Defendant Spitzer executed a guaranty of certain of the obligations of 220 Laundry.

2

10.     Deny the allegations of Paragraphs 51, 61 and 71, except admit that a Modification of Assets Purchase Agreement was executed by Spitzer and assigned to 220 Laundry and refer to the contents of that document for the scope and effect thereof.

11.     Deny the allegations of Paragraph 52, except admit receipt by 220 Laundry, on the afternoon of September 27, 2011, of the Notice of Default which is annexed to the Complaint.

12.     Deny the allegations of Paragraph 53, except admit receipt by 220 Laundry on the afternoon of September 27, 2011, of the Notice of Default annexed to the Complaint.

13.     In response to the allegations of Paragraphs 56, 57 and 58, admit that goods and services were purchased by 220 Laundry in the ordinary course of business prior to September 27, 2011; affirmatively allege that by reason of the abrupt and wrongful eviction of Defendants and their agents, made under threat of claim of trespass, 220 Laundry has been wrongfully deprived of access to payments by customers to which 220 Laundry provided services, and affirmatively allege that any use of B&M Linen Corp.'s accounts by the Purchaser following closing was at the request of, and with the knowledge and consent of B&M Linen Corp., which sought to maintain continuity with its former vendors and suppliers, post-closing.

14.     In response to the allegations of Paragraph 72, admit that B&M Linen Corp. performed certain consulting services, but affirmatively allege that it breached the consulting provisions of the Modification of Assets Purchase Agreement by demanding more money for such services than was called for by the agreement, and by threatening to withhold such services unless its excessive demands were met.

3

15. In response to the allegations of Paragraph 78, deny knowledge or information as to the specific services being referred to; admit that B&M Linen Corp. did perform certain consulting services; and incorporate the affirmative allegations of Paragraph 14 above.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

16. As of May 19, 2011, the date on which the transactional documents were executed, B&M Linen Corp. (hereafter "B&M or "Seller") was in material breach of its obligations under the Assets Purchase Agreement, was in material breach of the Modification of Assets Purchase Agreement upon its execution, and has continually remained in material breach of said agreements, as specified more fully in the Counterclaims below.

17. By reason of the foregoing, B&M and 220 Coster are barred from all remedies sought by them in this action.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

18. The Complaint fails to state a cause of action against Defendant Michael Steinberg.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

19. Plaintiff's First Cause of Action is barred by reason of 220 Laundry's tender of payment prior to B&M's wrongful declaration of a default, and B&M's rejection of such payment.

4

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

20.    Plaintiff's claim of default under the $8,600,000 note is barred by reason of

220 Laundry's tender of payment prior to B&M's wrongful declaration of a default, and

B&M's rejection of such payment.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

21.    To the extent that sums are due and owing to vendors for that period of

operations by 220 Laundry preceding Plaintiffs' abrupt and wrongful eviction of 220

Laundry and its agents from the business premises, Plaintiffs' claims are barred by

reason of their own acts of depriving 220 Laundry from funds paid by customers for

services provided by 220 Laundry, but wrongfully received and converted by B&M

following B&M's wrongful seizure of the premises.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

22.    Plaintiff's Second Cause of Action is barred by reason of Plaintiff's

demand for payment in accordance with its First Cause of Action.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

23.    To the extent that Plaintiffs contend that there was a diminution in the

value of the assets transferred and/or that there was damage to the business premises,

claims denied by Defendants, such diminution and damage are directly attributable to

B&M and its principals or agents, who, from May 23, 2011 to September 27, 2011

performed consulting services for good and valuable consideration, which services

included arranging for or performing required repairs and maintenance to the business

premises and to the assets transferred.

5

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

24.     The Tenth Cause of Action is barred by reason of the provisions of the

Assets Purchase Agreement which bar oral modification of its terms, and the absence

of any written modification supporting the claim.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

25.     Plaintiff's claims are barred by reason of their failure to mitigate their

alleged damages.

## COUNTERCLAIMS

### Allegations Common to all Counterclaims

26.     Defendants name as Additional Counterclaim Defendants Miron Markus

and Boris Markus.  Miron Markus is in individual residing in Nassau County, New York,

and is, upon information and belief, the President and sole shareholder of B&M Linen

Corp.  Boris Markus is an individual residing in Nassau County, New York, and is, upon

information and belief, the Vice-president of B&M and is the son of Miron Markus.

27.  The claims and counterclaims herein derive from the purchase by 220

Laundry from B&M of the business known as Miron & Sons Linen.   For many years

preceding the events complained of in these counterclaims, B&M operated a

commercial laundry facility at 220 Coster Street, Bronx, New York, doing business

under the name Miron & Sons Linen.

6

28.   Among B&M's changing customer list over the years were numerous New

York City hotels. A substantial part of B&M's business consisted of:  the regular

scheduled pick-up by trucks of dirty laundry from B&M's customers, including hotels; the

transport of that laundry to the Coster Street facility; the laundering of the customers'

linens; and the delivery of the clean linens to the customer.

29.   The 220 Coster Street facility, in the recent years, employed

approximately 145 full-time workers; and operated seven days each week.  The actual

laundering process is highly automated, and incorporates the use of massive machinery

and equipment which requires regular monitoring, servicing and maintenance.

30.   In or about 2010, B&M's President, Miron Markus, who had spent some

25 years in the laundry business, expressed an interest in selling the business.  Prior to

the formation of 220 Laundry, Spitzer, commencing in the Spring of 2010, engaged

B&M in negotiations, which ultimately culminated in the formation by Spitzer of 220

Laundry, which acquired the business by assignment from Spitzer, a party to the Assets

Purchase Agreement and Modification thereof, as detailed more fully below.

31.   More particularly, following a period of negotiation during which various

documentation and information was provided by B&M, principally through Miron Markus

and/or B&M's legal counsel, Juliean Galak, Esq., to Spitzer and/or his legal counsel, an

Assets Purchase Agreement was executed on or about November 10, 2010.  A copy of

that agreement is annexed hereto as Exhibit A. The information provided in the period

leading up to the execution of the Assets Purchase Agreement included, but not by way

of limitation, information as to operating revenues and expenses, and it was on that

7

basis that Spitzer/220 Laundry agreed to the terms set forth in the Assets Purchase

Agreement.

32.    The Assets Purchase Agreement, at Paragraph 27, provided for a period

of due diligence between its execution and the eventual closing, and obligated B&M as

Seller, to provide Purchaser with access to all financial and operating records of the

business.

33.    Prior to the closing, drafts of certain proposed closing documents were

circulated between or among representatives of B&M as Seller and 220 Laundry as

Purchaser. These documents included:

> a) Modification of Assets Purchase Agreement ("Modification"). The general form of that Modification (an Exhibit to the Complaint) was to confirm that the original Assets Purchase Agreement (Ex. A hereto) remained in force and effect, except as to superseding provisions contained in the text of the Modification;
>
> b) Promissory Note in the principal amount of $1,000,000;
>
> c) Promissory Note in the principal amount of $8,600,000, a copy of which is annexed hereto as Exhibit B;
>
> d) Guaranty, by Spitzer, of the $8,600,000 note;
>
> e) Security Agreement in favor of B&M, securing 220 Laundry's obligations under the $8,600,000 Note, covering all assets "as were transferred by Secured Party to the Debtor in accordance with an Assets Purchase Agreement and a bill of sale dated May 23, 2011";
>
> f) Security Agreement in favor of B&M, securing 220 Laundry's obligations under the $1,000,000 Note, covering all assets "as were transferred by Secured Party to the Debtor in accordance with an Assets Purchase Agreement and a bill of sale dated May 23, 2011"; and
>
> g) Lease for the business premises, running between 220 Coster, LLC, as Landlord, and 220 Laundry, as Tenant, the identity of the tenant being set forth in the Modification.

8

34.     The Modification provided that all closing documents, including originals
and copies, were to be held in escrow pending the satisfaction by 220 Laundry of its
obligations under the $1,000,000 Promissory Note.  As the balance of principal and
interest under that Note is not due until June 30, 2012, Defendants are not presently in
possession of executed copies of the closing documents.

35.     Upon information and belief, Exhibit B hereto fairly reflects the substantive
terms of the Note executed at closing, but held in escrow, and Plaintiffs' counsel, who
maintains the originals, has so confirmed.

Consulting Agreement

36.     Paragraph 21 of the Assets Purchase Agreement, provides "Seller shall
provide transition consulting to the Purchaser, after closing, on the following terms."
Those terms include:  arranging for any one of Miron Markus, Boris Markus, or Michael
Markus to be available in person or by telephone continuously between the hours of
6:00 am and 6:00 pm, seven days per week; providing such services at no cost to
Purchaser for the first month following closing; providing such services thereafter, at
Purchaser's sole discretion, for a fee of $125,000 for a six-month period, or $20,833.33
per month; and a right of cancellation by Purchaser at the end of any one month period
within the six months referred to.

37.     The complexity of the operations of the facility at 220 Coster Street was
such that operation of it by the newly-acquiring Purchaser would be adversely affected if
Purchaser did not, at least for an initial period, have access to the consulting services of
principals or representatives of B&M who were very familiar with all aspects of the
facility's operations.

9

## Post-Closing Performance by Purchaser

38.   Following the closing, 220 Laundry took possession of the facility, asserted control over its operations, and directly employed the former employees of B&M.

39.   As was 220 Laundry's business plan prior to the closing, representatives of 220 Laundry spent substantial time and effort increasing the existing customer base and adding to revenues which had been declining prior to closing.

40.   More particularly, as of the closing date, the business had been generating monthly revenues of approximately $500,000. As of September 27, 2011, when, as set forth more fully below, B&M wrongfully terminated the business relationship and barred Purchaser from access to the premises, monthly revenues had increased to approximately $800,000.

41.   220 Laundry's accurate belief that it could substantially grow the business was a key to its decision to undertake the substantial financial commitment represented by the subject transaction. In contrast, Miron Markus acknowledged that after engaging in the laundry business for some 25 years, and with revenues declining, he was looking to get out of the business by selling it.

42.   As respects 220 Laundry's transactional obligations, it complied entirely or substantially with all of its contractual obligations, including making timely monthly payments to Seller, and was never in material breach of any of its obligations. To date, Purchaser has paid Seller approximately $950,000 pursuant to the closing documents, and paid a broker an additional $100,000 in connection with the sale transaction. Until

10

September 27, 2011, Seller never provided written notice of any default to Purchaser as to any obligation arising under any of the closing documents.

## Seller's Post-Closing Performance

43. Since the closing, and notwithstanding the rights conferred to Purchaser under the closing documents, Seller has consistently and systematically interfered with Purchaser's operation of the business, and to a large extent conducted itself as though it had maintained all pre-closing operational authority.

44. More particularly, but only by way of several examples, the following events took place following the closing and before Seller's delivery to Purchaser of a Notice of Default on the afternoon of September 27, 2011:

a) On numerous occasions, Miron Markus demanded that Spitzer regularly arrive at work at 6:00 am, failing which Spitzer would be given "two weeks notice", a position wholly inconsistent with the transfer of the business effected by the closing documents, and made such comments in front of several of Purchaser's employees.

b) Prior to the declaration of a default, the validity of which Purchaser disputes, Defendants Miron Markus and Boris Markus, as well as Michael Markus, demanded that certain employees of 220 Laundry perform certain functions in certain ways, including by giving priority to certain customers. Further, without the approval or input of 220 Laundry, Miron Markus and Boris Markus, in a hostile manner, informed several key employees of 220 Laundry, including supervisory staff and mechanics, that they had to leave the facility immediately and never return.

11

c)     Rather than adhering to the on-call consultant arrangement plainly set forth in the Assets Purchase Agreement, one or more of Miron Markus, Boris Markus and Michael Markus regularly appeared at the facility without any request that they be present, and thereupon directed employee operations, as though no transfer of operational control had taken place.

d)     Boris Markus, on or about September 19, 2011, having no authority to do so, countermanded instructions of 220 Laundry's General Manager Olsen as to the loading and dispatch of trucks. When Olsen rightfully asserted control of the facility's operations, he was physically threatened by Boris Markus, who charged Olsen with a wheeled laundry bin in the back of a truck, in a manner that led to an emergency 911 call being placed to the New York City Police Department.

e)     Boris Markus, on several occasions, threatened various 220 Laundry employees with bodily harm, and on one occasion willfully and intentionally knocked a box out of an employee's hands, causing that employee to lose his balance and slip down several steps. Boris Markus thereupon: a) verbally abused that employee, and b) dropped his pants and "mooned" that employee, all in front of a number of male and female employees of 220 Laundry.

f)     On or about September 19, 2011, Boris Markus came to the premises, there being no request that he do so, and initiated a verbal confrontation with Spitzer. During that confrontation Boris Markus, in a highly enraged state, violently threw a clipboard at Spitzer, striking him on the upper leg, proximately causing him

12

contusion, and pain. Spitzer has retained photographic evidence of the injury suffered at the hand of Boris Markus.

g)    On multiple occasions, Defendants Miron Markus and Boris Markus, as well as Michael Markus, without authority to do so, communicated directly with existing customers of 220 Laundry regarding its business operations.

45.    The foregoing acts, and numerous other instances not specified here, led to virtually constant friction between the lawful post-closing operator of the facility, to wit, 220 Laundry and its authorized representatives, and the principals or agents of the Seller, notwithstanding Seller's transfer of operational authority and control pursuant to the closing documents. Pursuant to those documents, the principals or agents of Seller were only to provide post-closing consulting services at the sole discretion of 220 Laundry on an on-call basis.

46.    The foregoing conduct, described above only by way of examples, had detrimental effects on the operations of the business, to which Purchaser remained, and remains, financially committed. Among other things:

a) the conduct of Sellers had a disruptive effect on the relationship between 220 Laundry and its employees;

b) the conduct of Sellers had an adverse effect on the relationship between 220 Laundry and certain of its customers;

c) the repeated and systematic acts of interference by Sellers had a disruptive and financially damaging effect on the business which Purchaser had lawfully acquired the right to operate.

13

## The September 27, 2011 Meeting

47.     Prior to any declaration by Seller of any default on the part of Purchaser, Purchaser's representatives and Seller's legal counsel mutually requested a meeting of principals and legal counsel for the Purchaser and Seller, and such a meeting took place at 220 Coster Street on September 27, 2011, commencing at Noon.

48.     At that meeting, Purchaser's representatives, in substance, informed Seller's representatives of the desire on the part of Purchaser to cease any further involvement by Seller in the operations of the business, including pursuant to the consulting provisions of the Assets Purchase Agreement, a position wholly consistent with Purchaser's rights under the closing documents.

49.     Seller's initial response to Purchaser's position statement was to propose two alternatives. First, Seller's counsel introduced a "rollback" offer, by which his client would reacquire the business, but for terms which were not then provided by Seller's counsel. Second, Seller's counsel stated that if Purchasers still desired to operate the business pursuant to the agreements which had been entered into, then they could do so without interference from Seller's representatives, who would cease all involvement with the business.

50.     Upon the presentation of these two alternatives, Purchaser not only embraced the second alternative, but informed Sellers that that is precisely what they wanted from the meeting: a complete separation of Seller from the business, so that Purchaser could operate the business without interference and continue to meet all obligations under the closing documents.

14

51. In response, Seller's counsel, for the first time, stated in substance that the second alternative would only be available if Purchaser was not already in default, and that it might be. Upon further conversation, Seller's attorney clarified that it was its position that Purchaser was already in default, that the default was not curable, and that Seller intended to take back the business.

52. At no time prior to the September 27, 2011 meeting, and at no point during most of the meeting, did Seller assert that Purchaser had defaulted under any of the closing documents. Only after Purchaser not only accepted, but embraced, an alternative posed by Seller's counsel, that is, to operate the business in accordance with the closing documents without any interference from Seller, did Seller assert that Purchaser was in default.

53. When asked to identify the default, Seller's counsel stated, for the first time, that Purchaser was in default of its obligations pursuant to the $8,600,000 Note, by failing to make a payment said to be due on September 23, 2011. No other alleged default was identified in that meeting. Later on the afternoon of September 27, 2011, Seller's counsel caused to be delivered to Spitzer, a Notice of Default, a copy of which is annexed to the Complaint.

54. The only copy of that Note which has to date been provided to Purchaser by any representative of the Seller is annexed hereto as Exhibit B. A request for a copy of the executed Note was made at the September 27, 2011 meeting, and counsel for Seller stated that he would provide a copy, but has yet to do so.

55. The relevant facts surrounding the Note, of which no original or copy was ever delivered by Seller to Purchaser, are as follows:

15

     a)    Upon information and belief, in the first Paragraph of Exhibit B, the day of the month contained in the original executed note for the payment of monthly installments was the "23rd" of each month, as the closing took place on May 23, 2011.

     b)    Upon information and belief, the Note provides in relevant part that:

In the event 220 Laundry LLC shall default in payment of any installment of principal or interest when the same shall become due and payable hereunder and such default shall not be cured within thirty (30) days, then the holders of this Note may, at their option, declare the entire principal of this Note due and payable, together with all accrued interest thereon.

     c)    September 23, 2011 fell on a Friday.  Eliot Spitzer, as well as other key employees of 220 Laundry, are observant followers of the Jewish faith who honor their Sabbath.  Before any default was declared by Sellers, Purchaser caused a check to be prepared, on Sunday, September 25, and delivered to B&M that same day.  The check was in the amount of $41,666.67, as required by the Note.

     d)    The Delivery of the Notice of Default took place after the tender of the September check representing the installment payment under the Note.

     e)    The Assets Purchase Agreement, pursuant to which the Note was executed and delivered, and to which it is appended as Exhibit A, provides in relevant part as follows:

26. Both parties hereto agree that in the event of a material breach of this agreement by the Purchaser which material breach is not cured by Purchaser within ten (10) business days after receipt by Purchaser of such notice of material default, the Seller shall suffer material financial harm, but that such harm may be difficult to accurately compute.

     f)    The Assets Purchase Agreement provides that all notices must be in writing.

16

g) The September, 2011 payment due under the Note was tendered to Seller prior to the issuance by Seller to Purchaser of any Notice of Default.

56. The Notice of Default (a Complaint Exhibit) makes vague reference to other unspecified events of default. No specific default was previously identified by Seller before the Notice of Default was delivered to Purchaser.

57. The Notice of Default states that Purchaser has no further right to occupy the business premises, and that the presence of Purchaser's agents on the premises will be deemed a trespass.

58. Purchaser, by written notice delivered to Seller the day after the Notice of Default was received, rejected the claim of default and reserved all rights. A copy of that notice is annexed as Exhibit C.

<u>Seller's Performance of the Consulting Agreement</u>

59. As set forth more fully in Paragraphs 36 and 37 above, Seller committed itself to certain consulting obligations, in accordance with provisions in the Assets Purchase Agreement.

60. Notwithstanding its contractual commitment to provide consulting services without cost for the first month following the closing, and to provide consulting services for up to six months, at the discretion of Purchaser thereafter, Seller's principals or agents, including Miron Markus and Boris Markus, insisted, as a condition

17

to providing consulting services, on being paid for such services on an hourly basis, in addition to receiving the contractually provided for monthly consulting fee.

61.    This demand for consulting compensation beyond what was agreed to in the Assets Purchase Agreement came when Purchaser first acquired operational authority, and had little operational experience at the facility.  Purchaser was, therefore, constrained to pay the wrongfully demanded hourly compensation, in addition to the agreed compensation, for consulting services, or risk a significant loss of revenue from disrupted operations at the facility.

<u>Seller's Misrepresentations as to Utility Expenses</u>

62.    As set forth above, both in the period leading up to the entry into the Assets Purchase Agreement, and in the due diligence period prior to closing as provided for therein, both verbal and documentary assurances were given by Seller, in particular by Miron Markus, to representatives of Purchaser, in particular Spitzer, as to the operating expenses, including payments required to be made to utilities servicing the facility.

63.    The Assets Purchase Agreement, at Paragraph 27, provided for a period of due diligence between its execution and the eventual closing, and obligated B&M as Seller, to provide Purchaser with access to all financial and operating records of the business.

64.    The Assets Purchase Agreement, at Paragraph 6, provided that at closing, the Seller shall make and deliver to the Purchaser his affidavit in which he shall

18

state, under oath, the names and addresses of his creditors and the monies due each of
them, or an affidavit of no creditors with respect to the business sold.

65.    Pursuant to Paragraphs 8 and 8.4 of the Assets Purchase Agreement, in
order to induce the Purchaser to purchase the said properties and to pay the purchase
price therefor, the Seller warranted and represented to the Purchaser that to the best of
his knowledge the Seller had complied with all laws, ordinances, ruling and regulations
of all constituted governmental authorities having jurisdiction.

66.    Pursuant to Paragraph 10 of the Assets Purchase Agreement the Seller
was obligated to obtain and deliver at closing a final water meter reading and to pay all
outstanding charges in accordance with said reading.

67.    Pursuant to Paragraph 13 of the Assets Purchase Agreement, each of the
terms, conditions, covenants, provisions, agreements and representations contained
therein survived the closing of sale.

68.    Pursuant to Paragraph 29(d) of the Rider to the Assets Purchase
Agreement, the Seller represented and warranted that financial statements provided by
the Seller to the Purchaser "shall fairly present the consolidated financial conditions of
the Seller" and that the statements "reflect the consistent application of accounting
principles."

69    At Paragraph 29(i) of the Rider to the Assets Purchase Agreement the
Seller represented and warranted that the books of account and other records of the
Seller which were made available to the Purchaser "are accurate and complete in all
material respects and have been maintained in accordance with sound business
practices."

70    Pursuant to Paragraph 33 of the Rider to the Assets Purchase Agreement, the Seller was obligated to inform the Purchaser promptly and prior to closing if the Seller became aware of any fact or condition that caused or constituted a breach of any of the Seller's representations or warranties.

71.    Among the financial information presented by Miron Markus to Spitzer prior to closing were records which indicated the costs which the Seller had paid during the operation of its business for utilities, including, but not limited to, providers of water and gas.

72.    Seller's representations as to operating expenses, including through the presentation of business records, were material to Purchaser's commitment to paying the purchase price set forth in the Assets Purchase Agreements and related documents.

73.    It was in justifiable reliance on that information, and on the several warranties and representations set forth above, that Spitzer agreed to the purchase price which ultimately came to be contained in a Modification of Assets Purchase Agreement, and agreed to execute all other closing documents, including:

a) Promissory Note in the principal amount of $1,000,000;

b) Promissory Note in the principal amount of $8,600,000, a copy of which is annexed hereto as Exhibit B;

c) Guaranty, by Spitzer, of the $8,600,000 note;

d) Security Agreement in favor of B&M, securing 220 Laundry's obligations under the $8,600,000 Note, covering all assets "as were transferred by Secured Party to the Debtor in accordance with an Assets Purchase Agreement and a bill of sale dated May 23, 2011";

20

e) Security Agreement in favor of B&M, securing 220 Laundry's obligations under the $1,000,000 Note, covering all assets "as were transferred by Secured Party to the Debtor in accordance with an Assets Purchase Agreement and a bill of sale dated May 23, 2011"; and

f) Lease for the business premises, running between 220 Coster, LLC, as Landlord, and 220 Laundry, as Tenant, the identity of the tenant being set forth in the Modification.

74.    At no point prior to, or at closing, did Miron Markus or any other representative of the Seller, inform the Purchaser of any inaccuracies in the financial information provided during the due diligence period or of any non-compliance by the Seller with any of its legal obligations.

75.    After the closing and the commencement of operational control by Purchaser, Miron Markus approached Spitzer and informed him that the information that had been provided as to certain utility costs was not only inaccurate, but grossly disparate from what had been stated verbally, and had been reflected in documentation provided to Purchaser during the due diligence period.

76.    In fact, it has been learned since closing that Miron Markus actively and willfully concealed his knowing misrepresentations to Spitzer as to the actual, lawful costs of water and gas service necessary to operate the facility. Spitzer conservatively estimates that the actual lawful costs of water and gas necessary for the facility's operation was understated by the Seller and Miron Markus by some $850,000 per annum.

77.    Miron Markus had full knowledge of the actual lawful cost of utilities, but for the purpose of wrongfully inducing Spitzer to enter into the purchase transaction

21

activity concealed and misrepresented the utility costs and thereby defrauded 220 Laundry and Spitzer.

78.    Spitzer and 220 Laundry have been directly damaged by reason of the fraud perpetrated upon them by Miron Markus, such fraud being the proximate cause of money damages.

79.    By reason of the foregoing, B&M as Seller, was in default of its contractual obligations to the Purchaser prior to closing, and at closing, and remains in breach of its contractual obligations, and is barred by reason thereof from asserting any of the claims set forth in the Complaint.

80.    By reason of the foregoing, Miron Markus is liable to 220 Laundry and Spitzer for money damages, in an amount to be determined at trial, which amount should be trebelled by reason of the active and willful nature of the fraud perpetrated by Miron Markus.

81.    By reason of the foregoing, 220 Laundry and Spitzer are, in addition to money damages, entitled to a reformation of the agreed purchase price, including, if a proper accounting should so reflect, an order directing payment by the Seller to the Purchaser.

<u>The Restrictive Covenant</u>

82.    Paragraph 23 of the Assets Purchase Agreement provides that Seller and its principals and representatives, including Miron Markus, Boris Markus and Michael Markus, shall not re-establish, reopen, be engaged in, nor in any manner whatsoever

22

become interested, directly or indirectly, in any off-site or third-party laundry facility for a period of five years after closing.

83.     By wrongfully declaring a default, and wrongfully seizing operations of the 220 Coster Street facility, Miron Markus and Boris Markus, have breached the referenced provision and are answerable to Purchaser for money damages.

84.     By reason of the foregoing, 220 Laundry is entitled to a money judgment against Miron Markus and Boris Markus, in an amount equal to the profits made by B&M following the wrongful declaration of default and the wrongful seizure of operations, and to an order directing that they comply with the covenant restricting their engagement in the laundry business.

### Tortious Interference with Business Contracts

85.     By reason of the Assets Purchase transaction, Purchaser, to the exclusion of Seller and its agents, was lawfully entitled to maintain existing customer business contracts and to develop additional customer contracts, which in fact Purchaser did.

86.     Notwithstanding the foregoing, Miron Markus and Boris Markus, by multiple acts, directly interfered with the exclusive right of Purchaser to operate the business.  These acts of interference, included, but not by way of limitation:

a)  continuing to engage in direct communications with Purchaser's customers, without authorization to do so;

b)  directing that certain of Purchaser's employees leave the business premises and not return;

23

c) countermanding the rightful instructions of Purchaser's General Manager to Purchaser's employees as to operational details, including dispatch of trucks, priority of customers and other matters; and

d) demanding that principals and employees of Plaintiff, in particular Spitzer, report to work at stated hours or face termination, a position wholly inconsistent with the transfer of operational control from Seller to Purchaser.

87. The foregoing acts of interference by Miron Markus and Boris Markus occurred prior to the wrongful declaration by B&M, on September 27, 2011, of a default on the part of Purchaser.

88. Upon the baseless declaration by B&M and 220 Coster LLC of a default, they improperly and unlawfully seized operational control of the business, and thereupon Miron Markus and Boris Markus further tortiously interfered with: a) 220 Laundry's rights under the Assets Purchase Agreement and Modification thereof; b) 220 Laundry's customer contracts as were in place as of September 27, 2011; and c) 220 Laundry's employment contracts.

89. By its improper and unlawful seizure of operational control of the business, from Purchaser, B&M has tortiously interfered with all of Purchaser's customer contracts as were in place as of September 27, 2011.

90. Purchaser has suffered economic harm by reason of B&M's unlawful and improper conduct.

24

## Conversion and Unjust Enrichment

91.     From the time of closing, on May 19, 2011, effective May 23, 2011, until the issuance of the Notice of Default, Purchaser was entitled to operate, and receive the revenues and profits from, the business, it being Purchaser's position that that remains the case, and that the Notice of Default is not valid.

92.     The active operation of the business by Purchaser generated invoices to customers, solely on account of laundry services performed during Purchaser's undisputedly lawful operation of the business.

93.     Following Seller's wrongful eviction of Purchaser and its agents from the premises, Purchaser made a written demand upon Seller to turn over to Purchaser all checks sent to the address of the facility in payment for services provided by Purchaser during its undisputedly lawful operation of the business.

94.     Seller has expressly refused to comply with such demand.

95.     Upon information and belief, and to a near certainty, Seller, on and after September 27, 2011, received checks from customers in payment of laundry services provided during Purchaser's operation of the premises, and by retaining same Seller has converted property of Purchaser and has thereby been unjustly enriched.

25

### Failure to Deliver Email Account and Website

96.     Pursuant to the terms of the Assets Purchase Agreement, as modified, Seller was obligated to transfer to Purchaser control of Seller's email address and website account.

97.     Such a transfer was negotiated for by Purchaser, so that Purchaser could achieve a more complete transition into the newly acquired business, and better communicate directly with existing and new customers of the business in order to better service them.

98.     B&M, acting through Miron Markus and Boris Markus, failed and refused to comply with B&M's contractual obligation as concerns the transfer of the email address and website, and instead improperly retained control of the email address and website, by which means they engaged in unauthorized communications with Purchaser's customers and wrongfully deprived Purchaser of customer information to which it was entitled under the Assets Purchase Agreement, thereby causing economic injury to Purchaser.

## AS AND FOR A FIRST COUNTERCLAIM

99.     Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

100.    By reason of Seller's declaration of a default and issuance of a Notice of Default, and Purchaser's denial of any default and rejection of the Notice of Default, a

26

justiciable controversy exists between Seller and Purchaser as to their rights under the Assets Purchase Agreement and related documents.

     101.    Purchaser is entitled to declaratory relief as follows:

     a)  declaring the Notice of Default without force and effect;

     b)  declaring that Purchaser and its agents are entitled to all access to the premises and to have the lawful right to operate the business in accordance with the closing documents; and

     c)  declaring that Seller and its agents have no right to interfere in Purchaser's business operations at the facility.

## AS AND FOR A SECOND COUNTERCLAIM

     102.    Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

     103.    By reason of the foregoing, Seller is in breach of the Assets Purchase Agreement, the Modification of the Assets Purchase Agreement, and the Lease by:

     a) failing to provide financial documentation to Purchaser which fairly represented to Purchaser utility expenses necessary for the operation of the facility;

     b)  denying Purchaser operational access to the facility;

27

c) wrongfully demanding sums greater than those contractually required as a condition to performing agreed consulting services;

d) wrongfully, and without authority, engaging in the laundry business in breach of the covenants contained in the Assets Purchase Agreement; and

e) failing and refusing to transfer control of B&M's email address and its website to 220 Laundry, as required by the Assets Purchase Agreement.

104. Purchaser has been economically damaged as a result of such wrongful conduct by Seller, and Purchaser is entitled to a money judgment for the amount of such damages as may be proven at trial.

## AS AND FOR A THIRD COUNTERCLAIM

105. Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

106. Seller's wrongful diversion of monies lawfully earned by Purchaser has unjustly enriched Seller and constitutes a conversion of monies to which Purchaser is lawfully entitled. Purchaser is entitled to a money judgment and to an accounting and injunctive relief, as to all such sums received by Seller on or after September 27, 2011.

## AS AND FOR A FOURTH COUNTERCLAIM

107. Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

28

108.   By reason of the foregoing, B&M, 220 Coster, Miron Markus and Boris Markus have tortiously interfered with all contracts running between Purchaser and its customers as of September 27, 2011.

109.   Purchaser has been damaged thereby, and continues to be damaged thereby, and is entitled to a money judgment B&M, 220 Coster, Miron Markus and Boris Markus.

## AS AND FOR A FIFTH COUNTERCLAIM

110.   Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

111.   B&M, acting through Miron Markus, fraudulently misrepresented to Purchaser the actual utility costs which the business operations of the facility lawfully generated, rendering the business far less profitable than Purchaser justifiably and reasonably expected.

112.   By reason of the foregoing, B&M and Miron Markus are liable to 220 Laundry and Spitzer for money damages, in an amount to be determined at trial. 220 Laundry should, in addition, receive an award of punitive damages by reason of the knowing, active and willful fraud perpetrated by Miron Markus.

113.   Further, in conjunction with the restoration of Purchaser to operational control of the facility, Purchaser is entitled to a full accounting of actual utility costs, and to a downward adjustment to its purchase and payment obligations in an amount based on the difference between the utility costs as represented and the actual lawful utility

29

costs in operating the facility.  In the event the adjustment proves to be so large as to

require payments from Seller to Purchaser, Purchaser reserves the right to seek such

relief.

## AS AND FOR A SIXTH COUNTERCLAIM

114.    Defendants incorporate by reference each of the Paragraphs set forth

above, with the same force and effect as if fully set forth herein.

115.    By reason of Plaintiffs' wrongful declaration of a default, the demand by

Plaintiff 220 Coster LLC that 220 Laundry vacate the premises is an act of wrongful

eviction entitling 220 Laundry to an order awarding it possession of the premises and

money damages.

## AS AND FOR A SEVENTH COUNTERCLAIM

116.    Defendants incorporate by reference each of the Paragraphs set forth

above, with the same force and effect as if fully set forth herein.

117.    On or about September 19, 2011, Boris Markus came to the premises,

there being no request that he do so, and initiated a verbal confrontation with Spitzer.

During that confrontation Boris Markus, in a highly enraged state, violently threw a

clipboard at Spitzer, striking him on the upper leg, proximately causing him contusion,

and pain.  Spitzer has retained photographic evidence of the injury suffered at the hand

of Boris Markus.

118.    By reason of the conduct by Boris Markus referred to above and at

Paragraph 44(f), Boris Markus is liable to Spitzer for money damages as a result of the

30

pain, suffering and mental anguish which was proximately caused by the wrongful conduct of Boris Markus, in an amount to be determined at the trial of this matter.

### AS AND FOR A EIGHTH COUNTERCLAIM

119.    Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

120.    Pursuant to the terms of the Assets Purchase Agreement, as modified, Seller was obligated to transfer to Purchaser control of Seller's email address and website account.

121.    Such a transfer was negotiated for by Purchaser, so that Purchaser could achieve a more complete transition into the newly acquired business, and better communicate directly with existing and new customers of the business in order to better service them.

122.    Miron Markus and Boris Markus were personally aware of Purchaser's contractual right to the required transfer, yet failed and refused to permit B&M to comply with its contractual obligation as concerns the transfer of the email address and website, and instead improperly caused it to retain control of the email address and website.

123.    By reason of the foregoing, Miron Markus and Boris Markus have tortuously interfered with 220 Laundry's contractual rights.

124.    In so doing, they and B&M engaged in unauthorized communications with Purchaser's customers and wrongfully deprived Purchaser of customer information to

31

which it was entitled under the Assets Purchase Agreement, thereby causing economic injury to Purchaser.

## AS AND FOR A NINTH COUNTERCLAIM

125. Defendants incorporate by reference each of the Paragraphs set forth above, with the same force and effect as if fully set forth herein.

126. By reason of the foregoing, 220 Laundry is entitled to a money judgment against Miron Markus and Boris Markus, for money damages resulting from their breach of the covenant not to engage in the laundry business for a period of five years from the closing of the purchase transaction.

### Prayer for Relief

127. As to all of the foregoing defenses and counterclaims, Defendants hereby incorporate by reference the applicable provisions of the prayer for relief contained at the conclusion of the Third-party Complaint which follows.

### Third-party Complaint

Third-party Plaintiffs 220 Laundry LLC and Eliot Spitzer, for their Third-party Complaint herein allege as follows:

### Parties

1. Third-party Plaintiff 220 Laundry LLC ("220 Laundry") is a New York limited liability company which transacts business in the State of New York.

32

2.     Third-party Plaintiff, Eliot Spitzer is an individual residing in the state of New York.

3.     Miron Markus is in individual residing in Nassau County, New York, and is, upon information and belief, the President and sole shareholder of B&M Linen Corp.

4.     Boris Markus is an individual residing in Nassau County, New York, and is, upon information and belief, the Vice-president of B&M and is the son of Miron Markus.

### Venue

5.     Nassau County is a proper venue for the resolution of the claims which are the subject of this Third-party Complaint, by reason of the venue of the principal action, and a written agreement running between B&M and Spitzer, which agreement was assigned by Spitzer to 220 Laundry.

### AS AND FOR A FIRST CAUSE OF ACTION
#### Indemnification and Contribution

6.     In the primary action, 220 Coster, LLC alleges that Defendants have wrongfully diminished the value of the laundry facility located at 220 Coster Street, Bronx, New York and/or the equipment contained therein.

7.     For good and valuable consideration, including payment to them of sums greater than were required to be paid under the consulting provisions of the Assets Purchase Agreement, Miron Markus and Boris Markus, after the closing took place, directly undertook to arrange for, or to themselves perform, maintenance and servicing of the facility and certain of its equipment.  Such was their primary operational function under the consulting arrangement

33

8.      More particularly, Miron Markus and Boris Markus, based on their many
years of experience running and maintaining operations at the facility, directly
undertook, post-closing, to keep the facility and its equipment properly maintained and
in good repair, and were compensated to do so.

9.      By reason of the foregoing, as respects the claims by 220 Coster asserted
in the primary action, alleging any failure on the part of Defendants to maintain the
facility or its equipment, Third-party Defendants Miron Markus and Boris Markus should
be held liable for any and all such claims, to the exclusion of Defendants and Third-
party Plaintiffs.

WHEREFORE, Defendants in the primary action, and Third-party Plaintiffs in the
Third-party action, respectfully demand relief as follows:

1.      As to Plaintiffs' Claims in the Primary Action:

a)      an order and judgment dismissing with prejudice each of the Causes of
Action of the Complaint as to all Defendants.

2.      As to the Counterclaims of Defendants in the primary action:

a)      a declaratory judgment in favor of 220 Laundry on is First Counterclaim,
as follows:

i) declaring the Notice of Default dated September 27, 2011 to be without
force and effect;

34

      ii) declaring that 220 Laundry, as Purchaser, and its agents are entitled to

full access to the business premises at 220 Coster Street and that they

have the lawful right to operate the business in accordance with the

closing documents; and

      iii) declaring that Seller and its agents have no right to interfere in

Purchaser's business operations at the facility;

and granting preliminary injunctive relief consistent with the foregoing

declarations;

    b)      a money judgment in favor of 220 Laundry on its Second Counterclaim

against B&M, for damages proven at the trial of this matter to have resulted from B&M's

multiple breaches of the Assets Purchase Agreement, including:

      i) failing to provide financial documentation to 220 Laundry, as Purchaser,

which fairly represented to Purchaser utility expenses necessary for the

operation of the facility;

      ii) denying 220 Laundry operational access to the facility;

      iii) wrongfully demanding sums greater than those contractually required

as a condition to performing agreed consulting services;

      iv) wrongfully, and without authority, engaging in the laundry business in

breach of the covenants contained in the Assets Purchase Agreement;

and

35

v) failing and refusing to transfer control of B&M's email address and its

website to 220 Laundry, as required by the Assets Purchase Agreement;

the amount of said money judgment reasonably estimated be in excess of $10,000,000;

c)      a judgment in favor of 220 Laundry on its Third Counterclaim:

i) granting 220 Laundry a money judgment in the amount of all monies

received from customers of 220 Laundry from and including September

27, 2011, on which date B&M commenced conversion of customer

payments to which 220 Laundry was lawfully entitled; and

ii) directing a full and immediate accounting of all such sums received

from customers from and including September 27, 2011;

d)      a judgment in favor of 220 Laundry on its Fourth Counterclaim against

B&M, 220 Coster, Miron Markus and Boris Markus, for money damages proven at trial

to have been proximately caused by their tortious interference with 220 Laundry's

customer contracts, including:

i) from the May 23, 2011 effective date of the Agreement to September

27, 2011, on which date B&M and 220 Coster wrongfully declared 220

Laundry to be in breach of its contractual obligations, and wrongfully

evicted 220 Laundry from the premises; and

ii) from September 27, 2011 until 220 Laundry is restored to

possession of the premises as is its lawful right, without interference

by B&M, 220 Coster or their principals or agents;

36

the amount of which cannot be presently known as the nature and scope of such interference is concealed from 220 Laundry by reason of its wrongful exclusion from the premises;

e)     a judgment in favor of 220 Laundry, Eliot Spitzer and Michael Steinberg against B&M and Miron Markus, on the Fifth Counterclaim:

I) directing a full accounting of the actual utility costs lawfully required to be paid in operating the facility;

ii) determining the extent to which B&M understated those utility costs by representations made and documents provided during the period preceding, and constituting, the due diligence period provided for in the Assets Purchase Agreement;

iii) awarding 220 Laundry, Eliot Spitzer and Michael Steinberg a money judgment in the amount of such difference; and awarding 220 Laundry punitive damages as against Miron Markus, by reason of his knowing, active and willful fraudulent conduct;

iv) declaring that the purchase and payment obligations on the part of 220 Laundry and its guarantors as determined by the closing documents, be adjusted as to payments not yet due, in a manner consistent with the amount by which utility costs were understated, which sum is conservatively estimated to be $850,000 per annum. In the event the accounting prayed for establishes that the adjustment to be made is such

37

that 220 Laundry's payment obligations are reduced below zero, 220
Laundry requests that the money judgment to be awarded on the Fifth
Counterclaim so reflect that fact;

f)      a money judgment in favor of 220 Laundry and against 220 Coster on the
Sixth Counterclaim, for all money damages proven at trial to have resulted from the
wrongful eviction of 220 Laundry from the premises, which damages are continuing and
ongoing and can only be determined after 220 Laundry is properly restored to
possession.

g)      a money judgment in favor of Eliot Spitzer against Boris Markus on the
Seventh Counterclaim, for pain, suffering and mental anguish resulting from the
personal injury inflicted upon Spitzer by Boris Markus as set forth above, all without
justification on the part of Boris Markus, and that Spitzer further be awarded punitive
damages based on the willful and violent nature of the attack;

h)      a money judgment in favor of 220 Laundry against Miron Markus and
Boris Markus, jointly and severally, on the Eighth Counterclaim, for all money damages
proven at trial to have resulted from their tortious interference with the contract right of
220 Laundry to have transferred to it by B&M access to and control of the email
address and website of B&M;

i) a money judgment in favor of 220 Laundry against Miron Markus and Boris
Markus on the Ninth Counterclaim for all damages proven at trial to have resulted from
their breach of  contractual covenant not to engage in the laundry business for a period

38

of five years from closing, said damages to be in an amount equal to all monies and

other benefits received by B&M, Miron Markus and/or Boris Markus as a result of their

wrongfully engaging in the laundry business after May 23, 2011, which damages are

continuous and ongoing by reason of their continued wrongful acts;


3.      As to the Third-party Complaint:

        a) in the event the Court finds that there was any diminution in the value or

condition of the premises and/or the equipment contained therein during such time as

220 Laundry operated the facility, as is alleged by 220 Coster in the primary action, an

order and judgment in the nature of indemnity and contribution as against Miron Markus

and Boris Markus, by reason of their having undertaken, for consideration actually paid

to and retained by them, the responsibility of maintaining the facility and equipment

therein;


4.      As to the primary action and the Third-party action:

        a)      an award of interest on all money awards, as allowed by law;

        b)      an award of costs, disbursements and attorneys' fees, as allowed by law;

and

        c)      such other and further relief as to the Court may seem just and proper.

Dated: October 26, 2011

COTI & SUGRUE

By _Stephen R. Sugrue_
Stephen R. Sugrue
59 Grove Street Suite 1F
New Canaan, CT 06840
203-966-5817

To:    Juliean Galak, Esq.
31-05 Brighton 3rd Street Suite 1-K
Brooklyn, NY 11235-7372

40

# EXHIBIT C

FAXED TO ATTY ON _____
CONFORMED ON _____ 2/8/12

At a Term of the Supreme Court
IAS Part 4)
of the State of New York, held in and
for the County of Nassau, at the
Courthouse, 100 Supreme Court
Drive, Mineola, NY
on the 8th day of February, 2012

**PRESENT:**

HON. _Jaeger_
A.J.S.C.

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU**

MOTION SEQUENCE # 3

ORIGINAL RETURN DATE 2/22/12

RELIEF _OPI_

---------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,

        Plaintiffs,

    -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

        Defendants,

    -against-

MIRON MARKUS and BORIS MARKUS,

        Additional Counterclaim
        Defendants

---------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

        Third-party Plaintiffs,

    -against-

MIRON MARKUS and BORIS MARKUS,

        Third-party Defendants.

---------------------------------------------------------X

ASSIGNED TO:
HON. STEVEN M. JAEGER

Index No. 11-013989

**ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINING ORDER**

ENTERED
IN
COMPUTER
JT

Upon reading and filing the annexed affirmation of Stephen R. Sugrue, and the exhibits annexed thereto, and Defendants/Third-party Plaintiffs having previously moved this Court by Order to Show Cause for an Order granting Defendants/Third-party Plaintiffs a Preliminary Injunction entitling them to possession of the commercial laundry facility located at 220 Coster Street, Bronx, N.Y, which motion is now _sub judice_;

LET Plaintiffs B&M LINEN CORP. and 220 COSTER LLC and Additional Counterclaim Defendants, MIRON MARKUS AND BORIS MARKUS, show cause before the Hon. Steven M. Jaeger at Part 41 of the Courthouse, at Mineola, New York, on the 22 day of February, 2012 at 9³⁰ a.m., or as soon thereafter as counsel may be heard, why they and their agents, employees and representatives should not be temporarily restrained, pending the determination of the motion for a preliminary injunction or further Order of the Court, from selling, assigning, pledging, encumbering, or otherwise transferring any of the assets of B&M Linen Corp. or 220 Coster LLC located at the 220 Coster Street, Bronx, NY facility, and be restrained from selling, transferring, assigning or otherwise granting to any third-party the right to operate the laundry facility; and sufficient cause appearing therefor,

IT IS FURTHER ORDERED that pending the ~~hearing~~ determination of this motion, Plaintiffs B&M LINEN CORP. and 220 COSTER LLC and Additional Counterclaim Defendants, MIRON MARKUS AND BORIS MARKUS and their agents, employees and representatives are prohibited from selling, assigning, pledging, encumbering, or otherwise transferring any of the assets of B&M Linen Corp. or 220 Coster LLC located

at the 220 Coster Street, Bronx, NY facility, *except for ordinary operating expenses in the regular course of business* and are prohibited from selling, transferring,

assigning or otherwise granting to any third-party the right to operate the laundry facility.

SUFFICIENT REASON APPEARING THEREFOR, let service pursuant to CPLR

2103(b) 1, 3 or 6 of a copy of this Order together with all papers submitted in support

thereof on Julien Galak, Esq., counsel for Plaintiffs and Additional Counterclaim

Defendants, and any other appearing parties, if any, on or before the _10_ day of

___, 2012 be deemed good and sufficient service.

ENTER:

_____
A.J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
————————————————————————————X
B&M LINEN CORP. and 220 COSTER LLC,  :
                                     :
                    Plaintiffs,      :
                                     :
        -against-                    :
                                     :  Index No. 11-013989
220 LAUNDRY LLC, ELIOT SPITZER,      :
MICHAEL STEINBERG and ADAM J. TELLER, :  Assigned to:
                                     :   Hon. Steven M. Jaeger
                    Defendants,      :
                                     :
        -against-                    :
                                     :
MIRON MARKUS and BORIS MARKUS,       :
                                     :
            Additional Counterclaim  :
            Defendants               :  <u>AFFIDAVIT IN SUPPORT</u>
————————————————————————————X  <u>OF MOTION FOR</u>
220 LAUNDRY LLC and ELIOT SPITZER,   :  <u>TEMPORARY RESTRAINING</u>
                                     :  <u>ORDER</u>
            Third-party Plaintiffs,  :
                                     :
        -against-                    :
                                     :
MIRON MARKUS and BORIS MARKUS,       :
                                     :
            Third-party Defendants.  :
————————————————————————————X

Stephen R. Sugrue, an attorney duly admitted to practice before the Courts of New

York, hereby affirms under penalty of perjury as follows:

<u>Overview of this Motion</u>

1.    I submit this Affirmation in support of the motion by

Defendants/Third-party Plaintiffs for a Temporary Restraining Order, pending the

determination of the motion for a preliminary injunction which was taken under

submission by the Court on January 6, 2012.

1

2.      As I stated to the Court on that date, events relating to the discovery and assessment by Con Edison of the magnitude of a long-running, systematic theft of natural gas service by B&M Linen ("B&M" or "Seller") are just now unfolding. On January 5, 2012, just a day before that oral argument, I had received a response by Con Ed to a first subpoena served upon it. On January 26, 2011, I received Con Ed's response to a second subpoena, and that response has prompted this application for a TRO. I will put this in appropriate context, both as to procedural status and substantive significance, as succinctly as possible.

3.      As explained fully below, this application is based directly on the recent determination reached by Con Edison, that the theft of services committed by B&M was of such magnitude that there is presently due and owing to Con Ed, by B&M some $5,219,730. As I will also set forth more fully below, this calculation of the magnitude of the theft of services by B&M does not include B&M's non-payment of that portion of Con Edison bills for the actual supply of natural gas by an Energy Service Company. It is likely that the indebtedness to that entity will exceed the sum demanded by Con Edison, and that the total owed to both will be in the range of $10-13 million dollars.

4.      These developing circumstances warrant the relief requested on this motion, and should be considered as well on the pending injunction motion. B&M and the Markus' have now been presented with Con Edison's demand for payment of more than $5,000,000. Even omitting for present purposes an inevitable demand for perhaps as much as $8,000,000 more by the actual provider(s) of the natural gas,

2

B&M and its principals might well be inclined to conduct an immediate sale of the building itself or of the valuable equipment inside it, in an attempt to address their financial crisis.

5.      The very same facts now uncovered by Con Edison as to theft of service also establish, of course, that B&M cannot possibly prevail in this action. As recited fully on the pending injunction motion, B&M is now known to have been in perpetual default of its obligations regarding the honest disclosure of the cost of operations. That default in the Assets Purchase Agreement clearly preceded 220 Laundry's assuming possession of the premises and commencing operations.

6.      A Temporary Restraining Order is necessary and warranted to preserve the facility, plant and equipment, indeed all assets utilized by B&M in its continued wrongful operation of the business that 220 Laundry lawfully acquired. Simply stated, had the recently learned facts been known at the time of filing the Order to Show Cause for the preliminary injunction, that filing would have included a TRO request.

<u>Background</u>

7.      B&M sold its commercial laundry operation to 220 Laundry, LLC ("220 Laundry"). The closing of the transaction took place on May 19, 2011, effective May 23, 2011.

8.      Because 220 Laundry's principals had no knowledge of the technical operation of the complex plant and equipment, the closing documents included a provision by which the principals of B&M, the seller, would be on call to provide

3

consulting services, for an agreed payment of $20,883 per month. For present

purposes, this is significant only in that it explains that the principals of Seller had

continued access to the premises after closing, with the focus of their activities

being on the plant and equipment.

9.     During the pre-closing due diligence process, utility bills were

presented by Seller to representatives of 220 Laundry (an LLC formed at the time of

closing). These included bills for natural gas, electricity and water, but not oil. The

three commercial boilers on the premises are known as "dual-feed" or "dual fuel",

and can be fairly readily switched from operating on natural gas to operating on oil,

obviously where such fuels are supplied to them.

10.     As the Court was informed at oral argument of the preliminary

injunction motion, at one point after the sale, B&M's President and sole owner,

Miron Markus ("Markus"), brought Eliot Spitzer into the room where the gas meter

was located and had an odd and awkward conversation wherein Markus showed

Mr. Spitzer that it was "possible" to disable the gas meter by removing a small

component therefrom. It was not then clear to Mr. Spitzer whether Markus had in

fact been doing so. Mr. Spitzer concluded that awkward conversation, then directed

his General Manager, Christian Olsen, to attempt to determine whether the utility

bills provided during due diligence were likely accurate.

11.     I was first retained shortly thereafter. As my client sought to develop

an understanding, at least a rough understanding, of the actual gas usage for the

three boilers, I attempted to arrange a meeting among the parties' principals and

4

attorneys. The agenda on our side was simple: communicate the fact that the consulting arrangement would be terminated (as was 220 Laundry's absolute right under the purchase agreement) and communicate the fact that 220 Laundry, as buyer, now sought exclusive control and possession of the premises.

      12.    That meeting took place on September 27, 2011. After I explained that it was 220 Laundry's intention to terminate the consulting services and operate the facility on its own, B&M's counsel, Juliean Galak, Esq. politely inquired if 220 Laundry would be interested in discussing what he termed a "rollback", which he suggested was some negotiated repurchase of the operation by B&M, the Seller. We stated that we were not interested. It was at that point, and not before, that Mr. Galak stated that 220 Laundry was in material default of its purchase note obligations, by reason of a $41,666 monthly note payment said to have been made two days late. To be clear, that payment had by then been made, and was made before any claim of default was made by 220 Laundry.

      13    Mr. Galak and clients left the room, and returned some time later with a just-prepared Notice of Default. It demanded that 220 Laundry immediately leave the premises, under threat of claim of trespass. Because there had been violent confrontations between Markus' son, Boris Markus, who also attended the meeting, against both Spitzer and 220 Laundry's General Manager, Christian Olsen, and because of uncertainty as to the matter of theft of utility services, 220 Laundry left the premises. It has since then been operated by B&M.

5

14. The claim of "material breach" was utterly bogus. 220 Laundry had paid almost $1,000,000 toward the purchase price to that point, some four months after closing. Even at the statutory rate of interest, a two-day delay in a $42,000 payment corresponds to some $20 in interest. At current bank rates on deposits it is less than $5.00.

15. The clear evidence just acquired of B&M's long-running theft of natural gas service is explained in detail below. How was Markus planning to get away with it? His apparent plan was to bring Eliot Spitzer into his confidence and persuade him to perpetuate the long-running theft of utility services. The conversation between Markus and Spitzer referred to at Paragraph 6 above was Markus' initial introduction of the subject to Spitzer.

16. But for such a plan to persuade Spitzer to continue the theft of services from Con Edison, Markus could not possibly have kept his theft from Con Edison and his fraud upon 220 Laundry from coming to light. Consider: on Markus' last day in the premises (which we informed him on September 27, 2011 would be that day) Markus would either leave with the meter intact, or leave with it disabled. If the former, 220 Laundry would almost immediately receive gas bills some 10 times higher than had been shown during due diligence (a calculation explained below). If the latter, 220 Laundry would have received no gas charges. Both would have pointed to massive fraud. Thus Markus simply reclaimed the premises, though baselessly as a matter of fact and law.

6

## The Pending Motions

17.     By Order to Show Cause filed in November, 220 Laundry sought, primarily, to be restored to exclusive possession of the premises, pending further order of the Court . In opposition to that motion, Markus swore:

> I never misrepresented the utility costs or anything else to them. In the event that any of initial estimates were inaccurate, the same were corrected during the due diligence period. Prior to closing, my books were completely open to the defendants/third party plaintiffs.

18.     Of course the question is not whether the Con Edison bills actually received by B&M were shown to 220 Laundry during due diligence, it is whether B&M fraudulently concealed the actual costs of utilities necessary to operate the business lawfully, by presenting the bills which he in fact presented.

19.     On the day before the January 6, 2012 oral argument of the injunction motion, Con Edison responded to a first subpoena served on it. The documents produced were made available to opposing counsel on that day, but none was included in the record on the motion, simply because of the timing of receipt.

20.     Also on January 6, 2012, I served a motion for default on Plaintiffs' counsel, returnable January 17, 2012. This was based on the simple fact that Plaintiff had never served any Reply to Defendants' Counterclaims, and had not served any timely Answer the Third-party Complaint.   The default motion was made returnable January 17, 2012. Plaintiffs' counsel unilaterally obtained an adjournment, to February 21, of the default motion.

21.     Thus, the injunction motion is now <u>sub judice</u>; and the default motion is scheduled for February 21, 2012.

7

## The Documents Produced in Response to the Subpoenas

22.     The documents received in response to both subpoenas establish the magnitude of B&M's theft of services, and fully warrant the granting of a temporary restraining order preventing Plaintiffs from selling, assigning, leasing, encumbering or otherwise transferring any interest in B&M Linen, or any of the plant and equipment located there to anyone, pending further Order of the Court.

23.     Exhibit 1 is a copy of the first investigative report prepared by Con Edison upon being alerted to the possible theft of services. On the front page, Con Edison's investigator checked the box indicating a "suspect[ed] theft" of services. The narrative beginning on the second page states:

> When we initially approached MGR for access to gas [meter], he stated that employee w/key to room will return in 1 HR. Just out of curiosity we walked over to MRM [meter room] and observed owner of business Mr. Markus hastily exiting. Our subsequent inspection revealed the following.
>
> The 4 screws bolting register head to [meter] can be removed by hand. These screws 100% of the time are tightened to torque and can be removed with socket/ratchet only. After we took register head off we verified (and photographed) extensive scratching on register gears.
>
> It was then that Mr. Markus informed us that he switched dual fuel boilers over to oil when price is advantageous. J.G. [believed to be Jack Gaffney] asked for oil company's name. Mr. Markus thinks its "Embassy" but is not sure. He states further he used oil 1 mo. ago but cannot provide any receipts for oil deliveries. Oil storage tank empty at time of call [inserted text: oil pipe emerging from oil storage room is dead-ended and capped (took photo)]. We re-installed register head onto [meter] and took a test dial rotation. . . . We then installed 4 silver security caps over the 4 screws/bolts. We will be returning Tuesday JAN 3 2012 to verify [meter] [reading] and continue our investigation.

8

24.     A second Field Inspection Report by Con Edison is annexed as Exhibit

2. On the first page, the "Result of Inspection" field is marked "THEFT OF

SERVICE", in contrast to "SUSPECT THEFT" as was shown on the report of the

first inspection.  Page two of the SECOND report includes the following:

> We returned to site to continue investigation.  We verified left rear
> silver security cap intact, yet loosened.  There are visible scratch
> marks around perimeter of cap.  Someone attempted to once again
> remove register head.  We then performed a 30-day projection.
> Projection comes out to 63,450 cu ft of gas per MO! s/ Bob Eckstein.
> Phoned T. Vespers to begin billing process.

25.     Con Edison's response to a second subpoena was received on

Thursday, January 26, 2012.  It consists of only four pages, but in substance reflects

Con Edison's calculation of the sums due to Con Edison and confirms the theft of

services.  That response is annexed as Exhibit 3. The only redaction is on the last

page, as it made a reference to a settlement offer apparently made to Con Edison.

26.     The first page of Exhibit 3 contains the following text, in a

communication between two Con Edison employees referenced in some of the

reports quoted above:

> The reading today at 1300 hrs was 033187.  This pretty much confirms
> the billing and the theft of service determination.  The last reading
> was on Jan 3rd and that was 31312.
>
> The difference is 1275 x 10 = 12750/6 days = 2125 ADU x 30 = 63,750
> CCF a month.  That is exactly what we estimated.

27.     The next two pages of Exhibit 3 are the resulting bill prepared by Con

Edison.  I am informed by Con Edison that the bill is limited to a period of six years,

and that Con Edison did so by reason of the six-year statute of limitations for

9

contract actions in New York. The resulting sum claimed due from B&M to Con Edison is $5,219,730.71. Contrasting the figures in the column headed "Original Consumption" and those in the column headed "Revised Consumption" reveals that it was not uncommon for the actual consumption to be ten times higher than the doctored meter, and resulting bills, indicated.

28.     This is wholly consistent with the Con Edison printout produced in response to the first subpoena, a printout referred to at oral argument of the injunction motion. A copy is annexed as Exhibit 4. Exhibit 4 is an hourly recordation by Con Edison of *apparent* metered gas utilization by B&M from 9:00 am on November 21, 2011 until 8:00 am on January 3, 2012. It is useful to bear in mind that the first inspection referred to above (prompting Markus' hasty departure) was between those dates, on the morning of December 30, 2011.

29.     Exhibit 4 shows that the meter reported zero gas utilization every hour from 9:00 am on November 21, 2011 through 6:00 pm on December 4, 2011, and from 8:00 pm on December 4, 2011 through 3:00 am on December 5, 2011. One reading for one hour on December 4 shows consumption of 2,000 cubic feet of gas. There then begins a period, on December 5 and December 6, during which hourly consumption is typically reported at 12,000-15,000 cubic feet. Following that, for all but a very few hours, the printout shows no gas consumption until the morning of Con Edison's first appearance at the facility to explore the theft of services, on December 30, 2011.

10

30.     B&M, through Markus, and perhaps others, simply left the meter disconnected for the most part, except for a few days a month. I was informed by a Con Edison representative that Con Edison would read that meter some time during the first week of the month, typically the third, fourth or fifth day of the month.

31.     The available proof is overwhelming: B&M was regularly disabling the meter for almost 27 days a month, then reconnecting it in anticipation of the monthly reading. This is wholly consistent with the ten-fold discrepancy referred to in Paragraph 23 above.

### The ESCO Portion of the Gas Bills

32.     As the Court is likely aware, gas utility bills typically have two basic components: supply charges and delivery charges. The supply charges are for procuring and storing the natural gas itself, whereas the delivery charges are charges for maintaining in place the infrastructure necessary to deliver the natural gas to a user. This distinction is set forth on the website for Con Edison, with reference to a sample bill.

33.     Customers can select from among many Energy Supply Companies, or Energy Service Companies ("ESCOs") to provide the supply services. B&M did so. Although monthly gas bills cover both the Con Edison portion and the ESCO portion, I have confirmed with Con Edison's counsel that it is Con Edison's policy in a theft of services situation to submit a bill only for the Con Edison, that is delivery, portion.

11

34.     As I will explain, this means that the total demand likely to be made upon B&M for the theft of services discovered by Con Edison is not the $5,219,730 presently demanded, but likely to be closer to $13 million.

35.     Following Con Edison's response to the second subpoena, 220 Laundry's General Manager, Christian Olsen, provided me with an analysis of the 22 months of Con Edison bills which were produced by B&M during due diligence, specifically the bills for January, 2009 through October, 2010. The ratio of gas charges as between the ESCO and Con Edison over that period was 60.7% to 39.3%, respectively. Applying that ratio to Con Edison's calculations as to its own portion, yields a possible claim by the ESCO as to gas theft over six years of $3,866,377.41. Further, if the ESCO applies the same calculation method as Con Edison as to late charges, the ESCO late charges will total $4,195,649.41. The total potential, if not likely, charges by the ESCO for that same six-year period already billed by Con Edison would be $8,062,026. The total for Con Edison and the ESCO would therefore be $13,281,756.

<u>A Temporary Restraining Order is Necessary to Preserve Rights and Assets</u>

36.     The foregoing presents a solid picture of the dire financial situation in which B&M and its principals suddenly find themselves. It is not based on unsupported innuendo by one of two litigating entities, but on a reliable analysis undertaken by utility professionals experienced in the investigation of thefts of utility services.

12

37.     Markus' hasty explanation to the Con Edison investigators on the occasion of their first investigative visit to the facility—to the effect that B&M used oil from time to time—was not only undermined by Marcus' inability to present any oil receipts and the fact that that oil tank was both empty and not connected to any boiler, but it is not disputed that no oil bills were presented to 220 Laundry during due diligence.

38.     220 Laundry has a lawful right to operate the facility, and that is the fundamental aim of the preliminary injunction motion submitted to the Court on January 6, 2012. B&M and its principals have a very sudden and very significant need for money. They will surely consider an immediate sale of the valuable plant and equipment where the laundry operates. Such a transfer should be halted by the Court, pending a determination of the parties' rights and further order of the Court.

39.     There has been no prior application for the relief herein requested.


Dated: February 6, 2012

_Stephen R. Sugrue_
Stephen R. Sugrue

**EXHIBIT 1**

# PROPERTY PROTECTION
# FIELD INSPECTION REPORT

**conEdison**

CASE NUMBER

**220 Coster ST-**

ADDRESS

FACT - B93 02 103 7000 28

PART SUPPLIED

**B&M Linen Corp-** | G |

CUSTOMER NAME | E/G | SC | METER PREFIX | **359499/** 10 | MUNI M-

ACCOUNT NUMBER: 359499/ | METER NUMBER | CONSTANT | SIZE-TYPE **Connector**

**HL-**

METER LOCATION

**Bronx.**

TOWN **85833/**

**Re-field 1/3/12 -** | **12/20/11** | **70157-** | **/04680/**

COMMENTS | INSPECTION DATE | INSPECTOR EMP. # | INSPECTOR EMP. #

## EQUIPMENT NOT CHECKED FOR THE FOLLOWING REASON

| NO ACCESS | REFUSED | BLDG. VACANT | PEND. DEMO | CAN'T LOCATE | DNR | OTHER-SEE REVERSE |
|---|---|---|---|---|---|---|
| N | R | V | P | L | D | O |

## EQUIPMENT FOUND ON PREMISES

| NO METER | GAS METER | SOCKET-DMD | SOCKET NON-DMD | BOT FED DMD | BOT FED NON-DMD | CT METER |
|---|---|---|---|---|---|---|
| NON | GAS | SDM | SND | BFD | BFN | CTM |

| | LOCK-SEALS | METER COVER | TERM. CHAMBER | T.C.O. | CT-CABINET | SERV. SWITCH | SOCKET EQUIP. | 7 JAW EQUIP. | GAS-CAP | VALVE | PLUG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FOUND | | | | | | | | | | | |
| LEFT | | | | | | | | | | | |

| TYPE OF LOCK | TYPE OF SEAL | TYPE OF BUSINESS-RESIDENCE (SEE BELOW) |
|---|---|---|
| FOUND: BROKEN [B] MISSING [M] INTACT [I] | FOUND: BROKEN [B] MISSING [M] INTACT [I] | COMMERCIAL 7215 |
| ENTER BOTH TYPE FOUND AND TYPE LEFT | ENTER BOTH TYPE FOUND AND TYPE LEFT | |
| FOUND O LEFT O (SEE BELOW) | FOUND O LEFT O (SEE BELOW) | RESIDENTIAL |

## RESULT OF INSPECTION

| THEFT OF SERVICE | SUSPECT THEFT | DIVERSION OF SERVICE | IRR. METER CONDITION | NO THEFT |
|---|---|---|---|---|
| TOS | SUS | DOS | K U | IMC | NOS |

## NOTE SPECIFIC CONDITION OBSERVED

| CONFIRMED THEFT (T) | | SUSPECTED | | DIVERSION OF SVC (D) | | IRREGULAR METER CONDITION (I) | | NO THEFT (N) | |
|---|---|---|---|---|---|---|---|---|---|
| Reversed Leads | Jaws Spread [11] | Forged Seal [1] | Adequate Wire [1] | Damaged Meter [1] | New Meter Set [1] |
| Jumper | Shunt Device [12] | Tampered Seal [2] | Cust-to-Cust Theft [2] | Exchanged Meter [2] | Company Bypass [2] |
| Potential Wire | Heel/Toe Switch [13] | Scratches/Burns [3] | Temp. Co. Line [3] | Dial Eccentric [3] | Cont. of Service [3] |
| Potential Clip | Meter Switch [14] | Locking Device [4] | Damaged Equip. [4] | Meter Defective [4] | Customer Wiring [4] |
| Inverted Meter | Gas Valve/Bypass [15] | Other (see over) [X] | Other [5] | Other [5] | No Improper Cond. [5] |
| Neutral | Other (see over) [16] | | | | |
| Pot. Wire/Clip [7] | Dial Hand [17] | Was Condition Corrected Yes [ ] No [X] | | | |
| Adjust. Screw | U.O. Reconnect [18] | Was Rotation Test Completed [X] | If yes to any of these questions, | | |
| Gears Tampered | Jewel [19] | Was Ambrobe Test Taken [X] | Information must be noted on back. | | |
| Disk Tampered | Other [20] | Was Load Calculated [ ] | | | |

| Service Found | On [ ] Off [X] |
| Service Left | On [X] Off [ ] |
| TOS Evidence Obtained | Yes [ ] No [ ] |
| TOS UNL | Yes [ ] No [ ] |

### SCALE FOR TYPE OF LOCK

| Condition | Entry | Condition | Entry |
|---|---|---|---|
| No Lock | 0 | Lollipop | 5 |
| Barrel (Morse) | 1 | Swivel | 6 |
| Steel Ring | 2 | Steel Plate | 7 |
| Mattison | 3 | Glass/Plastic Plate | 8 |
| Power Safe | 4 | Other | 9 |

### SCALE FOR TYPE OF SEAL

| Condition | Entry | Condition | Entry |
|---|---|---|---|
| No Seal | 0 | Plastic Padlock | 4 |
| B.T. | 1 | Paper | 5 |
| Lead | 2 | Other | 6 |
| Metal Padlock | 3 | | |

DATE RECEIVED

SOURCE

### SCALE FOR TYPE OF BUSINESS OR RESIDENCE

| 2629 | Appliance Repair | 7216 | Dry Cleaner | 7832 | Movie Theatres | 0025 | Master Meters |
|---|---|---|---|---|---|---|---|
| 7532 | Auto Body Shop | 7261 | Funeral Parlor | 5511 | New and/or Used Car | 0026 | Public Light & Power |
| 5461 | Bakery | 5541 | Gas Station | | Dealership | 0027 | Other |
| 5813 | Bar & Grill | 5451 | Ice Cream Store | 7521 | Parking Lots | | |
| 7231 | Beauty Salon | 5944 | Jewelry Store | 2759 | Print Shops | RESIDENTIAL | |
| 7933 | Bowling Alley | 7215 | Laundromat | 7622 | Radio & T.V. Repair | 0030 | Private Dwelling |
| 5441 | Candy Store | 5921 | Liquor Store | 7623 | Refrigerator & A.C. Repair | 0031 | Two-Family House |
| 7542 | Car Wash | 5421 | Meat/Fish Mkts | 5812 | Restaurants/Caterers/Diners | 0032 | Multi Dwelling (to 6 families) |
| 5311 | Department Store | 7011 | Motel/Hotel | 5411 | Supermarkets/Grocery | 0033 | Multi Dwelling (6 families & over) |

GA 4117R 1/09

# PROPERTY PROTECTION
## FIELD INSPECTION REPORT

conEdison

DATE 12/30/11 – KWH RDG [ ] DMD FD [ ] DMD LFT [ ] GAS RDG 031,018 TIME ARR 11¹⁵ TIME LEFT 2⁰⁰

DATE 10/3/11 – LA RDG 025,498

DAYS 88 DIFFERENCE 1,550 MULTIPLY BY 10 – KWH USED 15,500 ÷ DAYS = PER DAY USE 176.13×30 = 5284

Got call over radio - Met B.E. & J.G. on site - A prospective Buyer of this
Business notified us that this cust. is undoubtedly tampering
with Gas mtr. Part supplied is a commercial laundromat located
in an extremely large warehouse. When we initially approached mtr
for access to Gas mtr. he stated that employee w/key to room will

Inspector Signature J. Ezty/M. Gerard/R. Dominguez    Supervisory Review _____

## Customer Interview Statement

Name of person interviewed: _____ Position/Title: _____
Name of person shown condition: _____ Position/Title: _____
Business Name: _____ Corporate Name: _____ Date of Occupancy: _____
Officers/Principals: _____

Landlord Name: _____ Address: _____ Telephone: _____

return in 1 HR - Just out of curiosity we walked
over to MRM & observed owner of Business Mr. Markus

Lease info: Effective Date: _____ Leasee: hastily exiting. Our subsequent
Liquor License #: _____ Issue Date: inspection
Business License #: _____ Issue Date: revealed the following  →
Health Certificate #: _____ Issue Date: 588-7777
Business days/hours of operation: 7⁰⁰ to 11⁰⁰ Any changes to days/hours of operation during occupancy?
7⁰⁰ to 11⁰⁰ 7 DAYS a wk - We determined that Gas
If yes, explain: ⊗ via phone - Usage that Gas is being used 16 HRS per DAY.

### Current Load Study

| | Number/Size of | Number | Size |
|---|---|---|---|
| Lighting | | | |
| Freezers | | | |
| Motors | | | |
| Air Conditioners | | | |
| Refrigerators | | | |
| Televisions | | | |
| Other | | | |

**NOTE ROTATION TEST, AMPROBE READING, AND LOAD AT CALL**

Rotation Test: A) Seconds per revolution with theft of service [ | | | ]
B) Seconds per revolution after correction [ | | | ]
(A – B)/A = Percent of unmetered service [ | | | ]

Amprobe Reading: Left Phase [ | | | ]
Center [ | | | ]
Right Phase [ | | | ]
Total Amps _____ x .120 = _____ KW

Load at
Call Calculation: Non CT Meters _____ CT Meters _____
Mtr KH x 3.6 + seconds per rev = KW Load at call  CT Radio Quotient x Mtr KH x 3.6 + seconds per rev = KW Load at call
_____ x 3.6 + _____ = _____    _____ x _____ x 3.6 + _____ = _____

## ACCOUNT STATUS

| | | Notes |
|---|---|---|
| Electric ☐ Active ☐ Inactive | Gas ☐ Active ☐ Inactive | |
| ☐ Pend. T/O ☐ T.O.N.P. _____ | ☐ Pend. T/O ☐ T.O.N.P. _____ | |
| Lar: KW _____ DMD __/__ Date _____ | Lar: _____ Date _____ | |
| Lar: KW _____ DMD __/__ Date _____ | Lar: _____ Date _____ | |
| Lar: KW _____ DMD __/__ Date _____ | Lar: _____ Date _____ | |
| Screened by _____ Date _____ By _____ Date _____ By _____ Date _____ | | |

conEdison

Revenue Protection
# Field Investigation Report

CASE # _____

Received From: _____  Date: _____
am
Deepartment: _____  Time: _____
pm

Address: _____

Name: _____

Meter #: _____  **GAS** ☐  Readings: _____
**ELEC** ☐

Location: _____  Part Supplied: _____

The 4 screws Bolting register head to MTR can Be
removed By hand - These screws 100% of the time are
tightened to torque & can Be removed with
Socket/ratchet only - After we took register head
off we verified (and photo graphed) extensive scratching
on register gears.
    It was then that MR Markus informed us that
he switches dual fuel Boilers over to oil when price is
advantageous - J.G. asked for oil company's name.
MR Markus thinks its "EmBAssy" But is not Sure.
He states further he used oil 1 mo. ago But cannot
provide any receipts for oil deliveries - Oil Storage tanks
empty at time of call ⊗ We re-installed register head onto
MTR and took a test head rotation: 1 complete revolution
in 6 mins & 25 secs - We then installed 4

**SURV**

GA-4779 Field Investigation Report R4/02

⊗ oil pipe emerging from oil Storage
Received by: _____
Room is dead - end & capped -
( took photo.)

CASE # _____

**conEdison**

Revenue Protection
# Field Investigation Report

Received From: _____  Date: _____

Deepartment: _____  Time: _____ am / pm

Address: _____

Name: _____

Meter #: _____  GAS ☐  ELEC ☐  Readings: _____

Location: _____  Part Supplied: _____

Silver Security caps over the 4 screws/Bolts-
We will Be returning TuesdAy JAN 3 2012
to verify mtr RDg's continue our investigation.
Made Suspect -

**SURV**

Received by: _____

GA-4779 Field Investigation Report R4/02

**EXHIBIT 2**

# PROPERTY PROTECTION
## FIELD INSPECTION REPORT

**conEdison**

CASE NUMBER

ADDRESS: 220 CosteR St-

FACT- BS302110370028

PART SUPPLIED | ACCOUNT NUMBER: BS9499/10 | MUN: L

CUSTOMER NAME: B & M Linen Corp- | E/G: G | SC | METER PREFIX | METER NUMBER | CONSTANT | SIZE-TYPE: 60,000

METER LOCATION: 1fl- | Pronx-

ACCESS INSTRUCTIONS | TOWN: BronX

COMMENTS | INSPECTION DATE: 1/3/12 | INSPECTOR EMP. #: 70159- | INSPECTOR EMP. #: 03581-

## EQUIPMENT NOT CHECKED FOR THE FOLLOWING REASON

| NO ACCESS | REFUSED | BLDG. VACANT | PEND. DEMO | CAN'T LOCATE | DNR | OTHER-SEE REVERSE |
|---|---|---|---|---|---|---|
| N | R | V | P | L | D | O |

## EQUIPMENT FOUND ON PREMISES

| NO METER | GAS METER | SOCKET-DMD | SOCKET NON-DMD | BOT FED DMD | BOT FED NON-DMD | CT METER |
|---|---|---|---|---|---|---|
| NON | GAS | SDM | SND | BPD | BFN | CTM |

| | LOCK-SEALS | METER COVER | TERM. CHAMBER | T.C.O. | CT.-CABINET | SERV. SWITCH | SOCKET EQUIP. | 7 JAW EQUIP. | GAS-CAP | VALVE | PLUG |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FOUND | | | | | | | | | | | |
| LEFT | | | | | | | | | | | |

| TYPE OF LOCK | | TYPE OF SEAL | | TYPE OF BUSINESS-RESIDENCE (SEE BELOW) | |
|---|---|---|---|---|---|
| FOUND: BROKEN B MISSING M INTACT I | | FOUND: BROKEN B MISSING M INTACT I | | COMMERCIAL | 7215 |
| ENTER BOTH TYPE FOUND AND TYPE LEFT | | ENTER BOTH TYPE FOUND AND TYPE LEFT | | | |
| FOUND O LEFT O (SEE BELOW) | | FOUND O LEFT O (SEE BELOW) | | RESIDENTIAL | — |

## RESULT OF INSPECTION

| THEFT OF SERVICE | SUSPECT THEFT | DIVERSION OF SERVICE | IRR. METER CONDITION | NO THEFT |
|---|---|---|---|---|
| TOS | SUS | DOS  K  U | IMC | NOS |

## NOTE SPECIFIC CONDITION OBSERVED

| CONFIRMED THEFT (T) | | SUSPECTED | DIVERSION OF SVC (D) | IRREGULAR METER CONDITION (I) | NO THEFT (N) |
|---|---|---|---|---|---|

**EXTERNAL**
| 1 Reversed Leads | 6 Jaws Spread 11 |
| 2 Jumper | 7 Shunt Device 12 |
| 3 Potential Wire | 8 Heel/Toe Switch 13 |
| 4 Potential Clip | 9 Meter Switch 14 |
| 5 Inverted Meter | 10 Gas Valve/Bypass 15 |
| Neutral | Other (see over) 16 |

**INTERNAL**
| 1 Pot. Wire/Clip | 6 Dial Hand 17 |
| 2 Adjust. Screw | 7 U.O. Reconnect 18 |
| 3 Gears Tampered | 8 Jewel 19 |
| 4 Disk Tampered | 9 Other 20 |

SUSPECTED:
| 1 Forged Seal |
| 2 Tampered Seal |
| 3 Scratches/Burns |
| 4 Locking Device |
| 5 Other (see over) |

DIVERSION OF SVC (D):
| 1 Adequate Wire |
| 2 Cust-to-Cust Theft |
| 3 Temp. Co. Line |
| 4 Damaged Equip. |
| 5 Other |

| Was Condition Corrected | Yes | No 6 |
| Was Rotation Test Completed | 7 |
| Was Ambrobe Test Taken | 8 |
| Was Load Calculated | 9 |

IRREGULAR METER CONDITION (I):
| 1 Damaged Meter |
| 2 Exchanged Meter |
| 3 Dial Eccentric |
| 4 Meter Defective |
| 5 Other |

If yes to any of these questions, information must be noted on back.

NO THEFT (N):
| 1 New Meter Set |
| 2 Company Bypass |
| 3 Cont. of Service |
| 4 Customer Wiring |
| 5 No Improper Cond. |

| Service Found | On Off |
| Service Left | On Off |
| TOS Evidence Obtained | Yes No |
| TOS    UNL | Yes No |

### SCALE FOR TYPE OF LOCK
| Condition | Entry | Condition | Entry |
|---|---|---|---|
| No Lock | 0 | Lollipop | 5 |
| Barrel (Morse) | 1 | Swivel | 6 |
| Steel Ring | 2 | Steel Plate | 7 |
| Mattison | 3 | Glass/Plastic Plate | 8 |
| Power Safe | 4 | Other | 9 |

### SCALE FOR TYPE OF SEAL
| Condition | Entry | Condition | Entry |
|---|---|---|---|
| No Seal | 0 | Plastic Padlock | 4 |
| B.T. | 1 | Paper | 5 |
| Lead | 2 | Other | 6 |
| Metal Padlock | 3 | | |

### SCALE FOR TYPE OF BUSINESS OR RESIDENCE
| | | | | | |
|---|---|---|---|---|---|
| 2629 Appliance Repair | 7216 Dry Cleaner | 7832 Movie Theatres | 0025 Master Meters |
| 7532 Auto Body Shop | 7261 Funeral Parlor | 5511 New and/or Used Car Dealership | 0026 Public Light & Power |
| 5481 Bakery | 5541 Gas Station | | 0027 Other |
| 5813 Bar & Grill | 5451 Ice Cream Store | 7521 Parking Lots | |
| 7231 Beauty Salon | 5944 Jewelry Store | 2759 Print Shops | **RESIDENTIAL** |
| 7933 Bowling Alley | 7215 Laundromat | 7622 Radio & T.V. Repair | 0030 Private Dwelling |
| 5441 Candy Store | 5921 Liquor Store | 7623 Refrigerator & A.C. Repair | 0031 Two-Family House |
| 7542 Car Wash | 5421 Meat/Fish Mkts | 5812 Restaurants/Caterers/Diners | 0032 Multi Dwelling (to 6 families) |
| 5311 Department Store | 7011 Motel/Hotel | 5411 Supermarkets/Grocery | 0033 Multi Dwelling (6 families & over) |

DATE RECEIVED

SOURCE

GA 4117R 1/09

# PROPERTY PROTECTION
# FIELD INSPECTION REPORT

**conEdison**

DATE 1/3/12 - KWH RDG | DMD FD | DMD LFT | GAS RDG 31894 TIME ARR 9°° TIME LEFT 145

DATE 12/30/11 LA RDG 31048

DAYS 4 DIFFERENCE 846 MULTIPLY BY 10 - KWH USED 8460 ÷ DAYS = PER DAY USE 2115 x 30 = 63,450

We returned to site to continue investigation. We verified left rear Silver Security ear intact, yet loosened. There are visible scratch marks around perimeter of ear. Someone attempted to once Again remove register lead. We then performed a 30 DAY Projection. Projection comes out to 63,450 cu ft of Gas per mo. Bob Eckstein

Inspector Signature J. Sito / K. Grove — Supervisory Review

## Customer Interview Statement

Name of person interviewed: _____ Position/Title: _____

Name of person shown condition: _____ Position/Title: _____

Business Name: _____ Corporate Name: _____ Date of Occupancy: _____

Officers/Principals: _____

Landlord Name: Phoned T. Vespers to Begin Billing process. We then
timed & verified RDGS over a 2HR time frame. In each of the
two HRS, 150 cu ft of GA was used.

Lease Info: Effective Date: _____ Leasee: _____

Liquor License #: _____ Issue Date: 9³⁵ to 10³⁵ 31912 Expiration Date: 10³⁵ to 11³⁵

    - 31897

Business License #: _____ Issue Date: 15 x 10 = 150

    - 31897

    - 31912

Health Certificate #: _____ Issue Date: _____ 15 x 10 = 150

Business days/hours of operation: _____ Any changes to days/hours of operation during occupancy? ➤

If yes, explain: _____

### Current Load Study

| | Number/Size of | Number | Size |
|---|---|---|---|
| Lighting | | | |
| Freezers | | | |
| Motors | | | |
| Air Conditioners | | | |
| Refrigerators | | | |
| Televisions | | | |
| Other | | | |

## NOTE ROTATION TEST, AMPROBE READING, AND LOAD AT CALL

Rotation Test: A) Seconds per revolution with theft of service | | |
    B) Seconds per revolution after correction | | |
    (A – B)/A = Percent of unmetered service

Amprobe Reading: Left Phase | | |
    Center | | |
    Right Phase | | |

Load at _____ Total Amps _____ x .120 = _____ KW

Call Calculation: Non CT Meters _____ CT Meters _____

Mtr KH x 3.6 + seconds per rev = KW Load at call  CT Radio Quotient x Mtr KH x 3.6 + seconds per rev = KW Load at call
_____ x 3.6 + _____ = _____  x _____ x 3.6 + _____ = _____

## ACCOUNT STATUS

| | | Notes |
|---|---|---|
| Electric ☐ Active ☐ Inactive | Gas ☐ Active ☐ Inactive | |
| ☐ Pend. T/O ☐ T.O.N.P. _____ | ☐ Pend. T/O ☐ T.O.N.P. _____ | |
| Lar: KW _____ DMD _____ Date _____ | Lar: _____ Date _____ | |
| Lar: KW _____ DMD _____ Date _____ | Lar: _____ Date _____ | |
| Lar: KW _____ DMD _____ Date _____ | Lar: _____ Date _____ | |
| Screened by _____ Date _____ By _____ Date _____ By _____ Date _____ | | |

conEdison

Revenue Protection
# Field Investigation Report

Received From: _____  Date: __1/3/12-__

Deepartment: _____  Time: _____ am/pm

CASE # _____

Address: 220 Coster St-

Name: Br M Linen Corp-

Meter #: 3594991    GAS ☑  ELEC ☐  Readings: _____

Location: Tbl-    Part Supplied: _____

GDS SMF. "Russell" arrived- He Hooked up laptop
to M-corrector- He determined that for a 2week
period in Both Nov. & Dec. 2011, there was ZERO
Gas consumption! This info goes Back 41 DAYS
We cannot verify for How Long this pattern
Existed- T. Vespers notified B. Eckstein that
Bill will not Be ready today- We will return tomorrow
to present Bill-

Asper B.E. we took a RDG at 1:35 P.M:
RDG: 031955

**SURV**

Received by: _____

GA-4779 Field Investigation Report R4/02

**EXHIBIT 3**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,

           Plaintiffs,

    -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

           Defendants,

    -against-

MIRON MARKUS and BORIS MARKUS,

           Additional Counterclaim
           Defendants
-------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

           Third-party Plaintiffs,

    -against-

MIRON MARKUS and BORIS MARKUS,

           Third-party Defendants.
-------------------------------------------------------------X

Index No. 11-013989

**JUDICIAL SUBPOENA
DUCES TECUM**

RECEIVED
JAN 2 4 2012
4:30 pm
LAW DEPARTMENT
DC o3 22o/9

## The People of the State of New York

TO: CONSOLIDATED EDISON COMPANY, a Con Edison, Inc. company
      4 Irving Street
      New York, New York
         ATTN: Mr. Jack Gaffney
                Section Manager
                Revenue Protection
                718-246-7574

**WE COMMAND YOU that all business and excuses
being laid aside, you deliver by 5:30 p.m. on January
25, 2012, to Stephen R. Sugrue, Esq. of Coti & Sugrue,**

**attorneys for the above-named Defendants/Third-party Plaintiffs, at such place as the originals of such documents are maintained, complete and accurate copies of the following:**

1.   Every report of every investigation, inspection and testing or sampling procedure conducted by Con Edison at any time after December 1, 2011, relating to the commercial laundry facility operated by B&M Linen Corp. at 220 Coster Street, Bronx, New York ("the Facility"); and

2.   Every analysis by Con Edison of natural gas utilization at the Facility based on any investigation, inspection or testing or sampling procedure conducted by Con Edison at any time after December 1, 2011; and

3.   A copy of every communication by Con Edison to B&M Linen Corp., or any representative thereof, after December 15, 2011, relating to natural gas utilization or metering.

EXCLUDED FROM THE SCOPE OF THIS SUBPOENA ARE ALL DOCUMENTS PRODUCED BY CON EDISON ON JANUARY 5, 2012 IN RESPONSE TO A SUBPOENA DATED JANUARY 5, 2012

**now in your custody, and all other deeds, evidences and writings concerning the above.**

**Failure to comply with this subpoena is punishable as a contempt of Court and shall make you liable to the person on whose behalf this subpoena was issued for a**

penalty not to exceed fifty dollars and all damages
sustained by reason of your failure to comply.

Dated:   January 23, 2012

Stephen R. Sugrue
COTI & SUGRUE
59 Grove Street Suite 1F
New Canaan, CT 06840
203-966-5817
Attorneys for Defendants/Third-party Plaintiffs

**From:** Schuchman, Nancy
**Sent:** Tuesday, January 24, 2012 11:34 AM
**To:** Gaffney, John
**Cc:** Vesper, Antoinette M.; Schuchman, Nancy
**Subject:** FW: B& M Linen

Jack,

Above is the billing statement which was prepared for the bill. Below is an email with the readings from RPU. The account also has the readings from RPU 12/30 the reading was 031048 and 1/3/12 RPU reading was 031912.

---

**From:** Schuchman, Nancy
**Sent:** Monday, January 09, 2012 1:38 PM
**To:** Davis, James
**Subject:** FW: 220 Coster St

---

**From:** Eckstein, Robert C
**Sent:** Monday, January 09, 2012 1:21 PM
**To:** Vesper, Antoinette M.; Schuchman, Nancy; Wolff, Joanna M.; Gaffney, John; Eckstein, Robert C
**Subject:** 220 Coster St

**The reading today at 1300 hrs was 033187. This pretty much confirms the billing and the theft of service determination. The last reading was on Jan 3rd and that was 31912.**

**The difference is 1275 X 10 = 12750 / 6 days = 2125 ADU X 30 = 63,750 CCF a month. That is exactly what we estimated.**

Robert C Eckstein
Operating Supervisor
Revenue Protection
917-578-9858
718-904-4974

**conEdison**

# Customer Operations

**Data Sheet of Account :**

| | | | |
|---|---|---|---|
| Name: | B & M LINEN CORP | ATRA: | |
| Address: | 220 COSTER STRE FACT | Beginning AR Balance: | 0.00 |
| Account Number: | 39-3021-1037-0002 | From/To Date: | 12/30/2005 - 12/30/2011 |
| SC: | 920 | Method of Calculation: | Subsequent Consumption |
| Service: | GAS | | Cons Date 01/03/2012  Cons 00021600  Dmd 00000.00 |
| Tax: | F | | |
| Westch Muni: | 0 | | |
| % Residtl Use: | 0 | | |
| Gas Therm Zone: | 3 | | |

| Reading Date | T X | E Days | O SC | R SC | Original Consumption | Revised Consumption | Original Demand | Revised Demand | Original Bill | Revised Bill | Difference | LPC | Total Bill |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/30/11 | F | 25 | 920 | 0 | 5340 | 54000 | 0.00 | 0.00 | 2475.10 | 21734.61 | 19259.51 | 0.00 | 5219730.71 |
| 12/05/11 | F | 34 | 920 | 0 | 7050 | 73440 | 0.00 | 0.00 | 3270.81 | 31190.78 | 27919.97 | 76854.25 | 5200471.20 |
| 11/01/11 | F | 29 | 920 | 0 | 1590 | 62640 | 0.00 | 0.00 | 913.83 | 27794.92 | 26881.09 | 75305.87 | 5095696.98 |
| 10/03/11 | F | 32 | 920 | 0 | 6320 | 69120 | 0.00 | 0.00 | 3085.05 | 30946.02 | 27860.97 | 73795.71 | 4993510.02 |
| 09/01/11 | F | 29 | 920 | 0 | 5010 | 62640 | 0.00 | 0.00 | 2476.31 | 27822.53 | 25346.22 | 72293.40 | 4891853.34 |
| 08/03/11 | F | 29 | 920 | 0 | 8390 | 62640 | 0.00 | 0.00 | 3901.34 | 28015.99 | 24114.65 | 70850.45 | 4794213.72 |
| 07/05/11 | F | 32 | 920 | 0 | 7520 | 69120 | 0.00 | 0.00 | 3656.62 | 30233.74 | 26577.12 | 69447.02 | 4699248.62 |
| 06/03/11 | F | 30 | 920 | 0 | 5500 | 64800 | 0.00 | 0.00 | 2773.12 | 28230.30 | 25457.18 | 68027.95 | 4603224.47 |
| 05/04/11 | F | 29 | 920 | 0 | 4700 | 62640 | 0.00 | 0.00 | 2425.01 | 27370.58 | 24945.57 | 66646.39 | 4509739.35 |
| 04/05/11 | F | 61 | 920 | 0 | 8010 | 131760 | 0.00 | 0.00 | 4248.40 | 56833.76 | 52585.36 | 65292.82 | 4418147.38 |
| 02/03/11 | F | 30 | 920 | 0 | 2820 | 64800 | 0.00 | 0.00 | 1591.26 | 27728.64 | 26137.38 | 63550.78 | 4300269.20 |
| 01/04/11 | F | 32 | 920 | 0 | 6950 | 69120 | 0.00 | 0.00 | 3469.70 | 30545.75 | 27076.05 | 62225.34 | 4210581.05 |
| 12/03/10 | F | 32 | 920 | 0 | 6640 | 69120 | 0.00 | 0.00 | 3347.01 | 30675.75 | 27328.74 | 60905.61 | 4121279.86 |
| 11/01/10 | F | 31 | 920 | 0 | 1700 | 66960 | 0.00 | 0.00 | 1181.38 | 36701.53 | 35520.15 | 59601.65 | 4033045.31 |
| 10/01/10 | F | 30 | 920 | 0 | 13770 | 64800 | 0.00 | 0.00 | 6879.94 | 30169.35 | 23289.41 | 58195.91 | 3937923.50 |
| 09/01/10 | F | 29 | 920 | 0 | 10870 | 62640 | 0.00 | 0.00 | 6659.24 | 29235.83 | 22576.59 | 56991.70 | 3856438.18 |
| 08/03/10 | F | 32 | 920 | 0 | 5130 | 69120 | 0.00 | 0.00 | 2937.14 | 32398.77 | 29461.63 | 55815.81 | 3776869.89 |
| 07/02/10 | F | 29 | 920 | 0 | 6960 | 62640 | 0.00 | 0.00 | 3721.38 | 28857.42 | 25136.04 | 54555.55 | 3891592.45 |
| 06/03/10 | F | 30 | 920 | 0 | 7850 | 64800 | 0.00 | 0.00 | 4188.53 | 29640.56 | 25452.03 | 53377.85 | 3611900.86 |
| 05/04/10 | F | 28 | 920 | 0 | 6790 | 60480 | 0.00 | 0.00 | 3541.07 | 27191.99 | 23650.92 | 52212.87 | -3533070.98 |
| 04/06/10 | F | 29 | 920 | 0 | 8630 | 62640 | 0.00 | 0.00 | 4212.18 | 26804.52 | 22592.34 | 51091.73 | 3457207.19 |
| 03/08/10 | F | 32 | 920 | 0 | 9070 | 69120 | 0.00 | 0.00 | 4389.90 | 29206.17 | 24816.27 | 50002.80 | 3383523.12 |
| 02/04/10 | F | 30 | 920 | 0 | 5400 | 64800 | 0.00 | 0.00 | 2724.58 | 27209.84 | 24485.26 | 48897.10 | 3308704.05 |
| 01/05/10 | F | 32 | 920 | 0 | 6950 | 69120 | 0.00 | 0.00 | 3435.35 | 27659.06 | 24223.71 | 47812.64 | 3235321.68 |
| 12/04/09 | F | 32 | 920 | 0 | 6270 | 69120 | 0.00 | 0.00 | 4933.86 | 27286.98 | 22353.12 | 46748.06 | 3163285.34 |
| 11/02/09 | F | 31 | 920 | 0 | 9350 | 66960 | 0.00 | 0.00 | 3820.84 | 23258.32 | 19437.48 | 45726.86 | 3094184.16 |
| 10/02/09 | F | 30 | 920 | 0 | 5430 | 64800 | 0.00 | 0.00 | 3043.65 | 22792.10 | 19748.45 | 44763.84 | 3029019.82 |
| 09/02/09 | F | 29 | 920 | 0 | 18920 | 62640 | 0.00 | 0.00 | 7318.43 | 22063.00 | 14744.57 | 43810.46 | 2964507.53 |
| 08/04/09 | F | 29 | 920 | 0 | 4650 | 62640 | 0.00 | 0.00 | 1907.08 | 21349.37 | 19442.29 | 42945.11 | 2905952.50 |
| 07/06/09 | F | 32 | 920 | 0 | 7690 | 69120 | 0.00 | 0.00 | 2689.88 | 21080.19 | 18390.31 | 42023.13 | 2843565.10 |
| 06/04/09 | F | 30 | 920 | 0 | 11260 | 64800 | 0.00 | 0.00 | 3355.01 | 17579.27 | 14224.26 | 41130.32 | 2783151.66 |
| 05/05/09 | F | 29 | 920 | 0 | 7040 | 62640 | 0.00 | 0.00 | 2337.01 | 17670.89 | 15333.88 | 40312.27 | 2727797.08 |
| 04/06/09 | F | 31 | 920 | 0 | 8000 | 66960 | 0.00 | 0.00 | 2519.28 | 18267.32 | 15748.04 | 39489.92 | 2672150.93 |
| 03/06/09 | F | 30 | 920 | 0 | 7970 | 64800 | 0.00 | 0.00 | 2447.38 | 17328.95 | 14881.57 | 38673.59 | 2616912.97 |
| 02/04/09 | F | 26 | 920 | 0 | 3820 | 56160 | 0.00 | 0.00 | 1350.08 | 15552.26 | 14202.18 | 37882.14 | 2563357.81 |
| 01/09/09 | F | 35 | 920 | 0 | 11540 | 75600 | 0.00 | 0.00 | 3534.25 | 20806.53 | 17272.28 | 37112.42 | 2511273.50 |
| 12/05/08 | F | 20 | 920 | 0 | 18200 | 43200 | 0.00 | 0.00 | 5579.22 | 11958.72 | 6379.50 | 36308.70 | 2456888.80 |
| 11/15/08 | F | 22 | 920 | 0 | 18000 | 47520 | 0.00 | 0.00 | 5595.64 | 13290.30 | 7694.66 | 35677.84 | 2414200.60 |
| 10/24/08 | F | 22 | 920 | 0 | 5930 | 47520 | 0.00 | 0.00 | 1902.89 | 13395.96 | 11493.07 | 35036.87 | 2370828.10 |
| 10/02/08 | F | 22 | 920 | 0 | 5930 | 47520 | 0.00 | 0.00 | 1861.39 | 12458.80 | 10597.41 | 34349.23 | 2324298.16 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/10/08 | F | 8 | 920 | 0 | 2250 | 17280 | 0.00 | 0.00 | 696.87 | 4500.12 | 3803.25 | 33685.00 | 2279351.52 |
| 09/02/08 | F | 32 | 920 | 0 | 9010 | 69120 | 0.00 | 0.00 | 2858.00 | 18519.40 | 15661.40 | 33130.98 | 2241863.27 |
| 08/01/08 | F | 30 | 920 | 0 | 6200 | 64800 | 0.00 | 0.00 | 2009.10 | 16907.12 | 14898.02 | 32409.91 | 2193070.88 |
| 07/02/08 | F | 29 | 920 | 0 | 8100 | 62640 | 0.00 | 0.00 | 2518.38 | 16368.77 | 13850.39 | 31710.78 | 2145762.95 |
| 06/03/08 | F | 32 | 920 | 0 | 9500 | 69120 | 0.00 | 0.00 | 2803.36 | 17161.93 | 14358.57 | 31037.46 | 2100201.78 |
| 05/02/08 | F | 29 | 920 | 0 | 12830 | 62640 | 0.00 | 0.00 | 3442.92 | 14594.19 | 11151.27 | 30366.59 | 2054805.74 |
| 04/03/08 | F | 29 | 920 | 0 | 9700 | 62640 | 0.00 | 0.00 | 2625.63 | 14275.83 | 11650.20 | 29753.02 | 2013287.89 |
| 03/05/08 | F | 30 | 920 | 0 | 6440 | 64800 | 0.00 | 0.00 | 1793.56 | 14124.97 | 12331.41 | 29141.15 | 1971884.66 |
| 02/04/08 | F | 32 | 920 | 0 | 6440 | 69120 | 0.00 | 0.00 | 1793.17 | 14925.50 | 13132.33 | 28528.26 | 1930412.10 |
| 01/03/08 | F | 30 | 920 | 0 | 8110 | 64800 | 0.00 | 0.00 | 2149.40 | 14005.02 | 11855.62 | 27912.58 | 1888751.51 |
| 12/04/07 | F | 34 | 920 | 0 | 6400 | 73440 | 0.00 | 0.00 | 1845.32 | 16312.96 | 14467.64 | 27324.88 | 1848983.31 |
| 10/31/07 | F | 29 | 920 | 0 | 6120 | 62640 | 0.00 | 0.00 | 1985.69 | 16702.96 | 14717.27 | 26707.25 | 1807190.79 |
| 10/02/07 | F | 61 | 920 | 0 | 1719 | 131760 | 0.00 | 0.00 | 703.28 | 34677.88 | 33974.60 | 26095.07 | 1765766.27 |
| 08/02/07 | F | 30 | 920 | 0 | 326 | 64800 | 0.00 | 0.00 | 146.98 | 15694.36 | 15547.38 | 25207.34 | 1705696.60 |
| 07/03/07 | F | 29 | 920 | 0 | 620 | 62640 | 0.00 | 0.00 | 261.45 | 15838.25 | 15576.80 | 24605.05 | 1664941.88 |
| 06/04/07 | F | 32 | 920 | 0 | 950 | 69120 | 0.00 | 0.00 | 362.68 | 16729.24 | 16366.58 | 24011.23 | 1624780.03 |
| 05/03/07 | F | 33 | 920 | 0 | 1924 | 71280 | 0.00 | 0.00 | 693.06 | 17647.69 | 16954.63 | 23414.52 | 1584382.22 |
| 03/31/07 | F | 25 | 2 | 0 | 332 | 54000 | 0.00 | 0.00 | 588.49 | 85237.69 | 84649.20 | 22817.93 | 1544013.07 |
| 03/06/07 | F | 32 | 2 | 0 | 644 | 69120 | 0.00 | 0.00 | 1147.07 | 111811.01 | 110663.94 | 21229.74 | 1436545.94 |
| 02/02/07 | F | 30 | 2 | 0 | 604 | 84800 | 0.00 | 0.00 | 1000.52 | 96760.05 | 95759.53 | 19280.58 | 1304652.26 |
| 01/03/07 | F | 30 | 2 | 0 | 811 | 84800 | 0.00 | 0.00 | 1274.93 | 92387.25 | 91112.32 | 17580.48 | 1189612.16 |
| 12/04/06 | F | 34 | 2 | 0 | 640 | 73440 | 0.00 | 0.00 | 1006.27 | 103315.03 | 102308.76 | 15974.18 | 1080919.36 |
| 10/31/06 | F | 29 | 2 | 0 | 612 | 62640 | 0.00 | 0.00 | 800.60 | 71889.95 | 71089.35 | 14226.15 | 962636.42 |
| 10/02/06 | F | 32 | 2 | 0 | 902 | 69120 | 0.00 | 0.00 | 1255.58 | 86126.67 | 84871.09 | 12965.33 | 877320.92 |
| 08/31/06 | F | 29 | 2 | 0 | 373 | 62640 | 0.00 | 0.00 | 539.09 | 78145.54 | 77606.45 | 11519.48 | 779484.50 |
| 08/02/06 | F | 30 | 2 | 0 | 326 | 64800 | 0.00 | 0.00 | 474.87 | 80654.03 | 80179.16 | 10202.34 | 690358.57 |
| 07/03/06 | F | 31 | 2 | 0 | 780 | 66960 | 0.00 | 0.00 | 1214.72 | 94118.52 | 92903.80 | 8866.66 | 599977.07 |
| 06/02/06 | F | 30 | 2 | 0 | 641 | 64800 | 0.00 | 0.00 | 1019.91 | 92734.54 | 91714.63 | 7362.86 | 498206.61 |
| 05/03/06 | F | 28 | 2 | 0 | 970 | 60480 | 0.00 | 0.00 | 1550.63 | 88339.91 | 86789.28 | 5898.46 | 399129.32 |
| 04/05/06 | F | 29 | 2 | 0 | 386 | 62640 | 0.00 | 0.00 | 595.36 | 84443.95 | 83848.59 | 4528.69 | 306441.58 |
| 03/07/06 | F | 67 | 2 | 0 | 1823 | 144720 | 0.00 | 0.00 | 3012.34 | 217854.01 | 214841.67 | 3222.63 | 218064.30 |
| 12/30/05 | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| TOTALS | | 2191 | | | 410103 | 4678560 | | | 177394.25 | 2661407.10 | 2503272.36 | 2716458.35 | 5219730.71 |

220 Costec St

220 Costec St, when Contenles, when mottos the (Rancens

1-14-12

34 years -

12-30-2005 -     12-30-2011

lin r   of   2,503,272

4/0

**EXHIBIT 4**

**Site Name:**

**Site Id:** 0-416891

**Site Location:** 220 Costa st

220 Costa st

| Date | Time | Incremental Cor CFx1000 | Vacremental Use CFx1000 | Vaterval Avg Pressu PSIG | Interval Avg Temp F | Log Trigger |
|------|------|------|------|------|------|------|
| 11/21/2011 | 09:00:00 | 0 | 0 | 3.43 | 58.80 | Time |
| 11/21/2011 | 10:00:00 | 0 | 0 | 3.33 | 58.97 | Time |
| 11/21/2011 | 11:00:00 | 0 | 0 | 3.32 | 59.13 | Time |
| 11/21/2011 | 12:00:00 | 0 | 0 | 3.40 | 59.63 | Time |
| 11/21/2011 | 13:00:00 | 0 | 0 | 3.04 | 59.30 | Time |
| 11/21/2011 | 14:00:00 | 0 | 0 | 3.18 | 59.13 | Time |
| 11/21/2011 | 15:00:00 | 0 | 0 | 3.32 | 59.30 | Time |
| 11/21/2011 | 16:00:00 | 0 | 0 | 3.27 | 59.79 | Time |
| 11/21/2011 | 17:00:00 | 0 | 0 | 3.06 | 59.63 | Time |
| 11/21/2011 | 18:00:00 | 0 | 0 | 3.33 | 58.80 | Time |
| 11/21/2011 | 19:00:00 | 0 | 0 | 3.18 | 59.13 | Time |
| 11/21/2011 | 20:00:00 | 0 | 0 | 3.40 | 63.49 | Time |
| 11/21/2011 | 21:00:00 | 0 | 0 | 3.55 | 69.64 | Time |
| 11/21/2011 | 22:00:00 | 0 | 0 | 3.54 | 71.91 | Time |
| 11/21/2011 | 23:00:00 | 0 | 0 | 3.53 | 72.97 | Time |
| 11/22/2011 | 00:00:00 | 0 | 0 | 3.53 | 73.51 | Time |
| 11/22/2011 | 01:00:00 | 0 | 0 | 3.53 | 73.69 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/22/2011 | 02:00:00 | 0 | 0 | 3.53 | 73.87 | Time |
| 11/22/2011 | 03:00:00 | 0 | 0 | 3.53 | 73.69 | Time |
| 11/22/2011 | 04:00:00 | 0 | 0 | 3.12 | 60.13 | Time |
| 11/22/2011 | 05:00:00 | 0 | 0 | 3.31 | 59.30 | Time |
| 11/22/2011 | 06:00:00 | 0 | 0 | 3.06 | 58.47 | Time |
| 11/22/2011 | 07:00:00 | 0 | 0 | 3.30 | 58.47 | Time |
| 11/22/2011 | 08:00:00 | 0 | 0 | 3.29 | 57.98 | Time |
| 11/22/2011 | 09:00:00 | 0 | 0 | 3.37 | 57.81 | Time |
| 11/22/2011 | 10:00:00 | 0 | 0 | 3.40 | 58.14 | Time |
| 11/22/2011 | 11:00:00 | 0 | 0 | 3.14 | 57.98 | Time |
| 11/22/2011 | 12:00:00 | 0 | 0 | 3.09 | 58.30 | Time |
| 11/22/2011 | 13:00:00 | 0 | 0 | 3.07 | 58.14 | Time |
| 11/22/2011 | 14:00:00 | 0 | 0 | 3.15 | 56.99 | Time |
| 11/22/2011 | 15:00:00 | 0 | 0 | 3.10 | 57.81 | Time |
| 11/22/2011 | 16:00:00 | 0 | 0 | 3.40 | 58.47 | Time |
| 11/22/2011 | 17:00:00 | 0 | 0 | 3.14 | 58.14 | Time |
| 11/22/2011 | 18:00:00 | 0 | 0 | 3.35 | 61.79 | Time |
| 11/22/2011 | 19:00:00 | 0 | 0 | 3.33 | 64.33 | Time |
| 11/22/2011 | 20:00:00 | 0 | 0 | 3.59 | 67.55 | Time |
| 11/22/2011 | 21:00:00 | 0 | 0 | 3.55 | 69.29 | Time |
| 11/22/2011 | 22:00:00 | 0 | 0 | 3.55 | 69.98 | Time |
| 11/22/2011 | 23:00:00 | 0 | 0 | 3.55 | 70.33 | Time |
| 11/23/2011 | 00:00:00 | 0 | 0 | 3.55 | 70.33 | Time |
| 11/23/2011 | 01:00:00 | 0 | 0 | 3.55 | 70.15 | Time |

| Date | Time | | | | | |
|------|------|---|---|------|-------|------|
| 11/23/2011 | 02:00:00 | 0 | 0 | 3.54 | 70.15 | Time |
| 11/23/2011 | 03:00:00 | 0 | 0 | 3.55 | 69.98 | Time |
| 11/23/2011 | 04:00:00 | 0 | 0 | 3.11 | 58.30 | Time |
| 11/23/2011 | 05:00:00 | 0 | 0 | 3.38 | 57.65 | Time |
| 11/23/2011 | 06:00:00 | 0 | 0 | 3.10 | 57.48 | Time |
| 11/23/2011 | 07:00:00 | 0 | 0 | 3.15 | 56.96 | Time |
| 11/23/2011 | 08:00:00 | 0 | 0 | 3.11 | 56.99 | Time |
| 11/23/2011 | 09:00:00 | 0 | 0 | 3.35 | 57.32 | Time |
| 11/23/2011 | 10:00:00 | 0 | 0 | 3.33 | 57.15 | Time |
| 11/23/2011 | 11:00:00 | 0 | 0 | 3.37 | 57.15 | Time |
| 11/23/2011 | 12:00:00 | 0 | 0 | 3.38 | 57.65 | Time |
| 11/23/2011 | 13:00:00 | 0 | 0 | 3.05 | 57.16 | Time |
| 11/23/2011 | 14:00:00 | 0 | 0 | 3.15 | 57.98 | Time |
| 11/23/2011 | 15:00:00 | 0 | 0 | 3.15 | 57.15 | Time |
| 11/23/2011 | 16:00:00 | 0 | 0 | 3.32 | 57.81 | Time |
| 11/23/2011 | 17:00:00 | 0 | 0 | 3.35 | 60.29 | Time |
| 11/23/2011 | 18:00:00 | 0 | 0 | 3.22 | 61.46 | Time |
| 11/23/2011 | 19:00:00 | 0 | 0 | 3.37 | 61.13 | Time |
| 11/23/2011 | 20:00:00 | 0 | 0 | 3.56 | 63.49 | Time |
| 11/23/2011 | 21:00:00 | 0 | 0 | 3.55 | 65.02 | Time |
| 11/23/2011 | 22:00:00 | 0 | 0 | 3.55 | 65.52 | Time |
| 11/23/2011 | 23:00:00 | 0 | 0 | 3.55 | 65.52 | Time |
| 11/24/2011 | 00:00:00 | 0 | 0 | 3.55 | 65.52 | Time |

| | | | | | |
|---|---|---|---|---|---|
| 11/24/2011 | 01:00:00 | 0 | 0 | 3.54 | 65.52 | Time |
| 11/24/2011 | 02:00:00 | 0 | 0 | 3.54 | 65.35 | Time |
| 11/24/2011 | 03:00:00 | 0 | 0 | 3.55 | 65.02 | Time |
| 11/24/2011 | 04:00:00 | 0 | 0 | 3.36 | 56.82 | Time |
| 11/24/2011 | 05:00:00 | 0 | 0 | 3.38 | 55.84 | Time |
| 11/24/2011 | 06:00:00 | 0 | 0 | 3.07 | 55.84 | Time |
| 11/24/2011 | 07:00:00 | 0 | 0 | 3.37 | 55.68 | Time |
| 11/24/2011 | 08:00:00 | 0 | 0 | 2.98 | 56.01 | Time |
| 11/24/2011 | 09:00:00 | 0 | 0 | 3.39 | 56.66 | Time |
| 11/24/2011 | 10:00:00 | 0 | 0 | 3.12 | 57.32 | Time |
| 11/24/2011 | 11:00:00 | 0 | 0 | 3.09 | 57.81 | Time |
| 11/24/2011 | 12:00:00 | 0 | 0 | 3.13 | 58.64 | Time |
| 11/24/2011 | 13:00:00 | 0 | 0 | 3.25 | 58.47 | Time |
| 11/24/2011 | 14:00:00 | 0 | 0 | 3.26 | 58.97 | Time |
| 11/24/2011 | 15:00:00 | 0 | 0 | 3.10 | 58.97 | Time |
| 11/24/2011 | 16:00:00 | 0 | 0 | 3.55 | 67.73 | Time |
| 11/24/2011 | 17:00:00 | 0 | 0 | 3.54 | 71.55 | Time |
| 11/24/2011 | 18:00:00 | 0 | 0 | 3.53 | 72.79 | Time |
| 11/24/2011 | 19:00:00 | 0 | 0 | 3.53 | 73.33 | Time |
| 11/24/2011 | 20:00:00 | 0 | 0 | 3.53 | 73.51 | Time |
| 11/24/2011 | 21:00:00 | 0 | 0 | 3.53 | 73.51 | Time |
| 11/24/2011 | 22:00:00 | 0 | 0 | 3.53 | 73.33 | Time |
| 11/24/2011 | 23:00:00 | 0 | 0 | 3.54 | 72.97 | Time |
| 11/25/2011 | 00:00:00 | 0 | 0 | 3.54 | 72.61 | Time |

| | | | | | |
|---|---|---|---|---|---|
| 11/25/2011 | 01:00:00 | 0 | 0 | 3.56 | 72.26 | Time |
| 11/25/2011 | 02:00:00 | 0 | 0 | 3.56 | 71.73 | Time |
| 11/25/2011 | 03:00:00 | 0 | 0 | 3.57 | 71.32 | Time |
| 11/25/2011 | 04:00:00 | 0 | 0 | 3.21 | 58.17 | Time |
| 11/25/2011 | 05:00:00 | 0 | 0 | 3.36 | 57.32 | Time |
| 11/25/2011 | 06:00:00 | 0 | 0 | 3.05 | 56.50 | Time |
| 11/25/2011 | 07:00:00 | 0 | 0 | 3.14 | 56.82 | Time |
| 11/25/2011 | 08:00:00 | 0 | 0 | 3.13 | 57.65 | Time |
| 11/25/2011 | 09:00:00 | 0 | 0 | 3.18 | 57.48 | Time |
| 11/25/2011 | 10:00:00 | 0 | 0 | 3.31 | 58.80 | Time |
| 11/25/2011 | 11:00:00 | 0 | 0 | 3.07 | 58.64 | Time |
| 11/25/2011 | 12:00:00 | 0 | 0 | 3.36 | 59.63 | Time |
| 11/25/2011 | 13:00:00 | 0 | 0 | 3.36 | 59.46 | Time |
| 11/25/2011 | 14:00:00 | 0 | 0 | 3.12 | 59.46 | Time |
| 11/25/2011 | 15:00:00 | 0 | 0 | 3.10 | 60.44 | Time |
| 11/25/2011 | 16:00:00 | 0 | 0 | 3.29 | 60.87 | Time |
| 11/25/2011 | 17:00:00 | 0 | 0 | 3.47 | 61.63 | Time |
| 11/25/2011 | 18:00:00 | 0 | 0 | 3.40 | 60.96 | Time |
| 11/25/2011 | 19:00:00 | 0 | 0 | 3.35 | 65.86 | Time |
| 11/25/2011 | 20:00:00 | 0 | 0 | 3.53 | 72.61 | Time |
| 11/25/2011 | 21:00:00 | 0 | 0 | 3.52 | 74.55 | Time |
| 11/25/2011 | 22:00:00 | 0 | 0 | 3.52 | 75.31 | Time |
| 11/25/2011 | 23:00:00 | 0 | 0 | 3.52 | 75.50 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/26/2011 | 00:00:00 | 0 | 0 | 3.52 | 75.35 | Time |
| 11/26/2011 | 01:00:00 | 0 | 0 | 3.52 | 75.31 | Time |
| 11/26/2011 | 02:00:00 | 0 | 0 | 3.52 | 74.95 | Time |
| 11/26/2011 | 03:00:00 | 0 | 0 | 3.52 | 74.59 | Time |
| 11/26/2011 | 04:00:00 | 0 | 0 | 3.25 | 58.47 | Time |
| 11/26/2011 | 05:00:00 | 0 | 0 | 3.09 | 57.65 | Time |
| 11/26/2011 | 06:00:00 | 0 | 0 | 3.28 | 55.19 | Time |
| 11/26/2011 | 07:00:00 | 0 | 0 | 3.19 | 57.65 | Time |
| 11/26/2011 | 08:00:00 | 0 | 0 | 3.08 | 57.65 | Time |
| 11/26/2011 | 09:00:00 | 0 | 0 | 3.11 | 57.98 | Time |
| 11/26/2011 | 10:00:00 | 0 | 0 | 3.16 | 59.81 | Time |
| 11/26/2011 | 11:00:00 | 0 | 0 | 3.08 | 59.46 | Time |
| 11/26/2011 | 12:00:00 | 0 | 0 | 3.17 | 59.79 | Time |
| 11/26/2011 | 13:00:00 | 0 | 0 | 3.07 | 59.30 | Time |
| 11/26/2011 | 14:00:00 | 0 | 0 | 3.06 | 59.46 | Time |
| 11/26/2011 | 15:00:00 | 0 | 0 | 3.11 | 60.46 | Time |
| 11/26/2011 | 16:00:00 | 0 | 0 | 3.10 | 60.96 | Time |
| 11/26/2011 | 17:00:00 | 0 | 0 | 3.25 | 60.79 | Time |
| 11/26/2011 | 18:00:00 | 0 | 0 | 3.32 | 61.96 | Time |
| 11/26/2011 | 19:00:00 | 0 | 0 | 3.33 | 68.25 | Time |
| 11/26/2011 | 20:00:00 | 0 | 0 | 3.30 | 67.38 | Time |
| 11/26/2011 | 21:00:00 | 0 | 0 | 3.55 | 73.69 | Time |
| 11/26/2011 | 22:00:00 | 0 | 0 | 3.54 | 75.50 | Time |
| 11/26/2011 | 23:00:00 | 0 | 0 | 3.53 | 76.40 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/27/2011 | 00:00:00 | . | 0 | 0 | 3.53 | 76.40 | Time |
| 11/27/2011 | 01:00:00 | | 0 | 0 | 3.53 | 76.40 | Time |
| 11/27/2011 | 02:00:00 | | 0 | 0 | 3.53 | 76.04 | Time |
| 11/27/2011 | 03:00:00 | | 0 | 0 | 3.53 | 75.57 | Time |
| 11/27/2011 | 04:00:00 | | 0 | 0 | 3.15 | 59.46 | Time |
| 11/27/2011 | 05:00:00 | | 0 | 0 | 3.05 | 57.65 | Time |
| 11/27/2011 | 06:00:00 | | 0 | 0 | 3.06 | 57.32 | Time |
| 11/27/2011 | 07:00:00 | | 0 | 0 | 3.19 | 57.32 | Time |
| 11/27/2011 | 08:00:00 | | 0 | 0 | 3.10 | 58.14 | Time |
| 11/27/2011 | 09:00:00 | | 0 | 0 | 3.05 | 57.98 | Time |
| 11/27/2011 | 10:00:00 | | 0 | 0 | 3.10 | 58.47 | Time |
| 11/27/2011 | 11:00:00 | | 0 | 0 | 3.13 | 58.47 | Time |
| 11/27/2011 | 12:00:00 | | 0 | 0 | 3.20 | 58.30 | Time |
| 11/27/2011 | 13:00:00 | | 0 | 0 | 3.05 | 59.13 | Time |
| 11/27/2011 | 14:00:00 | | 0 | 0 | 3.15 | 58.97 | Time |
| 11/27/2011 | 15:00:00 | | 0 | 0 | 3.16 | 58.80 | Time |
| 11/27/2011 | 16:00:00 | | 0 | 0 | 3.39 | 59.63 | Time |
| 11/27/2011 | 17:00:00 | | 0 | 0 | 3.17 | 59.13 | Time |
| 11/27/2011 | 18:00:00 | | 0 | 0 | 3.30 | 63.15 | Time |
| 11/27/2011 | 19:00:00 | | 0 | 0 | 3.27 | 65.19 | Time |
| 11/27/2011 | 20:00:00 | | 0 | 0 | 3.26 | 66.70 | Time |
| 11/27/2011 | 21:00:00 | | 0 | 0 | 3.55 | 70.67 | Time |
| 11/27/2011 | 22:00:00 | | 0 | 0 | 3.54 | 72.53 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/27/2011 | 23:00:00 | 0 | 0 | 3.54 | 72.79 | Time |
| 11/28/2011 | 00:00:00 | 0 | 0 | 3.54 | 72.79 | Time |
| 11/28/2011 | 01:00:00 | 0 | 0 | 3.53 | 72.43 | Time |
| 11/28/2011 | 02:00:00 | 0 | 0 | 3.53 | 72.26 | Time |
| 11/28/2011 | 03:00:00 | 0 | 0 | 3.58 | 71.91 | Time |
| 11/28/2011 | 04:00:00 | 0 | 0 | 3.32 | 60.13 | Time |
| 11/28/2011 | 05:00:00 | 0 | 0 | 3.33 | 57.81 | Time |
| 11/28/2011 | 06:00:00 | 0 | 0 | 3.12 | 57.48 | Time |
| 11/28/2011 | 07:00:00 | 0 | 0 | 3.15 | 57.32 | Time |
| 11/28/2011 | 08:00:00 | 0 | 0 | 3.29 | 57.48 | Time |
| 11/28/2011 | 09:00:00 | 0 | 0 | 3.26 | 56.99 | Time |
| 11/28/2011 | 10:00:00 | 0 | 0 | 3.34 | 59.30 | Time |
| 11/28/2011 | 11:00:00 | 0 | 0 | 3.36 | 58.14 | Time |
| 11/28/2011 | 12:00:00 | 0 | 0 | 3.14 | 58.30 | Time |
| 11/28/2011 | 13:00:00 | 0 | 0 | .308 | 58.94 | Time |
| 11/28/2011 | 14:00:00 | 0 | 0 | 3.35 | 58.28 | Time |
| 11/28/2011 | 15:00:00 | 0 | 0 | 3.11 | 58.80 | Time |
| 11/28/2011 | 16:00:00 | 0 | 0 | 3.16 | 58.97 | Time |
| 11/28/2011 | 17:00:00 | 0 | 0 | 3.42 | 58.64 | Time |
| 11/28/2011 | 18:00:00 | 0 | 0 | 3.37 | 59.13 | Time |
| 11/28/2011 | 19:00:00 | 0 | 0 | 3.07 | 59.79 | Time |
| 11/28/2011 | 20:00:00 | 0 | 0 | 3.31 | 63.31 | Time |
| 11/28/2011 | 21:00:00 | 0 | 0 | 3.40 | 66.20 | Time |
| 11/28/2011 | 22:00:00 | 0 | 0 | 3.62 | 69.12 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/28/2011 | 23:00:00 | 0 | 0 | 3.55 | 72.97 | Time |
| 11/29/2011 | 00:00:00 | 0 | 0 | 3.54 | 74.41 | Time |
| 11/29/2011 | 01:00:00 | 0 | 0 | 3.54 | 74.95 | Time |
| 11/29/2011 | 02:00:00 | 0 | 0 | 3.53 | 75.31 | Time |
| 11/29/2011 | 03:00:00 | 0 | 0 | 3.53 | 75.33 | Time |
| 11/29/2011 | 04:00:00 | 0 | 0 | 3.13 | 60.29 | Time |
| 11/29/2011 | 05:00:00 | 0 | 0 | 3.12 | 58.47 | Time |
| 11/29/2011 | 06:00:00 | 0 | 0 | 3.20 | 58.14 | Time |
| 11/29/2011 | 07:00:00 | 0 | 0 | 3.29 | 58.14 | Time |
| 11/29/2011 | 08:00:00 | 0 | 0 | 3.41 | 58.14 | Time |
| 11/29/2011 | 09:00:00 | 0 | 0 | 3.12 | 58.14 | Time |
| 11/29/2011 | 10:00:00 | 0 | 0 | 3.08 | 58.97 | Time |
| 11/29/2011 | 11:00:00 | 0 | 0 | 3.21 | 58.47 | Time |
| 11/29/2011 | 12:00:00 | 0 | 0 | 3.17 | 59.46 | Time |
| 11/29/2011 | 13:00:00 | 0 | 0 | 3.39 | 58.80 | Time |
| 11/29/2011 | 14:00:00 | 0 | 0 | 3.09 | 58.97 | Time |
| 11/29/2011 | 15:00:00 | 0 | 0 | 3.36 | 58.80 | Time |
| 11/29/2011 | 16:00:00 | 0 | 0 | 3.33 | 59.30 | Time |
| 11/29/2011 | 17:00:00 | 0 | 0 | 3.38 | 58.64 | Time |
| 11/29/2011 | 18:00:00 | 0 | 0 | 3.36 | 59.46 | Time |
| 11/29/2011 | 19:00:00 | 0 | 0 | 3.43 | 63.31 | Time |
| 11/29/2011 | 20:00:00 | 0 | 0 | 3.55 | 69.46 | Time |
| 11/29/2011 | 21:00:00 | 0 | 0 | 3.54 | 70.85 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/29/2011 | 22:00:00 | 0 | 0 | 3.54 | 71.20 | Time |
| 11/29/2011 | 23:00:00 | 0 | | 3.54 | 70.85 | Time |
| 11/30/2011 | 00:00:00 | 0 | | 3.54 | 70.33 | Time |
| 11/30/2011 | 01:00:00 | 0 | | 3.55 | 69.64 | Time |
| 11/30/2011 | 02:00:00 | 0 | | 3.56 | 68.94 | Time |
| 11/30/2011 | 03:00:00 | 0 | | 3.57 | 68.42 | Time |
| 11/30/2011 | 04:00:00 | 0 | | 3.36 | 57.48 | Time |
| 11/30/2011 | 05:00:00 | 0 | | 3.08 | 57.14 | Time |
| 11/30/2011 | 06:00:00 | 0 | | 3.38 | 56.99 | Time |
| 11/30/2011 | 07:00:00 | 0 | | 3.16 | 56.82 | Time |
| 11/30/2011 | 08:00:00 | 0 | | 3.10 | 57.32 | Time |
| 11/30/2011 | 09:00:00 | 0 | | 3.41 | 57.65 | Time |
| 11/30/2011 | 10:00:00 | 0 | | 3.30 | 57.98 | Time |
| 11/30/2011 | 11:00:00 | 0 | | 3.14 | 57.48 | Time |
| 11/30/2011 | 12:00:00 | 0 | | 3.30 | 57.81 | Time |
| 11/30/2011 | 13:00:00 | 0 | | 3.40 | 57.48 | Time |
| 11/30/2011 | 14:00:00 | 0 | | 3.14 | 57.32 | Time |
| 11/30/2011 | 15:00:00 | 0 | | 3.37 | 57.81 | Time |
| 11/30/2011 | 16:00:00 | 0 | | 3.27 | 60.96 | Time |
| 11/30/2011 | 17:00:00 | 0 | | 3.52 | 63.82 | Time |
| 11/30/2011 | 18:00:00 | 0 | | 3.27 | 62.64 | Time |
| 11/30/2011 | 19:00:00 | 0 | | 3.34 | 63.15 | Time |
| 11/30/2011 | 20:00:00 | 0 | | 3.54 | 67.38 | Time |
| 11/30/2011 | 21:00:00 | 0 | 0 | 3.54 | 68.60 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 11/30/2011 | 22:00:00 | 0 | 0 | 3.54 | 68.94 | Time |
| 11/30/2011 | 23:00:00 | 0 | 0 | 3.53 | 68.94 | Time |
| 12/1/2011 | 00:00:00 | 0 | 0 | 3.54 | 68.77 | Time |
| 12/1/2011 | 01:00:00 | 0 | 0 | 3.54 | 68.42 | Time |
| 12/1/2011 | 02:00:00 | 0 | 0 | 3.54 | 67.90 | Time |
| 12/1/2011 | 03:00:00 | 0 | 0 | 3.55 | 67.21 | Time |
| 12/1/2011 | 04:00:00 | 0 | 0 | 3.11 | 56.91 | Time |
| 12/1/2011 | 05:00:00 | 0 | 0 | 3.11 | 55.68 | Time |
| 12/1/2011 | 06:00:00 | 0 | 0 | 3.42 | 55.52 | Time |
| 12/1/2011 | 07:00:00 | 0 | 0 | 3.08 | 56.17 | Time |
| 12/1/2011 | 08:00:00 | 0 | 0 | 3.13 | 56.50 | Time |
| 12/1/2011 | 09:00:00 | 0 | 0 | 3.16 | 57.32 | Time |
| 12/1/2011 | 10:00:00 | 0 | 0 | 3.12 | 58.30 | Time |
| 12/1/2011 | 11:00:00 | 0 | 0 | 3.32 | 58.14 | Time |
| 12/1/2011 | 12:00:00 | 0 | 0 | 3.08 | 58.14 | Time |
| 12/1/2011 | 13:00:00 | 0 | 0 | 3.08 | 58.80 | Time |
| 12/1/2011 | 14:00:00 | 0 | 0 | 3.07 | 58.80 | Time |
| 12/1/2011 | 15:00:00 | 0 | 0 | 3.31 | 59.13 | Time |
| 12/1/2011 | 16:00:00 | 0 | 0 | 3.15 | 59.46 | Time |
| 12/1/2011 | 17:00:00 | 0 | 0 | 3.10 | 59.79 | Time |
| 12/1/2011 | 18:00:00 | 0 | 0 | 3.09 | 59.13 | Time |
| 12/1/2011 | 19:00:00 | 0 | 0 | 3.30 | 61.96 | Time |
| 12/1/2011 | 20:00:00 | 0 | 0 | 3.55 | 68.94 | Time |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/1/2011 | 21:00:00 | 0 | 0 | 3.94 | 71.55 | Time |
| 12/1/2011 | 22:00:00 | 0 | 0 | 3.54 | 72.79 | Time |
| 12/1/2011 | 23:00:00 | 0 | 0 | 3.53 | 73.15 | Time |
| 12/2/2011 | 00:00:00 | 0 | 0 | 3.53 | 73.15 | Time |
| 12/2/2011 | 01:00:00 | 0 | 0 | 3.53 | 72.97 | Time |
| 12/2/2011 | 02:00:00 | 0 | 0 | 3.53 | 72.61 | Time |
| 12/2/2011 | 03:00:00 | 0 | 0 | 3.54 | 72.08 | Time |
| 12/2/2011 | 04:00:00 | 0 | 0 | 3.11 | 57.65 | Time |
| 12/2/2011 | 05:00:00 | 0 | 0 | 3.08 | 56.82 | Time |
| 12/2/2011 | 06:00:00 | 0 | 0 | 3.13 | 56.50 | Time |
| 12/2/2011 | 07:00:00 | 0 | 0 | 3.13 | 57.14 | Time |
| 12/2/2011 | 08:00:00 | 0 | 0 | 3.36 | 57.45 | Time |
| 12/2/2011 | 09:00:00 | 0 | 0 | 3.09 | 57.32 | Time |
| 12/2/2011 | 10:00:00 | 0 | 0 | 3.09 | 57.65 | Time |
| 12/2/2011 | 11:00:00 | 0 | 0 | 3.35 | 58.14 | Time |
| 12/2/2011 | 12:00:00 | 0 | 0 | 3.31 | 58.80 | Time |
| 12/2/2011 | 13:00:00 | 0 | 0 | 3.04 | 57.81 | Time |
| 12/2/2011 | 14:00:00 | 0 | 0 | 3.06 | 57.50 | Time |
| 12/2/2011 | 15:00:00 | 0 | 0 | 3.16 | 57.65 | Time |
| 12/2/2011 | 16:00:00 | 0 | 0 | 3.67 | 60.96 | Time |
| 12/2/2011 | 17:00:00 | 0 | 0 | 3.31 | 58.64 | Time |
| 12/2/2011 | 18:00:00 | 0 | 0 | 3.13 | 58.14 | Time |
| 12/2/2011 | 19:00:00 | 0 | 0 | 3.39 | 60.13 | Time |
| 12/2/2011 | 20:00:00 | 0 | 0 | 3.25 | 58.97 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/2/2011 | 21:00:00 | 0 | 0 | 3.30 | 60.14 | Time |
| 12/2/2011 | 22:00:00 | 0 | 0 | 3.54 | 66.53 | Time |
| 12/2/2011 | 23:00:00 | 0 | 0 | 3.53 | 69.29 | Time |
| 12/3/2011 | 00:00:00 | 0 | 0 | 3.53 | 70.15 | Time |
| 12/3/2011 | 01:00:00 | 0 | 0 | 3.53 | 70.50 | Time |
| 12/3/2011 | 02:00:00 | 0 | 0 | 3.53 | 70.49 | Time |
| 12/3/2011 | 03:00:00 | 0 | 0 | 3.53 | 70.15 | Time |
| 12/3/2011 | 04:00:00 | 0 | 0 | 3.23 | 57.48 | Time |
| 12/3/2011 | 05:00:00 | 0 | 0 | 3.19 | 56.82 | Time |
| 12/3/2011 | 06:00:00 | 0 | 0 | 3.15 | 55.36 | Time |
| 12/3/2011 | 07:00:00 | 0 | 0 | 3.08 | 55.84 | Time |
| 12/3/2011 | 08:00:00 | 0 | 0 | 3.44 | 56.33 | Time |
| 12/3/2011 | 09:00:00 | 0 | 0 | 3.15 | 56.66 | Time |
| 12/3/2011 | 10:00:00 | 0 | 0 | 3.39 | 57.32 | Time |
| 12/3/2011 | 11:00:00 | 0 | 0 | 3.11 | 57.48 | Time |
| 12/3/2011 | 12:00:00 | 0 | 0 | 3.10 | 57.65 | Time |
| 12/3/2011 | 13:00:00 | 0 | 0 | 3.12 | 57.98 | Time |
| 12/3/2011 | 14:00:00 | 0 | 0 | 3.17 | 57.98 | Time |
| 12/3/2011 | 15:00:00 | 0 | 0 | 3.10 | 57.98 | Time |
| 12/3/2011 | 16:00:00 | 0 | 0 | 3.38 | 57.65 | Time |
| 12/3/2011 | 17:00:00 | 0 | 0 | 3.13 | 57.48 | Time |
| 12/3/2011 | 18:00:00 | 0 | 0 | 3.38 | 60.13 | Time |
| 12/3/2011 | 19:00:00 | 0 | 0 | 3.30 | 64.00 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/5/2011 | 20:00:00 | 0 | 0 | 3.40 | 62.81 | Time |
| 12/3/2011 | 21:00:00 | 0 | 0 | 3.55 | 68.94 | Time |
| 12/3/2011 | 22:00:00 | 0 | 0 | 3.54 | 69.98 | Time |
| 12/3/2011 | 23:00:00 | 0 | 0 | 3.54 | 70.67 | Time |
| 12/4/2011 | 00:00:00 | 0 | 0 | 3.53 | 70.85 | Time |
| 12/4/2011 | 01:00:00 | 0 | 0 | 3.53 | 70.67 | Time |
| 12/4/2011 | 02:00:00 | 0 | 0 | 3.53 | 70.46 | Time |
| 12/4/2011 | 03:00:00 | 0 | 0 | 3.54 | 70.15 | Time |
| 12/4/2011 | 04:00:00 | 0 | 0 | 2.90 | 55.68 | Time |
| 12/4/2011 | 05:00:00 | 0 | 0 | 3.23 | 54.87 | Time |
| 12/4/2011 | 06:00:00 | 0 | 0 | 3.10 | 54.55 | Time |
| 12/4/2011 | 07:00:00 | 0 | 0 | 3.42 | 54.55 | Time |
| 12/4/2011 | 08:00:00 | 0 | 0 | 3.04 | 54.98 | Time |
| 12/4/2011 | 09:00:00 | 0 | 0 | 3.39 | 55.19 | Time |
| 12/4/2011 | 10:00:00 | 0 | 0 | 3.22 | 55.70 | Time |
| 12/4/2011 | 11:00:00 | 0 | 0 | 3.41 | 55.36 | Time |
| 12/4/2011 | 12:00:00 | 0 | 0 | 3.31 | 56.17 | Time |
| 12/4/2011 | 13:00:00 | 0 | 0 | 3.11 | 55.84 | Time |
| 12/4/2011 | 14:00:00 | 0 | 0 | 3.08 | 55.36 | Time |
| 12/4/2011 | 15:00:00 | 0 | 0 | 3.05 | 55.84 | Time |
| 12/4/2011 | 16:00:00 | 0 | 0 | 3.06 | 56.16 | Time |
| 12/4/2011 | 17:00:00 | 0 | 0 | 3.26 | 56.50 | Time |
| 12/4/2011 | 18:00:00 | 0 | 0 | 3.13 | 57.81 | Time |
| 12/4/2011 | 19:00:00 | 2 | 1 | 3.55 | 60.96 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/4/2011 | 20:00:00 | | 0 | 3.54 | 68.60 | Time |
| 12/4/2011 | 21:00:00 | | 0 | 3.53 | 69.81 | Time |
| 12/4/2011 | 22:00:00 | 0 | 0 | 3.53 | 70.50 | Time |
| 12/4/2011 | 23:00:00 | 0 | 0 | 3.53 | 71.02 | Time |
| 12/5/2011 | 00:00:00 | 0 | 0 | 3.53 | 71.20 | Time |
| 12/5/2011 | 01:00:00 | 0 | 0 | 3.53 | 71.20 | Time |
| 12/5/2011 | 02:00:00 | 0 | 0 | 3.53 | 71.20 | Time |
| 12/5/2011 | 03:00:00 | 0 | 0 | 3.53 | 71.02 | Time |
| 12/5/2011 | 04:00:00 | 14 | 12 | 3.02 | 58.65 | Time |
| 12/5/2011 | 05:00:00 | 12 | 10 | 3.15 | 56.27 | Time |
| 12/5/2011 | 06:00:00 | 14 | 11 | 3.13 | 55.71 | Time |
| 12/5/2011 | 07:00:00 | 14 | 12 | 3.14 | 55.34 | Time |
| 12/5/2011 | 08:00:00 | 15 | 12 | 3.13 | 55.36 | Time |
| 12/5/2011 | 09:00:00 | 15 | 12 | 3.19 | 55.22 | Time |
| 12/5/2011 | 10:00:00 | 15 | 12 | 3.20 | 55.28 | Time |
| 12/5/2011 | 11:00:00 | 12 | 10 | 3.22 | 55.71 | Time |
| 12/5/2011 | 12:00:00 | 15 | 12 | 3.21 | 55.86 | Time |
| 12/5/2011 | 13:00:00 | 13 | 11 | 3.18 | 55.86 | Time |
| 12/5/2011 | 14:00:00 | 15 | 12 | 3.15 | 55.88 | Time |
| 12/5/2011 | 15:00:00 | 13 | 11 | 3.14 | 55.89 | Time |
| 12/5/2011 | 16:00:00 | 14 | 11 | 3.16 | 55.98 | Time |
| 12/5/2011 | 17:00:00 | 12 | 10 | 3.16 | 55.89 | Time |
| 12/5/2011 | 18:00:00 | 15 | 12 | 3.11 | 55.63 | Time |

| Date | Time | | | | | Time |
|---|---|---|---|---|---|---|
| 12/5/2011 | 19:00:00 | 10 | 8 | 3.19 | 56.43 | Time |
| 12/5/2011 | 20:00:00 | 7 | 6 | 3.26 | 57.98 | Time |
| 12/5/2011 | 21:00:00 | 5 | 4 | 3.32 | 59.59 | Time |
| 12/5/2011 | 22:00:00 | 1 | 1 | 3.30 | 61.13 | Time |
| 12/5/2011 | 23:00:00 | 0 | 1 | 3.53 | 69.81 | Time |
| 12/6/2011 | 00:00:00 | 0 | 0 | 3.53 | 70.85 | Time |
| 12/6/2011 | 01:00:00 | 0 | 0 | 3.52 | 71.20 | Time |
| 12/6/2011 | 02:00:00 | 0 | 0 | 3.53 | 71.38 | Time |
| 12/6/2011 | 03:00:00 | 0 | 0 | 3.53 | 71.55 | Time |
| 12/6/2011 | 04:00:00 | 13 | 11 | 3.08 | 60.50 | Time |
| 12/6/2011 | 05:00:00 | 14 | 11 | 3.15 | 56.74 | Time |
| 12/6/2011 | 06:00:00 | 13 | 11 | 3.13 | 56.02 | Time |
| 12/6/2011 | 07:00:00 | 15 | 12 | 3.13 | 55.86 | Time |
| 12/6/2011 | 08:00:00 | 13 | 11 | 3.15 | 55.93 | Time |
| 12/6/2011 | 09:00:00 | 15 | 12 | 3.13 | 56.02 | Time |
| 12/6/2011 | 10:00:00 | 12 | 10 | 3.18 | 56.33 | Time |
| 12/6/2011 | 11:00:00 | 14 | 11 | 3.16 | 56.30 | Time |
| 12/6/2011 | 12:00:00 | 12 | 10 | 3.17 | 56.44 | Time |
| 12/6/2011 | 13:00:00 | 13 | 11 | 3.18 | 56.49 | Time |
| 12/6/2011 | 14:00:00 | 15 | 12 | 3.17 | 56.17 | Time |
| 12/6/2011 | 15:00:00 | 14 | 11 | 3.14 | 56.23 | Time |
| 12/6/2011 | 16:00:00 | 13 | 11 | 3.17 | 56.17 | Time |
| 12/6/2011 | 17:00:00 | 12 | 10 | 3.19 | 56.66 | Time |
| 12/6/2011 | 18:00:00 | 13 | 10 | 3.29 | 56.85 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/6/2011 | 19:00:00 | 9 | 8 | 3.22 | 57.24 | Time |
| 12/6/2011 | 20:00:00 | 6 | 5 | 3.16 | 58.24 | Time |
| 12/6/2011 | 21:00:00 | 2 | 1 | 3.09 | 61.96 | Time |
| 12/6/2011 | 22:00:00 | 0 | 0 | 3.53 | 69.98 | Time |
| 12/6/2011 | 23:00:00 | 0 | 0 | 3.52 | 71.02 | Time |
| 12/7/2011 | 00:00:00 | 0 | 0 | 3.52 | 71.73 | Time |
| 12/7/2011 | 01:00:00 | 0 | 0 | 3.52 | 72.43 | Time |
| 12/7/2011 | 02:00:00 | 0 | 0 | 3.53 | 72.79 | Time |
| 12/7/2011 | 03:00:00 | 0 | 0 | 3.51 | 72.97 | Time |
| 12/7/2011 | 04:00:00 | 0 | 0 | 3.36 | 57.15 | Time |
| 12/7/2011 | 05:00:00 | 0 | 0 | 3.09 | 57.48 | Time |
| 12/7/2011 | 06:00:00 | 0 | 0 | 3.17 | 56.33 | Time |
| 12/7/2011 | 07:00:00 | 0 | 0 | 3.35 | 56.50 | Time |
| 12/7/2011 | 08:00:00 | 0 | 0 | 3.20 | 56.01 | Time |
| 12/7/2011 | 09:00:00 | 0 | 0 | 3.36 | 56.01 | Time |
| 12/7/2011 | 10:00:00 | 0 | 0 | 3.08 | 56.66 | Time |
| 12/7/2011 | 11:00:00 | 0 | 0 | 3.13 | 56.50 | Time |
| 12/7/2011 | 12:00:00 | 0 | 0 | 3.17 | 56.50 | Time |
| 12/7/2011 | 13:00:00 | 0 | 0 | 3.16 | 56.33 | Time |
| 12/7/2011 | 14:00:00 | 0 | 0 | 3.11 | 56.17 | Time |
| 12/7/2011 | 15:00:00 | 0 | 0 | 3.45 | 56.66 | Time |
| 12/7/2011 | 16:00:00 | 0 | 0 | 3.41 | 57.17 | Time |
| 12/7/2011 | 17:00:00 | 0 | 0 | 3.13 | 56.90 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/7/2011 | 18:00:00 | 0 | 0 | 3.40 | 56.82 | Time |
| 12/7/2011 | 19:00:00 | 0 | 0 | 3.33 | 58.97 | Time |
| 12/7/2011 | 20:00:00 | 0 | 0 | 3.56 | 64.51 | Time |
| 12/7/2011 | 21:00:00 | 0 | 0 | 3.55 | 66.87 | Time |
| 12/7/2011 | 22:00:00 | 0 | 0 | 3.54 | 67.90 | Time |
| 12/7/2011 | 23:00:00 | 0 | 0 | 3.54 | 68.58 | Time |
| 12/8/2011 | 00:00:00 | 0 | 0 | 3.54 | 68.60 | Time |
| 12/8/2011 | 01:00:00 | 0 | 0 | 3.54 | 68.42 | Time |
| 12/8/2011 | 02:00:00 | 0 | 0 | 3.54 | 68.25 | Time |
| 12/8/2011 | 03:00:00 | 0 | 0 | 3.55 | 67.73 | Time |
| 12/8/2011 | 04:00:00 | 0 | 0 | 3.22 | 56.82 | Time |
| 12/8/2011 | 05:00:00 | 0 | 0 | 3.07 | 55.02 | Time |
| 12/8/2011 | 06:00:00 | 0 | 0 | 3.10 | 55.19 | Time |
| 12/8/2011 | 07:00:00 | 0 | 0 | 3.39 | 55.19 | Time |
| 12/8/2011 | 08:00:00 | 0 | 0 | 3.31 | 55.19 | Time |
| 12/8/2011 | 09:00:00 | 0 | 0 | 3.29 | 55.68 | Time |
| 12/8/2011 | 10:00:00 | 0 | 0 | 3.14 | 57.15 | Time |
| 12/8/2011 | 11:00:00 | 0 | 0 | 3.07 | 56.99 | Time |
| 12/8/2011 | 12:00:00 | 0 | 0 | 3.06 | 57.15 | Time |
| 12/8/2011 | 13:00:00 | 0 | 0 | 3.07 | 56.99 | Time |
| 12/8/2011 | 14:00:00 | 0 | 0 | 3.09 | 56.82 | Time |
| 12/8/2011 | 15:00:00 | 0 | 0 | 3.05 | 57.32 | Time |
| 12/8/2011 | 16:00:00 | 0 | 0 | 3.35 | 57.98 | Time |
| 12/8/2011 | 17:00:00 | 0 | 0 | 3.32 | 56.66 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/8/2011 | 18:00:00 | 0 | | 3.06 | 56.50 | Time |
| 12/8/2011 | 19:00:00 | 0 | | 3.03 | 56.82 | Time |
| 12/8/2011 | 20:00:00 | 0 | | 3.51 | 59.79 | Time |
| 12/8/2011 | 21:00:00 | 0 | | 3.56 | 66.75 | Time |
| 12/8/2011 | 22:00:00 | 0 | | 3.54 | 69.29 | Time |
| 12/8/2011 | 23:00:00 | 0 | | 3.54 | 70.15 | Time |
| 12/9/2011 | 00:00:00 | 0 | | 3.54 | 69.98 | Time |
| 12/9/2011 | 01:00:00 | 0 | | 3.53 | 69.81 | Time |
| 12/9/2011 | 02:00:00 | 0 | | 3.54 | 69.81 | Time |
| 12/9/2011 | 03:00:00 | 0 | | 3.55 | 69.12 | Time |
| 12/9/2011 | 04:00:00 | 0 | | 3.34 | 56.33 | Time |
| 12/9/2011 | 05:00:00 | 0 | | 3.35 | 54.87 | Time |
| 12/9/2011 | 06:00:00 | 0 | | 3.09 | 54.06 | Time |
| 12/9/2011 | 07:00:00 | 0 | | 3.17 | 54.38 | Time |
| 12/9/2011 | 08:00:00 | 0 | | 3.36 | 54.55 | Time |
| 12/9/2011 | 09:00:00 | 0 | | 3.35 | 54.55 | Time |
| 12/9/2011 | 10:00:00 | 0 | | 3.08 | 55.84 | Time |
| 12/9/2011 | 11:00:00 | 0 | | 3.16 | 55.36 | Time |
| 12/9/2011 | 12:00:00 | 0 | | 3.08 | 55.52 | Time |
| 12/9/2011 | 13:00:00 | 0 | | 3.34 | 55.36 | Time |
| 12/9/2011 | 14:00:00 | 0 | 0 | 3.03 | 55.84 | Time |
| 12/9/2011 | 15:00:00 | 0 | 0 | 3.15 | 55.52 | Time |
| 12/9/2011 | 16:00:00 | 0 | 0 | 3.05 | 55.84 | Time |

| Date | Time | | | | | |
|------|------|---|---|------|-------|------|
| 12/9/2011 | 17:00:00 | 0 | 0 | 3.33 | 55.52 | Time |
| 12/9/2011 | 18:00:00 | 0 | 0 | 3.33 | 57.32 | Time |
| 12/9/2011 | 19:00:00 | 0 | 0 | 3.59 | 60.96 | Time |
| 12/9/2011 | 20:00:00 | 0 | 0 | 3.53 | 66.87 | Time |
| 12/9/2011 | 21:00:00 | 0 | 0 | 3.53 | 69.12 | Time |
| 12/9/2011 | 22:00:00 | 0 | 0 | 3.52 | 70.15 | Time |
| 12/9/2011 | 23:00:00 | 0 | 0 | 3.52 | 70.85 | Time |
| 12/10/2011 | 00:00:00 | 0 | 0 | 3.52 | 71.05 | Time |
| 12/10/2011 | 01:00:00 | 0 | 0 | 3.52 | 71.20 | Time |
| 12/10/2011 | 02:00:00 | 0 | 0 | 3.52 | 71.17 | Time |
| 12/10/2011 | 03:00:00 | 0 | 0 | 3.53 | 70.85 | Time |
| 12/10/2011 | 04:00:00 | 0 | 0 | 3.34 | 56.82 | Time |
| 12/10/2011 | 05:00:00 | 0 | 0 | 3.23 | 55.05 | Time |
| 12/10/2011 | 06:00:00 | 0 | 0 | 3.15 | 54.55 | Time |
| 12/10/2011 | 07:00:00 | 0 | 0 | 3.02 | 54.71 | Time |
| 12/10/2011 | 08:00:00 | 0 | 0 | 3.08 | 54.71 | Time |
| 12/10/2011 | 09:00:00 | 0 | 0 | 3.14 | 55.03 | Time |
| 12/10/2011 | 10:00:00 | 0 | 0 | 3.37 | 55.52 | Time |
| 12/10/2011 | 11:00:00 | 0 | 0 | 3.33 | 55.46 | Time |
| 12/10/2011 | 12:00:00 | 0 | 0 | 3.38 | 55.68 | Time |
| 12/10/2011 | 13:00:00 | 0 | 0 | 3.06 | 55.36 | Time |
| 12/10/2011 | 14:00:00 | 0 | 0 | 3.05 | 55.68 | Time |
| 12/10/2011 | 15:00:00 | 0 | 0 | 3.37 | 55.19 | Time |
| 12/10/2011 | 16:00:00 | 0 | 0 | 3.13 | 55.84 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/10/2011 | 17:00:00 | 0 | 0 | 3.39 | 55.84 | Time |
| 12/10/2011 | 18:00:00 | 0 | 0 | 3.05 | 55.52 | Time |
| 12/10/2011 | 19:00:00 | 0 | 0 | 3.36 | 59.96 | Time |
| 12/10/2011 | 20:00:00 | 0 | 0 | 3.33 | 61.79 | Time |
| 12/10/2011 | 21:00:00 | 0 | 0 | 3.56 | 66.70 | Time |
| 12/10/2011 | 22:00:00 | 0 | 0 | 3.54 | 67.90 | Time |
| 12/10/2011 | 23:00:00 | 0 | 0 | 3.54 | 68.25 | Time |
| 12/11/2011 | 00:00:00 | 0 | 0 | 3.54 | 68.08 | Time |
| 12/11/2011 | 01:00:00 | 0 | 0 | 3.53 | 67.73 | Time |
| 12/11/2011 | 02:00:00 | 0 | 0 | 3.55 | 67.04 | Time |
| 12/11/2011 | 03:00:00 | 0 | 0 | 3.56 | 66.53 | Time |
| 12/11/2011 | 04:00:00 | 0 | 0 | 3.27 | 53.08 | Time |
| 12/11/2011 | 05:00:00 | 0 | 0 | 3.11 | 52.75 | Time |
| 12/11/2011 | 06:00:00 | 0 | 0 | 3.38 | 52.59 | Time |
| 12/11/2011 | 07:00:00 | 0 | 0 | 3.03 | 52.91 | Time |
| 12/11/2011 | 08:00:00 | 0 | 0 | 3.34 | 53.24 | Time |
| 12/11/2011 | 09:00:00 | 0 | 0 | 3.07 | 53.89 | Time |
| 12/11/2011 | 10:00:00 | 0 | 0 | 3.36 | 54.22 | Time |
| 12/11/2011 | 11:00:00 | 0 | 0 | 3.09 | 54.87 | Time |
| 12/11/2011 | 12:00:00 | 0 | 0 | 3.33 | 54.71 | Time |
| 12/11/2011 | 13:00:00 | 0 | 0 | 3.19 | 54.71 | Time |
| 12/11/2011 | 14:00:00 | 0 | 0 | 3.13 | 54.87 | Time |
| 12/11/2011 | 15:00:00 | 0 | 0 | 3.17 | 56.01 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/11/2011 | 16:00:00 | 0 | 0 | 3.15 | 55.36 | Time |
| 12/11/2011 | 17:00:00 | 0 | 0 | 3.39 | 55.68 | Time |
| 12/11/2011 | 18:00:00 | 0 | 0 | 3.30 | 55.19 | Time |
| 12/11/2011 | 19:00:00 | 0 | 0 | 3.38 | 57.32 | Time |
| 12/11/2011 | 20:00:00 | 0 | 0 | 3.39 | 59.79 | Time |
| 12/11/2011 | 21:00:00 | 0 | 0 | 3.54 | 65.35 | Time |
| 12/11/2011 | 22:00:00 | 0 | 0 | 3.54 | 66.87 | Time |
| 12/11/2011 | 23:00:00 | 0 | 0 | 3.54 | 67.55 | Time |
| 12/12/2011 | 00:00:00 | 0 | 0 | 3.53 | 67.90 | Time |
| 12/12/2011 | 01:00:00 | 0 | 0 | 3.53 | 67.73 | Time |
| 12/12/2011 | 02:00:00 | 0 | 0 | 3.53 | 67.55 | Time |
| 12/12/2011 | 03:00:00 | 0 | 0 | 3.54 | 67.21 | Time |
| 12/12/2011 | 04:00:00 | 0 | 0 | 3.11 | 54.22 | Time |
| 12/12/2011 | 05:00:00 | 0 | 0 | 3.12 | 52.75 | Time |
| 12/12/2011 | 06:00:00 | 0 | 0 | 3.09 | 52.59 | Time |
| 12/12/2011 | 07:00:00 | 0 | 0 | 3.12 | 52.26 | Time |
| 12/12/2011 | 08:00:00 | 0 | 0 | 3.10 | 52.42 | Time |
| 12/12/2011 | 09:00:00 | 0 | 0 | 3.15 | 52.59 | Time |
| 12/12/2011 | 10:00:00 | 0 | 0 | 3.37 | 52.59 | Time |
| 12/12/2011 | 11:00:00 | 0 | 0 | 3.14 | 52.75 | Time |
| 12/12/2011 | 12:00:00 | 0 | 0 | 3.06 | 53.24 | Time |
| 12/12/2011 | 13:00:00 | 0 | 0 | 3.11 | 53.08 | Time |
| 12/12/2011 | 14:00:00 | 0 | 0 | 3.06 | 52.91 | Time |
| 12/12/2011 | 15:00:00 | 0 | 0 | 3.22 | 53.24 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/12/2011 | 16:00:00 | 0 | 0 | 3.36 | 53.08 | Time |
| 12/12/2011 | 17:00:00 | 0 | 0 | 3.07 | 52.91 | Time |
| 12/12/2011 | 18:00:00 | 0 | 0 | 3.39 | 52.91 | Time |
| 12/12/2011 | 19:00:00 | 0 | 0 | 3.09 | 52.91 | Time |
| 12/12/2011 | 20:00:00 | 0 | 0 | 3.08 | 54.22 | Time |
| 12/12/2011 | 21:00:00 | 0 | 0 | 3.55 | 59.79 | Time |
| 12/12/2011 | 22:00:00 | 0 | 0 | 3.54 | 64.00 | Time |
| 12/12/2011 | 23:00:00 | 0 | 0 | 3.53 | 65.52 | Time |
| 12/12/2011 | 00:00:00 | 0 | 0 | 3.53 | 66.20 | Time |
| 12/13/2011 | 01:00:00 | 0 | 0 | 3.53 | 66.53 | Time |
| 12/13/2011 | 02:00:00 | 0 | 0 | 3.52 | 66.53 | Time |
| 12/13/2011 | 03:00:00 | 0 | 0 | 3.53 | 66.20 | Time |
| 12/13/2011 | 04:00:00 | 0 | 0 | 3.27 | 56.33 | Time |
| 12/13/2011 | 05:00:00 | 0 | 0 | 3.04 | 51.61 | Time |
| 12/13/2011 | 06:00:00 | 0 | 0 | 3.28 | 51.44 | Time |
| 12/13/2011 | 07:00:00 | 0 | 0 | 3.04 | 51.61 | Time |
| 12/13/2011 | 08:00:00 | 0 | 0 | 3.36 | 51.77 | Time |
| 12/13/2011 | 09:00:00 | 0 | 0 | 3.35 | 53.24 | Time |
| 12/13/2011 | 10:00:00 | 0 | 0 | 3.33 | 53.73 | Time |
| 12/13/2011 | 11:00:00 | 0 | 0 | 3.07 | 53.25 | Time |
| 12/13/2011 | 12:00:00 | 0 | 0 | 3.01 | 53.73 | Time |
| 12/13/2011 | 13:00:00 | 0 | 0 | 3.29 | 54.22 | Time |
| 12/13/2011 | 14:00:00 | 0 | 0 | 3.03 | 54.55 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/13/2011 | 15:00:00 | 0 | 0 | 3.14 | 54.22 | Time |
| 12/13/2011 | 16:00:00 | 0 | 0 | 3.06 | 54.71 | Time |
| 12/13/2011 | 17:00:00 | 0 | 0 | 3.33 | 53.89 | Time |
| 12/13/2011 | 18:00:00 | 0 | 0 | 3.40 | 54.06 | Time |
| 12/13/2011 | 19:00:00 | 0 | 0 | 3.07 | 54.38 | Time |
| 12/13/2011 | 20:00:00 | 0 | 0 | 3.14 | 55.19 | Time |
| 12/13/2011 | 21:00:00 | 0 | 0 | 3.33 | 59.30 | Time |
| 12/13/2011 | 22:00:00 | 0 | 0 | 3.55 | 66.53 | Time |
| 12/13/2011 | 23:00:00 | 0 | 0 | 3.54 | 68.60 | Time |
| 12/14/2011 | 00:00:00 | 0 | 0 | 3.54 | 69.46 | Time |
| 12/14/2011 | 01:00:00 | 0 | 0 | 3.53 | 69.64 | Time |
| 12/14/2011 | 02:00:00 | 0 | 0 | 3.53 | 69.64 | Time |
| 12/14/2011 | 03:00:00 | 0 | 0 | 3.54 | 69.46 | Time |
| 12/14/2011 | 04:00:00 | 0 | 0 | 3.17 | 54.71 | Time |
| 12/14/2011 | 05:00:00 | 0 | 0 | 3.15 | 51.28 | Time |
| 12/14/2011 | 06:00:00 | 0 | 0 | 3.12 | 51.61 | Time |
| 12/14/2011 | 07:00:00 | 0 | 0 | 3.11 | 51.61 | Time |
| 12/14/2011 | 08:00:00 | 0 | 0 | 3.07 | 52.42 | Time |
| 12/14/2011 | 09:00:00 | 0 | 0 | 3.24 | 52.59 | Time |
| 12/14/2011 | 10:00:00 | 0 | 0 | 3.34 | 54.06 | Time |
| 12/14/2011 | 11:00:00 | 0 | 0 | 3.07 | 53.24 | Time |
| 12/14/2011 | 12:00:00 | 0 | 0 | 3.35 | 53.89 | Time |
| 12/14/2011 | 13:00:00 | 0 | 0 | 3.22 | 53.89 | Time |
| 12/14/2011 | 14:00:00 | 0 | 0 | 3.06 | 53.40 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/14/2011 | 15:00:00 | 0 | 0 | 3.10 | 54.06 | Time |
| 12/14/2011 | 16:00:00 | 0 | 0 | 3.06 | 54.22 | Time |
| 12/14/2011 | 17:00:00 | 0 | 0 | 3.20 | 53.57 | Time |
| 12/14/2011 | 18:00:00 | 0 | 0 | 3.43 | 55.52 | Time |
| 12/14/2011 | 19:00:00 | 0 | 0 | 3.23 | 59.30 | Time |
| 12/14/2011 | 20:00:00 | 0 | 0 | 3.32 | 60.13 | Time |
| 12/14/2011 | 21:00:00 | 0 | 0 | 3.56 | 64.51 | Time |
| 12/14/2011 | 22:00:00 | 0 | 0 | 3.54 | 66.91 | Time |
| 12/14/2011 | 23:00:00 | 0 | 0 | 3.54 | 67.73 | Time |
| 12/15/2011 | 00:00:00 | 0 | 0 | 3.54 | 67.90 | Time |
| 12/15/2011 | 01:00:00 | 0 | 0 | 3.54 | 67.73 | Time |
| 12/15/2011 | 02:00:00 | 0 | 0 | 3.54 | 67.38 | Time |
| 12/15/2011 | 03:00:00 | 0 | 0 | 3.55 | 67.04 | Time |
| 12/15/2011 | 04:00:00 | 0 | 0 | 3.14 | 52.42 | Time |
| 12/15/2011 | 05:00:00 | 0 | 0 | 3.05 | 51.61 | Time |
| 12/15/2011 | 06:00:00 | 0 | 0 | 3.33 | 51.44 | Time |
| 12/15/2011 | 07:00:00 | 0 | 0 | 3.09 | 51.44 | Time |
| 12/15/2011 | 08:00:00 | 0 | 0 | 3.20 | 51.44 | Time |
| 12/15/2011 | 09:00:00 | 0 | 0 | 3.13 | 51.44 | Time |
| 12/15/2011 | 10:00:00 | 0 | 0 | 3.36 | 52.59 | Time |
| 12/15/2011 | 11:00:00 | 0 | 0 | 3.06 | 52.26 | Time |
| 12/15/2011 | 12:00:00 | 0 | 0 | 3.23 | 52.59 | Time |
| 12/15/2011 | 13:00:00 | 0 | 0 | 3.24 | 52.42 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/15/2011 | 14:00:00 | 0 | 0 | 3.25 | 52.57 | Time |
| 12/15/2011 | 15:00:00 | 0 | 0 | 3.18 | 53.40 | Time |
| 12/15/2011 | 16:00:00 | 0 | 0 | 3.07 | 54.06 | Time |
| 12/15/2011 | 17:00:00 | 0 | 0 | 3.33 | 53.24 | Time |
| 12/15/2011 | 18:00:00 | 0 | 0 | 3.45 | 55.84 | Time |
| 12/15/2011 | 19:00:00 | 0 | 0 | 3.35 | 59.46 | Time |
| 12/15/2011 | 20:00:00 | 0 | 0 | 3.50 | 61.13 | Time |
| 12/15/2011 | 21:00:00 | 0 | 0 | 3.57 | 67.04 | Time |
| 12/15/2011 | 22:00:00 | 0 | 0 | 3.56 | 68.94 | Time |
| 12/15/2011 | 23:00:00 | 0 | 0 | 3.55 | 69.81 | Time |
| 12/16/2011 | 00:00:00 | 0 | 0 | 3.55 | 70.15 | Time |
| 12/16/2011 | 0:1:00:00 | 0 | 0 | 3.54 | 70.50 | Time |
| 12/16/2011 | 02:00:00 | 0 | 0 | 3.55 | 70.67 | Time |
| 12/16/2011 | 03:00:00 | 0 | 0 | 3.55 | 70.70 | Time |
| 12/16/2011 | 04:00:00 | 0 | 0 | 3.30 | 53.40 | Time |
| 12/16/2011 | 05:00:00 | 0 | 0 | 3.12 | 53.08 | Time |
| 12/16/2011 | 06:00:00 | 0 | 0 | 3.19 | 52.59 | Time |
| 12/16/2011 | 07:00:00 | 0 | 0 | 3.14 | 52.59 | Time |
| 12/16/2011 | 08:00:00 | 0 | 0 | 3.29 | 53.40 | Time |
| 12/16/2011 | 09:00:00 | 0 | 0 | 3.05 | 53.08 | Time |
| 12/16/2011 | 10:00:00 | 0 | 0 | 3.31 | 53.73 | Time |
| 12/16/2011 | 11:00:00 | 0 | 0 | 3.11 | 53.76 | Time |
| 12/16/2011 | 12:00:00 | 0 | 0 | 3.19 | 54.22 | Time |
| 12/16/2011 | 13:00:00 | 0 | 0 | 3.13 | 54.38 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/16/2011 | 14:00:00 | 0 | 0 | 3.08 | 54.06 | Time |
| 12/16/2011 | 15:00:00 | 0 | 0 | 3.28 | 53.24 | Time |
| 12/16/2011 | 16:00:00 | 0 | 0 | 3.27 | 54.55 | Time |
| 12/16/2011 | 17:00:00 | 0 | 0 | 3.13 | 55.03 | Time |
| 12/16/2011 | 18:00:00 | 0 | 0 | 3.22 | 55.03 | Time |
| 12/16/2011 | 19:00:00 | 0 | 0 | 3.09 | 56.17 | Time |
| 12/16/2011 | 20:00:00 | 0 | 0 | 3.52 | 57.48 | Time |
| 12/16/2011 | 21:00:00 | 0 | 0 | 3.52 | 61.29 | Time |
| 12/16/2011 | 22:00:00 | 0 | 0 | 3.56 | 67.04 | Time |
| 12/16/2011 | 23:00:00 | 0 | 0 | 3.55 | 68.60 | Time |
| 12/17/2011 | 00:00:00 | 0 | 0 | 3.55 | 69.12 | Time |
| 12/17/2011 | 01:00:00 | 0 | 0 | 3.54 | 69.29 | Time |
| 12/17/2011 | 02:00:00 | 0 | 0 | 3.54 | 69.29 | Time |
| 12/17/2011 | 03:00:00 | 0 | 0 | 3.54 | 68.94 | Time |
| 12/17/2011 | 04:00:00 | 0 | 0 | 3.54 | 67.21 | Time |
| 12/17/2011 | 05:00:00 | 0 | 0 | 3.05 | 52.26 | Time |
| 12/17/2011 | 06:00:00 | 0 | 0 | 2.91 | 51.93 | Time |
| 12/17/2011 | 07:00:00 | 0 | 0 | 3.35 | 52.26 | Time |
| 12/17/2011 | 08:00:00 | 0 | 0 | 3.14 | 52.75 | Time |
| 12/17/2011 | 09:00:00 | 0 | 0 | 3.37 | 52.42 | Time |
| 12/17/2011 | 10:00:00 | 0 | 0 | 3.06 | 53.08 | Time |
| 12/17/2011 | 11:00:00 | 0 | 0 | 3.35 | 52.59 | Time |
| 12/17/2011 | 12:00:00 | 0 | 0 | 3.42 | 52.75 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/17/2011 | 13:00:00 | 0 | 0 | 3.53 | 53.08 | Time |
| 12/17/2011 | 14:00:00 | 0 | 0 | 3.01 | 53.08 | Time |
| 12/17/2011 | 15:00:00 | 0 | 0 | 3.11 | 52.91 | Time |
| 12/17/2011 | 16:00:00 | 0 | 0 | 3.41 | 53.57 | Time |
| 12/17/2011 | 17:00:00 | 0 | 0 | 3.42 | 52.75 | Time |
| 12/17/2011 | 18:00:00 | 0 | 0 | 3.35 | 52.84 | Time |
| 12/17/2011 | 19:00:00 | 0 | 0 | 3.10 | 53.89 | Time |
| 12/17/2011 | 20:00:00 | 0 | 0 | 3.35 | 57.32 | Time |
| 12/17/2011 | 21:00:00 | 0 | 0 | 3.58 | 62.13 | Time |
| 12/17/2011 | 22:00:00 | 0 | 0 | 3.56 | 65.02 | Time |
| 12/17/2011 | 23:00:00 | 0 | 0 | 3.55 | 65.86 | Time |
| 12/18/2011 | 00:00:00 | 0 | 0 | 3.55 | 66.20 | Time |
| 12/18/2011 | 01:00:00 | 0 | 0 | 3.56 | 66.03 | Time |
| 12/18/2011 | 02:00:00 | 0 | 0 | 3.56 | 65.69 | Time |
| 12/18/2011 | 03:00:00 | 0 | 0 | 3.57 | 65.02 | Time |
| 12/18/2011 | 04:00:00 | 0 | 0 | 3.45 | 52.10 | Time |
| 12/18/2011 | 05:00:00 | 0 | 0 | 3.12 | 50.31 | Time |
| 12/18/2011 | 06:00:00 | 0 | 0 | 3.11 | 50.15 | Time |
| 12/18/2011 | 07:00:00 | 0 | 0 | 3.32 | 50.31 | Time |
| 12/18/2011 | 08:00:00 | 0 | 0 | 3.13 | 50.79 | Time |
| 12/18/2011 | 09:00:00 | 0 | 0 | 3.36 | 51.44 | Time |
| 12/18/2011 | 10:00:00 | 0 | 0 | 3.16 | 52.10 | Time |
| 12/18/2011 | 11:00:00 | 0 | 0 | 3.39 | 51.77 | Time |
| 12/18/2011 | 12:00:00 | 0 | 0 | 3.13 | 52.10 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/18/2011 | 13:00:00 | 0 | 0 | 3.39 | 53.08 | Time |
| 12/18/2011 | 14:00:00 | 0 | 0 | 3.13 | 52.75 | Time |
| 12/18/2011 | 15:00:00 | 0 | 0 | 3.07 | 52.42 | Time |
| 12/18/2011 | 16:00:00 | 0 | 0 | 3.07 | 53.08 | Time |
| 12/18/2011 | 17:00:00 | 0 | 0 | 3.25 | 52.10 | Time |
| 12/18/2011 | 18:00:00 | 0 | 0 | 3.46 | 52.26 | Time |
| 12/18/2011 | 19:00:00 | 0 | 0 | 3.40 | 54.22 | Time |
| 12/18/2011 | 20:00:00 | 0 | 0 | 3.59 | 61.96 | Time |
| 12/18/2011 | 21:00:00 | 0 | 0 | 3.57 | 65.19 | Time |
| 12/18/2011 | 22:00:00 | 0 | 0 | 3.56 | 66.36 | Time |
| 12/18/2011 | 23:00:00 | 0 | 0 | 3.56 | 66.03 | Time |
| 12/19/2011 | 00:00:00 | 0 | 0 | 3.57 | 65.44 | Time |
| 12/19/2011 | 01:00:00 | 0 | 0 | 3.57 | 65.02 | Time |
| 12/19/2011 | 02:00:00 | 0 | 0 | 3.58 | 64.17 | Time |
| 12/19/2011 | 03:00:00 | 0 | 0 | 3.59 | 62.98 | Time |
| 12/19/2011 | 04:00:00 | 0 | 0 | 3.17 | 53.89 | Time |
| 12/19/2011 | 05:00:00 | 0 | 0 | 3.11 | 49.67 | Time |
| 12/19/2011 | 06:00:00 | 0 | 0 | 3.17 | 49.67 | Time |
| 12/19/2011 | 07:00:00 | 0 | 0 | 3.06 | 49.50 | Time |
| 12/19/2011 | 08:00:00 | 0 | 0 | 3.28 | 49.67 | Time |
| 12/19/2011 | 09:00:00 | 0 | 0 | 3.06 | 50.47 | Time |
| 12/19/2011 | 10:00:00 | 0 | 0 | 3.31 | 50.47 | Time |
| 12/19/2011 | 11:00:00 | 0 | 0 | 3.39 | 50.76 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/19/2011 | 12:00:00 | 0 | 0 | 3.08 | 50.95 | Time |
| 12/19/2011 | 13:00:00 | 0 | 0 | 3.15 | 51.12 | Time |
| 12/19/2011 | 14:00:00 | 0 | 0 | 3.26 | 51.28 | Time |
| 12/19/2011 | 15:00:00 | 0 | 0 | 3.12 | 50.63 | Time |
| 12/19/2011 | 16:00:00 | 0 | 0 | 3.16 | 51.12 | Time |
| 12/19/2011 | 17:00:00 | 0 | 0 | 3.33 | 50.79 | Time |
| 12/19/2011 | 18:00:00 | 0 | 0 | 3.06 | 50.95 | Time |
| 12/19/2011 | 19:00:00 | 0 | 0 | 3.03 | 51.12 | Time |
| 12/19/2011 | 20:00:00 | 0 | 0 | 3.03 | 53.24 | Time |
| 12/19/2011 | 21:00:00 | 0 | 0 | 3.60 | 59.96 | Time |
| 12/19/2011 | 22:00:00 | 0 | 0 | 3.58 | 63.87 | Time |
| 12/19/2011 | 23:00:00 | 0 | 0 | 3.57 | 65.69 | Time |
| 12/20/2011 | 00:00:00 | 0 | 0 | 3.56 | 66.70 | Time |
| 12/20/2011 | 01:00:00 | 0 | 0 | 3.56 | 67.38 | Time |
| 12/20/2011 | 02:00:00 | 0 | 0 | 3.56 | 67.73 | Time |
| 12/20/2011 | 03:00:00 | 0 | 0 | 3.56 | 67.90 | Time |
| 12/20/2011 | 04:00:00 | 0 | 0 | 2.99 | 51.93 | Time |
| 12/20/2011 | 05:00:00 | 0 | 0 | 3.07 | 50.47 | Time |
| 12/20/2011 | 06:00:00 | 0 | 0 | 3.09 | 49.83 | Time |
| 12/20/2011 | 07:00:00 | 0 | 0 | 3.11 | 49.83 | Time |
| 12/20/2011 | 08:00:00 | 0 | 0 | 3.27 | 49.99 | Time |
| 12/20/2011 | 09:00:00 | 0 | 0 | 3.40 | 49.83 | Time |
| 12/20/2011 | 10:00:00 | 0 | 0 | 3.19 | 50.63 | Time |
| 12/20/2011 | 11:00:00 | 0 | 0 | 3.12 | 49.83 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/20/2011 | 12:00:00 | 0 | 0 | 3.19 | 50.31 | Time |
| 12/20/2011 | 13:00:00 | 0 | 0 | 3.14 | 50.15 | Time |
| 12/20/2011 | 14:00:00 | 0 | 0 | 3.24 | 51.44 | Time |
| 12/20/2011 | 15:00:00 | 0 | 0 | 3.44 | 50.47 | Time |
| 12/20/2011 | 16:00:00 | 0 | 0 | 3.30 | 50.47 | Time |
| 12/20/2011 | 17:00:00 | 0. | 0 | 3.22 | 50.15 | Time |
| 12/20/2011 | 18:00:00 | 0 | 0 | 3.20 | 50.15 | Time |
| 12/20/2011 | 19:00:00 | 0 | 0 | 3.16 | 54.38 | Time |
| 12/20/2011 | 20:00:00 | 0 | 0 | 3.46 | 56.82 | Time |
| 12/20/2011 | 21:00:00 | 0 | 0 | 3.58 | 61.96 | Time |
| 12/20/2011 | 22:00:00 | 0 | 0 | 3.57 | 63.65 | Time |
| 12/20/2011 | 23:00:00 | 0 | 0 | 3.57 | 64.51 | Time |
| 12/21/2011 | 00:00:00 | 0 | 0 | 3.56 | 65.02 | Time |
| 12/21/2011 | 01:00:00 | 0 | 0 | 3.56 | 65.35 | Time |
| 12/21/2011 | 02:00:00 | 0 | 0 | 3.56 | 65.52 | Time |
| 12/21/2011 | 03:00:00 | 0 | 0 | 3.56 | 65.52 | Time |
| 12/21/2011 | 04:00:00 | 0 | 0 | 3.10 | 51.12 | Time |
| 12/21/2011 | 05:00:00 | 0 | 0 | 3.04 | 49.83 | Time |
| 12/21/2011 | 06:00:00 | 18 | 15 | 2.40 | 49.47 | Time |
| 12/21/2011 | 07:00:00 | 15 | 13 | 2.50 | 49.72 | Time |
| 12/21/2011 | 08:00:00 | 14 | 12 | 2.42 | 50.09 | Time |
| 12/21/2011 | 09:00:00 | 15 | 12 | 2.54 | 50.15 | Time |
| 12/21/2011 | 10:00:00 | 10 | 9 | 2.48 | 50.85 | Time |

| Date | Time | | | | |
|---|---|---|---|---|---|
| 12/21/2011 | 11:00:00 | 12 | 10 | 2.42 | 51.02 | Time |
| 12/21/2011 | 12:00:00 | 14 | 12 | 2.45 | 50.54 | Time |
| 12/21/2011 | 13:00:00 | 9 | 7 | 2.40 | 50.35 | Time |
| 12/21/2011 | 14:00:00 | 0 | 0 | 2.36 | 50.79 | Time |
| 12/21/2011 | 15:00:00 | 0 | 0 | 2.45 | 51.49 | Time |
| 12/21/2011 | 16:00:00 | 0 | 0 | 2.61 | 52.10 | Time |
| 12/21/2011 | 17:00:00 | 0 | 0 | 2.64 | 53.80 | Time |
| 12/21/2011 | 18:00:00 | 0 | 0 | 2.87 | 57.81 | Time |
| 12/21/2011 | 19:00:00 | 0 | 0 | 2.53 | 58.30 | Time |
| 12/21/2011 | 20:00:00 | 0 | 0 | 2.87 | 62.98 | Time |
| 12/21/2011 | 21:00:00 | 0 | 0 | 2.85 | 65.86 | Time |
| 12/21/2011 | 22:00:00 | 0 | 0 | 2.83 | 67.04 | Time |
| 12/21/2011 | 23:00:00 | 0 | 0 | 2.84 | 67.55 | Time |
| 12/22/2011 | 00:00:00 | 0 | 0 | 2.82 | 67.90 | Time |
| 12/22/2011 | 01:00:00 | 0 | 0 | 2.83 | 68.08 | Time |
| 12/22/2011 | 02:00:00 | 0 | 0 | 2.83 | 68.08 | Time |
| 12/22/2011 | 03:00:00 | 0 | 0 | 2.82 | 67.90 | Time |
| 12/22/2011 | 04:00:00 | 0 | 0 | 2.37 | 52.10 | Time |
| 12/22/2011 | 05:00:00 | 0 | 0 | 2.45 | 50.79 | Time |
| 12/22/2011 | 06:00:00 | 0 | 0 | 2.70 | 50.63 | Time |
| 12/22/2011 | 07:00:00 | 0 | 0 | 2.23 | 50.95 | Time |
| 12/22/2011 | 08:00:00 | 0 | 0 | 2.40 | 51.12 | Time |
| 12/22/2011 | 09:00:00 | 0 | 0 | 2.25 | 52.10 | Time |
| 12/22/2011 | 10:00:00 | 0 | 0 | 2.27 | 52.91 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/22/2011 | 11:00:00 | 0 | 0 | 2.56 | 52.42 | Time |
| 12/22/2011 | 12:00:00 | 0 | 0 | 2.86 | 52.59 | Time |
| 12/22/2011 | 13:00:00 | 0 | 0 | 2.43 | 52.75 | Time |
| 12/22/2011 | 14:00:00 | 0 | 0 | 2.30 | 52.75 | Time |
| 12/22/2011 | 15:00:00 | 0 | 0 | 2.41 | 52.26 | Time |
| 12/22/2011 | 16:00:00 | 0 | 0 | 2.37 | 54.22 | Time |
| 12/22/2011 | 17:00:00 | 0 | 0 | 2.50 | 54.38 | Time |
| 12/22/2011 | 18:00:00 | 0 | 0 | 2.91 | 62.47 | Time |
| 12/22/2011 | 19:00:00 | 0 | 0 | 2.84 | 68.94 | Time |
| 12/22/2011 | 20:00:00 | 0 | 0 | 2.83 | 71.38 | Time |
| 12/22/2011 | 21:00:00 | 0 | 0 | 2.83 | 72.59 | Time |
| 12/22/2011 | 22:00:00 | 0 | 0 | 2.82 | 73.15 | Time |
| 12/22/2011 | 23:00:00 | 0 | 0 | 2.85 | 73.51 | Time |
| 12/23/2011 | 00:00:00 | 0 | 0 | 2.82 | 73.60 | Time |
| 12/23/2011 | 01:00:00 | 0 | 0 | 2.81 | 73.51 | Time |
| 12/23/2011 | 02:00:00 | 0 | 0 | 2.84 | 72.97 | Time |
| 12/23/2011 | 03:00:00 | 0 | 0 | 2.85 | 72.61 | Time |
| 12/23/2011 | 04:00:00 | 0 | 0 | 2.31 | 52.26 | Time |
| 12/23/2011 | 05:00:00 | 0 | 0 | 2.32 | 52.50 | Time |
| 12/23/2011 | 06:00:00 | 0 | 0 | 2.21 | 52.75 | Time |
| 12/23/2011 | 07:00:00 | 0 | 0 | 2.68 | 52.26 | Time |
| 12/23/2011 | 08:00:00 | 0 | 0 | 2.39 | 52.59 | Time |
| 12/23/2011 | 09:00:00 | 0 | 0 | 2.49 | 52.59 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/23/2011 | 10:00:00 | 0 | 0 | 2.55 | 53.57 | Time |
| 12/23/2011 | 11:00:00 | 0 | 0 | 2.73 | 52.91 | Time |
| 12/23/2011 | 12:00:00 | 0 | 0 | 2.38 | 52.91 | Time |
| 12/23/2011 | 13:00:00 | 0 | 0 | 2.72 | 52.75 | Time |
| 12/23/2011 | 14:00:00 | 0 | 0 | 2.54 | 52.91 | Time |
| 12/23/2011 | 15:00:00 | 0 | 0 | 2.47 | 52.59 | Time |
| 12/23/2011 | 16:00:00 | 0 | 0 | 2.29 | 53.89 | Time |
| 12/23/2011 | 17:00:00 | 0 | 0 | 2.36 | 53.24 | Time |
| 12/23/2011 | 18:00:00 | 0 | 0 | 2.72 | 59.13 | Time |
| 12/23/2011 | 19:00:00 | 0 | 0 | 2.85 | 66.36 | Time |
| 12/23/2011 | 20:00:00 | 0 | 0 | 2.83 | 68.60 | Time |
| 12/23/2011 | 21:00:00 | 0 | 0 | 2.83 | 69.46 | Time |
| 12/23/2011 | 22:00:00 | 0 | 0 | 2.82 | 69.64 | Time |
| 12/23/2011 | 23:00:00 | 0 | 0 | 2.83 | 69.46 | Time |
| 12/24/2011 | 00:00:00 | 0 | 0 | 2.83 | 69.29 | Time |
| 12/24/2011 | 01:00:00 | 0 | 0 | 2.83 | 68.77 | Time |
| 12/24/2011 | 02:00:00 | 0 | 0 | 2.85 | 68.25 | Time |
| 12/24/2011 | 03:00:00 | 0 | 0 | 2.85 | 67.55 | Time |
| 12/24/2011 | 04:00:00 | 0 | 0 | 2.29 | 52.26 | Time |
| 12/24/2011 | 05:00:00 | 0 | 0 | 2.63 | 50.95 | Time |
| 12/24/2011 | 06:00:00 | 0 | 0 | 2.17 | 51.44 | Time |
| 12/24/2011 | 07:00:00 | 0 | 0 | 2.67 | 51.61 | Time |
| 12/24/2011 | 08:00:00 | 0 | 0 | 2.31 | 51.28 | Time |
| 12/24/2011 | 09:00:00 | 0 | 0 | 2.49 | 51.79 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/24/2011 | 10:00:00 | 0 | 0 | 2.47 | 53.73 | Time |
| 12/24/2011 | 11:00:00 | 0 | 0 | 2.35 | 53.24 | Time |
| 12/24/2011 | 12:00:00 | 0 | 0 | 2.65 | 53.57 | Time |
| 12/24/2011 | 13:00:00 | 0 | 0 | 2.23 | 53.73 | Time |
| 12/24/2011 | 14:00:00 | 0 | 0 | 2.69 | 54.38 | Time |
| 12/24/2011 | 15:00:00 | 0 | 0 | 2.26 | 53.89 | Time |
| 12/24/2011 | 16:00:00 | 0 | 0 | 2.60 | 58.80 | Time |
| 12/24/2011 | 17:00:00 | 0 | 0 | 2.54 | 61.29 | Time |
| 12/24/2011 | 18:00:00 | 0 | 0 | 2.76 | 64.68 | Time |
| 12/24/2011 | 19:00:00 | 0 | 0 | 2.85 | 68.94 | Time |
| 12/24/2011 | 20:00:00 | 0 | 0 | 2.84 | 69.98 | Time |
| 12/24/2011 | 21:00:00 | 0 | 0 | 2.84 | 70.15 | Time |
| 12/24/2011 | 22:00:00 | 0 | 0 | 2.84 | 69.81 | Time |
| 12/24/2011 | 23:00:00 | 0 | 0 | 2.85 | 69.29 | Time |
| 12/25/2011 | 00:00:00 | 0 | 0 | 2.86 | 68.60 | Time |
| 12/25/2011 | 01:00:00 | 0 | 0 | 2.87 | 67.90 | Time |
| 12/25/2011 | 02:00:00 | 0 | 0 | 2.88 | 67.21 | Time |
| 12/25/2011 | 03:00:00 | 0 | 0 | 2.89 | 66.59 | Time |
| 12/25/2011 | 04:00:00 | 0 | 0 | 2.58 | 51.28 | Time |
| 12/25/2011 | 05:00:00 | 0 | 0 | 2.25 | 50.47 | Time |
| 12/25/2011 | 06:00:00 | 0 | 0 | 2.23 | 49.83 | Time |
| 12/25/2011 | 07:00:00 | 0 | 0 | 2.65 | 49.83 | Time |
| 12/25/2011 | 08:00:00 | 0 | 0 | 2.33 | 49.67 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/26/2011 | 08:00:00 | 0 | 0 | 2.44 | 49.67 | Time |
| 12/26/2011 | 07:00:00 | 0 | 0 | 2.33 | 49.50 | Time |
| 12/26/2011 | 06:00:00 | 0 | 0 | 2.59 | 49.34 | Time |
| 12/26/2011 | 05:00:00 | 0 | 0 | 2.33 | 49.67 | Time |
| 12/26/2011 | 04:00:00 | 0 | 0 | 2.36 | 50.95 | Time |
| 12/26/2011 | 03:00:00 | 0 | 0 | 2.86 | 63.65 | Time |
| 12/26/2011 | 02:00:00 | 0 | 0 | 2.85 | 64.00 | Time |
| 12/26/2011 | 01:00:00 | 0 | 0 | 2.84 | 64.33 | Time |
| 12/26/2011 | 00:00:00 | 0 | 0 | 2.85 | 64.51 | Time |
| 12/25/2011 | 23:00:00 | 0 | 0 | 2.84 | 64.51 | Time |
| 12/25/2011 | 22:00:00 | 0 | 0 | 2.84 | 64.68 | Time |
| 12/25/2011 | 21:00:00 | 0 | 0 | 2.84 | 64.51 | Time |
| 12/25/2011 | 20:00:00 | 0 | 0 | 2.84 | 64.33 | Time |
| 12/25/2011 | 19:00:00 | 0 | 0 | 2.84 | 63.82 | Time |
| 12/25/2011 | 18:00:00 | 0 | 0 | 2.86 | 62.81 | Time |
| 12/25/2011 | 17:00:00 | 0 | 0 | 2.91 | 60.46 | Time |
| 12/25/2011 | 16:00:00 | 0 | 0 | 2.65 | 56.66 | Time |
| 12/25/2011 | 15:00:00 | 0 | 0 | 2.77 | 56.17 | Time |
| 12/25/2011 | 14:00:00 | 0 | 0 | 2.20 | 51.93 | Time |
| 12/25/2011 | 13:00:00 | 0 | 0 | 2.28 | 50.63 | Time |
| 12/25/2011 | 12:00:00 | 0 | 0 | 2.73 | 51.12 | Time |
| 12/25/2011 | 11:00:00 | 0 | 0 | 2.66 | 49.99 | Time |
| 12/25/2011 | 10:00:00 | 0 | 0 | 2.61 | 50.03 | Time |
| 12/25/2011 | 09:00:00 | 0 | 0 | 2.55 | 49.67 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/26/2011 | 09:00:00 | 0 | 0 | 2.27 | 50.63 | Time |
| 12/26/2011 | 10:00:00 | 0 | 0 | 2.25 | 51.28 | Time |
| 12/26/2011 | 11:00:00 | 0 | 0 | 2.43 | 51.12 | Time |
| 12/26/2011 | 12:00:00 | 0 | 0 | 2.70 | 52.10 | Time |
| 12/26/2011 | 13:00:00 | 0 | 0 | 2.67 | 51.61 | Time |
| 12/26/2011 | 14:00:00 | 0 | 0 | 2.31 | 54.06 | Time |
| 12/26/2011 | 15:00:00 | 0 | 0 | 2.64 | 52.42 | Time |
| 12/26/2011 | 16:00:00 | 0 | 0 | 2.35 | 53.08 | Time |
| 12/26/2011 | 17:00:00 | 0 | 0 | 2.55 | 52.42 | Time |
| 12/26/2011 | 18:00:00 | 0 | 0 | 2.62 | 54.38 | Time |
| 12/26/2011 | 19:00:00 | 0 | 0 | 2.93 | 60.96 | Time |
| 12/26/2011 | 20:00:00 | 0 | 0 | 2.86 | 66.70 | Time |
| 12/26/2011 | 21:00:00 | 0 | 0 | 2.85 | 68.42 | Time |
| 12/26/2011 | 22:00:00 | 0 | 0 | 2.85 | 68.94 | Time |
| 12/26/2011 | 23:00:00 | 0 | 0 | 2.84 | 68.77 | Time |
| 12/27/2011 | 00:00:00 | 0 | 0 | 2.85 | 67.90 | Time |
| 12/27/2011 | 01:00:00 | 0 | 0 | 2.87 | 67.21 | Time |
| 12/27/2011 | 02:00:00 | 0 | 0 | 2.90 | 66.53 | Time |
| 12/27/2011 | 03:00:00 | 0 | 0 | 2.90 | 65.69 | Time |
| 12/27/2011 | 04:00:00 | 0 | 0 | 2.59 | 49.99 | Time |
| 12/27/2011 | 05:00:00 | 0 | 0 | 2.38 | 49.50 | Time |
| 12/27/2011 | 06:00:00 | 0 | 0 | 2.39 | 49.18 | Time |
| 12/27/2011 | 07:00:00 | 0 | 0 | 2.37 | 49.50 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/27/2011 | 08:00:00 | 0 | 0 | 2.61 | 49.54 | Time |
| 12/27/2011 | 09:00:00 | 0 | 0 | 2.47 | 49.34 | Time |
| 12/27/2011 | 10:00:00 | 0 | 0 | 2.43 | 50.15 | Time |
| 12/27/2011 | 11:00:00 | 0 | 0 | 2.18 | 49.99 | Time |
| 12/27/2011 | 12:00:00 | 0 | 0 | 2.42 | 49.99 | Time |
| 12/27/2011 | 13:00:00 | 0 | 0 | 2.63 | 50.31 | Time |
| 12/27/2011 | 14:00:00 | 0 | 0 | 2.28 | 50.79 | Time |
| 12/27/2011 | 15:00:00 | 0 | 0 | 2.70 | 51.12 | Time |
| 12/27/2011 | 16:00:00 | 0 | 0 | 2.32 | 51.28 | Time |
| 12/27/2011 | 17:00:00 | 0 | 0 | 2.34 | 51.28 | Time |
| 12/27/2011 | 18:00:00 | 0 | 0 | 2.65 | 51.28 | Time |
| 12/27/2011 | 19:00:00 | 0 | 0 | 2.67 | 55.84 | Time |
| 12/27/2011 | 20:00:00 | 0 | 0 | 2.87 | 61.29 | Time |
| 12/27/2011 | 21:00:00 | 0 | 0 | 2.85 | 63.49 | Time |
| 12/27/2011 | 22:00:00 | 0 | 0 | 2.84 | 64.68 | Time |
| 12/27/2011 | 23:00:00 | 0 | 0 | 2.84 | 65.35 | Time |
| 12/28/2011 | 00:00:00 | 0 | 0 | 2.84 | 65.52 | Time |
| 12/28/2011 | 01:00:00 | 0 | 0 | 2.84 | 65.35 | Time |
| 12/28/2011 | 02:00:00 | 0 | 0 | 2.84 | 65.19 | Time |
| 12/28/2011 | 03:00:00 | 0 | 0 | 2.84 | 64.84 | Time |
| 12/28/2011 | 04:00:00 | 0 | 0 | 2.65 | 50.79 | Time |
| 12/28/2011 | 05:00:00 | 0 | 0 | 2.21 | 49.67 | Time |
| 12/28/2011 | 06:00:00 | 0 | 0 | 2.36 | 49.38 | Time |
| 12/28/2011 | 07:00:00 | 0 | 0 | 2.37 | 49.34 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/28/2011 | 08:00:00 | 0 | 0 | 2.56 | 49.67 | Time |
| 12/28/2011 | 09:00:00 | 0 | 0 | 2.23 | 49.99 | Time |
| 12/28/2011 | 10:00:00 | 0 | 0 | 2.71 | 51.74 | Time |
| 12/28/2011 | 11:00:00 | 0 | 0 | 2.57 | 50.63 | Time |
| 12/28/2011 | 12:00:00 | 0 | 0 | 2.33 | 49.67 | Time |
| 12/28/2011 | 13:00:00 | 0 | 0 | 2.31 | 50.31 | Time |
| 12/28/2011 | 14:00:00 | 0 | 0 | 2.43 | 49.67 | Time |
| 12/28/2011 | 15:00:00 | 0 | 0 | 2.66 | 49.99 | Time |
| 12/28/2011 | 16:00:00 | 0 | 0 | 2.45 | 50.47 | Time |
| 12/28/2011 | 17:00:00 | 0 | 0 | 2.38 | 49.67 | Time |
| 12/28/2011 | 18:00:00 | 0 | 0 | 2.55 | 50.15 | Time |
| 12/28/2011 | 19:00:00 | 0 | 0 | 2.57 | 54.71 | Time |
| 12/28/2011 | 20:00:00 | 0 | 0 | 2.78 | 56.66 | Time |
| 12/28/2011 | 21:00:00 | 0 | 0 | 2.87 | 61.46 | Time |
| 12/28/2011 | 22:00:00 | 0 | 0 | 2.86 | 62.81 | Time |
| 12/28/2011 | 23:00:00 | 0 | 0 | 2.85 | 63.15 | Time |
| 12/29/2011 | 00:00:00 | 0 | 0 | 2.85 | 62.98 | Time |
| 12/29/2011 | 01:00:00 | 0 | 0 | 2.85 | 62.64 | Time |
| 12/29/2011 | 02:00:00 | 0 | 0 | 2.85 | 62.03 | Time |
| 12/29/2011 | 03:00:00 | 0 | 0 | 2.87 | 61.46 | Time |
| 12/29/2011 | 04:00:00 | 0 | 0 | 2.79 | 49.34 | Time |
| 12/29/2011 | 05:00:00 | 0 | 0 | 2.35 | 49.50 | Time |
| 12/29/2011 | 06:00:00 | 0 | 0 | 2.23 | 48.20 | Time |

| Date | Time | | | | | |
|------|------|---|---|---|---|------|
| 12/29/2011 | 07:00:00 | | | 0 | 2.37 | 48.53 | Time |
| 12/29/2011 | 08:00:00 | | | 0 | 2.62 | 48.69 | Time |
| 12/29/2011 | 09:00:00 | | | 0 | 2.64 | 49.18 | Time |
| 12/29/2011 | 10:00:00 | | | 0 | 2.61 | 49.99 | Time |
| 12/29/2011 | 11:00:00 | | | 0 | 2.47 | 49.99 | Time |
| 12/29/2011 | 12:00:00 | | | 0 | 2.25 | 49.99 | Time |
| 12/29/2011 | 13:00:00 | | | 0 | 2.71 | 50.47 | Time |
| 12/29/2011 | 14:00:00 | | | 0 | 2.32 | 50.79 | Time |
| 12/29/2011 | 15:00:00 | | | 0 | 2.72 | 50.31 | Time |
| 12/29/2011 | 16:00:00 | | | 0 | 2.71 | 50.47 | Time |
| 12/29/2011 | 17:00:00 | | | 0 | 2.56 | 50.15 | Time |
| 12/29/2011 | 18:00:00 | | | 0 | 2.63 | 50.79 | Time |
| 12/29/2011 | 19:00:00 | | | 0 | 2.72 | 52.59 | Time |
| 12/29/2011 | 20:00:00 | | | 0 | 2.72 | 54.71 | Time |
| 12/29/2011 | 21:00:00 | | | 0 | 2.91 | 58.14 | Time |
| 12/29/2011 | 22:00:00 | | | 0 | 2.88 | 60.46 | Time |
| 12/29/2011 | 23:00:00 | | | 0 | 2.87 | 61.46 | Time |
| 12/30/2011 | 00:00:00 | | | 0 | 2.86 | 61.79 | Time |
| 12/30/2011 | 01:00:00 | | | 0 | 2.86 | 62.13 | Time |
| 12/30/2011 | 02:00:00 | | | 0 | 2.85 | 62.30 | Time |
| 12/30/2011 | 03:00:00 | | | 0 | 2.85 | 62.30 | Time |
| 12/30/2011 | 04:00:00 | | | 0 | 2.46 | 49.83 | Time |
| 12/30/2011 | 05:00:00 | | | 0 | 2.39 | 48.69 | Time |
| 12/30/2011 | 06:00:00 | | | 0 | 2.16 | 48.69 | Time |

| Date | Time | | | | | |
|---|---|---|---|---|---|---|
| 12/30/2011 | 07:00:00 | 0 | 0 | 2.40 | 49.02 | Time |
| 12/30/2011 | 08:00:00 | 0 | 0 | 2.70 | 49.83 | Time |
| 12/30/2011 | 09:00:00 | 7 | 6 | 2.51 | 50.77 | Time |
| 12/30/2011 | 10:00:00 | 13 | 11 | 2.44 | 51.16 | Time |
| 12/30/2011 | 11:00:00 | 14 | 12 | 2.47 | 50.27 | Time |
| 12/30/2011 | 12:00:00 | 12 | 10 | 2.45 | 50.78 | Time |
| 12/30/2011 | 13:00:00 | 13 | 11 | 2.44 | 51.21 | Time |
| 12/30/2011 | 14:00:00 | 13 | 11 | 2.49 | 51.20 | Time |
| 12/30/2011 | 15:00:00 | 13 | 11 | 2.46 | 51.87 | Time |
| 12/30/2011 | 16:00:00 | 12 | 10 | 2.57 | 51.71 | Time |
| 12/30/2011 | 17:00:00 | 12 | 10 | 2.44 | 52.23 | Time |
| 12/30/2011 | 18:00:00 | 13 | 11 | 2.40 | 52.14 | Time |
| 12/30/2011 | 19:00:00 | 12 | 10 | 2.42 | 51.93 | Time |
| 12/30/2011 | 20:00:00 | 9 | 8 | 2.54 | 53.34 | Time |
| 12/30/2011 | 21:00:00 | 4 | 3 | 2.57 | 53.29 | Time |
| 12/30/2011 | 22:00:00 | 0 | 0 | 2.88 | 65.52 | Time |
| 12/30/2011 | 23:00:00 | 0 | 0 | 2.87 | 67.38 | Time |
| 12/31/2011 | 00:00:00 | 0 | 0 | 2.86 | 68.09 | Time |
| 12/31/2011 | 01:00:00 | 0 | 0 | 2.85 | 68.60 | Time |
| 12/31/2011 | 02:00:00 | 0 | 0 | 2.85 | 68.77 | Time |
| 12/31/2011 | 03:00:00 | 0 | 0 | 2.85 | 68.94 | Time |
| 12/31/2011 | 04:00:00 | 16 | 14 | 2.35 | 54.56 | Time |
| 12/31/2011 | 05:00:00 | 12 | 10 | 2.55 | 51.61 | Time |

| Date | Time | | | | |
|---|---|---|---|---|---|
| 12/31/2011 | 06:30:00 | 15 | 12 | 2.42 | 50.90 | Time |
| 12/31/2011 | 07:00:00 | 13 | 11 | 2.46 | 50.82 | Time |
| 12/31/2011 | 08:00:00 | 15 | 13 | 2.51 | 50.49 | Time |
| 12/31/2011 | 09:00:00 | 14 | 12 | 2.39 | 51.05 | Time |
| 12/31/2011 | 10:00:00 | 13 | 11 | 2.43 | 51.46 | Time |
| 12/31/2011 | 11:00:00 | 13 | 11 | 2.39 | 52.50 | Time |
| 12/31/2011 | 12:00:00 | 16 | 13 | 2.42 | 51.77 | Time |
| 12/31/2011 | 13:00:00 | 14 | 12 | 2.36 | 52.28 | Time |
| 12/31/2011 | 14:00:00 | 14 | 12 | 2.49 | 52.25 | Time |
| 12/31/2011 | 15:00:00 | 14 | 12 | 2.48 | 52.31 | Time |
| 12/31/2011 | 16:00:00 | 16 | 13 | 2.39 | 51.97 | Time |
| 12/31/2011 | 17:00:00 | 13 | 11 | 2.40 | 52.53 | Time |
| 12/31/2011 | 18:00:00 | 6 | 5 | 2.48 | 53.53 | Time |
| 12/31/2011 | 19:00:00 | 3 | 3 | 2.65 | 59.30 | Time |
| 12/31/2011 | 20:00:00 | 0 | 0 | 2.87 | 68.42 | Time |
| 12/31/2011 | 21:00:00 | 0 | 0 | 2.86 | 70.50 | Time |
| 12/31/2011 | 22:00:00 | 0 | 0 | 2.86 | 71.20 | Time |
| 12/31/2011 | 23:00:00 | 0 | 0 | 2.85 | 71.55 | Time |
| 1/1/2012 | 00:00:00 | 0 | 0 | 2.85 | 71.55 | Time |
| 1/1/2012 | 01:00:00 | 0 | 0 | 2.87 | 71.38 | Time |
| 1/1/2012 | 02:00:00 | 0 | 0 | 2.84 | 71.02 | Time |
| 1/1/2012 | 03:00:00 | 0 | 0 | 2.84 | 70.50 | Time |
| 1/1/2012 | 04:00:00 | 17 | 14 | 2.35 | 54.17 | Time |
| 1/1/2012 | 05:00:00 | 14 | 12 | 2.44 | 50.92 | Time |

| Date | Time | | | | | Time |
|---|---|---|---|---|---|---|
| 1/1/2012 | 06:00:00 | 15 | 13 | 2.46 | 50.54 | Time |
| 1/1/2012 | 07:00:00 | 14 | 12 | 2.42 | 50.54 | Time |
| 1/1/2012 | 08:00:00 | 16 | 13 | 2.42 | 50.67 | Time |
| 1/1/2012 | 09:00:00 | 14 | 12 | 2.43 | 51.14 | Time |
| 1/1/2012 | 10:00:00 | 12 | 10 | 2.49 | 52.23 | Time |
| 1/1/2012 | 11:00:00 | 14 | 12 | 2.43 | 52.64 | Time |
| 1/1/2012 | 12:00:00 | 14 | 12 | 2.43 | 51.84 | Time |
| 1/1/2012 | 13:00:00 | 15 | 12 | 2.48 | 51.87 | Time |
| 1/1/2012 | 14:00:00 | 13 | 11 | 2.47 | 52.03 | Time |
| 1/1/2012 | 15:00:00 | 12 | 10 | 2.44 | 52.29 | Time |
| 1/1/2012 | 16:00:00 | 11 | 10 | 2.44 | 51.99 | Time |
| 1/1/2012 | 17:00:00 | 12 | 10 | 2.49 | 52.24 | Time |
| 1/1/2012 | 18:00:00 | 12 | 10 | 2.43 | 51.63 | Time |
| 1/1/2012 | 19:00:00 | 2 | 2 | 2.42 | 54.05 | Time |
| 1/1/2012 | 20:00:00 | 0 | 0 | 2.85 | 65.86 | Time |
| 1/1/2012 | 21:00:00 | 0 | 0 | 2.83 | 67.73 | Time |
| 1/1/2012 | 22:00:00 | 0 | 0 | 2.82 | 68.60 | Time |
| 1/1/2012 | 23:00:00 | 0 | 0 | 2.84 | 69.12 | Time |
| 1/2/2012 | 00:00:00 | 0 | 0 | 2.83 | 69.46 | Time |
| 1/2/2012 | 01:00:00 | 0 | 0 | 2.82 | 69.46 | Time |
| 1/2/2012 | 02:00:00 | 0 | 0 | 2.82 | 69.12 | Time |
| 1/2/2012 | 03:00:00 | 0 | 0 | 2.82 | 68.77 | Time |
| 1/2/2012 | 04:00:00 | 17 | 14 | 2.34 | 54.35 | Time |

| Date | Time | | | | |
|---|---|---|---|---|---|
| 1/2/2012 | 05:00:00 | 13 | 11 | 2.45 | 51.27 | Time |
| 1/2/2012 | 06:00:00 | 15 | 13 | 2.45 | 50.35 | Time |
| 1/2/2012 | 07:00:00 | 15 | 12 | 2.44 | 50.33 | Time |
| 1/2/2012 | 08:00:00 | 14 | 12 | 2.46 | 50.41 | Time |
| 1/2/2012 | 09:00:00 | 17 | 14 | 2.44 | 50.17 | Time |
| 1/2/2012 | 10:00:00 | 13 | 11 | 2.54 | 51.05 | Time |
| 1/2/2012 | 11:00:00 | 14 | 12 | 2.42 | 51.42 | Time |
| 1/2/2012 | 12:00:00 | 13 | 11 | 2.52 | 51.82 | Time |
| 1/2/2012 | 13:00:00 | 13 | 11 | 2.47 | 51.68 | Time |
| 1/2/2012 | 14:00:00 | 15 | 13 | 2.47 | 51.43 | Time |
| 1/2/2012 | 15:00:00 | 15 | 11 | 2.45 | 51.49 | Time |
| 1/2/2012 | 16:00:00 | 14 | 12 | 2.45 | 51.06 | Time |
| 1/2/2012 | 17:00:00 | 14 | 12 | 2.43 | 51.37 | Time |
| 1/2/2012 | 18:00:00 | 15 | 13 | 2.38 | 50.66 | Time |
| 1/2/2012 | 19:00:00 | 13 | 11 | 2.47 | 50.88 | Time |
| 1/2/2012 | 20:00:00 | 9 | 7 | 2.50 | 51.59 | Time |
| 1/2/2012 | 21:00:00 | 2 | 2 | 2.51 | 56.25 | Time |
| 1/2/2012 | 22:00:00 | 0 | 0 | 2.89 | 63.49 | Time |
| 1/2/2012 | 23:00:00 | 0 | 0 | 2.86 | 65.19 | Time |
| 1/3/2012 | 00:00:00 | 0 | 0 | 2.86 | 65.86 | Time |
| 1/3/2012 | 01:00:00 | 0 | 0 | 2.84 | 65.86 | Time |
| 1/3/2012 | 02:00:00 | 0 | 0 | 2.84 | 65.69 | Time |
| 1/3/2012 | 03:00:00 | 0 | 0 | 2.85 | 65.19 | Time |
| 1/3/2012 | 04:00:00 | 17 | 14 | 2.40 | 53.06 | Time |

**Records have been modified**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/3/2012 | 05:00:00 | 13 | 11 | 2.44 | 49.72 | Time |
| 1/3/2012 | 06:00:00 | 14 | 12 | ·2.38 | 49.01 | Time |
| 1/3/2012 | 07:00:00 | 15 | 13 | 2.41 | 49.34 | Time |
| 1/3/2012 | 08:00:00 | 16 | 13 | 2.43 | 49.85 | Time |

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------X
B&M LINEN CORP. and 220 COSTER LLC,                    :

                        **Plaintiffs,**              :

     -against-                                    :

                                :   **Index No. 11-013989**

220 LAUNDRY LLC, ELIOT SPITZER,                        :
MICHAEL STEINBERG and ADAM J. TELLER,                  :

                    **Defendants,**              :

     -against-                                    :

MIRON MARKUS and BORIS MARKUS,                         :

            **Additional Counterclaim** :
            **Defendants**              :   **AFFIDAVIT IN SUPPORT**
------------------------------------------------------------X   **OF ORDER TO SHOW**
220 LAUNDRY LLC and ELIOT SPITZER,                     :   **CAUSE SEEKING PRE-**
                                :   **LIMINARY INJUNCTION**
          **Third-party Plaintiffs,**    :

     -against-                                    :

MIRON MARKUS and BORIS MARKUS,                         :

         **Third-party Defendants.** :
------------------------------------------------------------X

STATE OF CONNECTICUT)
                ss.:
COUNTY OF FAIRFIELD)

       ELIOT SPITZER, being duly sworn, deposes and says:

Preliminary Statement

    1.    I am one of the above-named Defendants in this action. I submit this

Affidavit in support of Defendants' application for an Order to Show Cause, seeking a

1

Preliminary Injunction, to restore my company to possession of a commercial laundry
facility which it lawfully purchased.

2.     As I will explain in detail below, after I purchased the laundry business in
May, 2011, I not only paid almost $1 million toward the purchase price, but increased by
some 60 percent the monthly revenues which B&M Linen Corp. (hereafter "B&M or
"Seller") had been generating. The Seller, under a complete pretense of default, then
wrongfully seized the business from me and evicted me from the premises.

3.     The relief I seek is a preliminary injunction restoring what was the *status
quo* prior to the wrongful declaration of a default by a Seller who, post-closing, now
understands the profit potential of a business that had been in decline under its control.
That business is mine, and I want it back.

The Purchase Transaction

4.     As is detailed more fully in the Answer, Counterclaims and Third-party
Complaint annexed hereto, in November, 2010, after a period of investigation and
negotiation, I entered into an Assets Purchase Agreement with B&M.  B&M was
operating a commercial laundry facility at 220 Coster Street in the Bronx.  Its primary
customer base was hotels located in the New York City area.

5.     On a scheduled basis, B&M picked up dirty laundry from hotels,
transported it to the Coster Street facility, laundered it, and re-delivered it to its
customers.  The operation is both highly automated and labor intensive.  At the time of
my acquisition, B&M had approximately 145 employees.

6.     B&M has one shareholder, its President, Miron Markus.  Mr. Markus had
been in the laundry business for at least 25 years, and had been in operation at the

2

Coster Street facility for approximately six years. The other key people at B&M are his

two sons, Boris Markus and Michael Markus.

7.    In my negotiations with Miron Markus leading to the purchase transaction,

he informed me, in substance, that he was tired of the laundry business and wanted to

sell it. He told me that revenues had been in decline for a substantial period of time.

Mr. Markus is 73 years of age; I am 32 years of age.

8.    After a period of investigation into the business, I entered into the Assets

Purchase Agreement, dated November 10, 2010. A copy is annexed as Exhibit A to our

Answer. The Answer is annexed, marked as such. In light of that Agreement, I formed

220 Laundry LLC. At the closing, all my rights under the Assets Purchase Agreement

and relating closing documents were assigned by me to 220 Laundry, LLC (hereafter,

"220 Laundry" or "Purchaser").

9.    That Assets Purchase Agreement sets forth the basic terms of the

acquisition which was to take place on or before a stated date, after a period of due

diligence.

10.    Multiple provisions of the Assets Purchase Agreement required the Seller

to make available to me accurate financial information relating to the operation of the

facility.

11.    Paragraphs 8 and 8.4 of the Assets Purchase Agreement, specifically

state that in order to induce the Purchaser to purchase and to pay the purchase price

therefor, the Seller warranted and represented to the Purchaser that to the best of his

knowledge the Seller had complied with all laws, ordinances, rulings and regulations of

all governmental authorities having jurisdiction.

3

12. By Paragraph 10 of the Assets Purchase Agreement the Seller was obligated to obtain and deliver at closing a final water meter reading and to pay all outstanding charges in accordance with said reading.

13. Pursuant to Paragraph 13 of the Assets Purchase Agreement, each of the terms, conditions, covenants, provisions, agreements and representations contained therein survived the closing of sale.

14. Pursuant to Paragraph 29(d) of the Rider to the Assets Purchase Agreement, the Seller represented and warranted that financial statements provided by the Seller to the Purchaser "shall fairly present the consolidated financial conditions of Seller" and that the statements "reflect the consistent application of accounting principles."

15. At Paragraph 29(i) of the Rider to the Assets Purchase Agreement the Seller represented and warranted that the books of account and other records of the Seller which were made available to the Purchaser "are accurate and complete in all material respects and have been maintained in accordance with sound business practices."

16. Pursuant to Paragraph 33 of the Rider to the Assets Purchase Agreement, the Seller was obligated to inform the Purchaser promptly in writing and prior to closing if the Seller became aware of any fact or condition that caused or constituted a breach of any of the Seller's representations and warranties.

17. Among the financial information presented by Miron Markus to me prior to closing were records which indicated the costs which the Seller had paid during the

4

operation of its business for utilities, including, but not limited to, providers of water and

gas.

18.  It was in reliance on the information which was provided to me, and on the

several warranties and representations set forth above, that I agreed to the purchase

price which ultimately came to be contained in a Modification of Assets Purchase

Agreement ("Modification"), and agreed to execute all other closing documents,

including:

a) Promissory Note in the principal amount of $1,000,000;

b)  Promissory Note in the principal amount of $8,600,000, a copy of
which is annexed to the Answer as Exhibit B;

c)  a Personal Guaranty of the $8,600,000 Note;

d)  Security Agreement in favor of  B&M, securing 220 Laundry's
obligations under the $8,600,000 Note, covering all assets "as were
transferred by Secured Party to the Debtor in accordance with an Assets
Purchase Agreement and a bill of sale dated May 23, 2011";

e)  Security Agreement in favor of  B&M, securing 220 Laundry's
obligations under the $1,000,000 Note, covering all assets "as were
transferred by Secured Party to the Debtor in accordance with an Assets
Purchase Agreement and a bill of sale dated May 23, 2011"; and

f)  Lease for the business premises, running between 220
Coster, LLC, as Landlord, and 220 Laundry, as Tenant, the identity of
the tenant being set forth in the Modification.

19.    At no point prior to or at closing, did Miron Markus or any other

representative of the Seller, inform me of any inaccuracies in the financial information

provided during the due diligence period or of any non-compliance by the Seller with

any of its legal obligations.

5

20.    I now know, in fact it was admitted to me by Miron Markus, that he actively and willfully concealed from me the actual, lawful costs of water and gas service necessary to operate the facility.

21.    I conservatively estimate that the actual lawful costs of water and gas necessary for the facility's operation was understated by the Seller and Miron Markus by some $850,000 per annum.

22.    Miron Markus, individually and as a principal of Seller, had full knowledge of the actual lawful cost of utilities, but for the purpose of wrongfully inducing me to enter into the purchase transaction, he activity concealed and misrepresented the utility costs.

<u>The Modification Agreement and Closing</u>

23.    After a period of due diligence, during which I justifiably assumed that I was receiving accurate financial information from the Seller, a closing came to be scheduled. By this point, however, I had substantially renegotiated the purchase terms. The new terms came to be set forth in the Modification. The basic form of that document was a reaffirmation of the provisions of the original agreement, except as specifically amended by the Modification. For example, a "time is of the essence" provision as to the original deadline for closing the transaction was deleted. As stated, payment terms were specifically amended. A copy of the Modification is annexed to the Complaint. The Complaint is annexed, marked as such.

24.    While the agreement speaks for itself, in the most basic terms, under the Modification, I was to pay a total of $10,600,000 to the Seller and a broker, with

6

$9,600,000 of such sum being reflected by two promissory notes. At closing there was a negotiated adjustment to the written terms. In fact, I paid $600,000 in connection with the closing; that is, $500,000 to the Seller and $100,000 to the broker, and executed two promissory notes, one in the principal amount of $1,000,000 and the other in the principal amount of $8,600,000. Monthly payments were required to be made under the latter note.

25.    The closing took place on May 19, 2011, effective May 23, 2011, as is alleged in the Complaint. A provision in the Modification stated that all originals and all copies of closing documents were to be held in escrow until the $1,000,000 Note was fully paid. The last payment on that Note is not due until a date in June, 2012, and therefore I am not in possession of executed copies of most of the closing documents.

### Consulting Arrangement

26.    For a simple and obvious reason, I negotiated a provision in the Modification by which I could call upon any of the Seller's principals or representatives for consulting services, from 6:00am to 6:00 pm, seven days a week. That reason was that I had no experience in the laundry business and they did. Even if I had had experience in the laundry business in general, they had complete knowledge as to that particular facility. As the facility was highly automated, housing sophisticated and complex machinery, their availability under the consulting arrangement was very important to my transition into the business.

7

27.  More particularly, under the Assets Purchase Agreement, the Seller was to

provide one month of free consulting.  Thereafter, consulting services were to be

performed only as requested by Purchaser, and compensated for monthly, at the rate of

$20,833.33, that is, $125,000 for a six-month period.   The Purchaser had the right to

terminate the consulting arrangement at any time.  This reflected the realities of the

transaction:  I needed the Seller to be on call for the period immediately following the

closing, then, as I learned the business and/or brought in key operations people, I could

at some point conclude the consulting arrangement.

<u>Post-Closing Conduct by Seller and its Representatives</u>

28.  At least as concerns attitude, I can summarize the post-closing conduct of

the Markus' in one phrase:  they acted like they never sold the business.

29.  Almost immediately after the closing, I began to grow the business and did

so significantly.  Prior to closing, B&M had monthly revenues of approximately

$500,000. Within three and one-half months, I had grown the monthly revenues to

approximately $800,000, a 60 percent increase.  It should be said that some of that

increase was based on steps which had been initiated by B&M prior to closing,

however, much of the growth was due to the hard work and energy which we, as new

owners, applied to the business.  That is exactly what I thought would happen when I

made a serious financial commitment to purchase the business.

30.    The Markus' seemed to regret almost immediately their decision to sell the

business.  In fact, only Miron Markus had the right to sell the business, and he did so

8

over the strenuous objection of his sons. Although the Markus' had the right to be on the premises when requested under the consulting provisions of the agreement I referred to above, they regularly came to the facility without being asked.

31.     As is detailed more fully in our Answer, after the closing, and notwithstanding the rights conferred to Purchaser under the closing documents, the Markus' consistently and systematically interfered with our operation of the business, and, as I stated, to a large extent conducted themselves as though Seller had maintained all pre-closing operational authority.

32.     On numerous occasions, Miron Markus demanded that I regularly arrive at work at 6:00 am. He said to me, including in front of my own employees, that if I did not do so I would be given "two weeks notice", a position wholly inconsistent with the transfer of the business effected by the closing documents.

33.     Both Miron Markus and Boris Markus, as well as Michael Markus, demanded that certain employees of 220 Laundry perform certain functions in certain ways, including by giving priority to certain customers, particularly the New York Palace Hotel. To be clear, this was not "consulting advice" being given to us pursuant to the terms of the agreement. These were hostile demands made by Miron and Boris Markus.

34.     Boris Markus, on or about September 19, 2011, having no authority to do so, countermanded instructions of my General Manager, Christian Olsen, as to the loading and dispatch of trucks. Boris wanted trucks dispatched to a customer which he preferred. When Olsen rightfully asserted control of the facility's operations, he was

9

physically threatened by Boris Markus, who charged Olsen with a wheeled laundry bin in the back of a truck, in a manner that led to an emergency 911 call being placed to the New York City Police Department.

35.    Both Miron Markus and Boris Markus, went so far as to fire people who were no longer employees of the Seller; they were employees of 220 Laundry. These included supervisory staff and mechanics who were told that they had to leave the facility immediately and never return.

36.    On or about September 19, 2011, Boris Markus came to the premises, without being asked, and started an argument with me. In a highly enraged state, he violently threw a clipboard at me, hitting me on the upper leg. I have a photograph of the resulting injury.

<u>The September 27, 2011 Meeting</u>

37.    Obviously the situation at the facility could not continue.  I retained legal counsel and asked him to try to convene a meeting between the principals and counsel. The other side seemed to want to meet as well. A meeting commenced at Noon on September 27, 2011.

38. Our goal at the meeting was simply to terminate all involvement by Seller, its principal and representatives in the business, and to continue to honor our purchase commitments. We came to inform them that the consulting agreement was terminated, as was clearly our right, and that we did not wish them to be on the business premises any longer.

10

39. Counsel for the Seller, Juliean Galak, responded by saying that we should consider accepting "a rollback", which he explained was some arrangement by which the purchase transaction would be "undone". He then stated, specifically, that if, however, we wanted to continue to run the business, that would be fine, and there would be no interference from the Seller. We immediately embraced that very scenario, and told the Seller that that is exactly what we came to the meeting to accomplish.

40. At that point, and only at that point, did Mr. Galak say something to the effect: "Of course this presumes that you have the right to do so and that there are no defaults."

41. To be clear, at no point up until that statement had we received any notice of any default as to any obligation. In response to that comment, our attorney asked: "Are you contending that there is a default of some kind?" The initial response was to the effect: "Well, there may be." After further probing, Seller, for the first time contended that a monthly installment payment due under the $8,600,000 Note in the amount of $41,666.67 had not been paid on Friday, May 23, 2011 when they claimed it was due. In fact, that payment was made by me personally on Sunday, May 25, 2011. I did not do so on Friday simply because of Sabbath observance, both by me and by other key employees.

42. Thus, two days before the meeting, and before any declaration of a default, a check was delivered by Purchaser to Seller. It was not deposited by Seller, yet by its First Cause of Action, Plaintiff demands payment of that very sum.

11

43. It is obvious that Seller regrets its decision to sell. It saw how, in a short period of time, revenues were increased some 60 percent. It was also confronted with the termination of a $20,833.33 monthly consulting arrangement, and looking at a fairly slow pay-out of the purchase price, under the binding and fully negotiated terms of the purchase agreement. Miron and Boris Markus came to the meeting to attempt to introduce a buy-back of some kind; when they were told that that was of no interest to Purchaser, they invented a claim of default.

44. The Notice of Default is annexed to the Complaint. Even if payment was due on Friday, May 23, 2011 (we were never given an executed copy of the Note), the notion that delivery of the May payment on May 25, 2011 constitutes a "material breach" is baseless. We made the payment before any claim of default, and although the check was not deposited, in its own Complaint, Seller renews its demand for payment of that very sum.

45. As for the other vaguely referenced claims of default enumerated in the Complaint, surely included to shore up a plainly deficient one, they are similarly baseless. For example, as to a claim of diminution of the value of the assets, it was the Markus' themselves who, for valuable consideration, took on the task of arranging for or performing continuing maintenance of the facility and equipment therein. That was their main function operating under the consulting agreement. We knew how to grow the business, and did not need their help in that regard, what we needed them to do was to maintain the complex equipment with which they, and not we, were familiar, particularly as we brought more and more business to the facility.

12

## Seller's Material and Pre-existing Default

46.   Moreover, it is now known that Seller was perpetually in material default of
its contractual obligations.   Miron Markus was actively aware that the financial
documents which he presented to me, which were warranted to present fairly the
company's finances, were grossly distorted as concerns, at least, utility costs. I actually
believe that because it was just a matter of time before the true utility costs would
become known to me that Miron Markus disclosed the discrepancy.   Then, as I was in
the process of determining the magnitude of the discrepancy, the Seller advanced its
baseless claim of default.

## Our Eviction from the Premises

47.   The Notice of Default asserts that the appearance of any agent of the
Purchaser on the premises will be deemed by Seller as a trespass.  Given the hostile
and violent behavior, particularly of Boris Markus, we have not returned to the facility.
When our General Manager, Christian Olsen, went to the facility on September 29,
2011 to deliver payroll checks, he was denied access to the premises, specifically by
Boris Markus.

## Conversion of Funds

48.   Significant sums are received every day at the facility in the form of
payment by customers.  As stated, as of the time of our wrongful eviction, monthly

13

revenues were approximately $800,000, and our outstanding accounts receivable stood at approximately $850,000.

49.     Sums received by Seller on and after September 27, 2011 were on account of services rendered to customers by Purchaser, prior to any declaration of a default.  We have demanded the turnover of such funds to us.  Seller has refused that demand and has refused even to account for the sums undoubtedly received.

## Relief Requested

50.  The situation begs for injunctive relief, including the restoration of the <u>status quo ante</u>.  I respectfully request that an order be issued as follows:

a) that Plaintiffs and Additional Counterclaim Defendants be ordered to show cause, at the earliest possible return date, why a preliminary injunction should not be granted:

i)      restoring Defendant 220 Laundry to immediate possession of the 220 Coster Street facility;

ii)     barring Plaintiffs and their agents from the facility and barring them from any interference with the business operations of the facility by 220 Laundry;

iii)    directing Plaintiff B&M to account immediately for all sums received and all payments made from and including September 27, 2011 to the date of such accounting as a result of operations at the facility;

iv)    suspending all payment obligations on the part of Purchaser and its guarantors, pending further order of the Court upon a determination of the amount by which monthly expenses for water and gas service to the facility were wrongfully

14

misstated by Plaintiffs and Additional Counterclaim Defendants, and directing that discovery proceed immediately as to said monthly expenses;

v)    directing Seller and its principals and representatives to comply immediately with all obligations contained in the closing documents relating to the transfer of operational control of the facility from Seller to Purchaser, including but not limited to those provisions relating to the email address and website for the business; and

vi) such other and further relief as to the Court may seem just and proper;

51.    No prior application has been made for the relief herein requested.

_____
Eliot Spitzer

Sworn to before me this

6 th    day of November, 2011

Stephen R. Sugrue
Commissioner of the Superior Court of the
State of Connecticut
JURIS NO. 101533

15

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,

                            Plaintiffs,

     -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                          Defendants,

     -against-

MIRON MARKUS and BORIS MARKUS,

                 Additional Counterclaim
                 Defendants

**Index No. 11-013989**

-------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

                 Third-party Plaintiffs,

     -against-

MIRON MARKUS and BORIS MARKUS,

                 Third-party Defendants.

-------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

       Defendants 220 Laundry LLC, Eliot Spitzer, Michael Steinberg and Adam

J. Teller, by their undersigned attorneys, for their Memorandum of Law in Support of

their motion for a preliminary injunction, state as follows.

1

## Relevant Facts

For a statement of the relevant facts, the Court is respectfully referred to the accompanying Affidavit of Eliot Spitzer, a Defendant and Third-party Plaintiff. An even more detailed statement of the facts is contained in Defendants' Answer and Third-party Complaint, a copy of which is annexed to the Spitzer Affidavit.

Facts relevant to particular arguments set forth below will be incorporated further, with appropriate references to that Affidavit and exhibits thereto.

### Argument

### POINT I

### ALL OF THE STANDARDS FOR THE ISSUANCE OF A PRELIMINARY INJUNCTION ARE SATISFIED.

The standards for the granting of preliminary injunctive relief are by now well settled. A party seeking a preliminary injunction has the burden of demonstrating by clear and convincing evidence: 1) a likelihood of ultimate success on the merits; 2) the prospect of irreparable injury if the provisional relief is withheld; and 3) a balance of the equities in the movant's favor. Reichman v. Reichman, 2011 NY Slip Op 7023, 2011 N.Y. App. Div. LEXIS 6921 (2d Dep't 2011), and see multiple citations therein. See also, Putter v. Singer, 73 A.D. 3d 1147, 901 N.Y.S. 2d 382 (2d Dep't 2010).

Each of these standards is met upon this application.

2

## A. Likelihood of Success on the Merits.

Both the existence of a material default by <u>Seller</u> as of the date of closing and continuing thereafter, and absence of any material default by Purchaser are clear.

B&M, as Seller, had the obligation during the due diligence period to present books and records which fairly presented, among other things, the cost of operation of the business. Not only did B&M, acting through Miron Markus, admit, post-closing, that the actual cost of both gas and water necessary to operate the business had been grossly understated by Seller prior to closing, but the discrepancy between what was represented and what the actual costs are can be established readily apart from Miron Markus' admission.

Although under the Modification of the Assets Purchase Agreement, Purchaser was not entitled to retain either originals or copies of the closing documents, Purchaser has retained possession of documentation produced during the due diligence process as relates to the represented costs for gas and water service to the facility. The actual costs are, obviously, readily determinable. Thus the discrepancy can be easily demonstrated once access to the premises is restored.

Purchaser conservatively estimates that the annual total utility costs were understated by some $850,000. This represents a significant percentage of annual revenues generated from operations.

Thus, even before consideration of the bogus claim by Seller of a material default by Purchaser, the conclusion is inescapable that Seller was in perpetual material default of the Assets Purchase Agreement.

3

Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain, or synonymously, where that party has committed a material breach.

Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F. 3d 171, 185 (2d Cir. 2007), cited in ASM Financial Funding Corp. v. K-sher Corp., 21 Misc. 3d 1102, 873 N.Y.S. 2d 231 (Sup. Ct. Nassau Co. 2008).

While the misrepresentation as to actual utility costs was, until the wrongful declaration of default and wrongful eviction, Seller's most significant material breach, the several other material breaches are clear and convincing as well.

As just some examples, Seller was obligated under the transactional documents to transfer control of its website and email address to Purchaser. It simply never did, and there is no factual basis for Seller to contend otherwise. Similarly, Seller's obligation as to the provision of consulting services is plainly set forth in the transactional documents (Assets Purchase Agreement at Paragraph 21), which provide for on-call consulting services in exchange for stated monthly compensation. As set forth in the Spitzer Affidavit, it was critical that Purchaser, in the months after the acquisition, have access to the operational experience of Seller, because of the complexity of the plant and equipment.

Realizing this, the Markus' demanded that sums be paid to them for consulting services beyond what was called for under the agreement. That they did so is not in dispute; it is admitted by their own Complaint, in which they assert that certain additional charges were not paid. The Assets Purchase Agreement, and Modification thereof, preclude oral modification of their terms. Plaintiffs have no written modification

4

of the terms of the consulting agreement. Thus, it is clear that Seller refused to provide contractually required consulting services for the contractually bargained for consideration.

As stated, under New York law, these multiple breaches by Seller, which are in fact material, excuse performance by Purchaser. Nonetheless, Purchaser did in fact perform its obligations.

As recited in the Spitzer Affidavit, 220 Laundry, either in connection with the closing or thereafter, paid some $950,000 toward the total purchase obligations. The contention by Seller that a material default exists because a monthly note payment of $41,666.67, said to be due September 23, 2011, was not paid until September 25, 2011, is baseless.

In the first place, under the closing documents, Purchaser was not permitted to retain either the originals or any copies of the closing documents. Presuming that the 23rd of the month was the date set forth in the original note (the closing having taken place on May 19, 2011, but effective May 23, 2011), September 23, 2011 was a Friday. Mr. Spitzer and other principals of 220 Laundry observe the Jewish Sabbath. Consistent therewith, on Sunday, September 25, 2011, Mr. Spitzer prepared and delivered the check.

This occurred prior to any declaration of any default of any kind. The check was retained by Seller, though not deposited. It is noteworthy that by its First Cause of Action, B&M seeks payment of that very installment-- the check having been tendered to and retained by B&M.

5

Even if a conclusion were reached that payment was actually due on the 23rd of September, the contention that this was a material breach is utterly baseless.

Under New York law, materiality of a breach is a question of fact. For a breach to be material, it must be so substantial that it defeats the object of the parties in making the contract; the breach must go to the root of the agreement between the parties. See, e.g., Qualcomm, Inc. v. Texas Instruments, Inc., 875 A. 2d 626 (applying New York law) (Supreme Ct. Delaware 2004).

Thus, for example, courts have denied claims of foreclosure where a borrower has resolved, or been willing and able to resolve, technical departures from loan obligations. See, Noyes v. Anderson, 124 NY 175 (1981) (sewer assessment paid late); Domus Ralty Corp. v. 3440 Realty Co., 179 Misc. 749 (five-day delay in payment of principal; Germania Life Ins. v. Potter, 124 A.D. 814 (1st Dep't 1908) (one day delay in payment of taxes); LaSalle Bank, N.A. v. Merrill Lynch Mortgage Lending, Inc., 2007 U.S. Dist. LEXIS 59303, at pp. 38-40 (S.D.N.Y. 2007) (payment outside a five-day grace period).

Even if the New York statutory rate of interest were to be applied to a two-day delay in making the September payment, interest amounts to about twenty dollars. Consideration of deposit interest actually available currently yields a loss of interest of less than $5.00.

After payment of some $950,000 in the four-month period from closing to the wrongful declaration of default— made after the September check was tendered and retained—the contention that a material breach occurred on the part of Purchaser is baseless.

6

As to the other claims of default, no notice whatsoever being given to Purchaser prior to its eviction, they are clearly and convincingly without merit. The assertion that there was a diminution in the value of the plant and/or equipment during Purchaser's operation of the premises is, if it were true, something for which Seller, acting through Miron and Boris Markus, was directly responsible. Their basic responsibility under the consulting agreement was to perform, or arrange to be performed, necessary maintenance for the plant and equipment. Not only were they paid for doing so, even their excessive demands for payment were met, as Purchaser was critically dependent on the Markus' expertise in the period immediately following the acquisition.

Simply stated, the parties' competing claims of material breach are diametrical opposites: the multiple material defaults by Seller are readily demonstrable; the contention that a two-day delay in making a payment, if indeed it was due on September 23, 2011, cannot conceivably be deemed material in light of the transaction considered as a whole. Further, the material breaches by Seller were pre-existing and continuous.


**B.    Irreparable Injury.**

Following the May 23, 2011 acquisition, 220 Laundry immediately began to add significantly to the monthly revenue generated by the facility. Monthly *revenues* generated by Seller as of closing, some $500,000, had increased some 60 percent, to $800,000, as of the time of the sudden, wrongful eviction.

7

Indeed, as explained in the Spitzer Affidavit, it is surely the realization by the Seller, post-closing, of the actual potential of the business that prompted the Seller to take the business back, with no genuine legal basis for doing so.

Simply stated, by its wrongful seizure of the business, there is an ongoing interference, every day, by Seller with Purchaser's customer and vendor relationships. Even if, upon Purchaser's restoration to possession, a full accounting is made, damage to the business relationships which rightfully belong to Purchaser could never be quantified accurately.

It merits emphasis that the Assets Purchase Agreement contained a provision barring the Seller and its principals from engaging in the commercial laundry business for a period of five years from closing. Courts have routinely recognized that violation of such covenants provides a basis for injunctive relief, as the effect of a breach cannot be determined easily, if at all.

Further, the egregious nature of Seller's conduct renders it highly doubtful that Seller will henceforth maintain accurate books and records of its post-seizure business dealings such as would provide Purchaser with a reliable basis to determine money damages. Restoration of Purchaser to possession of the premises, without interference by Seller, is thus essential to achieve justice.

> "The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation of property that could render a judgment ineffectual." (Ruiz v. Meloney, 26 AD3d 485, 486, 810 N.Y.S. 2d 216). "The decision to grant or deny a preliminary injunction lies within the sound discretion of the Supreme Court" (Arcamone-Makinano v. Britton Prop., Inc., 83 AD3d 623, 625, 920 N.Y.S. 2d 362). "The mere existence of an issue of fact will not itself be grounds for the denial of the motion" (id).

8

Reichman, supra at p.3

Defendants are similarly concerned that Plaintiffs, having wrongfully seized control of the business, will attempt to sell it to some third party, which could well impact adversely Defendants' judgment rights and remedies.

In Reichman, supra, the Appellate Division Second Department modified so much of this Court's order (per Justice Driscoll) as denied preliminary injunctive relief. There, the plaintiff commenced a declaratory judgment action, seeking a declaration that he was the rightful owner of a majority of shares of a limited liability company. The Appellate Division ordered that the defendant be restrained during the pendency of the action from transferring accounts associated with the LLC, accessing its computers and servers, drawing funds of the company, etc. Similar relief is warranted here, where the central question in the case is as to lawful ownership of the business and lawful possession of the business premises.

## C. Balance of Equities.

Clearly the balance of equities in this case is in favor of Defendants. Plaintiffs have been paid some $950,000 by 220 Laundry. In addition, Plaintiffs, by their wrongful seizure of the premises have received some $850,000 in receivables generated by Purchaser's undisputedly lawful operation of the business prior to any declaration of a default, and has refused to account to Purchaser for any such sums received.

During the four months or so that Purchaser was operating the business, revenues were increased some 60 percent, and Seller has, of course, seized the benefits of Purchaser's demonstrated business skill.

9

In contrast, the most that Seller complains of is a $41,666.67 payment being two days late, a payment which was tendered prior to any declaration of a default. To the extent that Plaintiffs complain of some diminution in the plant and/or equipment taking place during Purchaser's possession of the premises, this can only be laid at the door of Seller, which was paid significant consulting fees for the very purpose of maintaining the plant and equipment.

As specified more fully in the Spitzer Affidavit and in the Answer and Third-party Complaint, even before the wrongful eviction of Purchaser from the premises, Purchaser had to endure constant interference with its rightful control of the business operations, including acts of violence perpetrated by Boris Markus.

No equitable consideration in this case favors Plaintiffs. In contrast, the injustice suffered by Defendants, who did nothing other than meet all of their purchase obligations, only to learn later that those commitments were fraudulently obtained by Seller, is clear and convincing.

### Conclusion

The requested injunctive relief is warranted

Dated: November 6, 2011

COTI & SUGRUE

By _____

Stephen R. Sugrue
59 Grove Street Suite 1F
New Canaan, CT 06840
203-966-5817

10

# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,

                       Plaintiffs,

    -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                    Defendants,

    -against-

MIRON MARKUS and BORIS MARKUS,

              Additional Counterclaim
              Defendants

------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

              Third-party Plaintiffs,

    -against-

MIRON MARKUS and BORIS MARKUS,

              Third-party Defendants.

------------------------------------------------------------X

Index No. 11-013989

**AFFIMATION AS TO
SERVICE OF ORDER TO
SHOW CAUSE**

STEPHEN R. SUGRUE, an attorney duly admitted to practice before the Courts
of the State of New York, hereby affirms under penalty of perjury, as follows:

1.    I am counsel for Defendants and Third-party Plaintiffs herein.

2.    As to the provision in the proposed Order to Show Cause relating to

sufficient service of the signed Order and supporting papers, I wish to inform the Court

of a Stipulation entered into between me, and Juliean Galak, Esq., on behalf of our respective clients, relating to service of papers, a copy of which is attached. We have each agreed to accept service of all papers on behalf of our respective clients.

Dated:  November 6, 2011

_Stephen R. Sugrue_
Stephen R. Sugrue

nee York, hef

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NASSAU

---

B&M LINEN CORP and 220 COSTER LLC,

                        Plaintiff(s),

      -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER

                       Defendant(s).

**STIPULATION**

Index No.: 11-013989

---

     IT IS HEREBY STIPULATED AND AGREED, by and between the
undersigned, parties to the above entitled action, or their
attorneys of record, that whereas no party hereto is an infant,
incompetent person for whom a committee has been appointed, or
conservatee and no person not a party has an interest in the subject
matter of the action, the Plaintiffs and the Defendants hereby agree
as follows:
     That Steve Sugrue, Esq., of COTI & SUGRUE, attorney for
Defendants, accepts service of the enclosed summons and complaint in
the abovecaptioned matter on behalf of all Defendants, and that the
Defendants hereby waive any and all defenses in this matter related
to the service of process.
     That Juliean Galak, Esq., of Law Offices of Juliean Galak, PC,
attorney for Plaintiffs shall accept service of any and all legal
documents related to any disputes between the parties hereto, and
that upon actual receipt by Juliean Galak of any such documents,
service shall be deemed complete, and if said documents actually
received by Juliean Galak constitute a summons and complaint, or
summons with notice in any action between the parties hereto,
Plaintiffs shall waive any and all defenses related to the service
of proces
     For the purposes of this stipulation, faxed signatures shall be
deemed to be original. This stipulation may be filed without
further notice with the Clerk of the Court.

Dated: _10-26-11_ , _____

_____, ' _____

Dated: Brooklyn, New York
      October 7, 2011

Steve Sugrue,
Attorney for Defendants

Juliean Galak,
Attorney for Plaintiffs

# EXHIBIT G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------------X
B&M LINEN CORP and 220 COSTER LLC,

                           Plaintiffs,

      -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                          Defendants,

      -against-

MIRON MARKUS and BORIS MARKUS

         Additional Counterclaim Defendants.
-----------------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,

             Third-party Plaintiffs,

      -against-

MIRON MARKUS and BORIS MARKUS

             Third-party Defendants,
-----------------------------------------------------------------------X

Index No.: 13989/11

**Notice of Cross-Motion**

**Assigned to:**
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

       PLEASE TAKE NOTICE, that upon the annexed affirmation of THOMAS J. SOLOMON,

ESQ., duly affirmed the February 17, 2012, together with the Exhibits annexed thereto, the

undersigned will cross-move this Court at the Motion Support Office thereof, at the Supreme

Courthouse located at 100 Supreme Court Drive, Mineola, NY, on **February 22, 2012 at 9:30 AM,,**

or as soon thereafter as counsel can be heard for an Order for Default Judgment, or in the alternative,

extending the time of the Plaintiffs/Third-party Defendants herein to submit an Answer to the Third-

Party complaint and the Counterclaims and in opposition to the motion of Defendants/Third Party

Plaintiffs' motion seeking Default Judgment and for such other, further, and different relief that this

Court may find just and proper.

Dated: Brooklyn, New York
November 28, 2008

Yours, etc.

LAZAROWITZ & MANGANILLO, L.L.P.

By: Thomas J. Solomon
Trial Counsel for Plaintiffs/Third-party Defendants
Office and P.O. Address
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700

To: Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------------X
B&M LINEN CORP and 220 COSTER LLC,

                                Plaintiffs,

        -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                              Defendants,

        -against-

MIRON MARKUS and BORIS MARKUS

            Additional Counterclaim Defendants.
------------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,

                Third-party Plaintiffs,

        -against-

MIRON MARKUS and BORIS MARKUS

                Third-party Defendants,
------------------------------------------------------------------X

Index No.: 13989/11

**<u>Affirmation in Support
of the Cross-Motion
and in Opposition to the
Motion</u>**

**Assigned to:**
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

THOMAS J. SOLOMON, an attorney duly licensed to practice law in The State of New York,

herby affirms the truth of the following upon information and belief pursuant to CPLR §2106 and

under the penalty of perjury upon information and belief, the source of said belief being a file

maintained by this office and conversations in which I personally engaged as described herein:

       1.     I am an associate of the law firm Lazarowitz & Manganillo, L.L.P., trial counsel to

the attorneys for the Plaintiffs/Third-party Defendants herein, and I am fully familiar with the facts

and circumstances of this matter based upon working with the case file maintained in my office.

       2.     This affirmation is submitted in support of the instant motion for Default Judgment

or in the alternative to extend the Plaintiffs/Third-party Defendants' time to submit an Answer to

the Third-Party complaint and the Counterclaims and in opposition to the motion of Defendants/Third Party Plaintiffs' motion seeking Default Judgment.

3.      This action was commenced by service of the Summons and Complaint attached hereto as Exhibit A. Receipt of this is acknowledged in Defendants/Third Party Plaintiffs' motion seeking Default Judgment.

4.      Attached hereto as Exhibit B is the affidavit of MIRON MARKUS, properly sworn and clearly laying out the merits of both the claims and the defenses of the Plaintiffs/Third-party Defendants. Mr. Markus is a principal of the Plaintiffs and is one of the Third-party Defendants in the above-entitled action. In his affidavit, he clearly details the facts underlying the allegations in the Complaint. He also refutes, with great specificity, the claims of Defendants/Third Party Plaintiffs. Additionally submitted herewith are two proposed Orders s this motion seeks alternative relief.

5.      While I did meet Mr. Sugrue on November 29, 2011, the contents of the conversation was somewhat different than he has represented to this Honorable Court. At that time, I pointed out to counsel that his Answer was defective due to the fact that it was unverified. I offered to waive this defect in return for additional time to submit an Answer to their claims contained therein. I made this offer in hopes of expediting the process of moving this case forward on its merits. I pointed out that I had been just been retained upon my clients' receipt of a lengthy Order to Show Cause served on the eve of the Thanksgiving holiday travel week and returnable immediately thereafter. Mr. Sugrue correctly reports that he spurned my offer.

6.      Mr. Sugrue also correctly reports that I rejected his defective papers promptly thereafter and elected, in writing, to treat the defective papers as a nullity pursuant to CPLR §3022. Since the Answer of Defendants/Third Party Plaintiffs was properly rejected, Plaintiffs/Third-party

Defendants are entitled to Default Judgment. As discussed in the Memorandum of Law submitted herewith, the rejection of Defendants/Third Party Plaintiffs' papers was proper because, being unverified, they contravened CPLR § 3020(b)(2) and because New York law does treat Limited Liability Companies as Corporations.

7.     Despite the foregoing, the undersigned made one more attempt to move this matter forward on its merits by submitting an Answer to the Defendants/Third Party Plaintiffs. Their motion papers concede receipt of the Answer and detail the rebuffing of this overture.

8.     Since the Answer of Defendants/Third Party Plaintiffs was properly rejected, it cannot form the basis of a Default Judgment. Even if it could form the basis for a Default Judgment, the moving papers in this case contain a serious defect: They contain neither a verification nor an affidavit by a party. As discussed in the Memorandum of Law submitted herewith, this defect is not only fatal to a Default Judgment motion; it also cannot be remedied in reply papers. For this reason alone, Defendants/Third Party Plaintiffs' motion for Default Judgment must be denied.

9.     If, for any reason, this Court finds that Defendants/Third Party Plaintiffs are owed an answer, then it is respectfully requested that Plaintiffs/Third-party Defendants' time to supply one be extended. As detailed in the Memorandum of Law Submitted herewith, the time to provide an Answer should be extended upon a showing of a meritorious defense and a reasonable excuse for the delay.

10.     The affidavit attached hereto as Exhibit B clearly details a meritorious defense. As to a reasonable excuse for the delay, complexities unique to this case provide such an excuse over and above the belief of the undersigned that no such Answer is due.

11.     As pointed out above, this office had been just been retained upon my clients' receipt of a lengthy Order to Show Cause served on the eve of the Thanksgiving holiday travel week and returnable immediately thereafter. Responding to the Order to Show Cause required detailed analysis of documents and negotiations and actions of the parties.    At that time, it appeared that the Defendants/Third Party Plaintiffs were destroying the subject business due to their management incompetence and business inexperience. On the day before the return date of the Order to Show Cause, the undersigned first became aware of more than a dozen different lawsuits in eight different New York venues wherein Defendants/Third Party Plaintiffs Eliot Spitzer and Michael Steinberg appear together as Defendants under the names by which they have appeared in this case as well as with various "A/K/As." The venues and index numbers are as follows: Supreme Court, Nassau County index number17713/08; Supreme Court, Rockland County index numbers 4 292/09 and 11509/09; Supreme Court, Kings County index number 27340/10; Supreme Court, Onondaga County index number 2140/08; County Court, Oneida County index number 1311043/08; Supreme Court, New York County index numbers 101417/09, 107229/09, 600701/09, 117329/08, 600348/09, 652277/10, 111193/09, and County Court, Ulster County index numbers 4578/08 and 4579/08. At least one of these appears to be an enforcement action on an out of state judgment. Each of these cases, to the extent that this office has been able to gather the details about them, involve these Defendants defaulting on promissory notes and/or leases like those at issue in this action.

12.     Numerous judgments, totaling in the millions of dollars have been uncovered against each of the Defendants/Third Party Plaintiffs Eliot Spitzer and Michael Steinberg. These facts, which are still continuing to be uncovered, have required reevaluation of every conversation, negotiation, behavior and document in this case against the possibility that, rather than

incompetence and inexperience, the actions of these gentlemen were a shrewd scheme to loot the subject business.

13.    This change of perspective, from Defendants/Third Party Plaintiffs being bumbling incompetents to their being wily schemers is much like viewing the classic optical illusion which at first glance appears to be a vase but when seen again, appears to be two faces in profile.  The business history of these Defendants, as reflected in litigation, has shown itself to require intense and exhaustive investigation which is still underway.

14.    Therefore, since both a meritorious defense and a reasonable excuse for the delay has been shown, it is respectfully requested that Plaintiffs/Third-party Defendants' time to supply one be extended if this Court finds that Defendants/Third Party Plaintiffs are owed an answer.


**Wherefore**, it is respectfully requested that Order be issued granting Plaintiffs/Third-party Defendants Default Judgment, or in the alternative, extending the time of the Plaintiffs/Third-party Defendants herein to submit an Answer to the Third-Party Complaint and the Counterclaims and that the motion of Defendants/Third Party Plaintiffs' motion for Default Judgment be denied in its entirety and for such other, further, and different relief that this Court may find just and proper.


Dated: Brooklyn, New York
      February 18, 2012

                    Yours, etc.

                    LAZAROWITZ & MANGANILLO, L.L.P.


                    By: Thomas J. Solomon
                    Trial Counsel for Plaintiffs/Third-party Defendants
                    Office and P.O. Address
                    2004 Ralph Avenue

Brooklyn, New York 11234
(718) 531-9700

To: Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

B&M LINEN CORP and 220 COSTER LLC,
                   Plaintiff(s),

      -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER
                   Defendant(s).

**COMPLAINT**

Index No. *15989-11*

Plaintiffs, B&M LINEN CORP (hereinafter, "B&M") and 220 COSTER LLC (hereinafter, "COSTER"), by their attorneys LAW OFFICES OF JULIEAN GALAK, P.C., as and for their Complaint, upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, hereby alleges as follows:

### THE PARTIES

1) At all times hereinafter mentioned, Plaintiff B&M was, and still is, a corporation organized and existing under the laws of the State of New York, having their principal office at 100 Leahy St., Jericho, NY 11753.

2) At all times hereinafter mentioned, Plaintiff COSTER was, and still is, a Limited Liability Company organized and existing under the laws of the State of New York, having their principal office at 100 Leahy St., Jericho, NY 11753

3) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., (hereinafter, "220 LAUNDRY") was/is, a domestic Limited Liability Company with a place of business located in Bronx, New York.

4) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign Limited Liability Company duly authorized to conduct and conducting business in the State of New York.

5) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign Limited Liability Company doing business in the State of New York.

6) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic partnership duly existing under and by virtue of the laws of the State of New York.

7) At all times hereinafter mentioned, ZAR Defendant 220 LAUNDRY LLC. was/is, a foreign partnership duly authorized to conduct and conducting business in the State of New York.

8) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign partnership doing business in the State of New York.

9) At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic sole proprietorship duly existing under and by virtue of the laws of the State of New York.

10)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign sole proprietorship duly authorized to conduct and conducting business in the State of New York.

11)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign sole proprietorship doing business in the State of New York.

12)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC. was/is, a domestic entity duly existing under and by virtue of the laws of the State of New York.

13)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign entity duly authorized to conduct and conducting business in the State of New York.

14)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign entity doing business in the State of New York.

15)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC was/is, a domestic corporation duly existing under and by virtue of the laws of the State of New York.

16)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign corporation duly authorized to conduct and conducting business in the State of New York.

17)     At all times hereinafter mentioned, Defendant 220 LAUNDRY LLC., was/is, a foreign corporation doing business in the State of New York.

18)     At all times hereinafter mentioned, Defendant ELIOT SPITZER (hereinafter, "SPITZER"), was/is, an individual residing in the State of New York.

19)     At all times hereinafter mentioned, SPITZER was/is, an individual doing business in the State of New York.

20)     At all times hereinafter mentioned, Defendant ADAM J. TELLER (hereinafter, "TELLER"), was/is, an individual residing in the State of New York.

21)     At all times hereinafter mentioned, TELLER was/is, an individual doing business in the State of New York.

22)     At all times hereinafter mentioned, Defendant MICHAEL STEINBERG (hereinafter, "STEINBERG"), was/is, an individual residing in the State of New York.

23)     At all times hereinafter mentioned, STEINBERG was/is, an individual doing business in the State of New York.

**THE DOCUMENTS**

24)     On or about November 2010, B&M as Seller and SPITZER as Purchaser entered into an Asset Sale Agreement for the sale of a commercial laundry business (hereinafter, "Original Agreement").

25)     On or about May 19, 2011, B&M and SPITZER entered into the attached written modification of the Agreement (hereinafter "Modification" when referring to said writing, or "Modified Agreement" when referring to the Agreement as modified by the Modification).

26)     On or about May 19, 2011, SPITZER executed an assignment, assigning all of his rights under the Modified Agreement to 220 LAUNDRY.

27)     On or about May 19, 2011, and effective May 23, 2011, B&M and 220 LAUNDRY closed title on the assets transferred under the Modified Agreement.

28)     On or about May 19, 2011, and effective May 23, 2011, 220 LAUNDRY executed a note in the face amount of $8,600,000 (hereinafter, "First Note"), along with a security agreement, in favor of B&M as part of the agreed upon purchase price.

29)     On or about May 19, 2011, and effective May 23, 2011, 220 LAUNDRY executed a note in the face amount of $1,000,000 (hereinafter, "Second Note"), along with a security agreement, in favor of B&M as part of the agreed upon purchase price.

30)     On or about May 19, 2011, and effective May 23, 2011, SPITZER executed a Guaranty personally guaranteeing the First and Second Notes.

31)     On or about May 19, 2011, and effective May 23, 2011, TELLER executed a Guaranty personally guaranteeing the First and Second Notes.

32)     On or about May 19, 2011, and effective May 23, 2011, STEINBERG executed a Guaranty personally guaranteeing the First and Second Notes.

33)     On or about May 19, 2011, and effective May 23, 2011, COSTER as Landlord and 220 LAUNDRY as Tenants entered into a lease agreement (hereinafter, "Lease") for the premises known as 220 Coster St., Bronx, NY 10474 (hereinafter, "Premises").

34)    Pursuant to Section 50 of the Modified Agreement, all documents enumerated above were and are held in escrow by B&M's attorney.

### DEFENDANTS' DEFAULTS

35)    220 LAUNDRY have defaulted on the First Note in that they have failed to pay the sum of $41,666.67, due no later than September 23, 2011 by that date.

36)    220 LAUNDRY have defaulted on the Modified Agreement in that they have failed to timely and fully make payments on account of Accounts Receivable in accordance with Section 49 of the Modified Agreement.

37)    220 LAUNDRY have defaulted under Article III, Section 1 of the Lease in that they have failed to adequately maintain the Premises.

38)    220 LAUNDRY have defaulted under Article V of the Lease in that they have failed to comply with all applicable federal, state, and local regulations, including but not limited to workplace safety regulations.

39)    220 LAUNDRY have defaulted under the First and Second Note in that a default under the Lease constitutes a default under the Notes.

40)    220 LAUNDERY have defaulted under the Lease in that a default under the First or Second Note constitutes a default under the Lease.

### FIRST CAUSE OF ACTION AGAINST 220 LAUNDRY

41)    Plaintiffs repeat all allegations in paragraphs 1 through 38.

42)    220 LAUNDRY have failed to pay B&M the amounts owing pursuant to the First Note.

43)    Accordingly, 220 LAUNDRY are liable to B&M for, and B&M has been damaged in the aggregate amount of Forty One Thousand Six Hundred Sixty Six Dollars and Sixty Seven cents ($41,666.67), plus interest and other remedies as determined appropriate by the Court.

## SECOND CAUSE OF ACTION AGAINST 220 LAUNDRY

44)     Plaintiffs repeat all allegations in paragraphs 1 through 43.

45)     In accordance with the acceleration clauses therein, a default in
payment under the First and Second Note makes the entire principal of the Notes
due and payable immediately.

46)     Accordingly, 220 LAUNDRY are liable to B&M for, and B&M has been
damaged in the aggregate amount of Eight Million Six Hundred Thousand Dollars
($8,600,000.00) under the First Note, and One Million Dollars ($1,000,000.00)
under the Second Note, less any principal actually paid to date, plus interest
and other remedies as determined appropriate by the Court.

## THIRD CAUSE OF ACTION AGAINST SPITZER AND TELLER

47)     Plaintiffs repeat all allegations in paragraphs 1 through 46.

48)     The Defendants, SPITZER and TELLER are obligated to B&M under the
Guarantees in the event of the failure of 220 LAUNDERY to pay under the notes.

49)     Accordingly, SPITZER and TELLER are liable to B&M for, and B&M has
been damaged in the aggregate amount Eight Million Six Hundred Thousand Dollars
($8,600,000.00) under the First Note, and One Million Dollars ($1,000,000.00)
under the Second Note, less any principal actually paid to date, plus interest
and other remedies as determined appropriate by the Court.

## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS

50)     Plaintiffs repeat all allegations in paragraphs 1 through 49.

51)     In accordance with Section 50 of the Modified Agreement, 220 LAUNDRY's
failure to make timely payment under the note permits B&M to reverse the
transaction of sale, regain possession of all Assets, and terminate the Lease.

52)    On or about September 27, 2011, B&M notified 220 LAUNDRY in writing (hereinafter, "Notice of Default", attached) that 220 LAUNDRY is in default, and that B&M is enforcing the provisions in Section 50 of the Modified Agreement, and that no sale has occurred and all assets are transferred back to B&M.

53)    On or about September 27, 2011, COSTER notified 220 LAUNDRY in writing, by the aforementioned Notice of Default, that 220 LAUNDRY is in default, and that COSTER is enforcing the provisions in Section 50 of the Modified Agreement, and that the lease is deemed void effective September 27, 2011.

54)    Accordingly, the Defendants have no further interest in the Assets and/or Premises of any kind.

## FIFTH CAUSE OF ACTION AGAINST DEFENDANTS

55)    Plaintiffs repeat all allegations in paragraphs 1 through 54.

56)    During the period from May 23, 2011 through September 27, 2011, the Defendants made purchases of goods and services under B&M's name and/or accounts.

57)    Defendants have failed to make payment for said goods and services, and the vendors of such goods and services have made demands for payment against B&M.

58)    Said goods and services were purchased by the Defendants for use by 220 LAUNDRY.

59)    Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Two Hundred Forty Six Thousand Six Hundred Seventy Six Dollars and Sixty Four cents ($246,676.30), plus interest and other remedies as determined appropriate by the Court

## SIXTH CAUSE OF ACTION AGAINST DEFENDANTS

60)    Plaintiffs repeat all allegations in paragraphs 1 through 59.

61)     Under Section 49 of the Modified Agreement, 220 LAUNDRY is required to collect from customers and pay to B&M those accounts receivable due for work performed by B&M prior to May 23, 2011.

62)     220 LAUNDRY has failed to do so, and one or more of the Defendants have retained the monies so collected.

63)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Five Hundred Ninety Seven Thousand Eight Hundred Eighty Five Dollars and Seventy Four cents ($597,885.74), plus interest and other remedies as determined appropriate by the Court.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS

64)     Plaintiffs repeat all allegations in paragraphs 1 through 63.

65)     Through the actions, inactions, and negligence of the Defendants, the value of the Assets has decreased from the time that the Defendants took possession of the Assets on or about May 23, 2011 until B&M regained possession on or about September 27, 2011.

66)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the amount of said reduction of value as determined by the court but in no event less than Four Million Dollars ($4,000,000.00).

## EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS

67)     Plaintiffs repeat all allegations in paragraphs 1 through 66.

68)     Through the actions, inactions, and negligence of the Defendants, the Premises suffered material damage.

69)     Accordingly, the Defendants are liable to COSTER for, and COSTER has been damaged in the amount of said damage as determined by the court but in no event less than One Million Dollars ($1,000,000.00).

### NINTH CAUSE OF ACTION AGAINST 220 LAUNDRY

70)     Plaintiffs repeat all allegations in paragraphs 1 through 69.

71)     In accordance with the Modified Agreement, B&M agreed to provide, and 220 LAUNDRY agreed to pay for, consulting services, to be performed by employees of B&M, to assist 220 LAUNDRY in operating the business.

72)     B&M performed said consulting services.

73)     220 LAUNDRY failed to fully pay for said services.

74)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Twenty Thousand Eight Hundred Thirty Three Dollars ($20,883.00), plus interest and other remedies as determined appropriate by the Court

### TENTH CAUSE OF ACTION AGAINST DEFENDANTS

75)     Plaintiffs repeat all allegations in paragraphs 1 through 74.

76)     On or about September 1, 2011, SPITZER requested that the employees of B&M provide additional assistance to 220 LAUNDRY, beyond that contemplated by the Modified Agreement.

77)     SPITZER and B&M agreed that employees of B&M would perform such services, and that B&M would be paid $100 per hour for such services, including travel time from the employee's residences in Nassau County.

78)     B&M performed said such services.

79)     220 LAUNDRY failed to fully pay for said services.

80)     Accordingly, the Defendants are liable to B&M for, and B&M has been damaged in the aggregate amount of Nine Thousand Dollars ($9,000.00), plus interest and other remedies as determined appropriate by the Court

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

a)     on their first cause of action against 220 LAUNDRY in the principal amount of Forty One Thousand Six Hundred Sixty Six Dollars and Sixty Seven cents ($41,666.67), plus interest;

b)     on their second cause of action against 220 LAUNDRY in the principal amount of Nine Million Six Hundred Thousand Dollars ($9,600,000.00), less principal previously received, plus interest;

c)     on their third cause of action against SPITZER and TELLER in the principal amount of Nine Million Six Hundred Thousand Dollars ($9,600,000.00), less principal previously received, plus interest;

d)     on their fourth cause of action against the Defendants judgment declaring that the Defendants have no interest in the Assets or the Premises of any kind;

e)     on their fifth cause of action against the Defendants in the principal amount of Two Hundred Forty Six Thousand Six Hundred Seventy Six Dollars and Sixty Four cents ($246,676.30), plus interest, and

f)     on their sixth cause of action against the Defendants in the principal amount of Five Hundred Ninety Seven Thousand Eight Hundred Eighty Five Dollars and Seventy Four cents ($597,885.74), plus interest, and

g)     on their seventh cause of action against the Defendants for such sums as may be determined by the court, but no less than Four Million Dollars ($4,000,000.00), and

h)     on their eighth cause of action against the Defendants for such sums as may be determined by the court, but no less than One Million Dollars ($1,000,000.00), and

i)    on their ninth cause of action against the Defendants in the principal amount of Twenty Thousand Eight Hundred Thirty Three Dollars ($20,883.00), plus interest, and

j)    on their tenth cause of action against the Defendants in the principal amount of Thousand Dollars ($9,000.00), plus interest, and

k)    costs, disbursements, attorney's fees, and

l)    such other and further relief as the Court deems appropriate.

DATED:    Brooklyn, New York
           September 27, 2011

/S/

Juliean Galak,
LAW OFFICES OF JULIEAN GALAK, P.C.
Attorney for the Plaintiff
3105 BRIGHTON 3RD ST., SUITE 1-K
BROOKLYN, NY 11235
(718) 646-4715

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------X

B&M LINEN CORP and 220 COSTER LLC,

                             Plaintiffs,

     -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                           Defendants.

-----------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

                  Third-party Plaintiffs,

     -against-

MIRON MARKUS and BORIS MARKUS

                  Third-party Defendants,

-----------------------------------------------------------------X

Index No.: 13989/11

**Affidavit in
Opposition**

Assigned to:
**Hon. Steven M. Jaeger**

Returnable: 11/29/2011

STATE OF NEW YORK    )
COUNTY OF NASSAU    ) ss:

     MIRON MARKUS, being duly sworn, deposes and asserts the truth of the following under the

penalties of perjury:

     1.     I am a principal of the plaintiffs and one of the third party defendants in the

above-entitled action and as such I am fully familiar with the facts and circumstances contained

herein.

     2.     I make this affidavit in opposition to the Order to Show Cause served by the

defendants/third party plaintiffs.  Not only should the requested relief be denied, but an Order

should be issued enjoining the defendants/third party plaintiffs from collecting any further

receivables owing to the business and requiring them to account for those receivables wrongly collected by them since September 27, 2011.

3.    The business at issue in this lawsuit is my life's work. I spent my life building it up from nothing. I resolved to sell it not because of any failing it had but because I reached my seventies and decided it was time to retire. While there was a dip in revenues when our economy essentially collapsed, my business was strong and weathered the storm better than most. This was nothing I hadn't seen before and certainly was not part of my decision to sell.

4.    When I first met Mr. Spitzer, he seemed to be a good prospect as a purchaser. Although he and his partner Michael Steinberg were young, they had an older partner (referred to as "Orin") and seemed reasonably well financed. Both of these things were to change.

5.    On November 10, 2010 we went to contract (the Asset Purchase Agreement attached to Mr. Spitzer's affidavit in movant's papers). For me, some of the key terms of the contract were that by closing, I would have two million dollars in cash (with notes for the other 8.6 million dollars), closing would be about a month later (with a December 15, 2010 "time is of the essence" clause) and my accounts receivable checks would keep coming to me. All of these things would also change.

6.    Almost immediately, black clouds appeared on the horizon. The buyers were not ready to close the following month despite the "time is of the essence" clause we had agreed to. Soon, the buyers had a second attorney—and then a third. "Orin" was no longer a part of the deal and the youngsters who remained no longer had the money to stand behind the other terms that had been agreed to in the contract. This worried me as businesses need both funds and good management to prosper.

7.     Since Mr. Spitzer seemed cognizant of these facts, I continued to try to work with him despite his inability to stand by his prior agreement. I made several concessions in a good faith effort to help the deal go through. I agreed to take only five hundred thousand dollars down, that is, a quarter of what we originally agreed. To ensure the business's liquidity in Mr. Spitzer's hands, I agreed to allow him to use the accounts receivables as they came in, requiring him to pay me back in even installments over the course of a year. This amounted to an interest free loan of $732,885.74, almost fifty percent more than his down payment.

8.     In consideration of the huge concessions, I received an additional bit of security: the grace period was removed from the note so that at the minute of the first breach I could take the business back. This precaution became necessary due to the buyers' loss of availability of ready cash apparently suffered after entering into the Asset Purchase Agreement. I was acutely aware that, due to the ongoing upkeep expenses of running the business, a lack of liquidity could kill this healthy child of mine as quickly as a lack of oxygen could kill the sons of my body. This provision would allow me to respond to a "code blue" quickly enough to resuscitate the patient and prevent the death of my life's work. These provisions were put in the Modification Agreement (attached to Mr. Spitzer's affidavit) which was signed at closing together with the other closing documents(copies of the notes, guarantees and security agreements, also signed at closing, are attached hereto as an exhibit).

9.     From the beginning, I had agreed to a consulting agreement whereby my sons and I would be available to answer any questions the buyers might have, either in person or by telephone twelve hours a day, seven days a week. Due to the buyers' lack of business acumen and experience, it quickly became apparent to them that this would be insufficient and they requested that we find a way to be on premises much more than the agreement called for.   In

response to this request for modification, we agreed to free up a lot of time for them in exchange for an hourly rate. I was to show the purchasers how to manage the business I had built. While, upon request, I would tinker with the machinery, I was not retained either as a mechanic or to supervise the upkeep of the machinery.

10.    Despite having insisted that I come in and advise them, the buyers tended to ignore my advice in almost every area. In management, plant safety and account servicing Mr. Spitzer was such a bad student that I had taken to quip that if he were my employee, he would be getting two weeks' notice. This statement was misrepresented in his perjurious affidavit.

11.    One example of his refusal to take my advice in management was his failure to be present or have a supervisor present at shift change. With a payroll as large as this one, allowing employees to clock in a little early or out a little late quickly adds up in overtime payments. When I pointed this out, he responded as if I was trying to set his hours. The overtime on his payroll tended to be huge. For instance, his payroll for the week ending September 22, 2011 had almost $23,000.00 in overtime; mine for last week (the week ending November 23, 2011) was under a thousand dollars.

12.    One example of his refusal to take my advice in plant safety has to do with the ironing pits. The machines used for ironing have trenches in front of them to allow sheets to be fully unfurled so that they can be ironed. My policy, as expressed to the buyers, was to have these pits covered when the machines were not in use. Through the sad experience of a worker injury a few years ago I learned that this was an important safety precaution. Purchasers were told all of this more than once, as well as the fact that this violation was a breach of the lease, but they continued to ignore this issue.

13.     One example of his refusal to take my advice in account servicing was his failure to acknowledge that different customers required different amounts of attention. His failure, and that of his employees, to heed my suggestions in this area, together with his incompetence in quality control, led to numerous complaints and multiple lost accounts.

14.     Purchasers' default in a note payment was not their first material breach, just the straw which broke the camel's back. They had been informed many times about other material breaches. Multiple reoccurring safety violations breached the lease. Failure to perform necessary routine maintenance on the equipment breached the security agreement. By the date of default, the buyers were almost $110,000.00 behind in the payments they owed me for my receivables. But this was not the worst of it. The most important business asset that the buyers were destroying was the goodwill of the customers.

15.     Goodwill accounted for seven million dollars in a sale of ten million six hundred thousand dollars. Yet, due to purchasers' bungling, customer complaint after complaint came in and they did nothing to address the problems. Initially, they had scoffed at my suggestion that they bring in a salesman, claiming their hotel connections to be enough. I had a brief glimmer of hope for them when they finally listened and did so. The salesman brought in an important account with real growth potential, the Lam Group; however this account was quickly lost due to the terrible service provided by the buyers. I hesitate to name too many customers in this document which may become public, as customer lists are generally held in confidence, but, by way of example, the Warwick Hotel and Double Tree Lex, together representing about a million dollars a year in revenues, both fled due to purchasers' mismanagement.

16.     Any claim the defendants/third party plaintiffs are making to increasing revenues are simply false. First, in their best month, purchasers did not reach $800,000.00 in revenues.

Second, any increase in revenues is due to that fact that, after years of intensive sales work, my son and I landed a huge account, the Palace Hotel, which we brought in last summer and is good for six figures a month in revenues. I believe that we have kept this account only by acknowledging the default of the buyers and returning the business to functionality.

17.     There are other false claims invented by movant for this lawsuit. For instance, they claim that they were prevented from issuing payroll on September 29, 2011. In fact, they did issue payroll on or about that date after several telephone calls from me to do so. Another was their claim that they were denied access to email and the website. That simply is not true.

18.     The deterioration of the business became increasingly apparent. Checks began to bounce. One or more employees were under Child Support Orders and checks they wrote pursuant to these Orders bounced (the documentation is attached hereto as an exhibit). I am informed that they wrote a bad check for workers' compensation. By September, 2011, it was clear that purchasers were in way over their head.

19.     The September 27, 2011 meeting did not go as described by movant. When the buyers requested that meeting, I naturally assumed that they had finally come to grips with their failings and wanted to negotiate a rollback of the contract to save the business. I was shocked to find that they seemed to be in total denial of their situation and merely wanted to cancel the modified consulting agreement that they had insisted upon. I instructed my attorney to default and evict them, and went back to my pre-closing work. I did not have seller's remorse. My concern was that I would not be paid. I didn't want to get stuck with only one million dollars for a business worth ten million six hundred thousand dollars.

20.     They went quietly. They did not wait for an eviction proceeding or try to get a Temporary Restraining Order or in any way resist ouster. I assumed that their quick and quiet

departure meant that, on some level, they realized the truly diminished status of the business. They did not sue for breach or possession or attempt reentry by legal process until we brought suit against them. Only now have they brought this motion in response to our suit.

21.     Upon reentering the business, I found the situation to be even worse than I feared. Boiler number 1 had been dry fired which could have caused it to violently explode. Luckily, it didn't and "only" cost me $30,000.00 dollars to repair. Several of the truck drivers have informed me that they were denied brake jobs that they were begging for. Additionally, due to lack of routine maintenance, truck number 2 is now getting a new transmission and truck number 1 blew an engine that was just put in about 3 years ago. I need to replace that one. The sheet folders on ironers 2 and 3 were badly in need of repair. I have given up on the sheet folder on ironer 2 and am replacing it. These are only a few examples! Not only were equipment parts such as inverters, motor contractors relays overloads, and valves not replaced, I even had to restock such things as toilet paper, plastic bags and pens.

22.     Furthermore, I have been informed that movants have been contacting our customers and collecting our receivables. I have been told that they have been visiting customers in person and asking them to pay them by accepting partial payment and offering interest free financing of the balance, thus further wasting the assets of the business.

23.     The claim made by the defendants/third party plaintiffs of financial misrepresentation is false. I never misrepresented the utility costs or anything else to them. In the event that any of initial estimates were inaccurate, the same were corrected during the due diligence period. Prior to closing, my books were completely open to the defendants/third party plaintiffs. In fact, in November or December, 2010, a meeting was held between my accountant and that of the buyers with both me and Mr. Spitzer in attendance. Not only were they shown

the complete and accurate books of the business at that time, but every question they had was answered fully and accurately.

24.     In short, defendants/third party plaintiffs have brought the business to the brink of destruction. I have used all my efforts to nurse the business back to health and begin to correct the damage that they caused. If they are allowed to reenter, they will again damage the business, placing them in a financial position where they clearly lack the resources to pay money damages. They have been in almost continuous breach prior to their non-payment of the note and we have never committed a single breach.

**Wherefore**, it is respectfully requested that the defendants/third party plaintiffs' motion be denied in its entirety, that an Order should be issued enjoining the defendants/third party plaintiffs from collecting any further receivables owing to the business and requiring them to account for those receivables wrongly collected by them since September 27, 2011 and for such other further and different relief as this Court finds just and proper.

MIRON MARKUS

Sworn to before me this
28th day of November, 2011

NOTARY PUBLIC

JULIEAN GALAK
NOTARY PUBLIC - STATE OF NEW YORK
No. 02GA6108082
Qualified in Nassau County
Commission Expires April 12, 2012

### AFFIRMATION OF SERVICE

STATE OF NEW YORK)
              ) ss:
COUNTY OF KINGS   )

       THOMAS J. SOLOMON, ESQ., An attorney duly admitted to practice law in the State of New York, hereby affirms under the penalty of perjury that I am not a party to this action, am over 18 years of age and am an associate of the firm of LAZAROWITZ & MANGANILLO, LLP, located at 2004 Ralph Avenue, Brooklyn, New York.

       That on February 18, 2012, I served a true copy of the within **Motion Papers** upon Defendants/Third-party Plaintiffs at the addresses designated by the said person for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, an overnight delivery service for overnight delivery, prior to the latest time designated by the overnight delivery service for overnight delivery at:

Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

Dated:  Brooklyn, NY
       February 18, 2012

                                 THOMAS J. SOLOMON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------X
B&M LINEN CORP and 220 COSTER LLC,

                            Plaintiffs,

        -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                          Defendants,

        -against-

MIRON MARKUS and BORIS MARKUS
         Additional Counterclaim Defendants.
------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,

              Third-party Plaintiffs,

        -against-

MIRON MARKUS and BORIS MARKUS
              Third-party Defendants,

------------------------------------------------------------X

Index No.: 13989/11

**Motion Papers**

**Assigned to:**
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

**Motion Papers**

**LAZAROWITZ & MANGANILLO, L.L.P.**
**Attorneys for Plaintiff(s)**
**Office & Post Office Address**
**2004 Ralph Avenue**
**Brooklyn, New York 11234**
**(718) 531-9700**

**Signature (Rule 130-1,1-a)**

**THOMAS J. SOLOMON, ESQ.**

# EXHIBIT H

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

B&M LINEN CORP and 220 COSTER LLC,

                                 Plaintiffs,

      -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                               Defendants.

-------------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

                Third-party Plaintiffs,

      -against-

MIRON MARKUS and BORIS MARKUS

              Third-party Defendants,

-------------------------------------------------------------------X

Index No.: 13989/11

**Assigned to:**
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

# **Memorandum of Law**

Respectfully submitted,

Lazarowitz & Manganillo, L.L.P.
**Trial Counsel for Plaintiffs/Third-party Defendants**
**Office and P.O. Address**
**2004 Ralph Avenue**
**Brooklyn, New York 11234**
**(718) 531-9700**

By: Thomas J. Solomon, Esq.

## Plaintiffs/Third-Party Defendants Are Entitled To Default Judgment

In their motion, Defendants/Third Party Plaintiffs claim that their failure to supply a verification pursuant to CPLR §3020(b)(2) is that CPLR §3020(b)(2) uses the word "Corporation" rather than the phrase "Limited Liability Company." They also assert that New York does not treat Limited Liability Companies as Corporations. New York law, however, does treat Limited Liability Companies as Corporations. This is because "...a limited liability company is a hybrid of a corporation and a limited partnership...." See, Hotel 71 Mezz Lender LLC v. Falor, 58 A.D.3d 270; 869 N.Y.S.2d 61 (1st Dept. 2008). See also, Tzolis v. Wolff, 9 A.D.3d 138; 829 N.Y.S.2d 488 (1st Dept. 2007) in which Limited Liability Company members were given the right to bring derivative action as corporate shareholders without any statute authorizing same.

While it is true that the this appears to be a case of first impression regarding CPLR §3020(b)(2) specifically, there is no reason to believe that our Courts should treat this statute in a manner inconsistent with the above-cited cases. The willful refusal of the Defendants to comply with this simple requirement despite having been given an opportunity to do so coupled with the rejection of the defective document requires it to be treated as a nullity.

Attached to the cross-motion as Exhibit B is one of the requirements of Default Judgment -- the affidavit of a party, properly sworn and clearly laying out the merits of both the claims and the defenses of the Plaintiffs/Third-party Defendants. The only other requirements for granting a motion for Default Judgment are conceded by the Defendants/Third Party Plaintiffs in their motion papers. It is therefore respectfully requested that an Order be issued by this Honorable Court granting Plaintiffs/Third-party Defendants Default Judgment.

## The Defendants/Third Party Plaintiffs' Motion Seeking
## Default Judgment Must Be Denied

Since the Answer of Defendants/Third Party Plaintiffs was properly rejected, it cannot

form the basis of a Default Judgment. This in itself is sufficient reason to deny their motion. It

is not, however, the only reason. Even if properly rejected papers could form the basis for a

Default Judgment, the moving papers in this case are insufficient to merit that relief. A motion

for Default Judgment must contain either a verification (signed by a party who has personal

knowledge of the underlying facts) or an affidavit by a party. Defendants/Third Party Plaintiffs'

papers contain neither and their motion must therefore be denied.

In the words of the Appellate Division for the Second Department, given while affirming

the denial of an unopposed Default Judgment motion:

> In support of their motion for leave to enter a default judgment
> against the respondent upon his failure to appear or to answer the
> complaint, the plaintiffs failed to proffer either an affidavit of the
> facts or a complaint verified by a party with personal knowledge of
> the facts as required by CPLR 3215 (f) (see Peniston v Epstein, 10
> AD3d 450, 780 NYS2d 916 [2004]; DeVivo v Sparago, 287 AD2d
> 535, 536, 731 NYS2d 501 [2001]; Fiorino v Yung Poon Yung, 281
> AD2d 513, 721 NYS2d 803 [2001]).
>
> Lamb v. Moody, 62 A.D.3d 839; 878 N.Y.S.2d 635 (2d Dept.
> 2009).

See also, e.g., Beaton v. Transit Facility Corp., 14 A.D.3d 637; 789 N.Y.S.2d 314 (2d

Dept. 2005).

This is not a defect that can be remedied in reply papers. See, Rengifo v. City, 7 A.D.3d

773; 776 N.Y.S.2d 865 (2d Dept. 2004); Voytek Technology, v. Rapid Access Consulting, 279

A.D.2d 470; 719 N.Y.S.2d 112 (2d Dept. 2001); Conte v. Valley Stream Central High School

District, 283 A.D.2d 625; 725 N.Y.S.2d 854 (2d Dept. 2001).

The words of the holding of the Second Department in <u>Parratta v. McAllister</u>, 283 A.D.2d 625; 725 N.Y.S.2d 854 (2d Dept. 2001) are instructive:

> In support of their motion for leave to enter judgment against the defendants upon their respective defaults in answering the complaint, the plaintiffs failed to proffer either an affidavit of the facts or a complaint verified by a party with personal knowledge of the facts (see, CPLR 3215 [f]; Fiorino v Yung Poon Yung, 281 AD2d 513). Therefore, the motion was properly denied. We have not considered the affidavit which was improperly submitted by the plaintiffs in their reply papers on the motion (see, McCullough v Maurer, 268 AD2d 569; Hirsch v Syrota, 253 AD2d 538; Russo v Automotive Rentals, 247 AD2d 603).
>
> Under the circumstances of this case, the Supreme Court providently exercised its discretion in granting the defendants leave to serve late answers (see, Hermele v Sumkin, 282 AD2d 502).
>
> <u>Parratta v. McAllister</u>, 283 A.D.2d 625; 725 N.Y.S.2d 854 (2d Dept. 2001).

Thus, the Defendants/Third Party Plaintiffs' papers contain a fatal defect which cannot, at this time be remedied. There motion must, therefore, be denied.

### <u>Plaintiffs/Third-Party Defendants' Time To Supply An Answer Should Be Extended If This Court Finds That Defendants/Third Party Plaintiffs Are Owed One</u>

If, this Court finds that Defendants/Third Party Plaintiffs are owed an answer, then it is respectfully requested that Plaintiffs/Third-party Defendants' time to supply one be extended. The time to provide an Answer should be extended upon a showing of a meritorious defense and a reasonable excuse for the delay.

In reversing a lower Court's refusal to permit a Defendant to submit a late answer, the Appellate Division for the Second Department opined as follows:

> The Supreme Court improvidently exercised its discretion in denying the defendants' motion pursuant to CPLR 3012 (d) to vacate their default in appearing and answering and to compel the plaintiff to accept their verified answer .... Considering the defendants' additional explanations for the brief delay, the absence of prejudice to the plaintiff, the existence of a potentially meritorious defense, and the strong public policy in favor of resolving cases on the merits, the defendants' motion should be granted (see Jolkovsky v Legeman, 32 AD3d 418, 819 NYS2d 561 [2006]; Rottenberg v Preferred Prop. Mgt., Inc., 22 AD3d 826, 803 NYS2d 177 [2005]; Kaiser v Delaney, 255 AD2d 362, 679 NYS2d 686 [1998]; Classie v Stratton Oakmont, 236 AD2d 505, 653 NYS2d 377 [1997]; Van Man Adhesives Corp. v City of New York, 236 AD2d 465, 653 NYS2d 40 [1997]; Robles v Grace Episcopal Church, 192 AD2d 515, 595 NYS2d 824 [1993]).
>
> Jeffrey L. Rosenberg & Assoc., LLC v. Lajaunie, 35 A.D.3d 668; 824 N.Y.S.2d 920 (2d Dept. 2006).

See also, Parratta v. McAllister, 283 A.D.2d 625; 725 N.Y.S.2d 854 (2d Dept. 2001) quoted supra in the previous section.

As pointed out above the affidavit of a party, properly sworn and clearly laying out the meritorious defense of the Plaintiffs/Third-party Defendants in this action is attached to the cross-motion as Exhibit B. The timing of the motion practice in this matter, the complexity of the case and the multiplication of complexities brought about by the recent revelation of the history of the Defendants/Third Party Plaintiffs, the continuing investigation and reevaluation of the underlying transaction and occurrences of this matter provided reasonable excuse enough to extend the Plaintiffs/Third-party Defendants' time to answer if need be. This case is similar to the case of Yonkers Rib House, Inc. v. 1789 Cent. Park Corp., 19 A.D.3d 687; 799 N.Y.S.2d 62 (2d 2005) in which the Second Department held:

> The Supreme Court providently exercised its discretion in denying that branch of the plaintiffs' cross motion which was for leave to enter a default judgment pursuant to CPLR 3215 (i) (1) and in granting the defendants' motion to compel the plaintiffs to accept their verified answer, thereby excusing the defendants' delay in

serving it (see CPLR 2004, 3012 [d]). In light of the lack of prejudice to the plaintiffs from the delay, the existence of potentially meritorious defenses, and public policy which favors resolving cases on the merits, we agree with the Supreme Court that, as a matter of discretion, the defendants' delay in answering was properly excused (see Trimble v SAS Taxi Co. Inc., 8 AD3d 557, 778 NYS2d 707 [2004]; Goodman v New York City Health & Hosps. Corp., 2 AD3d 581, 768 NYS2d 365 [2003]; Drake v Drake, 296 AD2d 566, 745 NYS2d 712 [2002]; Beresford v Waheed, 288 AD2d 170, 732 NYS2d 374 [2001]; Sippin v Gallardo, 287 AD2d 703, 732 NYS2d 62 [2001]; Gurreri v Village of Briarcliff Manor, 249 AD2d 508, 671 NYS2d 346 [1998]; Van Man Adhesives Corp. v City of New York, 236 AD2d 465, 653 NYS2d 40 [1997]; Miles v Blue Label Trucking, 232 AD2d 382, 648 NYS2d 138 [1996]).

Yonkers Rib House, Inc. v. 1789 Cent. Park Corp., 19 A.D.3d 687; 799 N.Y.S.2d 62 (2d 2005).

Therefore, since both a meritorious defense and a reasonable excuse for the delay has been shown, it is respectfully requested that Plaintiffs/Third-party Defendants' time to supply one be extended if this Court finds that Defendants/Third Party Plaintiffs are owed an answer.

**Wherefore**, it is respectfully requested that Order be issued granting Plaintiffs/Third-party Defendants Default Judgment, or in the alternative, extending the time of the Plaintiffs/Third-party Defendants herein to submit an Answer to the Third-Party Complaint and the Counterclaims and that the motion of Defendants/Third Party Plaintiffs' motion for Default Judgment be denied in its entirety and for such other, further, and different relief that this Court may find just and proper.

Dated: Brooklyn, New York
February 18, 2012

Respectfully Submitted,

LAZAROWITZ & MANGANILLO, L.L.P.

By: Thomas J. Solomon
Trial Counsel for Plaintiffs/Third-party Defendants
Office and P.O. Address
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700

## AFFIRMATION OF SERVICE

STATE OF NEW YORK)
          ) ss:
COUNTY OF KINGS   )

      THOMAS J. SOLOMON, ESQ., An attorney duly admitted to practice law in the State of New York, hereby affirms under the penalty of perjury that I am not a party to this action, am over 18 years of age and am an associate of the firm of LAZAROWITZ & MANGANILLO, LLP, located at 2004 Ralph Avenue, Brooklyn, New York.

      That on February 18, 2012, I served a true copy of the within **Memorandum of Law** upon Defendants/Third-party Plaintiffs at the addresses designated by the said person for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, an overnight delivery service for overnight delivery, prior to the latest time designated by the overnight delivery service for overnight delivery at:

Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

Dated:  Brooklyn, NY
        February 18, 2012

                            THOMAS J. SOLOMON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

----------------------------------------------------------------------X

B&M LINEN CORP and 220 COSTER LLC,

                                   Plaintiffs,

            -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                                 Defendants,

             -against-

MIRON MARKUS and BORIS MARKUS

               Additional Counterclaim Defendants.

----------------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

                  Third-party Plaintiffs,

             -against-

MIRON MARKUS and BORIS MARKUS

               Third-party Defendants,

----------------------------------------------------------------------X

Index No.: 13989/11

**Memorandum of Law**

Assigned to:
Hon. Steven M. Jaeger

Returnable: 2/22/12

---

Memorandum of Law

---

LAZAROWITZ & MANGANILLO, L.L.P.
Attorneys for Plaintiff(s)
Office & Post Office Address
2004 Ralph Avenue
Brooklyn, New York 11234
(718) 531-9700

==================================================================

Signature (Rule 130-1.1-a)

_____
THOMAS J. SOLOMON, ESQ.

# EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------X
B&M LINEN CORP. and 220 COSTER LLC,   :

                       **Plaintiffs,**   :

       -against-                   :

                             :  **Index No. 11-013989**
220 LAUNDRY LLC, ELIOT SPITZER,   :
MICHAEL STEINBERG and ADAM J. TELLER,  :

                   :  **Assigned to:**
           **Defendants,**   :    **Hon. Steven M. Jaeger**

       -against-                   :

MIRON MARKUS and BORIS MARKUS,   :

      **Additional Counterclaim** :  **AFFIRMATION IN REPLY**
      **Defendants.**     :  **AND IN OPPOSITION TO**
-------------------------------------------------------------X **CROSS-MOTION**
220 LAUNDRY LLC and ELIOT SPITZER,  :

       **Third-party Plaintiffs,**  :

       -against-                   :

MIRON MARKUS and BORIS MARKUS,   :

       **Third-party Defendants.**  :
-------------------------------------------------------------X

      Stephen R. Sugrue, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirms under penalty of perjury as follows:

Preliminary Statement

      1.    I am counsel for Defendants and Third-party Plaintiffs (hereafter,

"Defendants") and I am fully familiar with all prior proceedings.  I submit this Affirmation

as a Reply Affirmation on Defendant's motion for an order of default as to: a)  the

1

Counterclaims to which no reply was ever served, and b) the Third-party Summons and Complaint, to which no timely answer was served. I further submit this Affirmation in opposition to a cross-motion, received yesterday, by which Plaintiffs and Third-party Defendants seek an extension of time to file pleadings.

<u>Receipt of Opposition and Cross-motion Papers</u>

2.    As the Court may recall, the default motion was first referred to at the oral argument of the motion for a preliminary injunction, which took place on January 6, 2012. The Court was informed at that time that although Plaintiffs' and Third-party Defendants were not in default at the time of the initial filing of that show cause motion, such that no default was referenced in the preliminary injunction papers, as of the time of oral argument Plaintiffs' and Third-party Defendants were in default. I informed the Court that at the conclusion of oral argument, that I would serve a default motion, and I did.

3.    The original return date was January 17, 2012. I received no opposition papers by that date, but on that date received by fax a letter from Plaintiff's counsel, informing me that he had unilaterally obtained a five-week adjournment of the default motion (see Exhibit A). The letter specifies that the adjourned date of the motion is February 21, 2012.

4.    As of the morning of February 21, 2012, I had received no opposition papers. I proceeded to the Courthouse that morning, not expecting to have oral argument of the default motion, which I was aware would be submitted, but to determine whether any opposition papers had been received by the Court.

2

5.      I spoke to the Part Clerk, a gentleman who informed me that he had been temporarily assigned to that position. I identified the case, and he quickly located my default motion in a stack papers on his desk. No opposition papers were included. I stated that if there was no opposition, then there was obviously no need to reply, but if for any reason the Court received opposition papers and was inclined to accept them, I certainly wanted the opportunity to reply.

6.      Upon my return to the office I found a notice from the U.S. Postal Service that an Express Mail package, which they first attempted to deliver on Monday, a Federal holiday, was at the post office. I picked up the papers, and am now responding to them as promptly as possible so as to delay the case no further.

### The Cross-Motion is Baseless

7.      Plaintiff's claim that Defendants are in default is based on the completely unsupported contention that Defendants' Answer with Counterclaims, which was admittedly timely served, was required to be verified pursuant to CPLR Section 3020(b)(2). This contention is addressed in our prior submission on the motion, including in a Memorandum of Law wherein we state:

> Research produced no case in which it was held that the word "corporation" as contained in 3020 (b)(2) must be interpreted as extending to limited liability companies. In this regard, the matter can be reliably researched through the Lexis system, inputting search the terms "limited liability company", "corporation" "verify! (i.e. verified, verification, etc) and "3020" in the New York case library. While such a search produces cases, in none does a court expand the clearly worded CPLR provision to include limited liability companies.

8.      Examining the opposition papers for Plaintiffs' response to this contention, one finds the following statement (at Paragraph 6):

3

**As discussed in the Memorandum of Law submitted herewith**, the rejection of Defendant's/third Party Plaintiffs' papers was proper because, being unverified, they contravened CPLR Section 3020(b)(2) and because New York law does treat Limited Liability Companies as Corporations. [emphasis added]

9. That Memorandum of Law literally does not contain the word "corporation" or the phrase "limited liability company", and never even attempts to address the applicability of Section 3020(b)(2) to a limited liability company. For the record, the copy served on me consists of a cover page and five unnumbered pages thereafter, the last of which is simply a continuation of the signature block. It is also unsigned, as was the Affirmation in support.

10. Thus, the pivotal issue on the motion and cross-motion—whether Defendants' Answer and Counterclaims, timely receipt of which was acknowledged, was in sufficient form so as to require a timely Reply—is not addressed by Plaintiffs' counsel. Worse, Plaintiffs' counsel falsely states that it is addressed.

11. Plaintiffs have defaulted in replying to the significant Counterclaims, have no excuse therefor, and simply offer flimflam to the Court.

12. Obviously, matters of pleading requirements such as verification are governed by statute. New York statutes created corporations; distinct New York statutes created limited liability companies. Corporations and LLCs have both existed for quite some time. CPLR 3020(b)(2) refers to corporations and does not refer to limited liability companies, and, remarkably, Plaintiffs' Memorandum of Law refers to neither.

4

### Plaintiffs' Purported Rejection of the Unverified Answer was Untimely

13.     As stated, here and in the prior submission, Defendants' Answer to the unverified Complaint simply did not have to be verified. But, that aside, Plaintiffs' purported rejection of it was plainly untimely. As set forth in the accompanying Memorandum of Law, if a party is to treat an unverified pleading as a nullity, that party must notify the pleading party with due diligence, which has been interpreted by the courts to be virtually immediately, that is, 24 to 48 hours after receipt.

14. Here, the undisputed chronology is that the first time that notice was given of Plainitiffs' intention to reject the Answer on the grounds that it was not verified was **after the time to respond to it had expired.** That is, Plaintiffs' counsel had the Answer for more than 20 days before notifying me that Plaintiffs were rejecting it. Plaintiffs were in default, had no excuse for that default, and having nothing else to say, advanced a baseless argument that the Answer had to be verified.

15.     To be clear, as established by our prior submission, with exhibit support, on October 27, 2011, Plaintiffs' counsel, Juliean Galak, Esq. who was the attorney who signed the Complaint, acknowledged in writing receipt of the Answer, Third-party Summons and Third-party Complaint and acknowledged his authority to accept those pleadings on behalf of all parties to whom they were directed. A Reply to the Counterclaim was thus due on November 16, 2011. If the Answer was to be rejected on grounds of lack of verification, notification of that position was required to be made within a day or two of receipt—certainly by the end of October, 2011. Yet, it was on December 1, 2011, after the time to reply had expired, that Mr. Solomon purportedly rejected the Answer on the ground of lack of verification.

5

## There is No Showing of Excusable Neglect

16.    While a Court has some latitude as to matters of default, Defendants most

respectfully submit that it would be an abuse of discretion for the Court to conclude that

Plaintiffs' submission on this motion has established excusable neglect as to either the

missing reply or the late answer to the Third-party Complaint.

17.    Proving Shakespeare's job is safe, Mr. Solomon treats us to passages

such as:

> 13. This change of perspective, from Defendants/Third Party Plaintiffs
> being bumbling incompetents to their being wily schemers is much like
> viewing the classic optical illusion which at first glance appears to be a
> vase but when seen again, appears to be two faces in profile.

18.    Is the Court being asked to find that the excusable neglect needed for

Plaintiffs to be granted relief from their default is some form of optical impairment on the

part of its counsel?

19.    And, speaking of counsel, no mention is ever made of Juliean Galak, Esq.

It was he who initiated this action by the filing of the Complaint. He has remained in

place as Plaintiffs' and Third-party Defendants' counsel. Mr. Solomon was introduced

as "trial counsel", and signs papers as such. What prevented Mr. Galak, who himself

acknowledged receipt of pleadings, from responding to them in a timely manner?

20.    No excusable neglect has been established. Indeed the relevant

chronology is undisputed: Plaintiffs defaulted first, and thereafter asserted that they had

no obligation to respond. The Court should not assist in this charade; the cross-motion

should be denied.

6

## The Opposition to the Default Motion is Baseless

21.     Finally, the Court should reject the contention that Defendants' default motion was not adequately supported.   As a threshold matter, Plaintiffs reliance on CPLR 3215(f) and cases interpreting it is wholly misplaced.  Defendants did not move for relief under that provision, as is made clear by the Notice of Motion.

22.     The CPLR provision cited in the Notice of Motion is CPLR 3012, which specifies when responsive pleadings must be served.  Quite specifically, Defendants were seeking an Order of Default by reason of the provisions of that section, not a "default judgment" which is the subject of CPLR 3215.   Defendants were, and are, hoping to advance the inevitable conclusion of the issues in this case, and a ruling by the Court to the effect that Plaintiffs and Third-party Defendants are in default as to the Counterclaims and Third-party Complaint would serve to accomplish that.  No request for entry of a default judgment has yet been made.

23.     However, even it a motion for a default judgment pursuant to CPLR 3215 had been made, the requirements of that section were for all practical purposes satisfied.  Defendants had, on the day the default motion was addressed in open court, presented the Court with a comprehensive Affidavit from Eliot Spitzer, annexing numerous exhibits, explaining in detail the baselessness of Plaintiffs' claim of default under the terms of the purchase agreement, and explaining the abject, and pre-existing default by Plaintiffs in failing to present accurate information as to the actual costs of utility service to the building.

24.     This is not a game.  That Defendants, in moving for a default, did not staple to the default motion itself the voluminous submission just made to the Court on

7

the motion pending when the default occurred, is no basis for denial of the default

motion, even if it had been made under CPLR 3215. The requirements of CPLR 3215(f)

are fully satisfied by the proceedings in this case. The cases cited by Plaintiffs appear

to deal with situations in which there is a pure default to an initial pleading and no one is

heard from on the part of the defendants such that a default judgment ensues.

     25.    CPLR 3215 is clearly intended to bar courts from entering default

judgments without being sufficiently informed of a meritorious substantive basis for the

claims asserted; it is not a rule about what is stapled to what. The proceedings in this

case have provided the Court with the information contemplated by the rule.

     26.    If for any reason the Court first concludes that the provisions of CPLR

3215 were required to be met, even though relief under that section was not sought,

and then concludes that the submission by Defendant did not meet the requirements of

that rule, then a denial of the motion for default should be without prejudice to the

resubmission of the default motion. More particularly, if the Court considers the form of

Defendants' default motion to be inadequate, this by no means makes Plaintiffs' plainly

baseless cross-motion any more sound. Thus, in the event described, the cross-

motion should be denied with prejudice and the default motion denied without prejudice.

Defendants will then re-file the default motion not only with the Spitzer Affidavit

attached, but with Con Edison's recent demand upon B&M Linen that it pay more than

$5.2 million for its long-running theft of utility services, a deceit which not only gives rise

to a claim by Con Edison, but to plainly meritorious counterclaims on the part of

Defendants.

8

27.    As stated, however, Defendant at this time are not seeking a default

judgment under CPLR 3215.

.

Dated:  February 22, 2012

_____
Stephen R. Sugrue



# LAZAROWITZ & MANGANILLO, L.L.P.

## ATTORNEYS AT LAW

(718) 531-9700
TELECOPIER NO. (718) 444-5768
E-MAIL: lazmanlaw@aol.com

MICHAEL S. LAZAROWITZ
MARC J. HELD
_____
EDWARD S. MILLER
HYDER A. NAQVI
PHILIP M. HINES
THOMAS J. SOLOMON

2004 RALPH AVENUE
BROOKLYN, NY 11234

HARVEY O. LAZAROWITZ
OF COUNSEL

CARLO MANGANILLO
OF COUNSEL

WRITER'S DIRECT E-MAIL: TSolomon@lazmanlaw.com

January 17, 2012

Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840
Attn: Stephen R Sugrue, Esq

## VIA REGULAR MAIL and FACIMILE AT: 203-966-6385

RE: B&M Linen Corp v. 220 Laundry LLC, Index #: 13989/11

Dear Mr. Sugrue:

Since I was unable to reach you via telephone, I appeared on the above-referenced matter to make an application for an adjournment today.

Your default judgment motion was adjourned to February 21, 2012. If you have any questions, please do not hesitate to contact the undersigned.

Yours truly,

Thomas J. Solomon

TJS:st
cc: Chambers of the Honorable Steven M. Jaeger
via facsimile at: 516-571-0161

# EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------X

B&M LINEN CORP. and 220 COSTER LLC,

                    Plaintiffs,

   -against-

                                **Index No. 11-013989**

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,    **Assigned to:**
                                       **Hon. Steven M. Jaeger**

                    Defendants,

   -against-

MIRON MARKUS and BORIS MARKUS,

                    **Additional Counterclaim
                    Defendants**

-------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

               **Third-party Plaintiffs,**
   -against-

MIRON MARKUS and BORIS MARKUS,

              **Third-party Defendants.**

-------------------------------------------------------------X

## **MEMORANDUM OF LAW IN REPLY AND
IN OPPOSITION TO CROSS-MOTION**

### Preliminary Statement

      Defendants 220 Laundry LLC, Eliot Spitzer, Michael Steinberg and Adam

J. Teller, by their undersigned attorneys, submit this Memorandum of Law in further

support of their motion for an Order of default, and in opposition to Plaintiff's Cross-

motion for an Order of default or alternatively an order extending time to plead.

1

This Memorandum will necessarily be brief, because, as pointed out in the accompanying Affirmation of Stephen R. Sugrue, Esq., Plaintiffs, in their Memorandum in opposition to Defendants' default motion, have completely failed to address the fundamental issue on which their entire position depends:  the contention that the reference in at CPLR 3020(b)(2) to "corporation" extends to a limited liability company. By Defendants' initial submission on this motion, Plaintiffs were challenged to present such authority, and Plaintiffs' counsel went so far as to state, falsely, in his Affirmation that it was addressed in the Memorandum in Opposition, but it is not.

Argument

## THE PURPORTED REJECTION OF THE
## UNVERIFIED ANSWER WAS UNTIMELY

With the fundamental issue affecting both the claim by Plaintiffs that Defendants are in default in answering, and that Plaintiffs are not in default in replying to counterclaims left completely unaddressed in opposition papers, this Memorandum will be confined to one point.

The contention that Plaintiffs' purported rejection of the unverified Answer was proper and valid is without merit.

Substantively, of course, no verification of the Answer to the unverified Complaint was required because the single specified ground on which Plaintiffs assert that a verification was necessary is inapplicable.

2

Procedurally, however, even that baseless contention was untimely, and by a wide margin.

> Where a pleading is required to be verified because it is in response to a verified pleading, and it is unverified, the attorney who served the verified pleading, in this case the complaint, may treat the unverified pleading as a nullity, provided that he notify the other side "with due diligence". Due diligence has been held to mean "within twenty-four hours" (Westchester Life v. Westchester Mag. Co., 85 N.Y.S. 2d 34). A party who waits longer before giving notice should be held to have waived the objection.

State of New York v. McMahon, 78 Misc. 2d 388, 365 N.Y.S. 2d 933 (Sup. Ct. Albany Co. 1974).

Here, Plaintiffs' counsel not only failed to reject the unverified Answer to the unverified Complaint within 24 hours, he waited until after the time to serve a Reply expired. It is thus procedurally inconceivable that any effect can be given to Plaintiffs' counsel's purported rejection of the Answer. The conclusion must be that Defendants are not in default and that Plaintiffs are.

Dated: February 22, 2012        COTI & SUGRUE

By _____
      Stephen R. Sugrue
      59 Grove Street Suite 1F
      New Canaan, CT 06840
      203-966-5817

3

# EXHIBIT K

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**
-------------------------------------------------------------X
B&M LINEN CORP. and 220 COSTER LLC,     :
                         :
             Plaintiffs,         :

    -against-                  :
                      :  **Index No. 11-013989**
220 LAUNDRY LLC, ELIOT SPITZER,    :
MICHAEL STEINBERG and ADAM J. TELLER,  :
                      :  **Assigned to:**
            Defendants,     :   **Hon. Steven M. Jaeger**

    -against-                  :
                      :
MIRON MARKUS and BORIS MARKUS,    :
                      :
        Additional Counterclaim :  **SUPPLEMENTAL REPLY**
        Defendants       :  **AFFIRMATION IN SUPPORT**
-------------------------------------------------------------X  **OF MOTION FOR ORDER**
220 LAUNDRY LLC and ELIOT SPITZER,    **OF DEFAULT AND IN**
                      :  **OPPOSITION TO CROSS-**
           Third-party Plaintiffs,  :  **MOTIONS**

    -against-                  :
                      :
MIRON MARKUS and BORIS MARKUS,    :
                      :
           Third-party Defendants.  :
-------------------------------------------------------------X

      Stephen R. Sugrue, an attorney duly admitted to practice before the Courts of the

State of New York, hereby affirms under penalty of perjury as follows:


      1.      I am counsel for Defendants and Third-party Plaintiffs (hereafter,

"Defendants") in this case and I am fully familiar with all prior proceedings.

2.      I submit this brief Affirmation simply to address the arguments made by Plaintiffs/Third-party Defendants in a single page of their Memorandum of Law dated February 18, 2012 which had not been served upon me, but which was included in the original filed with the Court.

3.      More particularly, in our previous submission to the Court on Defendants' Default Motion and Plaintiffs' Cross-motions, I described in detail the contents of the Memorandum served upon me, noting the absence of any case authority for the extension of the word "corporation" in CPLR Section 3020(b)(2) to a limited liability company. In the copy of the Memorandum served upon me, such an argument was not even attempted.

4.      I have retained that document as it was served, without removing either of the two staples. Upon filing our response with the Court, I asked to see the Court's original. The Part Clerk and I compared the documents, and there was an additional unnumbered page (the first page) in the Court original, which had not been served upon me. Surely this was inadvertent.

5.      The accompanying Supplemental Memorandum of Law is confined to that single missing page. Thus, this is not a sur-reply submission, it is Defendants' first opportunity to address the contents of a document not served.

Dated: January 5, 2012

_____
Stephen R. Sugrue

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
--------------------------------------------------------------------X
B&M LINEN CORP. and 220 COSTER LLC,          :
                                             :
                          Plaintiffs,        :
                                             :
          -against-                          :
                                             :  Index No. 11-013989
220 LAUNDRY LLC, ELIOT SPITZER,              :
MICHAEL STEINBERG and ADAM J. TELLER,        :  Assigned to:
                                             :     Hon. Steven M. Jaeger
                          Defendants,        :
                                             :
          -against-                          :
                                             :
MIRON MARKUS and BORIS MARKUS,               :
                                             :
                          Additional Counterclaim :
                          Defendants         :
--------------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,           :
                                             :
                          Third-party Plaintiffs, :
          -against-                          :
                                             :
MIRON MARKUS and BORIS MARKUS,               :
                                             :
                          Third-party Defendants. :
--------------------------------------------------------------------X


## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER OF DEFAULT AND IN OPPOSITION TO CROSS-MOTIONS

### Preliminary Statement

Defendants, 220 Laundry LLC, Eliot Spitzer, Michael Steinberg and Adam

J. Teller, by their undersigned attorneys, for their Supplemental Memorandum of Law in

1

Support of their Motion for an Order of Default, and in opposition to Cross-motions,
state as follows.

The basis for this supplemental submission is simply that a page was
missing from the service copy of the Memorandum of Law served upon Defendants'
counsel, as set forth more fully in the accompanying Supplemental Affirmation.

This Supplemental Memorandum is confined to the text of that single
unnumbered page (the first page), photocopied from the original document filed with the
Court.

### Argument
#### POINT I
#### PLAINTIFFS/THIRD-PARTY DEFENDANTS
#### OFFER NO SUPPORT FOR THEIR DEFAULTS

Confining this submission to that missing first page, it is now clear that
Plaintiffs assert that they willfully failed to Reply to Defendants' Counterclaims because
they concluded that the express statutory reference to "a corporation" in CPLR Section
3020(b)(2) extends to limited liability companies.  It is further clear that Plaintiffs had,
and have, no knowledge of any case in which a Court has so held, for they state that
this is a case of "first impression."

No explanation is offered by Plaintiffs as to why they waited until the time
permitted to serve a Reply actually expired, before first asserting that the Answer was
defective by reason of a lack of verification said by them to be required under that
section.  Our prior submission establishes that such a contention must be asserted
"immediately" or it is waived.

2

It is remarkable that Plaintiffs would "bet" the outcome of the matter of liability on the significant counterclaims on a position never previously supported by a court, that is, on a position of "first impression". It is similarly remarkable that Plaintiffs would assert, as they do by way of cross-motion, that Defendants, who admittedly served a timely Answer, are actually in default, even though no Court has ever adopted Plaintiffs' analysis.

Defendants submit that the description of the "issue" as one of "first impression" is false scholarship. The reality is that the distinction among corporations, partnerships and limited liability companies is well known to the law, and matters of default in the service of pleadings and matters of sufficiency in the form or pleadings are inherently statutory. A statute which references "corporation" but not other business forms must be construed as having the effect written.

"Case of first impression" is a wildly generous description by Plaintiffs. Where no Court has ever held "x", because the statute says "y", a litigant's position urging "x" is not aptly described as a case of "first impression", but as a position utterly lacking in legal support. So it is here, and that would be entirely true even if the unverified Answer had been timely rejected, which is not the case.

The purported authority set forth at the first unnumbered page of Plaintiffs' Memorandum is not only no authority favoring Plaintiffs, but supports Defendants' position clearly and plainly.

Plaintiffs' primary reliance is on Hotel 71 Mezz Lender LLC v. Falor, cited by Plaintiffs as "58 A.D. 3d 270; 869 N.Y.S. 2d 61 (1st Dept. 2008)." **Plaintiffs fail to inform the Court that the cited decision and order was expressly reversed by the**

3

**Court of Appeals.** The Court of Appeals, in its decision, reported at 14 N.Y. 3d 303;

900 N.Y.S. 2d 698 (2010), reversed the Order of the Appellate Division Second

Department on which Plaintiffs rely, reported at 58 A.D. 3d 270, and reinstated the order

of the trial court.

Moreover, in doing so, the Court of Appeals enforced the CPLR as strictly

written, rejecting a contrary approach taken by the Appellate Division, which contrary

approach is precisely that which Plaintiffs here urge in a case they generously describe

as a case of "first impression." The Court of Appeals observed:

> At the outset, we acknowledge that "[t]he CPLR contains no provision as
> to the situs of [intangible] property for attachment purposes". We have
> therefore commented that '[t]he situs of intangibles is in truth a legal
> fiction". (citations omitted)

14 N.Y. 3d at 314.

The analogous conclusion here is that the CPLR contains no provision as

to the requirement that an LLC provide a verified answer under the circumstances

presented and a contention to the contrary is a legal fiction.

The Court's strict reference to the provisions of the CPLR is by no means

supportive of Plaintiffs' position here. Simply stated, it is only in reliance on the

expressly reversed conclusion of the Appellate Division that Plaintiffs could even

formulate the most remote, tangential contention that CPLR 3020(b)(2) extends to

limited liability companies.

The only other case relied upon similarly offers no support. This is so

despite an affirmance by the Court of Appeals which Plaintiffs also failed to cite. First,

4

the issue in that case, <u>Tzolis v. Wolff</u>, as plainly framed by the Court of Appeals was: "whether derivative suits on behalf of LLCs are allowed."

In concluding that such suits were allowed, the Court did <u>not</u> base its decision on the conclusion that the express statutory recognition of the derivative right of action contained in New York Corporations Law must have been intended by the legislature to extend to LLCs, which is the analog of the argument Plaintiffs present here. Rather, the court reasoned:

> The derivative suit has been part of the general corporate law of this state at least since 1832. It was not created by statute, but by case law.
>
> . . . .
>
> Eventually, the rule that derivative suits could be brought on behalf of ordinary business corporations was codified by statute. But until relatively recently, no similar statutory provision was made for another kind of entity, the limited partnership; again, the absence of a statute did not prevent courts from recognizing the remedy. (citations omitted)

10 N.Y. 3d at 103-04.

The court in <u>Tzolis</u> thus refused to do the very thing that Plaintiffs here urge, just as did the Court of Appeals in <u>Hotel 71</u>, that is: to extend a clear statutory term to a business form the statute does not cover. The court's very search for a non-statutory basis for the right at issue runs directly contrary to Plaintiffs' position.

## Conclusion

For the foregoing reasons, and those set forth in Defendants' prior

submissions, Defendants' Motion for orders of Default should be granted, and the

Cross-motions of Plaintiffs/third-party Plaintiffs denied.


Dated:   February 29, 2012                    COTI & SUGRUE


By _____
         Stephen R. Sugrue
         59 Grove Street Suite 1F
         New Canaan, CT 06840
         203-966-5817


**6**

# EXHIBIT L

SHORT FORM ORDER

## SUPREME COURT - STATE OF NEW YORK

Present:

### HON. STEVEN M. JAEGER,
Acting Supreme Court Justice

---

B&M LINEN CORP. and 220 COSTER LLC,

                     Plaintiffs,

        -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J.
TELLER,

                Defendants.

        -against-

MIRON MARKUS and BORIS MARKUS,

        Additional Counterclaim
        Defendants.

---

220 LAUNDRY LLC and ELIOT SPITZER,

            Third-Party
            Plaintiffs,

       -against-

MIRON MARKUS and BORIS MARKUS,

           Third-Party
           Defendants.

---

TRIAL/IAS, PART 41
NASSAU COUNTY
INDEX NO.: 11-013989

MOTION SUBMISSION
DATE: 3-5-12

MOTION SEQUENCE
NO. 01, 02, 03, 04

    There are currently four motions pending before this Court in the above-entitled

action. In Mot. Seq. No. 1, Defendants 220 LAUNDRY LLC, ELIOT SPITZER,

MICHAEL STEINBERG, and ADAM J. TELLER (hereinafter referred to as

"Defendants") move for a preliminary injunction as follows:

    I)    restoring Defendant 220 Laundry to immediate
        possession of the 220 Coster Street laundry facility;

    ii)    barring Plaintiffs and their principals, representatives
        and agents from the facility and barring them from
        any interference with the business operations of the
        facility by 220 Laundry;

    iii)    directing Plaintiff B&M to account immediately for all
        sums received and all payments made from and
        including September 27, 2011 to the date of such
        accounting as a result of operations at the facility;

    iv)    suspending all payment obligations on the part of
        Purchaser and its guarantors, pending further Order
        of the Court upon a determination of the amount by
        which monthly expenses for water and gas service to
        the facility were wrongfully misstated by Plaintiffs
        and/or Additional Counterclaim Defendants, and
        directing that discovery proceed immediately as to
        said monthly expenses;

    v)    directing Seller and its principals and representatives
        to comply immediately with all obligations contained
        in the closing documents relating to the transfer of
        operational control of the 220 Coster Street facility
        from Seller to Purchaser, including but not limited to
        those provisions relating to the email address and
        website for the business; and

Movants did not request any temporary relief.  Plaintiffs B&M LINEN CORP. and

220 COSTER LLC (hereinafter "Plaintiffs") oppose said relief for reasons set forth

below.

In Mot. Seq. No. 03, Defendants sought a temporary restraining order and

injunctive relief pending determination of Mot. Seq. No. 01 to restrain and enjoin

Plaintiffs and Third Party Defendants/Additional Counterclaim Defendants MIRON

MARKUS and BORIS MARKUS (hereinafter "Markus") from "selling, assigning,

pledging, encumbering or otherwise transferring any of the assets of Plaintiffs...or

otherwise granting to any third party the right to operate" the laundry business at 220

Coster Street, Bronx, New York. The Court granted a temporary restraining order to

said effect "except for ordinary operating expenses in the regular course of business" by

Order to Show Cause dated February 8, 2012.

This second Order to Show Cause arose out of Defendants' investigation into

whether the utility bills provided by the Plaintiffs during due diligence were accurate.

Subpoenas were served upon Con Edison and the first response was received the day

before oral argument on the first Order to Show Cause (held on January 5, 2012).

Subsequently, a second response was received on January 26, 2012 and the second

Order to Show Cause followed.

Defendants claim that Con Edison determined there was a theft of past services

by B & M in excess of $5 million and Con Edison demanded payment of same from B &

M or service would be shut off thereby putting the laundry out of business. Defendants

further claim that this theft of services establishes that B & M cannot prevail on its

claims and that Defendants will prevail on their Counterclaims that B & M and MARKUS

fraudulently concealed the actual utility costs. In support, Defendants produced copies

of Con Edison investigative reports, emails, and other documents purportedly prepared

by Con Edison.

3

In Mot. Seq. No. 02, Defendants/Third Party Plaintiffs move for default judgment against Plaintiffs and the Third Party Defendants for failure to file and serve a Reply or an Answer pursuant to CPLR 3012.

In Mot. Seq. No. 04, Plaintiffs and Third Party Defendants cross-moved to extend the time to serve a Reply and an Answer and for default judgment against Defendants due to their service of an unverified Answer pursuant to CPLR 3020.

This action arises out of the purchase of a laundry business by Defendants from Plaintiffs located at 220 Coster Street, Bronx, New York, In May 2011. Prior thereto, Plaintiff B & M Linen Corp. (hereinafter "B & M") was operating a commercial laundry facility at the above address. B & M is solely owned by Additional Counterclaim Defendant BORIS MARKUS, whose son MIRON MARKUS, is an officer of B & M.

On November 10, 2010, Defendant ELIOT SPITZER entered into an Asset Purchase Agreement with B & M. SPITZER assigned all his rights under the Agreement to Defendant 220 LAUNDRY LLC at the closing.

Based upon information provided prior to closing and upon the warranties and representations in said Agreement, a Modification of Assets Purchase Agreement was entered into at the closing on May 19, 2011, as well as the following documents:

a)  Promissory Note in the principal amount of
    $1,000,000;

b)  Promissory Note in the principal amount of
    $8,600,000;

c)  a Personal Guaranty of the $8,600,000 Note;

4

    d)    Security Agreement in favor of B & M, securing 220
Laundry's obligations under the $8,600,000 Note,
covering all assets "as were transferred by Secured
Party to the Debtor in accordance with an Assets
Purchase Agreement and a bill of sale dated May 23,
2011";

    e)    Security Agreement in favor of B & M, securing 220
Laundry's obligations under the $1,000,000 Note,
covering all assets "as were transferred by Secured
Party to the Debtor in accordance with an Assets
Purchase Agreement and a bill of sale dated May 23,
2011"; and

    f)    Lease for the business premises, running between
220 Coster, LLC, as Landlord, and 220 Laundry, as
Tenant, the identity of the tenant being set forth in
the Modification.

All originals and copies of the closing documents were to be held in escrow by
Plaintiff B & M's attorney until the $1,000,000 Note was fully paid. The Agreement
included an agreement for MARKUS to consult for a six-month period, terminable by
Defendants at any time.

Defendants claim that post-closing MIRON MARKUS and BORIS MARKUS
"consistently and systematically" interfered with the operation of the business in
numerous ways set forth in the Affidavit of ELIOT SPITZER dated November 6, 2011
(paragraphs 31-36). On September 27, 2011, a meeting was held between all
principals and their counsel. When SPITZER advised that the consulting agreement
was terminated, counsel for B & M allegedly offered to "undo" the transaction or allow
SPITZER to proceed with the business. SPITZER chose the latter, but B & M's counsel
advised that this was agreeable provided they were not in default.

5

At that point, B & M advised that the monthly payment under the 8.6 million

dollar Note due on Friday, May 23, 2011 was not paid timely.  SPITZER alleged in his

affidavit he personally paid same on Sunday, May 25th due to his observance of the

Jewish Sabbath.  Additionally, SPITZER states that on or about September 25, 2011 a

Note payment was delivered to B & M and not deposited by B & M.  Nonetheless, B &

M demanded payment of an unpaid note payment in the First Cause of Action in the

Complaint dated September 27, 2011.  SPITZER contends no payments were unpaid

on said date.

A Notice of Default was annexed to the Complaint, alleging that the September

23 payment "was not timely made" and "other events of default" occurred.  B & M

declared a material default and stated in relevant part as follows:

> Whereas the payment due on 9/23/2011 was not timely made,
> and
>
> Whereas other events of default under the Modified Agreement,
> Lease, Note, and related Document has occurred,
>
> The Seller hereby notifies the Purchaser that a material default
> has occurred under the Note, and that no cure provision is
> present in either the Note, Modified Agreement, or any related
> document, and that
>
> In accordance with Section 50.3.2 of the Modified Agreement,
> the Seller hereby declares that no sale has occurred, and all
> assets transferred to the Purchaser are hereby reclaimed by the
> Seller.
>
> In accordance with Section 50.3.3.2 the Purchaser has no
> further right to occupy the Premises.
>
> The Purchaser is hereby informed that the presence of the
> Purchaser or his agents on the Premises after 9/27/2011 shall
> be deemed as trespass.

6

Defendants state that based on the Notice of Default and the facts and
circumstances set forth in the moving papers, including hostile and violent behavior by
the Additional Defendants MARKUS, they have not returned to the laundry facility,
which is now being operated by Plaintiffs and the Third Party Defendants. Further, one
of 220 LAUNDRY's employees was denied access to the facility on September 29,
2011 by BORIS MARKUS.

Based on this, Defendants seek the injunctive relief set forth above in Mot. Seq.
No. 01. Plaintiffs and Third Party Defendants oppose said relief. Said motion is denied
for the reasons set forth below:

"A party seeking the drastic remedy of a preliminary injunction must establish a
clear right to that relief under the law and the undisputed facts" (*Radiology Associates
of Poughkeepsie, PLLC v. Drocea*, 87 AD3d 1121, 1123). More specifically, to
establish entitlement to a preliminary injunction must "demonstrate, by clear and
convincing evidence, (1) a likelihood of success on the merits, (2) irreparable injury
absent a preliminary injunction, and (3) a balancing of the equities in the movant's
favor" (*84-85 Gardens Owners Corp. v. 84-12 35th Ave. Apartment Corp.*, 91 AD3d
702; *306 Rutledge, LLC v City of New York*, 90 AD3d 1026, 1028 see, CPLR 6301;
*Nobu Next Door, LLC v. Fine Arts Housing, Inc.*, 4 NY3d 839, 840 [2005]; *Aetna Ins.
Co. v Capasso*, 75 NY2d 860, 862 [1990]; *Perpignan v. Persaud*, 91 AD3d 622). The
decision whether to grant or deny the remedy, "which should be used sparingly," rests
in the sound discretion of the Supreme Court (*Doe v Axelrod*, 73 NY2d 748, 750 [1988];

7

Trump on the Ocean, LLC v. Ash, 81 AD3d 713, 715 see, 61 West 62 Owners Corp. v.

CGM EMP LLC, 77 AD3d 330, aff'd, 16 NY3d 822 [2011]).

With these principles in mind, and at this early juncture of the proceeding, the

Court finds that the defendants have not established a clear right to the relief sought

(e.g, 306 Rutledge, LLC v City of New York, supra, 90 AD3d 1026, 1028; Cooper v.

Board of White Sands Condominium, 89 AD3d 669, 670; Board of Managers of

Wharfside Condominium v. Nehrich, 73 AD2d 822).

Subsequent to the Court's signing of the second Order to Show Cause, and the

receipt of letters from counsel for all parties on February 21 and 22, 2012, the Court, by

short form order dated February 23, 2012, ordered a hearing "concerning the shut off of

gas service by Con Ed" on March 5, 2012, and other relief. The Court restored both

Orders to Show Cause and the other pending motions to the calendar for said date.

Thereafter, and based upon the letters from Defendants' counsel dated March 2

and 5, 2012, Defendants advised there was no need to proceed with the hearing.

Plaintiffs did not wish to proceed with the hearing based on that statement.

Accordingly, the hearing was cancelled and all motions marked submit. The Court has

not received certified copies of Con Ed's documents or other evidence in admissible

form concerning the investigation and any payment agreement with Con Edison.

It is settled, that the purpose of a preliminary injunction is to maintain the status

quo (Matter of Wheaton/TMW Fourth Ave., LP v. New York City Dept. of Bldgs., 65

AD3d 1051, 1052 see, Rutledge, LLC v. City of New York, supra, 90 AD3d 1026,

1028). The pendente lite remedy demanded here, however, is tantamount to a status

8

quo-altering, mandatory injunction which would also award the defendants portions of the "ultimate relief" sought in their counterclaims and third party actions. *See generally, 306 Rutledge, LLC v. City of New York, supra,* 90 AD3d at 1028; *In re Marciano v. Champion Motor Group, Inc.,* \_\_\_Misc.3d.\_\_\_, 2007 WL 4473342 [Supreme Court, Nassau County 2007] *see also, Board of Managers of Wharfside Condominium v. Nehrich,* 73 AD3d 822, 824; *Matter of Wheaton/TMW Fourth Ave., LP v New York City Dept. of Bldgs.,* 65 AD3d 1051, 1053; *Village of Westhampton Beach v Cayea, supra,* 38 AD3d 760, 762; *Rosa Hair Stylists, Inc. v. Jaber Food Corp.,* 218 AD2d 793, 794).

Significantly, a mandatory injunction, "which is used to compel the performance of an act * * * is an extraordinary and drastic remedy which is rarely granted and then only under unusual circumstances where such relief is essential to maintain the status quo pending trial of the action" (*Matos v. City of New York,* 21 AD3d 936, 937; *Rosa Hair Stylists v. Jaber Food Corp., supra,* 218 AD2d 793, 794 *see, Kane v. Walsh,* 295 NY 198, 205-206 [1946]; *306 Rutledge, LLC v City of New York, supra,* 90 AD3d 1026, 1028). Relatedly, and "absent extraordinary circumstances" – not demonstrated here – a preliminary injunction will not issue where to do so would "grant the movant the ultimate relief to which he or she would be entitled in a final judgment" (*SHS Baisley, LLC v Res Land, Inc.,* 18 AD3d 727, 729; *Paul Fire & Mar. Ins. Co. v York Claims Serv.,* 308 AD3d 347, 348-349 *see, 306 Rutledge, LLC v City of New York, supra*).

9

In sum, and upon carefully weighing the constellation of relevant factors and balancing of the equities, the Court concludes in its discretion that granting the drastic, equitable remedy sought in the Order to Show Cause dated November 14, 2011 (Mot. Seq. No. 01) is not warranted. It bears noting, however, that the Court's holding with respect to that motion for preliminary injunctive relief is not a determination on the merits of the defendants' claims (*e.g., J. A. Preston Corp. v Fabrication Enters.,* 68 NY2d 397, 406-407 [1986]; *Hudson Val. Mar., Inc. v Town of Cortlandt,* 79 AD3d 700, 703). It follows that if the defendants ultimately succeed in establishing that, *inter alia,* the plaintiffs/third party defendants breached the agreements and that the allegations of fraud concerning Con Edison billings are established by admissible evidence, they may be ultimately entitled to a damage award and/or the issuance of mandatory injunctive relief, as requested in their counterclaims (*see, Rutledge, LLC v. City of New York, supra,* 90 AD3d 1028).

Further, the Court upon review of all the relevant factors and a balancing of the equities, concludes in its discretion and in the interest of justice that the request for injunctive relief in the Order to Show Cause dated February 8, 2011 (Mot. Seq. No. 03) is granted only to the extent that the plaintiffs and additional counterclaim defendants are prohibited from selling, assigning, pledging, encumbering, or otherwise transferring any assets of B & M LINEN CORP. or 220 COSTER LLC except for ordinary operating expenses in the ordinary course of business pending further order of the Court, provided that Defendants file an undertaking in the sum of $10,000.00 within twenty (20) days of service of a copy of this order with notice of entry.

10

The remaining motions for a default judgment (Mot. Seq. No. 02) and for leave to extend the time to serve a Reply and for a default judgment (Mot. Seq. No. 04) are disposed of as follows:

According to defendants, the delay in serving a Reply – which was attributable to an inadvertent, law office failure – was minimal, unintentional and non-prejudicial in import. Upon the record papers submitted, B & M's motion should be denied. The cross-motion for leave to extend the time is granted.

The record indicates that the delay was brief – approximately three weeks – and that the actual default in serving the Reply was neither willful nor the product of bad faith, but rather, occasioned by law office failure which was unintentional (*see generally, Cakmakian v. Maroney*, 78 AD3d 1103, 1104; *Merchants Ins. Group v. Hudson Valley Fire Protection Co., Inc.*, 72 AD3d 762, 764 *see also, Adolph H. Schreiber Hebrew Academy of Rockland, Inc. v. Needleman*, AD3d 791; *Klughaupt v. Hi-Tower Contractors, Inc.*, 64 AD3d 545, 546). Notably, the Court has broad discretion to accept law office failure as a reasonable excuse (*see,* CPLR 2005; *Swenson v. MV Transp., Inc.*, 89 AD3d 924, 925). Moreover, "[w]hether an excuse is reasonable is a determination within the sound discretion of the Supreme Court" (*Walker v. Mohammed*, 90 AD3d 1034; *Adolph H. Schreiber Hebrew Academy of Rockland, Inc. v. Needleman, supra; Swenson v. MB Transp., Inc., supra*). Nor has the defendant shown that it would sustain prejudice if the plaintiff's application were to be granted (*Zeccola & Selinger, LLC v. Horowitz*, 88 AD3d 992, 993; *Giha v. Giannos Enterprises, Inc.*, 69 AD3d 564, 565 *cf., Spitzer v. Schussel*, 48 AD3d 233, 234). Additionally, and for the

11

purposes of the motion (*Moore v. Day,* 55 AD3d 83, 805), the plaintiff has adequately shown potential merit to its defenses (*Walker v. Mohammed, supra; Quis v. Bolden,* 298 AD2d 375).

In sum, the cumulative import of these factors, tempered by the strong public policy favoring dispositions on the merits, supports an exercise of discretion in favor of excusing the delay at issue (*Zanelli v. Jmm Raceway, LLC,* 83 AD3d 697).

The Court has considered the remaining contentions in these motions addressed to verification of the pleadings and in the interest of justice directs that defendants serve and file a Verification of the Answer within twenty (20) days of service of a copy of this order with notice of entry. Plaintiffs shall serve and file a Verified Reply within ten (10) days of service of the Verification of the Answer. All other requests for relief are denied.

Accordingly, the motions are decided as follows:

1. Mot. Seq. No. 01 is denied.

2. Mot. Seq. No. 02 is denied.

3. Mot. Seq. No. 03 is granted to the extent that the plaintiffs and additional counterclaim defendants are enjoined from selling, assigning, pledging, encumbering, or otherwise transferring any assets of B & M LINEN CORP. or 220 COSTER LLC except for ordinary operating expenses in the ordinary course of business pending further order of the Court, provided that Defendants file an undertaking in the sum of $10,000.00 within twenty (20) days of service of a copy of this order with notice of entry.

12

4. Mot. Seq. No. 04 is denied.

The foregoing constitutes the decision and order of the Court.

Dated: March 16, 2012

STEVEN M. JAEGER, A.J.S.C.

13

# EXHIBIT M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------X

B&M LINEN CORP and 220 COSTER LLC,

          Plaintiffs,

    -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

          Defendants,

    -against-

MIRON MARKUS and BORIS MARKUS

     Additional Counterclaim Defendants.

------------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

       Third-party Plaintiffs,

    -against-

MIRON MARKUS and BORIS MARKUS

       Third-party Defendants,

------------------------------------------------------------------X

Index No.: 13989/11

**Order**

**Assigned to:**
**Hon. Steven M. Jaeger**

Defendants/Third-party Plaintiffs having moved this Court for an order granting them Default Judgment and Plaintiffs/Third-party Defendants having cross-moved this Court for an Order granting them Default Judgment or, in the alternative, to extend the Plaintiffs/Third-party Defendants' time to submit an Answer to the Third-Party Complaint and the Counterclaims, and said motion and cross-motion having come before this Court on February 22, 2012, and

     NOW, after reading and filing the Notice of Motion dated January 5, 2012, the affirmation of Steven R. Sugrue, Esq., in support of the motion dated January 5, 2012 and the exhibits attached thereto, read in support of the motion and after reading and filing the Notice of Cross-Motion dated February 18, 2012, the affirmation of Thomas J. Solomon, Esq., in support of the cross-motion dated February 18, 2012 and the exhibits attached thereto, read in support of the cross-motion.

NOW, on the motion of Thomas J. Solomon, Esq., attorney for the Plaintiffs/Third-party Defendants, it is

ORDERED that Plaintiffs/Third-party Defendants' motion for an Order granting the Plaintiffs/Third-party Defendants Default Judgment is granted in its entirety; and it is further

ORDERED that Defendants/Third Party Plaintiffs' motion for an Order granting the Defendants/Third Party Plaintiffs Default Judgment is denied in its entirety; and it is further

ORDERED that the Defendants are jointly and severally liable to the Plaintiffs for each cause of action asserted in the Complaint; and it is further

ORDERED that this matter is to proceed to an Inquest to assess the amount of damages owed to the Plaintiff by the Defendants; and it is further

ORDERED that Plaintiff serve a copy of this order with notice of entry upon the Defendants.

Dated:

ENTER:

_____

Hon. Steven M. Jaeger, J.S.C.

## AFFIRMATION OF SERVICE

STATE OF NEW YORK)
               ) ss:
COUNTY OF KINGS  )

       THOMAS J. SOLOMON, ESQ., An attorney duly admitted to practice law in the State of New York, hereby affirms under the penalty of perjury that I am not a party to this action, am over 18 years of age and am an associate of the firm of LAZAROWITZ & MANGANILLO, LLP, located at 2004 Ralph Avenue, Brooklyn, New York.

       That on February 18, 2012, I served a true copy of the within **Proposed Order** upon Defendants/Third-party Plaintiffs at the addresses designated by the said person for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, an overnight delivery service for overnight delivery, prior to the latest time designated by the overnight delivery service for overnight delivery at:

Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

Dated:  Brooklyn, NY
        February 18, 2012

THOMAS J. SOLOMON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
--------------------------------------------------------------------X
B&M LINEN CORP and 220 COSTER LLC,

         Plaintiffs,

   -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

         Defendants,

   -against-

MIRON MARKUS and BORIS MARKUS
   Additional Counterclaim Defendants.
--------------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,
      Third-party Plaintiffs,

   -against-

MIRON MARKUS and BORIS MARKUS
      Third-party Defendants,

--------------------------------------------------------------------X

Index No.: 13989/11

**Proposed Order**

**Assigned to:**
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

<u>Proposed Order</u>

**LAZAROWITZ & MANGANILLO, L.L.P.**
**Attorneys for Plaintiff(s)**
**Office & Post Office Address**
**2004 Ralph Avenue**
**Brooklyn, New York 11234**
**(718) 531-9700**

Signature (Rule 130-1.1-a)

THOMAS J. SOLOMON, ESQ.

# EXHIBIT N

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-----------------------------------------------------------------------X

B&M LINEN CORP and 220 COSTER LLC,

                                            Plaintiffs,

        -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                                     Defendants,

        -against-

MIRON MARKUS and BORIS MARKUS

               Additional Counterclaim Defendants.

-----------------------------------------------------------------------X

220 LAUNDRY LLC and ELIOT SPITZER,

                          Third-party Plaintiffs,

        -against-

MIRON MARKUS and BORIS MARKUS

                    Third-party Defendants,

-----------------------------------------------------------------------X

Index No.: 13989/11

**Order**

Assigned to:
**Hon. Steven M. Jaeger**

Defendants/Third-party Plaintiffs having moved this Court for an order granting them Default Judgment

and Plaintiffs/Third-party Defendants having cross-moved this Court for an Order granting them Default

Judgment or, in the alternative, to extend the Plaintiffs/Third-party Defendants' time to submit an Answer

to the Third-Party complaint and the Counterclaims, and said motion and cross-motion having come

before this Court on February 22, 2012, and

                    NOW, after reading and filing the Notice of Motion dated January 5, 2012, the

affirmation of Steven R. Sugrue, Esq., in support of the motion dated January 5, 2012 and the exhibits

attached thereto, read in support of the motion and after reading and filing the Notice of Cross-Motion

dated February 18, 2012, the affirmation of Thomas J. Solomon, Esq., in support of the cross-motion and

in opposition to the motion dated February 18, 2012 and the exhibits attached thereto, read in support of the cross-motion and in opposition to the motion.

NOW, on the motion of Thomas J. Solomon, Esq., attorney for the Plaintiffs/Third-party Defendants, it is

ORDERED that Defendants/Third Party Plaintiffs' motion for an Order granting the Defendants/Third Party Plaintiffs Default Judgment is denied in its entirety; and it is further

ORDERED that Plaintiffs/Third-party Defendants' cross-motion, to the extent that it seeks an Order granting the Plaintiffs/Third-party Defendants Default Judgment, is denied; and it is further

ORDERED that Plaintiffs/Third-party Defendants' cross-motion, to the extent that it seeks an Order to extend the Plaintiffs/Third-party Defendants time to submit an Answer to the Third-Party Complaint and the Counterclaims, is granted; and it is further

ORDERED that the Plaintiffs/Third-party Defendants time to submit an Answer to the Third-Party Complaint and the Counterclaims is hereby extended to thirty (30) days from the date of this Order; and it is further

ORDERED that the Plaintiffs/Third-party Defendants serve a copy of this order with notice of entry upon the Defendants/Third Party Plaintiffs.

Dated:

ENTER:

_____

Hon. Steven M. Jaeger, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-------------------------------------------------------------------X
B&M LINEN CORP and 220 COSTER LLC,

                                Plaintiffs,

      -against-

220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER,

                                Defendants,

      -against-

MIRON MARKUS and BORIS MARKUS

         Additional Counterclaim Defendants.
-------------------------------------------------------------------X
220 LAUNDRY LLC and ELIOT SPITZER,

               Third-party Plaintiffs,

      -against-

MIRON MARKUS and BORIS MARKUS

            Third-party Defendants,

-------------------------------------------------------------------X

Index No.: 13989/11

**Proposed Order**

Assigned to:
**Hon. Steven M. Jaeger**

Returnable: 2/22/12

═══════════════════════════════════════════════════

**Proposed Order**

═══════════════════════════════════════════════════

**LAZAROWITZ & MANGANILLO, L.L.P.**
**Attorneys for Plaintiff(s)**
**Office & Post Office Address**
**2004 Ralph Avenue**
**Brooklyn, New York 11234**
**(718) 531-9700**

═══════════════════════════════════════════════════

Signature (Rule 130-1.1-a)

**THOMAS J. SOLOMON, ESQ.**

## AFFIRMATION OF SERVICE

STATE OF NEW YORK)
                ) ss:
COUNTY OF KINGS   )

        THOMAS J. SOLOMON, ESQ., An attorney duly admitted to practice law in the State of New York, hereby affirms under the penalty of perjury that I am not a party to this action, am over 18 years of age and am an associate of the firm of **LAZAROWITZ & MANGANILLO, LLP**, located at 2004 Ralph Avenue, Brooklyn, New York.

        That on February 18, 2012, I served a true copy of the within **Proposed Order** upon Defendants/Third-party Plaintiffs at the addresses designated by the said person for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, an overnight delivery service for overnight delivery, prior to the latest time designated by the overnight delivery service for overnight delivery at:

Coti & Sugrue
59 Grove Street Suite 1F
New Canaan, Ct 06840

Dated:  Brooklyn, NY
        February 18, 2012

                    THOMAS J. SOLOMON

JS 44 (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
B&M LINEN CORP and 220 COSTER LLC

**DEFENDANTS**
220 LAUNDRY LLC, ELIOT SPITZER,
MICHAEL STEINBERG and ADAM J. TELLER

**(b)** County of Residence of First Listed Plaintiff  Nassau
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Bronx
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Shafferman & Feldman LLP, 286 Madison Avenue, Suite 502
New York, NY 10017 (212) 509-1802

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights ☐ 830 Patent ☐ 840 Trademark | ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | | |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange ☐ 890 Other Statutory Actions |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☒ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | | ☐ 790 Other Labor Litigation ☐ 791 Employee Ret. Inc. | | ☐ 895 Freedom of Information Act |
| ☐ 196 Franchise | | | Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision ☐ 950 Constitutionality of |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | | State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 462 Naturalization Application ☐ 463 Habeas Corpus - | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 560 Civil Detainee - Conditions of | Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
Removal of State Court Action under 28 USC sections 1334 and 1452(a) and transfer to Bankruptcy Court SDNY.

Brief description of cause:
Removed Action for breach of contract connected to Chapter 11 Bankruptcy Case where Plaintiff is Debtor.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE  6/14/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE  JFB  MAG. JUDGE  WDW

2982

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.10 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

I, __Joel Shafferman__, counsel for __Plaintiff__, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☒      monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐      the complaint seeks injunctive relief,

☐      the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.)      Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County: __Yes__

2.)      If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? _____

b) Did the events of omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? _____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? _____
     (Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.
     ☒    Yes          ☐    No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?
     ☐    Yes    (If yes, please explain)      ☒    No

I certify the accuracy of all information provided above.

**Signature:** _____

JS 44 Reverse (Rev. 09/11)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**    Example:    U.S. Civil Statute: 47 USC 553
                                                      Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.    **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.