Page 1

1  UNITED STATES BANKRUPTCY COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Case No. 12-11560-alg

4  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6  B&M LINEN CORP.,

7                     Debtors.

8  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9  ADV. PROC. NO.:  12-0185-alg

10  B&M LINEN CORP., ET AL.,

11                 Plaintiffs,

12  v

13  220 LAUNDRY, LLC, ET AL.,

14                 Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16                 United States Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19

20                 January 9, 2013

21                 11:03 a.m.

22

23  B E F O R E :

24  HON ALLAN L. GROPPER

25  U.S. BANKRUPTCY JUDGE

Page 2

1   Hearing re: Motion by laundry, dry cleaning workers and

2   Allied Industries Benefit Funds to convert the debtor's case

3   to Chapter 7 or, alternatively, for appointment of a Chapter

4   11 trustee

5

6   Case Conference

7

8   Motion by the UST to convert Chapter 11 case or in the

9   alternative to appoint a Chapter 11 trustee

10

11  Debtor's objection to proof of claim no. 14 filed by 220

12  Laundry, LLC

13

14  Adversary proceeding: 12-01885-alg B&M Linen Corp., et al. v

15  220 Laundry, LLC, et al.:  Pretrial conference

16

17  Adversary proceeding: 12-01885-alg B&M Linen Corp., et al. v

18  220 Laundry, LLC, et al.:  Motion by Defendants for partial

19  summary judgment

20

21

22

23

24

25  Transcribed by:  Sherri L. Breach, CERT*D-397

Page 3

```
 1    A P P E A R A N C E S :

 2    SHAFFERMAN & FELDMAN, LLP

 3         Attorneys for Debtor

 4         286 Madison Avenue

 5         Suite 502

 6         New York, New York 10017

 7

 8    BY:  JOEL SHAFFERMAN, ESQ.

 9

10    MCDERMOTT, WILL & EMERY

11         Attorneys for Marcus's and 220 Coster, LLC

12         340 Madison Avenue

13         New York, New York 10173

14

15    BY:  NAVA HAZAN, ESQ.

16

17    COTI & SUGRUE

18         Attorneys for 220 Laundry, LLC

19         59 Grove Street

20         Suite 1f

21         New Canaan, Connecticut 06840

22

23    BY:  STEPHEN R. SUGRUE, ESQ.

24

25
```

Page 4

1    Consolidated Edison Company of New York, Inc.

2         Attorneys for conEdison

3         4 Irving Place - Room 1875-S

4         New York, New York 10003

5

6    BY:  LEON Z. MENER, ESQ.

7

8    SCHULTE, ROTH & ZABEL, LLP

9         Attorneys for Laundry, Dry Cleaners Workers and Allied

10        Industries Benefit Fund

11        919 Third Avenue

12        New York, New York 10022

13

14   BY:  LAWRENCE V. GELBER, ESQ.

15

16   SICHENZIA, ROSS, FRIEDMAN & FERENCE, LLP

17        Attorneys for All Points Capital Leasing Company

18        61 Broadway

19        New York, New York 10006

20

21   BY:  RALPH E. PREITE, ESQ.

22

23

24

25

1    U.S. DEPARTMENT OF JUSTICE

2    OFFICE OF THE UNITED STATES TRUSTEE

3         Attorneys for U.S. Trustee

4         33 Whitehall Street

5         21st Floor

6         New York, New York 10004

7

8    BY:  MICHAEL DRISCOLL, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  B&M Linen Corp.

3              MR. DRISCOLL:  Good morning, Your Honor.  Michael

4      Driscoll for the U.S. Trustee.

5              MR. SHAFFERMAN:  Good morning.  Joel Shafferman,

6      Shafferman & Feldman for the debtor.

7              MS. HAZAN:  Good morning, Your Honor.  Nava Hazan,

8      McDermott, Will & Emery on behalf of the Marcus's and 220

9      Coster, LLC.

10             MR. SUGRUE:  Stephen Sugrue for 220 Laundry, LLC,

11     a creditor in the lead case, and party to the adversary

12     proceeding.

13             MR. MENER:  Appearing on behalf of the

14     Consolidated Edison Company of New York, Leon Z. Mener.

15             MR. GELBER:  Lawrence Gelber, Schulte, Roth &

16     Zabel, for the laundry, dry cleaning workers and Allied

17     Benefit Fund.

18             MR. PREITE:  Good morning, Your Honor.  Ralph

19     Preite, Sichenzia, Ross, Friedman & Ference, for All Points

20     Capital Leasing Company.  I apologize for my casual

21     appearance, Your Honor, but I consented --

22             THE COURT:  All right.

23             MR. PREITE:  -- an adjournment last week and then

24     I found out this morning this matter hadn't been adjourned.

25             THE COURT:  You're perfectly well-dressed.  I've

1   had people much more casual, and maybe it will introduce a

2   good -- a feeling of good cheer into the room.  But we'll

3   see.

4           Do you want to start, Mr. Shafferman?

5           MR. SHAFFERMAN:  If I may, Your Honor.

6           THE COURT:  We don't have anybody on the telephone

7   on this matter, do we?  I don't think so.

8           MR. SHAFFERMAN:  Well, in terms of a status, I can

9   touch on a few -- a few points.  I guess most positively and

10  significantly on Monday of this week, Hanover Insurance,

11  which is the insurer of both of the properties, informed us

12  that an additional $2 million of insurance proceeds under

13  the commercial insurance policy will be remitted or paid by

14  the end of this week.  And they also talked about the timing

15  of remaining payments under the insurance policies, also, on

16  top of the additional two.  And --

17          THE COURT:  So there is now 4 million of insurance

18  total?

19          MR. SHAFFERMAN:  Yes.  That's -- that's correct.

20  And they've -- the conversations and their questions were

21  directed towards counsel for Coster (ph) and the

22  individuals.  But that's,  yeah, what we've been advised.

