| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **SOUTHERN DISTRICT OF NEW YORK** <br> ------------------------------------------------------------x <br> In re: <br><br> B&M LINEN CORP., <br><br>                 Debtor. <br> ------------------------------------------------------------x <br> B&M LINEN CORP. and 220 COSTER LLC, <br><br>                 Plaintiffs, <br><br>      vs. <br><br> 220 LAUNDRY LLC, ELIOT SPITZER, <br> MICHAEL STEINBERG and ADAM J. TELLER, <br><br>                 Defendants, <br><br>      vs. <br><br> MIRON MARKUS and BORIS MARKUS, <br><br>                 Counterclaim <br>                 Defendants, <br> ------------------------------------------------------------x <br> 220 LAUNDRY LLC and ELIOT SPITZER, <br><br>                 Third-Party <br>                 Plaintiffs, <br><br>      vs. <br><br>  MIRON MARKUS and BORIS MARKUS <br><br>                 Third-Party <br>                 Defendants. <br> ------------------------------------------------------------x | NOT FOR PUBLICATION <br><br><br> Chapter 11 <br><br> Case No. 12-11560 (ALG) <br><br><br><br> Adv. Pro. No. 12-1885-alg |

**<u>MEMORANDUM OF DECISION</u>**

A P P E A R A N C E S:

SHAFFERMAN & FELDMAN LLP
*Counsel for Debtor and Plaintiff, B&M Linen Corp.*
    By:  Joel M. Shafferman, Esq.
18 East 41st Street, Suite 1201
New York, New York 10017

MCDERMOTT WILL & EMERY LLP
*Counsel for Plaintiff 220 Coster LLC and*
*Third-Party Defendants Miron Markus and*
*Boris Markus*
    By:  Timothy W. Walsh, Esq.
340 Madison Avenue
New York, New York 10173

COTI & SUGRUE
*Counsel for Defendants and Third-Party Plaintiffs*
    By:  Stephen R. Sugrue, Esq.
59 Grove Street, Suite 1F
New Canaan, Connecticut 06840

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion (the "Motion") of defendants and third-party plaintiffs Eliot Spitzer and 220 Laundry LLC (collectively the "Buyers") for partial summary judgment declaring either that plaintiff B&M Linen Corp. (the "Debtor") and third-party defendants Miron Markus and Boris Markus (collectively the "Markuses") materially breached their obligations under an Assets Purchase Agreement dated November 10, 2010 (the "APA"), as amended (collectively, the "Modified Agreement"), or, in the alternative, that the Buyers did not materially breach their obligations under the Modified Agreement.

The present dispute involves a contract for the purchase of the Debtor's commercial laundry business. The Buyers claim that the Debtor materially breached the Modified Agreement by willfully understating the costs of natural gas necessary to lawfully operate the business. The Debtor argues that the materiality of its breach, if any, cannot be decided on

2

summary judgment and further claims that the Buyers materially breached the Modified Agreement themselves when they made a late payment on the purchase price pursuant to an 18-year $8.6 million Promissory Note (the "$8.6 Million Note").

For the reasons stated hereafter, the Court finds the Debtor materially breached the Modified Agreement by misrepresenting the costs of natural gas necessary to lawfully operate the laundry business and grant summary judgment to the Buyers on the issue of liability. It is unnecessary to reach the issue whether the Buyers breached by making a late payment on the $8.6 Million Note.

## Background

Miron Markus is the President and sole shareholder of the Debtor and also of plaintiff 220 Coster LLC ("220 Coster"). (Decl. of Miron Markus in Opp'n to Defs.' Mot. for Partial Summ. J. and in Supp. of Pls.' Cross-Mot. for Partial Summ. J. (hereafter, "Decl. of Miron Markus"), Docket No. 21, ¶ 1.)[1] For over two decades, Miron Markus and his son Boris ran the Debtor's commercial laundry business located at 220 Coster Street, Bronx, New York. (*Id.* at ¶ 2.) The premises are owned by 220 Coster, which is also owned by the Markuses. (*Id.* at ¶ 22.) In 2010, Spitzer began negotiating with Miron to acquire the business. (*Id.* at ¶ 2.)