23          To that end, last evening the debtor and the

24  Marcus Coster group jointly filed or filed a joint motion

25  seeking an order directing that all insurance proceeds be

1   deposited into CRIS, the Court Registry Investment System.

2   And --

3           THE COURT:  I -- I directed --

4           MR. SHAFFERMAN:  Yes.

5           THE COURT:  -- at the last hearing that all

6   insurance proceeds be paid into the court.  That hasn't been

7   done yet?

8           MR. SHAFFERMAN:  No.  We were trying to just deal

9   with the --

10          THE COURT:  I think that should be done today.

11  You have now a motion?

12          MR. SHAFFERMAN:  We have a motion.

13          MS. HAZAN:  Yes, we do.

14          THE COURT:  Well, I'm going to sign that today.

15          MR. SHAFFERMAN:  Okay.

16          THE COURT:  I don't think we need any notice to

17  pay funds into the court.  Where is -- is it -- is it on the

18  --

19          MR. SHAFFERMAN:  Docket.

20          THE COURT:  -- docket?  I would --

21          MR. SHAFFERMAN:  It --

22          MS. HAZAN:  Yes.

23          THE COURT:  If it went on the docket, it went on

24  the docket either late last night or --

25          MS. HAZAN:  That's correct, Your Honor.  It was --

Page 9

```
 1               THE COURT:  -- early this morning.

 2               MS. HAZAN:  It was filed around 5 p.m. last night.

 3               THE COURT:  All right.

 4               MR. SHAFFERMAN:  Okay.  We'll -- so that --

 5               THE COURT:  So there's 2 million in hand now; is

 6   that correct?

 7               MR. SHAFFERMAN:  That's correct.

 8               THE COURT:  And the other 2 million is coming in?

 9               MS. HAZAN:  I was -- I was told it would be -- it

10   would be coming in at -- by the end of this week on Friday.

11               THE COURT:  That should be immediately paid into

12   court.

13               MS. HAZAN:  Sure.

14               MR. SHAFFERMAN:  And mechanically the -- well,

15   we've been -- been interfacing with the clerk's office in

16   terms of paying it in, whether the payee is someone other

17   than the court -- the government or the court.  That's, I

18   guess, the mechanical issue we were dealing with in terms of

19   the order and -- and how that would all work.  That was the

20   basis for the motion.

21               But there's -- you know, there's no question the

22   check is -- is there and --

23               THE COURT:  Well, the rights --

24               MR. SHAFFERMAN:  -- it's good for --

25               THE COURT:  -- of all parties to the actual funds
```

1    are reserved.

2              MS. HAZAN:  Yeah.  That's --

3              THE COURT:  Whoever is entitled to them remain

4    entitled to them.  It's only paid into the court for

5    safekeeping purposes.

6              MS. HAZAN:  And that was reflected in the order,

7    Your Honor.

8              THE COURT:  All right.

9              MR. SHAFFERMAN:  So on that note, we're -- the --

10   and I've also been advised that the investigation by the

11   fire marshal should be completed this week.  I know I said

12   that at the last hearing, but I guess with all the other

13   issues the insurance companies are dealing with in the

14   holiday season, things got delayed.  But that's what we've

15   been assured.  And -- and without being too speculative,

16   it's -- it's just my -- my sense of logic is that given the

17   additional money that's coming, that probably boats well for

18   where the investigation is going to come out.  So we feel

19   cautiously optimistic about --

20             THE COURT:  How much more --

21             MR. SHAFFERMAN:  -- that whole thing?

22             THE COURT:  -- insurance money is expected?

23             MS. HAZAN:  Well, under both policies there is

24   approximately $15 million, and now the fire adjuster for the

25   -- for the debtor is now -- is meeting tomorrow with the

1   fire adjuster for Hanover and they're going to discuss what

2   amounts exactly are going to be paid.  It's not going to be

3   -- I mean, it is not going to be the total amount, but we're

4   expecting -- we're expecting a significant amount.

5             MR. SHAFFERMAN:  So -- and, actually, in speaking

6   with the clerk's office -- I will -- I will reach out to

7   them again.  The monies are deposited, I believe, up until

8   1:00 on Wednesday, you know, one time a week.  So before we

9   send a check down, should -- would -- I would call the

10  gentleman from the clerk's office and see, do they hold the

11  check if it's going to miss the 1:00 time or should we hold

12  it and send it with the two checks or the additional check

13  that we send -- we receive this week so that it's

14  definitely, you know, set for the next window, which would

15  be the 15th.  That would be mechanically --

16            THE COURT:  Where -- where are the funds now?  In

17  your firm, ma'am?

18            MS. HAZAN:  No, sir.

19            MR. SHAFFERMAN:  No.  No.  The issue was the

20  checks --

21            THE COURT:  Where are the -- where -- oh, the

22  check --

23            MR. SHAFFERMAN:  The check is --

24            THE COURT:  -- hasn't been cashed?

25            MR. SHAFFERMAN:  It's a physical check because it

Page 12

```
 1    was --

 2              THE COURT:  And where does that reside?

 3              MR. SHAFFERMAN:  It's in my office in the -- in --

 4    you know, in a safe place.  And it -- the issue with

 5    negotiating it into a normal escrow or to the office was

 6    that it was payable to -- not only to the debtor and to the

 7    Marcus's and Coster, but also to the mortgagee on the

 8    building, and that was the difficulty or the mechanical

 9    issue in terms of negotiating the check.

10              I mean, the check is -- is good for six months.

11    It's a check that was issued in November and there's no

12    question with that.  It's just a matter of mechanically, you

13    know, dealing -- dealing with it.  So that was, I think --

14              THE COURT:  All right.

15              MR. SHAFFERMAN:  -- the purpose of the motion and

16    the order so that there would be no mechanical issues.

17              THE COURT:  Well, I would ask interested parties

18    to look at the order on the docket immediately and -- but

19    before the end of the day.  Let the Court know if there's

20    any question.  We could have a telephone call if there's any

21    question with regard to the form of the order.

22              MR. PREITE:  If I may, Your Honor.  If I recall

23    correctly, a prior order had been entered in this case

24    directing insurance proceeds to be deposited into debtor's

25    counsel account.  So if this new order that's being proposed
```

Page 13

1    is entered, I think we'll have conflicting orders.