On November 10, 2010, Spitzer and the Debtor executed the APA whereby the Debtor agreed to sell its commercial laundry business. (*Id.* at ¶ 4.) The APA provided for a due diligence period between its execution and eventual closing and obligated the Debtor, as seller, to provide the Buyers access to all of the laundry business's financial and operating records. (*Id.* at Ex. A, Assets Purchase Agreement, ¶ 27.) The APA also contained the following warranties and representations:

---

[1] Unless otherwise stated, citations to court documents refer to the docket for Adv. Pro. No. 12-1885.

3

> To induce the Purchaser to purchase the said properties and to pay the purchase price . . . the Seller warrants and represents to the Purchaser . . . that to the best of his knowledge he has fully complied with all laws, ordinances, rulings, and regulations of all constituted governmental authorities having jurisdiction.

(*Id.* at Ex. A, Assets Purchase Agreement, ¶¶ 8, 8.4.)

> Each of the terms, conditions, covenants, provisions, agreements and representations herein shall survive the closing of sale and shall not be deemed as merged in the transfer of title of said business and property or the payment of the consideration therefore.

(*Id.* at Ex. A, Assets Purchase Agreement, ¶ 13.)

> Seller shall deliver to Purchaser unaudited balance sheets . . . as at [sic] December 31, 2009 [sic] for each of the years 2007, 2008 and 2009, and the related consolidated statement of income [sic] Such financial statements and notes shall fairly present the consolidated financial conditions of Seller as at the respective dates of and for the periods referred to in such financial statements, [sic] The financial statements referred to in this Section reflect the consistent application of accounting principles throughout the periods involved.

(*Id.* at Ex. A, Rider to Asset Purchase Agreement, ¶ 29(d).)

> The books of account and other records of Seller, all of which have been made available to Purchaser, are accurate and complete in all material respects and have been maintained in accordance with sound business practices. Each transaction of Seller has been properly and accurately recorded on the books and records of Seller, and each document (*including any contract, invoice or receipt*) on which entries in the entities' books and records are based is accurate and complete in all material respects.

(*Id.* at Ex. A, Rider to Asset Purchase Agreement, ¶ 29(i) (emphasis added).)

> Between the date of this Agreement and the Closing Date, the Seller will promptly notify Purchaser in writing if Seller becomes aware of (a) any fact or condition that causes or constitutes a breach of any of Seller's representations and warranties as of the date of this Agreement, [or] (b) the occurrence after the date of this Agreement of any fact or condition that would cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence or discovery of such fact or condition . . . .

(*Id.* at Ex. A, Rider to Asset Purchase Agreement, ¶ 33.) To satisfy the foregoing provisions of

the APA, during the due diligence period, the Debtor provided the Buyers with actual utility bills

4

the Debtor received from Consolidated Edison Company of New York, Inc. ("Con Ed"). (Sellers' Resp. to Buyers' Statement of Material Facts Pursuant to Local Rule 7056-1(c) and Statement of Material Facts in Support of Cross-Mot. for Partial Summ. J. (hereafter "Sellers' Statement of Facts"), Docket No. 22, ¶ 8.) The Buyers claim that as a result of significant long-term unmetered services which Con Ed subsequently discovered, the Con Ed utility bills grossly understated the actual costs of natural gas required to lawfully operate the laundry business. (*See* Decl. of Eliot Spitzer in Supp. of Defs.' Mot. for Partial Summ. J. (hereafter "Decl. of Eliot Spitzer"), Docket No. 6, ¶ 72.)