2            So for purposes of clarity, perhaps the new

3    proposed order should reference the old order, void it,

4    direct any funds that may have been deposited into debtor's

5    counsel's account to be forwarded to the court account so

6    it's consistent with any new order that might be submitted.

7            Was there a check deposited?

8            MR. SHAFFERMAN:  The -- no.  The only check that

9    was received was a prepetition retainer which was all part

10   of the retention application.  But, no.  But I -- we --

11   certainly the debtor has no objection to the order

12   containing that language nor -- nor do I.

13           THE COURT:  All right.

14           MR. SHAFFERMAN:  So in terms of the other issues

15   in the case, Your Honor did enter the bar order.  The bar

16   date was the 27th of December.  That has -- that has passed

17   and we -- myself and the counsel for Marcus's intend to go

18   through all the claims and ferret out any issues that we may

19   have.  Before making any objections we will reach out to the

20   interested parties and try to keep any -- any of that stuff

21   to a minimum.  But there were really no major surprises that

22   we didn't expect.

23           The proceed -- we believe that the high end of the

24   claims would be roughly $4 million, so it would be somewhere

25   between 3 to $4 million in terms of claims, with -- putting

Page 14

1    aside -- which is -- makes the plan that we've proposed

2    feasible and, frankly, we're -- we would -- we're -- we feel

3    that we're ready to go for disclosure statement and

4    confirmation.  The only issue that, I guess, could be a bar

5    to that or -- or that hurdle, if you will, is the issue of

6    the litigation with 220 Laundry.

7               On December 17th, 220 Laundry filed its motion for

8    summary judgment.  We've been in discussions with Mr.

9    Sugrue, who is here today, on a discovery schedule and we're

10   hopefully -- we'll get that concluded.  And the debtor in

11   220 also intend to file our own motion for summary judgment

12   to seek a declaration that 220 breached the modified APA and

13   it's not entitled to any insurance proceeds.

14              However, you know, in thinking about it and the

15   litigation in terms of the length and potential cost, we've

16   -- we haven't raised this with 220 Laundry's counsel yet,

17   but in discussions with the debtor and with the Marcus's,

18   they would be amenable to trying to take a crack at

19   submitting that dispute to the mediation panel with this

20   court to hopefully, maybe shortcut all the litigation and

21   have a settlement, which then would put us in a position to

22   really confirm this plan on -- on the fast track.

23              THE COURT:  What -- what discovery are you talking

24   about?

25              MS. HAZAN:  We were talking about the discovery

1    with respect to the proof of claim as well as the summary

2    judgments.

3                THE COURT:  Yes.  No.  I understand that.  But

4    what -- what is the nature of the discovery?

5                MS. HAZAN:  Well, the discovery would be basically

6    to -- to get -- I mean, we would need -- we would like to

7    take the deposition of all the -- of all the defendants and

8    we would like also to understand how the damages have been

9    calculated.  So we would -- we would request any documents

10   explaining how the damages were calculated for each item in

11   the proof of claim.

12               THE COURT:  Okay.

13               MR. SHAFFERMAN:  The other issue out -- we've

14   discussed or was raised was we made a motion by notice of

15   presentment to approve a stipulation with conEdison which

16   fixes their prepetition claim and requires the payment of

17   their administrative claim in the amount of $173,000 to be

18   paid within 90 days or on the effective date of a plan,

19   whichever comes sooner.

20               There was a limited objection filed, I think, two

21   days ago by the funds, the labor -- the laundry funds.

22   We've discussed, prior to the court hearing this morning,

23   that in view of the imminent arrival of the additional funds

24   -- money funds to put in to escrow, they've both agreed to

25   adjourn the matter until -- for a few days.  We had noticed

```
 1    the motion on the insurance proceeds being filed with the

 2    Court for the 23rd.

 3              There is also a pending motion, which we hope to

 4    resolve, but by an administrative creditor with a $30,000

 5    claim for immediate payment.  That's also scheduled for the

 6    23rd.  So our thought was to adjourn the submission of the

 7    presentment of that order to the 23rd and to see where we

 8    are in terms of the hopeful progress.

 9              I'm not speaking for them, but I believe the

10    conEdison counsel and the funds counsel, who are both here,

11    would agree to that temporary resolution of that issue.

12              THE COURT:  All right.  But I -- I'm -- well, I'll

13    hear from the parties.  I'm not going to delay entry of the

14    order --

15              MR. SHAFFERMAN:  No.

16              THE COURT:  -- requiring payment of the insurance

17    proceeds into the court.

18              MR. SHAFFERMAN:  No.  No.  That wasn't -- it's

19    just that we had picked the -- that arbitrary date of the

20    23rd because the motion had been pending.  But I certainly

21    have no problem with the same date, you know.

22              THE COURT:  All right.  Does anyone want to be

23    heard on the adjournment of the conEd stipulation?

24              All right.  Yes, sir.

25              MR. MENER:  We have no -- on behalf of conEdison,
```

1   we have no objection to putting it off to January 23rd with

2   the thought that the objection -- the limited objection to

3   the payment of the administrative claim would be withdrawn

4   by the moving -- the person that made the motion with

5   respect to that because the additional funds have been paid.

6              THE COURT:  All right.

7              MR. SHAFFERMAN:  That's -- that's -- I'm sorry.

8              MR. GELBER:  Just to be clear, I -- we didn't say

9   that we were definitely going to withdraw the objection.  We

10  said we would consider it.  We would talk to our client

11  about it.

12             THE COURT:  All right.

13             MR. SHAFFERMAN:  That -- that's what we have here

14  in way of status.  Unless Your Honor has additional --

15             THE COURT:  All right.

16             MR. SHAFFERMAN:  -- questions.

17             THE COURT:  Let me hear from any other party that

18  wishes to be heard.