On May 19, 2011, after due diligence and subsequent negotiations, the Buyers closed the sale of the laundry business under the Modified Agreement, effective May 23, 2011, and paid $1 million of the $10.6 million purchase price.[2] (*See* Decl. of Miron Markus at ¶¶ 7, 11.) To satisfy the remaining $9.6 million of the purchase price, Spitzer's newly-created company, 220 Laundry LLC, executed a $8.6 Million Note, payable to the Debtor in monthly installments of $41,666.67 on the twenty-third day of each month, and a $1 million note, payable to the Debtor within a year of closing in two installments of $500,000, with interest. (*Id.* at ¶ 8, Exs. C, D.) Additionally, the Buyers, as tenants, entered into a long-term lease of the laundry business premises with 220 Coster, as landlord. (*See id.* at Ex. A, ¶ 20, Ex. B, § 20.) The Modified Agreement also arranged for the Markuses to provide consulting services for up to six months after the closing. (*Id.* at Ex. A, ¶ 21.) The Buyers had the option to terminate this consulting arrangement after the first month of services. (*Id.* at Ex. A, ¶ 21.3.)

Following the closing effective date of May 23, 2011, the Buyers took possession of the laundry business premises and asserted control over the laundry's operations. (Decl. of Eliot

---

[2] Spitzer paid $500,000 directly to the Debtor (Docket No. 21 at ¶ 8, Ex. B §§ 4.1-4.3) and paid the broker's fee of $500,000, which otherwise would have been the Debtor's obligation. (*Id.* at. ¶ 8, Ex. B § 4.4).

Spitzer at ¶ 22). Up to September 23, 2011, the Buyers operated the laundry business with the assistance of the Markuses under the consulting arrangement (*Id.* at ¶¶ 8, 27), and they made timely monthly payments on the $8.6 Million Note (*Id.* at ¶ 24). At one point during this period, however, Spitzer alleges that Miron Markus brought Spitzer into the room containing Con Ed's gas meter and indicated it was possible to disable the meter. (*Id* at ¶ 27.) Spitzer left this conversation suspicious that the Markuses had been systematically disabling the meter. (*Id.*) For this reason, *inter alia*, Spitzer's attorney met with the Markuses and their attorney on September 27, 2011, to inform them that Spitzer had become sufficiently familiar with the operation of the laundry business and wished to terminate the consulting arrangement. (*Id.* at ¶ 30.) However, during this meeting the Markuses' attorney informed Spitzer's attorney that Spitzer had defaulted on the Modified Agreement by failing to make the $41,666.67 monthly payment due on September 23, 2011, on the $8.6 Million Note. (Decl. of Miron Markus at ¶¶ 15, 18, Ex. F; Decl. of Eliot Spitzer, ¶¶ 17-18, 33.)[3] The Markuses' attorney then issued a notice of default to Spitzer's attorney and informed him that the Markuses were asserting their contractual right to rescind the sale and evict the Buyers from the business premises. (*See id.* at Ex. F.) The Buyers complied with the demand to leave the premises but rejected the claim of default (*see* Decl. of Eliot Spitzer at Ex. E), maintaining that they had made the required payment on Sunday, September 25, 2011, and that any breach was not material (*see id.* at ¶¶ 44-47).

On September 28, 2011, after issuing the notice of default to Spitzer's attorney, the Debtor and Coster also filed a complaint in the New York Supreme Court, Nassau County, against the Buyer as well as Spitzer and two alleged guarantors of the Note, Michael Steinberg

---

[3] Section 50.3 of the Modified Agreement provides, "In the event that any of the following events, and only those events, occur, the Seller, in his sole discretion, may reverse this transaction . . . and this transaction, including the lease, shall be deemed null and void." (Docket No. 23 at Ex. B, § 50.3.) Section 50.3.1 of the Modified Agreement defines one such event as "[t]he Purchaser is not current as to payments under any note," including the $8.6 Million Note. (*Id.* at Ex. B, § 50.3.1.)

and Adam J. Teller, for alleged breach of the Modified Agreement by defaulting on the $8.6 Million Note. Spitzer and 220 Laundry filed a counterclaim against the Debtor and Coster and a third-party claim against the Markuses alleging that it was they who had breached the Modified Agreement and wrongfully evicted the Buyers. (*See id.* at Ex. B.) A request by the Buyers for a preliminary injunction restoring them to possession was denied on the ground that movants had not demonstrated that extraordinary circumstances warranted a mandatory injunction which would also award the Buyers the ultimate relief they sought. (Short Form Order by Hon. Steven Jaeger dated Mar. 16, 2012, N.Y. Sup. Ct. Case No. 11-013989, Mot. Seq. Nos. 01, 02, 03, 04, p. 8-10.) The state court action proceeded until the Debtor filed for bankruptcy on April 16, 2012, after which the case was removed to this Court.