19             MR. SUGRUE:  Thank you, Your Honor.  Steve Sugrue

20  for 220 Laundry, LLC.

21             When we appeared on the 11th, I indicated we were

22  imminently going to file a motion for partial summary

23  judgment.  I said we would do it by Monday, and we did.  The

24  subject of discovery did come up at the last appearance as

25  did your -- Your Honor urging us to confer on a briefing

1    schedule.

2         On January 2nd I spoke to Mr. Walsh.  He had not

3    yet read the motion for summary judgment.

4         THE COURT:  Mr. Walsh?

5         MR. SUGRUE:  Mr. Walsh, excuse me, of the

6    McDermott, Will, Emery --

7         THE COURT:  Oh, right..

8         MR. SUGRUE: -- firm representing the Marcus's.  I

9    beg your pardon, Your Honor.

10        THE COURT:  Okay.

11        MR. SUGRUE:  As of January 2nd he hadn't read the

12   motion for summary judgment.  He wanted to discuss

13   discovery.  I said, well, who do you -- who do you want to

14   depose from our side.  He said he didn't know yet.  I told

15   him that once he read the motion I think he would agree with

16   me that there is no discovery necessary as respects the

17   limited issues raised by that partial summary judgment

18   motion.

19        They are critical issues to the case, to the lead

20   case and to the adversary proceeding, but we didn't make the

21   motion for summary judgment believing there were triable

22   issues of fact requiring discovery.  If we had believed that

23   we wouldn't have made the motion.

24        We certainly discussed the need for some discovery

25   in the case.  Our motion has nothing to do with any of the

1    numbers in the case.  It has to do with a resolution of the

2    competing claims of material breach of the purchase

3    agreement, such that resolution of the limited motion will

4    determine whether we own the business, which we've been

5    talking about since April, or whether somebody else owns it,

6    whether the debtor owns it.

7            I think I had a -- I believe we have agreement

8    from a discussion in the hall before today's appearances

9    that would -- what we would like to do is set a briefing

10   schedule.  At the same time, we do not mind proceeding with

11   a discovery schedule.  From our standpoint, we regard it as

12   unrelated to the pending motion, but, obviously, if a

13   deposition gets taken next week prior to their time to

14   respond to the summary judgment motion, they can use

15   whatever information they've gathered.  We're not trying to

16   segregate or limit the scope of any discovery that may be

17   taken.

18           So I urged with counsel for the Marcus's that we

19   agree to allow their response to our December 17th motion to

20   be filed -- served and filed by the end of this month, and

21   that would include any cross-motions as she did indicate

22   that there would likely be such a cross-motion.  We could --

23   we could respond to that in two weeks.  So, to me, that is

24   one set of deadlines that's agreeable to us.  I think it's

25   agreeable to counsel for the Marcus's.

```
 1            Separate and apart, we've urged them if they want
 2    to proceed with discovery to commence it.  On January 2nd I
 3    spoke to Mr. Walsh.  He had sent me a letter previously with
 4    his first item of proposed schedule being on or before
 5    January 2nd we will serve deposition notices and document
 6    requests.  When I spoke to him on that very date, I said, go
 7    ahead.  Let's go.  I said, if you serve a document request,
 8    you will be surprised by how few documents we have,
 9    principally because we were summarily evicted from the
10    premises.  We were not told to gather our possessions and
11    leave.  We were told to leave.
12            I said, so, if you serve me with that document
13    request today, as you indicated in this letter you would do,
14    I said, I bet you within 24 hours I can tell you when I'll
15    respond to it and when I do, I bet you it will be something
16    like two or three days.  So I expected to have document
17    production done already.
18            Well, it isn't.  I would like to engage Ms. Hazan
19    in further discussions regarding that discovery schedule,
20    but I want to segregate that from any agreement we can come
21    to regarding the briefing schedule in the case.  I think
22    that's what will cause discovery to happen is when they want
23    to take a deposition, perhaps in preparation of their
24    opposition to summary judgment.
25            That's the way the movant would like to proceed,
```

1    Your Honor.

2              THE COURT:  All right.

3              MR. SUGRUE:  Thank you.

4              MS. HAZAN:  Your Honor, I think -- just -- just to

5    explain what has happened, there is -- obviously, there is

6    the adversary proceeding and then there is also the proof of

7    claim that was filed, and then we filed with the debtor an

8    objection.  And the reason why -- you know, we have proposed

9    a certain schedule, and then when we looked at the adversary

10   proceeding as well as the -- as well as the proof of claim,

11   we thought that it may be more efficient, basically, to

12   serve discovery with respect to everything.

13             And that is when, basically, we -- and that is --

14   and I've tried to -- yesterday or the day before I've tried

15   to discuss this, and I think we can -- I think we can come

16   up with a schedule.  But I think the most efficient way for

17   us to do this would be to, basically, prepare a schedule

18   that would -- that would include both the proof of claim as

19   well as the issues that were raised in the summary judgment.

20             The -- and, again, you know, when we looked at the

21   -- when we looked at the issue, we would also support the --

22   we would also support the idea that a mediation in this case

23   may be something that we could agree to.

24             THE COURT:  All right.

25             MS. HAZAN:  And the reason for that is that --

1   because -- because, you know -- because we would like the

2   plan to move forward and we would like some finality with

3   respect to this claim.  And so we think it's the best --

4   it's -- I think it's the best way for all the parties just

5   to go to mediation, try to see if we can settle this matter.

6   I mean, this is the only -- I mean, in my view this is the

7   only matter that is still outstanding in a way.  And so we

8   would like -- we would like to try to get it resolved as

9   soon as possible.  We don't think that a -- that a lengthy

10   litigation is going to help in this case.

11          MR. SUGRUE:  Just very briefly, Your Honor.  We

12   did litigate for six months in state court before we were

13   stayed by this proceeding from --

14          THE COURT:  You probably --

15          MR. SUGRUE:  -- proceeding.

16          THE COURT:  -- didn't get very far.

17          MR. SUGRUE:  Well, we went through preliminary

18   injunction motions.  But you're right.  We didn't get six

19   months' worth of litigation.  Your Honor's quite correct.