On December 30, 2011, after the Buyers had left the business premises but before the Chapter 11 filing, Spitzer, acting through his representatives, informed Con Ed of his suspicions that the Debtor had been disabling the laundry business's natural gas meter. (Decl. of Eliot Spitzer at ¶¶ 52-53). According to Spitzer, Con Ed immediately inquired into these allegations and in 2012, after a several-month investigation, determined that the Debtor had been stealing natural gas for years by disconnecting the laundry business' natural gas meter for extended periods of time and reconnecting it only for the monthly meter readings by Con Ed. (*See* Decl. of Eliot Spitzer at ¶¶ 54-63.)

There is no dispute that based on the results of an investigation Con Ed presented the Debtor with an invoice for $5.2 million for six years of unmetered service charges and late payment charges. (Debtor's and Markuses' Statement of Facts at ¶ 11). There is no dispute that in February 2012, the Debtor entered into a settlement with Con Ed and signed a Confession of Judgment in the amount of $1.5 million to resolve this payment dispute. (Decl. of Miron Markus

7

at ¶ 26.) Further, it is a matter of record that on March 8, 2013, after the Debtor had filed for bankruptcy, this Court "so ordered" a stipulation between the Debtor and Con Ed which allowed Con Ed a prepetition general unsecured claim in the amount of approximately $1 million. (Decl. of Miron Markus at ¶ 26.)

On July 30, 2012, ten months after the Debtor had retaken possession of the laundry business and three months after its filing under Chapter 11, a four-alarm fire destroyed the facility. (Decl. of Miron Markus at ¶ 20.) Two insurance policies cover the business and the premises on which it was located. (*Id.* at ¶ 21.) The first policy is a Building Owner Lessors Risk Policy with Massachusetts Bay Insurance Company (the "Building Policy") with a combined commercial property and business income insurance limit of approximately $6.1 million. (*Id.* at ¶ 22, Ex. G.) Because 220 Coster has at all times been the landlord and owner of the premises, neither Spitzer nor 220 Laundry was added to this policy. (*Id.*) The second policy is a Commercial Laundry Operations Policy with Massachusetts Bay Insurance Company (the "Contents Policy") with a combined contents and business income insurance limit of approximately $8.0 million. (*Id.* at ¶ 23, Ex. H.) Spitzer and 220 Laundry were added to this policy when they purchased the business, and their names have never been deleted. (*Id.* at ¶¶ 24-25.)

The Buyers have now moved for partial summary judgment, requesting: (1) a declaration that the Debtor materially breached the Modified Agreement first by understating operating expenses; and (2) dismissal of the Sellers' claim that the Buyers materially breached the agreement by missing the September 23, 2011 payment on the $8.6 Million Note by two days.[4] (Mem. of Law in Supp. of Defs.' Mot. for Partial Summ. J., Docket No. 10, 5.)

---

[4] The Buyers also moved to dismiss with prejudice all claims against Adam J. Teller ("Teller"), who was listed as a defendant solely by reason of his alleged guaranties on the two promissory notes, on the ground that he did not

8

## Discussion

### I. Legal Standard

Summary judgment under Fed. R. Civ. P. 56, made applicable by Bankruptcy Rule 7056, may be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, once there is a showing of the absence of an issue of fact, the opposing party must produce specific evidence that raises a genuine issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is considered material if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### II. Any Breach by the Buyers as a Consequence of Their Late Payment on the $8.6 Million Note is Irrelevant Assuming a Prior Material Breach by the Debtor

Although the parties have disputed the materiality of 220 Laundry's late payment on the $8.6 Million Note, we need not reach this issue because, as discussed below, the record is clear that the Debtor had materially breached the Modified Agreement earlier. "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to