20          My point is this.  There is -- there are no dollar

21   and cents issues in that partial motion -- motion for

22   partial summary judgment.  We steadfastly avoided that.

23   Certainly, discovery is necessary as to that.  So I just

24   want to get that motion that we have filed on a briefing

25   schedule.  I think there was agreement that a response by

```
 1    the end of this month, including any cross-motions they may
 2    wish, was acceptable.  Whatever they want to raise during
 3    discovery, I put no limits on that except the obvious, you
 4    know, general limits on relevance, et cetera.  No special
 5    limitations, et cetera.
 6              As to mediation, I would prefer that they pick up
 7    the phone and call us rather than go through some process
 8    where we have to schedule other people's times, et cetera.
 9    But I'm not going to take a hard line position that I oppose
10    mediation or anything like that.  Anytime they want to
11    discuss a resolution we'll be happy to do it.
12              THE COURT:  All right.
13              Well, unlike -- unlike some of the other
14    interested parties, I have read the memorandum in support of
15    a motion for summary judgment and I haven't studied it.  I
16    certainly am in no position to make any comment on it.  And
17    I don't make any official or any comment on it that should
18    effect anyone's decision in this matter.
19              However, I am confused and it has to do with the
20    relief that the movant is seeking.  It was my view of -- at
21    least I have a vague recollection from having taken
22    contracts 40 years ago -- I think everyone in this room has
23    taken it more recently than I have.  But I have a view that
24    someone who claims that the contract has been breached can
25    either claim a breach and sue for damages and -- or affirm
```

1   the contract, and I don't know if you waive the breach, but

2   you say, I want to go forward with the contract.  Maybe I'm

3   released from parts of it or from some obligations under the

4   contract.

5           You speak, Mr. Sugrue, vaguely of, we own the

6   business.  There is no business.  It's gone.  I don't know

7   what it is that your client would want to own, but the fire

8   apparently has at least resolved that issue.  There is no

9   business to own.  I may be wrong.  I haven't been there.  I

10  don't know what the situation is.  Maybe there can be

11  rebuilding in this part of the Bronx.  But I don't know that

12  there's anything to own immediately, and I'm dealing only

13  with what's before us today.

14          So it seems to me that what you're doing is

15  claiming a breach and suing for damages.  Now you can

16  perhaps make an argument in connection with any plan in this

17  case that somehow you're the debtor and any residual funds

18  from insurance, after everyone is satisfied, comes to you

19  rather than to the debtor or the punitive owners, the

20  Marcus's.

21          But isn't that a function of damages; that you're

22  -- the contract is breached, you say by them, a material

23  breach that entitled you to terminate the contract.  You

24  left.  You say they evicted you, but you left from what I

25  see in your own papers, and you have a claim for damages.

1   Now it may be a huge claim as you assert in your proof of

2   claim, but isn't that really what we're talking about?

3           That's my question because when you say, we own

4   the business and you -- if you -- if you waive the breach

5   and assume the contract, you're talking about paying another

6   how many million, another 20 million, another 10 million

7   over the next ten years.  You don't want to do that, I don't

8   think.  That's not what your client has in mind.

9           MR. SUGRUE:  Your Honor used the word "confusion,"

10  and I think one of the problems is that when we filed the

11  complaint in the state court action there was an active,

12  ongoing business and that complaint was not amended.

13          In our motion we effectively update, if you will,

14  the complaint and address what we consider appropriate

15  relief given the known circumstances:  The filing of the

16  bankruptcy and the fire.

17          To --

18          THE COURT:  And -- and so what exactly what relief

19  are you seeking?

20          MR. SUGRUE:  The relief we're seeking would be

21  attendant to the finding that there was a full transfer of

22  the laundry business known as Myron & Sons Laundry by the

23  entity which is the debtor to us.  We did not acquire the

24  stock of the debtor.  It's not as though we are stepping in

25  that debtor's shoes.

1              THE COURT:  No.  I understand that.

2              MR. SUGRUE:  So there was, as far as we're

3      concerned, an absolute, complete transfer of assets -- of

4      certain asset -- defined assets to us in that assets

5      purchase agreement.  We owned, for example, the equipment

6      which was damaged in the fire.  It may be subject to other

7      claims for security interests, but we owned it.  We did not,

8      by the way, own the real property.

9              If we were wrongfully evicted, however, we have a

10     claim against the landlord for the wrongful eviction.  We

11     also claim an entitlement, for example, to business

12     interruption insurance.  It was our business that was

13     interrupted, and these policies do identify us as an

14     additional named insured.

15             On the subject of vacating the premises, we did so

16     under protest, immediately put in a written notice saying

17     that we reserve all of our rights.  In effect, this is our

18     business that you're taking from us.  And if you want to go

19     ahead and earn money running our business, you'll -- we make

20     a claim to the profits of the business that should have been

21     our profits as distinct from yours.

22             Another example is when we were thrown --

23             THE COURT:  That's -- that is another word for

24     damages --

25             MR. SUGRUE:  I --

1          THE COURT:  -- for their --

2          MR. SUGRUE:  Yes.

3          THE COURT:  -- material breach.

4          MR. SUGRUE:  Right.

5          THE COURT:  But in terms of owning the business,

6    are you going to pay into the debtor the $10 million that

7    was unpaid under the contract?  Do you have that intent?

8          MR. SUGRUE:  No, and the reason is this:  There

9    was a material misrepresentation as to the cost of doing

10   business.  What really took place in state court and the

11   focus of that was to seek a declaration that we were the

12   owner and then reform our purchase obligations consistent

13   with the actual cost of doing business as distinct from the

14   represented costs of doing business.  And the difference is

15   approximately $600,000 a year, I would say at a minimum.