---

execute a guaranty of either of the two notes. The Debtor and the Markuses do not demonstrate in response that he guaranteed anything, and Teller is entitled to dismissal of the complaint on that ground as well as the ground that Sellers first materially breached the contract.

perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. v. Alleghany Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citations omitted) (applying New York state law).[5] This rule applies even where a party has no knowledge of the other party's earlier breach. As the Supreme Court stated in a contract case:

> A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

*College Point Boat Corp. v. United States*, 267 U.S. 12, 15-16 (1925); *see Williston on Contracts* § 43:12 (4th ed. 1993), where it is stated, "a defendant who refuses to perform and is sued for breach of contract should be excused from liability if the plaintiff has personally failed in a material particular to perform the contract, although the defendant, at the time of his or her refusal to perform or continue performance, was ignorant of the plaintiff's prior breach." For example, in *Hoffman v. Gen. Motors Acceptance Corp.*, 814 F.2d 1385 (9th Cir. 1987), the debtor sued the lender for wrongfully terminating a line of credit. The Ninth Circuit held that because the line of credit was terminable upon the filing of a tax lien against the debtor's property, and a tax lien was filed against the debtor's property, the lender did not breach the contract even though it was unaware of the tax lien at the time it terminated the agreement. *Id.* at 1388.

Therefore, the Debtor's material breach of the Modified Agreement (as discussed below) excused the Buyers from any liability for late payment under the $8.6 Million Note.

---

[5] There is no dispute that New York law governs this dispute. The Modified Agreement provides that it is governed by New York law (Assets Purchase Agreement, ¶ 15.6.), and all relevant events took place in New York.

### III.    The Debtor's Misrepresentation to the Buyers of its Actual Natural Gas Costs Was a Material Breach of the Modified Agreement

The primary question presented by this motion for partial summary judgment is whether the Debtor materially breached the Modified Agreement by misrepresenting one of the major expenses necessary to operate the laundry business. The Debtor and the Markuses argue that the Buyers' motion for summary judgment should be denied because there is a question whether their understatement of the costs of purchasing natural gas from Con Ed was material and represented a material breach of the Modified Agreement. However, for the reasons discussed below, their arguments are unavailing.

First, there is no real issue that the Debtor significantly understated the costs of natural gas required to lawfully operate the laundry business during the due diligence period. The Debtor admits that it provided Spitzer with actual Con Ed invoices during the due diligence period as evidence of the operating costs of the laundry business. (Debtor's and Markuses' Statement of Facts at ¶ 8.) The Debtor further admits that after it retook the laundry business from the Buyers it received an invoice from Con Ed for $5.2 million for six years of unmetered service charges. (*Id.* at ¶ 11.) Eventually the Debtor confessed judgment on February 23, 2012, in favor of Con Ed, in the sum of $1.5 million. (*See* Debtor's Mot. for Approval of Stipulation and Order with Con Ed dated May 17, 2012, Case No. 12-11560, Docket No. 14, at ¶ 9.) The Confession of Judgment, filed with the Supreme Court of the State of New York, County of Bronx, was for "a debt justly due to the plaintiff [Con Ed] arising from the following facts: [t]he supply of unmetered gas utility service for the period ending December 30, 2005 to December 30, 2011." (*Id.* at Ex. C.)

After the Debtor's Chapter 11 filing, the facts relating to the Debtor's liability to Con Ed were placed before this Court. Under § 366 of the Bankruptcy Code, Con Ed was entitled to

11

seek a security deposit or other form of protection against post-petition accruals of utility charges 30 days after the Debtor's bankruptcy filing. On May 14, 2012, the Debtor and Con Ed accordingly entered into an agreement whereby the $1.5 million liability represented by the Confession of Judgment would be "transferred to a newly-established post-petition account," recognized as a post-petition expense and paid at the monthly rate of $12,500, and Con Ed would forego any further security for ongoing utility service. In order to induce the Court to approve this stipulation, the Debtor represented, among other things, that "[Con Ed] is, in essence, a secured creditor of the Debtor. Therefore, the Debtor believes that assumption of the Agreement will have no actual or potential negative impact on it or its estates." (Debtor's Mot. for Approval of Stipulation and Order with Con Ed dated May 17, 2012, Case No. 12-11560, Docket No. 14, at ¶ 15.)