16          In other words, if we had been informed honestly

17   of the cost of natural gas service to the facility in

18   negotiating this deal, the purchase price wouldn't have been

19   $10.6 million.  It would have been very substantially less

20   than that.  But any component of our damage claim -- and I'm

21   not resisting the word "damage."  I think you're correct in

22   saying that's what we're after.  Any component of -- any

23   calculation of our damages would entail some component of

24   our purchase price obligations going forward, but as

25   adjusted to reflect the discovered fraud.

     1              THE COURT:  Well, it sounds to me like damages.

     2              MR. SUGRUE:  Yes.  I agree.  And in our proof of

     3       claim, by the way, notwithstanding an objection which says

     4       we never address our purchase obligations, we specifically

     5       address it and provide calculations at the end and

     6       throughout as to -- as to an appropriate, if you will,

     7       credit to the seller for our purchase obligation.

     8              So we are not looking for a windfall here.  We're

     9       looking for what would have been ours, taking into

    10       consideration all facts, including the fact that we would

    11       have had to pay something going forward on a promissory

    12       note.

    13              Now if the adjustment to be made to the purchase

    14       price is overwhelmed by -- you know, the magnitude of the

    15       theft of utility services, I guess we would have an odd

    16       situation where the credit would be a negative number.  I

    17       don't think that's the case, but it is a very, very

    18       significant adjustment.  We're basically talking about them

    19       having paid -- or represented what was three days of utility

    20       service a month as distinct from 30 days.  So it's a tenfold

    21       discrepancy.

    22              And as we point out in the pending motion, that

    23       doesn't include what we call the escrow portion of the

    24       utility bills.  We point out in our papers -- and this is

    25       why we do need some discovery.  This motion steadfastly

1    avoids any issues of calculation.  It is to get a basic

2    determination as to whether our claim of material breach is

3    valid versus their claim.  But, eventually, it will --

4            THE COURT:  I -- I still remain confused as to why

5    that, at this point, is relevant.

6            MR. SUGRUE:  Because --

7            THE COURT:  The -- there is no question -- there

8    is a -- you raise a question as to the materiality of your

9    alleged breach and you raise a question that I don't know

10   can be decided on the papers as to whether there was any

11   breach at all:  Was there an unsigned check; was the check

12   due on Sunday; was it due on Friday.  As I read the

13   contract, there was a grace period.  I don't -- it's not

14   discussed very much, but there's a grace period and there's

15   requirement of notice before a breach is called and I don't

16   see that.

17           But assuming that your breach did not exist, on

18   the record before me it would appear -- and I stress it

19   would appear because I haven't heard from the debtor on this

20   point -- but it would appear that there was a material

21   breach of the debtor's relationship with conEdison.  There

22   appears to be no dispute about that.  And it's embodied in a

23   stipulation that's coming before me the second time, and

24   this is a different stipulation, but the matter came before

25   me once before, as I'm sure conEd will recall.

Page 30

1           So I don't know that there's any dispute.  Now

2    maybe there's a dispute as to whether or not the conEd

3    situation was a material breach of a contract; whether there

4    was any representation that picked that up.  That I can see

5    being a matter of dispute.

6           But it seems to me that we're still talking about

7    a contract that has been terminated.  You haven't asked for

8    reformation, and we're talking about what your damage claim

9    is and whether your damage claim includes all future profits

10   of the business, perhaps subject to whatever future payments

11   you were required to make under the contract, and the like.

12   We should take into account that there is no business.   It

13   may be restored to at the moment, and perhaps permanently.

14          And let me only say that -- I'm going to set a

15   briefing schedule today.  I believe that at the end of the

16   day damages may be more important than any of this, so I

17   think the parties really should get on with the question of

18   damages because that's really what we're talking about, I

19   think.  And that isn't dealt with in your motion at all.

20          And I endorse wholeheartedly, as I think the most

21   recent colloquy indicates, mediation because I think that it

22   would help both parties focus on the issues and it might

23   help.  There's a lot of ill will between the parties for

24   obvious reasons, and perhaps a mediator would help.  I

25   certainly endorse the concept that you talk among

1    yourselves.  Mediation is not free, but a mediator might --

2    might help.

3                    MR. SUGRUE:  We're absolutely open to that, Your

4    Honor.

5                    THE COURT:  So now on the question of responsive

6    pleading, January 31st for your response and cross-motion?

7                    MS. HAZAN:  Well, I think, Your Honor -- I mean,

8    we're prepared to -- to enter into a -- we're prepared to

9    agree to a schedule.  But my point is that just exactly as

10   you described.  There are just too many facts in dispute and

11   I don't think that a summary judgment is --

12                   THE COURT:  Well, that's --

13                   MS. HAZAN:  -- is going to be --

14                   THE COURT:  -- that's a --

15                   MS. HAZAN:  -- helpful.

16                   THE COURT:  That's a time-honored response to a

17   motion for summary judgment.

18                   MS. HAZAN:  But --

19                   THE COURT:  Too many facts in dispute.  It may

20   make it difficult for you to make your cross-motion for

21   summary judgment, but I don't know that that isn't, in this

22   case as in many cases, a waste of time.

23                   MS. HAZAN:  You mean the summary judgment is --

24   you mean that the -- I mean, my view is that going to the

25   route of the summary judgment is a waste of time because

 1    there are just too many facts in dispute.  And so we're

 2    going to find ourselves two months from now having -- having

 3    to deal with this same issue.  Exactly as you said, this is

 4    a question of damages.  This is a question of whether there

 5    was a breach and there -- this is a question of whether, you

 6    know, the defendant breached --

 7                   THE COURT:  There was --

 8                   MS. HAZAN:  -- or the plaintiff breached.

 9                   THE COURT:  -- a breach.  Let us be clear on that.

10    The conEd theft, if I can use that word, was a breach.  It

11    may not have been a material breach.  It may not have been a

12    specific representation in the contract, but --

13                   MS. HAZAN:  Right.  And so --

14                   THE COURT:  -- there was something going on here

15    --

16                   MS. HAZAN:  Right.  And so --

17                   THE COURT:  -- and whether it affected the

18    contract or not is another issue.