Although the Buyers objected to approval of the arrangement with Con Ed, the Court accepted the Debtor's representations to the extent of approving the stipulation on an interim basis, permitting the Debtor to make monthly post-petition payments to Con Ed of $12,500 and adjourning the remainder of the motion. (*See* Order entered June 3, 2012 (Case No. 12-11560, Docket No. 24), and "So Ordered" stipulation of the same date (Case No. 12-11560, Docket No. 25).) In a subsequent stipulation the amount of Con Ed's claim was further reduced to approximately $1 million. (*See* Stipulation So Ordered by the Court on March 8, 2013, Case No. 12-11560, Docket No. 121.) This latter stipulation gave Con Ed a prepetition claim of $1,033,342 to be paid in accordance with the terms of a plan of reorganization to be filed and provided for payment to Con Ed of a post-petition administrative claim of $173,355 within 90 days out of insurance proceeds. No party objected to this settlement, and $173,355 has in fact been paid to Con Ed. (*See* Order entered June 4, 2013, Case No. 12-11560, Docket No. 149.)

Thus, on the present record, the Debtor has admitted to a prepetition debt of at least $1 million to Con Ed. The Markuses and 220 Coster have also admitted this. On October 12, 2012, they filed a plan and disclosure statement in which they proposed to use insurance proceeds to pay all creditors in the Chapter 11 case.[6] The Disclosure Statement stated flatly that $1.5 million owed to Con Ed from a pre-petition settlement arose "out of an unpaid balance on the Debtor's utility bills." (Second Amended Disclosure Statement dated Apr. 2, 2013 filed by Miron and Boris Markus and 220 Coster LLC as well as the Debtor in support of their Second Amended Plan of Reorganization, Case No. 12-11560, Docket No. 134, p. 19.)[7]

It is also black-letter law that a party responding to a motion for summary judgment is required to come forward with evidence that refutes the evidence adduced by the movant. As the Supreme Court said in *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87, "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue*

---

[6] The plan and disclosure statement were filed in opposition to motions of the U.S. Trustee and one of the Debtor's unions to convert the case to Chapter 7 or appoint a trustee for cause (including allegations of dishonesty on the part of the Debtor's principals).

[7] The Disclosure Statement draft contains the following language on page 2 (in capital letters):

> As to contested matters, adversary proceedings and other actions or threatened actions, this disclosure statement shall not constitute or be construed as an admission of any fact or liability, stipulation or waiver but rather as the Debtor's statement of the status of the respective matter.

This language is typically included in disclosure statements, and because this Court is not aware of any legal authority to support such a disclaimer, this Court's policy is to require the introductory words, "It is the Plan Proponents' position that . . . ." The Court knows of no authority that would permit a debtor to include knowingly false information in a disclosure statement and protect itself by a caveat such as the above. Disclosure statements must contain "adequate information" to enable a "hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The information must obviously be accurate to the best of the Plan Proponents' knowledge. *Cf. Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) (considering the "accuracy of disclosure" as "an issue that must be addressed at the confirmation hearing" in revoking the order confirming a plan of reorganization for fraud on the court). The caveat in the Second Amended Disclosure Statement provides no basis for the Plan Proponents, who include the Debtor and the Markuses, to disavow their flat and unqualified statement that the debt to Con Ed was for "an unpaid balance on the Debtor's utility bills."

13

*for trial.*'" (emphasis in original) (footnote omitted) (citations omitted). *See also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (stating that "[o]nce the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor."). The papers filed in opposition to the Buyers' motion for summary judgment never even deny that the Buyer has a debt of at least $1 million to Con Ed for unpaid utility charges.