19                   MS. HAZAN:  And so the relief for a breach of

20    representation is in the form of damages.

21                   THE COURT:  Yes.

22                   MS. HAZAN:  And so this is what -- this is what we

23    have to talk about because, you know --

24                   THE COURT:  But the damages can include every

25    penny that would have come to this debtor over the next --

1    permanently less the remainder of the purchase price or

2    whatever the purchase price should have been.  And I'm not

3    sure that, in lieu of the -- in consequence of the fire I'm

4    not sure that many of these calculations are necessary.

5            MS. HAZAN:  Well, you see, Your Honor, the issue

6    with respect to the breach of representation is that in the

7    proof of claim that they filed, they claim approximately --

8    that the breach of representation would -- would entitle

9    them to a claim for damages in the amount of 12 million.

10   And the way they calculate --

11           THE COURT:  So their proof of claim is higher than

12   that, isn't it 30 --

13           MS. HAZAN:  $32 million, but only --

14           THE COURT:  Yes.

15           MS. HAZAN:  -- with respect to the breach of

16   representation with respect to the utility costs, 12

17   million.  And the way this is calculated, as far as I

18   understand it, is that they've calculated the costs for the

19   next 30 years, what -- what the business would have to pay

20   in terms of costs.  And I'm just -- I'm just -- this is not

21   the way damages have to be calculated and this is why I'm --

22   and this -- and I think there is enough issue of facts that

23   the parties should just go to mediation and not -- and not

24   lose more time and more money.  This has to be resolved.

25   There's a number that has to come out of this -- out of this

Page 34

1    litigation.

2           THE COURT:  I agree that mediation should start

3    immediately.

4           MS. HAZAN:  Okay.

5           THE COURT:  We have a panel of mediators, as you

6    may know.  Some are more expensive than others.  I think you

7    should find a mediator who has time --

8           MS. HAZAN:  Sure.

9           THE COURT:  -- and has enough stature that he or

10   she would be someone your respective clients would at least

11   listen to.

12          MS. HAZAN:  Sure.

13          THE COURT:  And I endorse that wholeheartedly.

14   But I think we need a deadline.  If mediation is proceeding

15   and making progress, certainly that deadline can be

16   extended, but we need a deadline for your response to their

17   motion for summary judgment or we'll be playing around with

18   this for a long time.

19          MS. HAZAN:  Sure.  So may I request that the

20   deadline be February 15th so that we have the time to gear

21   up the mediation and try to make some progress?

22          MR. SUGRUE:  The end of this month will have given

23   them a month and a half from the filing of the motion.  I'm

24   not going to split hairs here, but I think that's probably

25   enough.  If you want to divide the difference and give them

 1    February 7th or something, that's fine.

 2            MS. HAZAN:  I mean, respectfully, you know, we're

 3    just trying to move things forward and I don't think --

 4            MR. SUGRUE:  Yeah, but you're not.

 5            MS. HAZAN:  -- a summary judgment motion is going

 6    to move things forward.

 7            THE COURT:  I do think -- I do think that -- I

 8    should say that I think this is without prejudice to the

 9    debtor's right to have discovery on the question of damages

10    --

11            MR. SUGRUE:  Absolutely.  And --

12            THE COURT:  -- and the question of --

13            MR. SUGRUE:  And that can begin right away as far

14    as we're concerned.

15            THE COURT:  And that can also --

16            MS. HAZAN:  Yeah.

17            THE COURT:  -- begin.  But I haven't seen any --

18            MS. HAZAN:  I've urged it.  I've urged it.

19            THE COURT:  -- movant on the debtor's part with

20    regard to this motion.  I'll -- in order to give the

21    mediation a chance to succeed, I'll say February 15th.

22            MS. HAZAN:  Thank you, Your Honor.

23            THE COURT:  But I do think that you should

24    consider that a firm date.

25            MS. HAZAN:  Sure.

1              MR. SUGRUE:  Excellent.  Thank you.

2              THE COURT:  And then give the debtor -- pardon me

3        -- give Mr. Sugrue two weeks --

4              MR. SUGRUE:  That would be fine, Your Honor.

5              THE COURT:  -- to reply.  February 15th is a

6        Friday.  Two weeks takes us to March 1st, and we should --

7        can have a hearing on the motion for -- should we say March

8        5th?

9              MR. SUGRUE:  That's fine with us, Your Honor.

10             THE COURT:  March 5th at 11:00.

11             In the meantime, you would like a hearing on

12       January the 23rd on the motion -- on the conEd motion and on

13       a report on where we stand --

14             MR. SUGRUE:  That's fine.

15             THE COURT:  -- generally.

16             MR. GELBER:  Just to complete the record, also,

17       the funds do still have a pending motion for conversion or

18       the appointment of a trustee, and we would agree to adjourn

19       that motion to January 23rd also.

20             THE COURT:  I think the U.S. Trustee does --

21             MR. DRISCOL:  That's correct, Your Honor.

22             THE COURT:  -- and we'll use that date for the

23       initial case conference.

24             MR. DRISCOL:  Thank you, Your Honor.

25             MR. MENER:  At what time --

1           MR. PREITE:  Your Honor, Ralph Preite.  I'm sorry,

2     Mr. Mener.  Would you like to --

3           MR. MENER:  I just wanted to determine the time on

4     January 23rd.

5           THE COURT:  Ten o'clock.

6           MR. PREITE:  If I may, Your Honor.

7           THE COURT:  Yes.

8           MR. PREITE:  Each time I've heard Mr. Sugrue

9     explain what his clients interest is, which is, if I

10    understand correctly, it closed on the acquisition of the

11    business.  It operated the business, and then it claims it

12    was wrongfully evicted from the business premises, I can't

13    help but think -- and I believe I mentioned this last time

14    -- that perhaps the wrong debtor is here in possession, and

15    the wrong entity is administering the insurance proceeds,

16    and the wrong entity is in Chapter 11.