On this record, the Debtor's admission of a huge debt to Con Ed is not only an admission but a judicial admission:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations and internal quotation marks omitted); *see also* 18 Moore's Federal Practice 134.30, p.134-62 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."). To determine whether judicial estoppel applies, courts examine such factors as whether: (1) the party's later position is clearly inconsistent with its earlier position; (2) the party either succeeded in persuading the court of its earlier position "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled," or—if the party's prior position was not adopted by the court—the later inconsistent position poses a threat to judicial integrity; and (3) the party would derive an unfair advantage against the opposing party if not estopped. *See New Hampshire*, 532 U.S. at 750-51.

The doctrine has been applied in bankruptcy cases where judicial adoption of a party's position is implicit in and necessary for the court's approval of a settlement or similar compromise. *See In re Allegiance Telecom, Inc.*, 356 B.R. 93, 107 (Bankr. S.D.N.Y. 2006); *In re Galerie Des Monnaies, Ltd.*, 62 B.R. 224, 225, 226 (S.D.N.Y. 1986) (applying judicial estoppel notwithstanding absence of litigated result, because court approval implicitly required adoption of party's position). In order for this Court to approve the Debtor's stipulation granting Con Ed a claim of $1.5 million, later reduced to $1 million, the Debtor had to and did convince this Court that Con Ed had a substantial claim and that compromise of that claim was reasonable. The Debtor cannot now be heard to argue that there is a triable issue of fact whether it received unmetered service charges from Con Ed. Combined with the admitted fact that the Buyers were shown actual invoices during the due diligence period, the Debtor's judicial admissions are enough to establish that the Debtor misrepresented its costs of natural gas and therefore breached the Modified Agreement.

The Debtor disputes the admissibility of the Confession of Judgment that was entered in connection with its settlement with Con Ed as allegedly evidence of a compromise or offer to compromise and thus barred by Fed. R. Evid. 408.[8] The Debtor cites no authority that a confession of judgment in which a party admits it is "justly indebted" is evidence of an offer to compromise. In any event the Court is not relying on the stipulation of settlement with Con Ed or the subsequent Confession of Judgment. The Court is relying on the Debtor's and the

---

[8] Fed. R. Evid. 408(a) states:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction: (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or a statement made during compromise negotiations about the claim-- except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

15

Markuses' admission and judicial admission that Con Ed had a claim for unpaid services and that it was reasonable to settle that claim for an amount in excess of $1 million.

The only remaining question is whether the Debtor's failure to disclose that it had underpaid Con Ed by at least $1 million was material. Based on the facts of this case, it is clear that the Debtor's failure to disclose constituted a material breach of the Modified Agreement. "Under New York law . . . a breach is material if it is 'so substantial that it defeats the object of the parties in making the contract.' Stated differently, the breach must 'go to the root of the agreement between the parties.'" *Frank Felix Assoc. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York law); *accord Qualcomm Inc. v. Texas Instruments Inc.*, 875 A.2d 626, 628 (Del. 2005) (applying New York law). Under New York law courts consider the following factors in deciding whether a breach is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Qualcomm Inc.*, 875 A.2d at 628 (citing Restatement (Second) of Contracts, § 241). Because utility charges are a major cost of running a laundry business and the Debtor's understatement of its actual costs of natural gas was at least $1 million, it is clear that the Debtor materially breached the Modified Agreement by misrepresenting its operating costs to Spitzer during the due diligence period.

The Debtor contends that whether its breach was material presents a triable issue of fact that cannot be decided on summary judgment. The law is to the contrary. As the Supreme Court

16

has stated, in circumstances where established omissions are "'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality,'" the ultimate issue of materiality may be appropriately resolved as a matter of law by summary judgment. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976), quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970). In *Johns Hopkins University*, cited by the Supreme Court, the defendant sold securities to the plaintiff by misrepresenting estimated future net revenues from the security as $6.5 million after representing to another investor that future net revenue from the security would be $5.3 million. *See* 422 F.2d at 1129. The Fourth Circuit held that "[c]learly, a reasonable man would attach importance to this discrepancy of over a million dollars" and upheld the District Court's determination on summary judgment that the defendant's misrepresentation was material. *See also SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978) (upholding the district court's determination on summary judgment that defendant's omissions and misrepresentations were material with respect to the sale of their company's securities); *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475 (S.D.N.Y. 2002) (granting summary judgment and holding that trustee's misrepresentations made in connection with the sale of securities were material).