17           However, if I understood Mr. Sugrue today, perhaps

18    that issue is resolved if, indeed, his client has shifted

19    away from seeking ownership of the debtor's business and is

20    now seeking damages.  And I'm not trying to say you have

21    agreed to that, Mr. Sugrue.  But if that is the case, then

22    maybe the issue of who owns the business is resolved.

23           But that brings me to a more important issue.

24    I've -- and that issue is who has an interest or which

25    entities have interests in the insurance proceeds.  I

1    understand Mr. Sugrue's client is named as an additional

2    insured.  I don't know if that was on the building policy or

3    the commercial policy.  I know that my client, All Points

4    Capital Corp. is named as an additional insured under, I

5    believe, the commercial policy which debtor's counsel was

6    kind enough to share.  I think it was posted on -- on Pacer

7    as well.  And, of course, we filed a claim or we put the

8    insurance company on notice of our claim or potential claim

9    against the insurance proceeds.

10           But there are a host of entities, Your Honor, that

11   are named on that additional insured page, at least with

12   respect to the policy that my client is concerned with.  And

13   -- and that raises the issue of how is the debtor going to

14   feasibly fund a plan of reorganization based on insurance

15   proceeds, and I think that's the concept when other parties

16   apparently have claims towards that -- towards the proceeds

17   of that policy or at least are named additional insureds,

18   including perhaps Mr. Sugrue's claim and certainly my claim

19   and those that are named.

20           So that takes us -- even if we deal with the

21   ownership issue of the business, it's a fundamental

22   threshold issue as to how the debtor could possibly use

23   funds that other parties have an interest in.

24           THE COURT:  All right.  That's -- that's a very

25   simple answer.

1             MR. PREITE:  Okay.

2             THE COURT:  It depends on how much and who has an

3     interest in the -- a direct interest in the insurance and

4     how much comes back to the debtor.  I assume all the

5     policies say that the insurance -- the insureds are as their

6     interests may appear.  There is several hundred years of law

7     on the question of what that means.  And I think one of the

8     debtor's goals is to avoid litigation on that subject,

9     hopefully, because there's enough for everyone except,

10    perhaps, for Mr. Sugrue's client who is coming forward with

11    a $32 million claim.

12            But I don't think your client has a $32 million

13    claim, does it?

14            MR. PREITE:  No, Your Honor.  It's under half a

15    million.  I think --

16            THE COURT:  Well --

17            MR. PREITE:  -- it's $300,000.

18            THE COURT:  So let's -- let's be optimistic.  I

19    haven't forgotten that that is a critical issue.  We don't

20    have either of the mortgagees here today.  They were here

21    last time.  They're very interested in the proceeds.

22            And one of the reasons why I have delayed going

23    forward with the debtor's proposed plan and disclosure

24    statement, which has been on file, is that it doesn't and

25    can't at this point really discuss with any certainty how

1    the insurance proceeds are going to be distributed because

2    they haven't been received.  We don't know how much they

3    are.  The 2 million doesn't even cover the two mortgagees on

4    the real estate.  Again, I'm not saying that they have a

5    prior claim, but that all remains to be seen.

6            I have motions to convert outstanding.  I have not

7    acted on them because it appears that all of the principal

8    creditors in the case are satisfied that those parties who

9    are administering the estate are doing it fairly and with a

10   reasonable and appropriate purposes.  There are also some

11   alleged concessions on the part of the landlord that are

12   meaningful.

13           So -- and, of course, a conversion would be

14   expensive.  If anyone feels that things are not going

15   forward appropriately, I have their -- I have their motions

16   and they can certainly be heard.  But we're proceeding on

17   that basis and we certainly haven't forgotten that how to

18   allocate the insurance proceeds is perhaps the key issue,

19   but maybe it won't be an issue if there's enough to satisfy

20   everyone.

21           MR. PREITE:  Very well, Your Honor.  Thank you.

22           THE COURT:  Anything else today?

23           MR. SHAFFERMAN:  Nothing else.

24           THE COURT:  All right.

25           MR. SHAFFERMAN:  Thank you.

1            THE COURT:  So you will, then, let me know by the

2    end of the day whether there is any objection to the order

3    on file with regard to paying over insurance proceeds into

4    the court.

5            MR. SHAFFERMAN:  Right.  And we will also add that

6    additional language that Mr. Preite suggested avoiding the

7    -- or having this order supersede the prior order which

8    directed the proceeds go into my firm's escrow.

9            THE COURT:  All right.

10            MR. SHAFFERMAN:  We'll modify that and circulate

11    it.

12            THE COURT:  Very good.

13            MR. SHAFFERMAN:  Thank you, Judge.

14            MR. SUGRUE:  Thank you, Your Honor.

15        (Whereupon these proceedings were concluded at 11:51

16    a.m.)

17

18

19

20

21

22

23

24

25

Page 42

```
1                        I N D E X

2

3                          RULINGS

4   DESCRIPTION                              PAGE        LINE

5

6   Hearing re: Motion by laundry, dry

7   cleaning workers and Allied Industries

8   Benefit Funds to convert the debtor's

9   case to Chapter 7 or, alternatively,

10  for appointment of a Chapter 11 trustee    --          --

11

12  Motion by the UST to convert Chapter 11

13  case or in the alternative to appoint a

14  Chapter 11 trustee                         --          --

15

16  Debtor's objection to proof of claim

17  no. 14 filed by 220 Laundry, LLC           --          --

18

19  Adv. Proc.: 12-01885-alg -  Motion by

20  Defendants for partial summary judgment    --          --

21

22

23

24

25
```

Page 43

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

         SHERRI L. BREACH

9

         AAERT Certified Electronic Reporter & Transcriber

10

         CERT*D -397

11

12

13

         Veritext

14

         200 Old Country Road

15

         Suite 580

16

         Mineola, NY 11501

17

18

         Date:  January 14, 2013

19

20

21

22

23

24

25