New York law is the same. New York law is clear that while "[g]enerally, the question whether a breach [of contract] is material is for the finder of fact . . . 'where the evidence concerning the materiality is clear and substantially uncontradicted . . . the question is a matter of law for the court to decide.'" *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617, 920 N.Y.S.2d 495, 497 (4th Dept. 2011) (internal quotation marks omitted); *accord Process Plants Corp. v. Beneficial Nat'l Life Ins. Co.*, 53 A.D.2d 214, 216, 385 N.Y.S.2d 308, 310-11 (1st Dept. 1976), *aff'd*, 42 N.Y.2d 928, 397 N.Y.S.2d 1007, 366 N.E.2d 1361 (1977). Therefore,

in appropriate circumstances, where "reasonable minds cannot differ on the question of materiality," *TSC Indus., Inc.*, 426 U.S. at 450, this Court can decide materiality on a motion for summary judgment.

Finally, the Debtor makes a feeble attempt to argue that its breach was not material by contending that Con Ed did not discover the theft until after the Debtor evicted the Buyers from the premises and therefore the Buyers never paid a higher amount to Con Ed than what was represented to them during due diligence. (Decl. of Miron Markus at ¶ 27.) The Debtor is claiming in effect that the Buyer would not have incurred damages if it had continued to steal from Con Ed. This argument, besides being reprehensible, misses the point. The Buyers cannot be expected to reap the benefits of a contract by continuing the Seller's practice of stealing from the utility.

In the present case, no reasonable juror could find that the Debtor's misrepresentation of its natural gas expenses to the Buyers during the due diligence period was not material.

## **Conclusion**

In conclusion, it is evident that the Debtor and the Markuses materially breached the Modified Agreement by misrepresenting the costs of natural gas necessary to lawfully operate the laundry business. Therefore, the Buyers' motion for partial summary judgment declaring that the Buyers breached the Modified Agreement is granted. The complaint should be dismissed against all Defendants with respect to all counts that depend on the existence of a material default under the Modified Agreement.

The issue of damages was not raised in the Buyers' motion for partial summary judgment, and we do not reach it. However, it is not evident that damages needs to be further litigated in this adversary proceeding, which is a removed state court proceeding. The state court

18

suit was commenced at a time when the Debtor, controlled by the Markuses, was operating, and the Buyers, among other things, sought to be restored to possession. The Debtor has now not only filed a bankruptcy petition but its business has been destroyed and reduced to insurance proceeds. Whatever claims the Buyers have for damages for the Seller's breach of contract are properly determined in connection with the resolution of the Buyers' proof of claim against the Debtor, filed on October 25, 2012. If Sellers can still maintain any of the miscellaneous claims they assert in the complaint, they can do so as an offset to the Buyers' claim for damages.

The Debtor has objected to the proof of claim (Debtor's Objection to Proof of Claim, Case No. 12-11560, Docket No. 85), and the Buyers have responded (Response to Objection by Debtor to Proof of Claim, Case No. 12-11560, Docket No. 96). It is essential to determine the amount of the Buyers' claim promptly, as the Debtor and the Markuses have filed a Second Amended Plan of Reorganization that purports to pay all creditors in full, depending on the amount of the Buyers' claim. Accordingly, in order to take account of this decision, the Debtor (and the Markuses) may supplement the Debtor's objection to the damages sought in the Buyers' proof of claim on or before July 31, 2013. The Debtor may also, if it is so advised, move to estimate the Buyers' claim pursuant to § 502(c) of the Bankruptcy Code. The Buyers may respond on or before August 19, 2013. A hearing will be held on the claim objection on August 27, 2013, at 11:00 a.m.

Buyers are directed to settle an order on five days' notice.

Dated: New York, New York
      July 12, 2013

                              **s/Allan L. Gropper**
                              UNITED STATES BANKRUPTCY JUDGE